**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHARLOTTE BENNETT, | 22-CV-7846 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| | **PLAINTIFF DEMANDS A TRIAL BY JURY** |
| ANDREW M. CUOMO, MELISSA DEROSA, JILL DESROSIERS, and JUDITH MOGUL, | |
| Defendants. | |

Plaintiff Charlotte Bennett ("Ms. Bennett" or "Plaintiff"), represented by her counsel, Katz Banks Kumin LLP and Eisenberg & Schnell LLP, alleges as follows of defendants, Andrew M. Cuomo, Jill DesRosiers, Judith Mogul, and Melissa DeRosa (collectively, "Defendants"):

## NATURE OF CLAIMS

1.      Charlotte Bennett brings this action against the former Governor of the State of New York Andrew M. Cuomo ("Defendant Cuomo") and three of the former Governor's top aides, Secretary to the Governor Melissa DeRosa ("DeRosa"), Chief of Staff Jill DesRosiers ("DesRosiers"), and Special Counsel Judith Mogul ("Mogul"), to remedy discrimination on the basis of gender in employment in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution ("Equal Protection Clause") and 42 U.S.C. § 1983; and for sexual harassment, discrimination, and retaliation in violation of the New York State Human Rights Law, N.Y. Exec. Law § 290, et seq. ("NYSHRL") and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL").

1

2.      Ms. Bennett was a Briefer or Senior Briefer and Executive Assistant to Defendant Cuomo from May 2019 to June 2020.  Throughout her employment as Defendant Cuomo's Executive Assistant, the then-Governor subjected her to sexualized comments about her appearance, assigned her humiliating and demeaning tasks, and beginning in early June 2020, subjected her to invasive and unwanted questions about her personal life, romantic and sexual relationships, and history as a survivor of sexual assault.  He told her he was "lonely," wanted a girlfriend who lived in Albany, and was willing to date someone over the age of 21 years old.  At the time of that conversation, and as Defendant Cuomo knew, Ms. Bennett was 25 years old and living with other Executive Chamber staffers in an Albany hotel.  Defendant Cuomo's comments and behavior were unwelcome and Ms. Bennett reasonably perceived them to constitute a sexual advance.

3.      Ms. Bennett promptly reported Defendant Cuomo's sexual harassment of her to Defendant DesRosiers and expressed her fear of retaliation by the then-Governor.  Rather than taking appropriate corrective measures, Defendant DesRosiers immediately arranged for Ms. Bennett's transfer to an inferior position on the Executive Chamber's health policy team.  But it was not until three weeks later, and only after Ms. Bennett had disclosed the then-Governor's conduct to other Executive Chamber staffers, that Defendants DesRosiers and Mogul interviewed Ms. Bennett about Defendant Cuomo's sexual harassment of her.  Even then, neither Defendant DesRosiers nor Defendant Mogul referred Ms. Bennett's complaint of sexual harassment to the Governor's Office of Employee Relations ("GOER") for investigation, as required by the Executive Department's Equal Employment Opportunity Handbook ("the Handbook").  Defendant DeRosa, who also had been notified of Ms. Bennett's complaint of

sexual harassment against Defendant Cuomo, likewise failed to refer Ms. Bennett's complaint to GOER for investigation, as required by the Handbook.

4.     Over the next two months, Ms. Bennett was not assigned enough work to keep busy in her new position.  She experienced near-debilitating anxiety, symptoms of depression, and began suffering from a chronic neurological disorder as a direct result of Defendant Cuomo's sexual harassment of her and the hasty and disorganized transfer of her to the health policy team.  In early September 2020, Ms. Bennett was forced to take medical leave to address her declining health.  Ultimately, Ms. Bennett was forced into an involuntary resignation from her employment with the State because her work environment had become intolerable.

5.     On February 27, 2021, after former Executive Chamber staffer Lindsey Boylan published her own account of sexual harassment by Defendant Cuomo, Ms. Bennett made her allegations against Defendant Cuomo public in an article published in *The New York Times.*  See Jesse McKinley, *Cuomo Is Accused of Sexual Harassment by a 2nd Former Aide*, N.Y. Times (Feb. 27, 2021), https://www.nytimes.com/2021/02/27/nyregion/cuomo-charlotte-bennett-sexual-harassment.html.  Initially, Defendant Cuomo did not deny the misconduct Ms. Bennett accused him of, as detailed in paragraph 2, above, but instead claimed that his actions were misunderstood.  He insisted that he was a product of a bygone era and claimed he now understood that he needed to change how he treated women.  Less than two weeks after Ms. Bennett made her allegations public, New York Attorney General Letitia James commenced an investigation into allegations of sexual harassment against Defendant Cuomo.

6.     Over the next several months, Ms. Bennett provided hours of testimony and produced hundreds of pages of documents to the Attorney General.  At the same time, she weathered retaliatory public criticism from the then-Governor, himself, who used his media

platform to portray her as a liar and sought to undermine her credibility as a complainant in the

Attorney General's investigation. The Attorney General's office released the Report of

Investigation into Allegations of Sexual Harassment by Governor Andrew M. Cuomo on

August 3, 2021. The Report concluded that Defendant Cuomo had created a hostile work

environment and notably that he had subjected Ms. Bennett to sexual harassment, in violation of

state and federal civil rights.  Defendant Cuomo, personally and through his attorney, Rita

Glavin, continue to retaliate against Ms. Bennett by smearing her reputation and otherwise

attempting to discredit her during press conferences and through dissemination of material on the

former Governor's campaign website.  In carrying out this smear campaign, Governor Cuomo

and his aides enlisted the assistance of his brother, Chris Cuomo, then an anchor on CNN, and

others.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 1343 as this action involves federal questions regarding the deprivation of

Plaintiff's rights under federal law.  This Court has supplemental subject matter jurisdiction over

Plaintiff's related state and local claims pursuant to 28 U.S.C. § 1367(a).

8.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C.

§ 1391(b) because one or more defendants reside within the Southern District of New York, and

all defendants are residents of the State of New York.

9.      Pursuant to N.Y.C. Admin. Code § 8-502(c), Plaintiff will serve a copy of this

Complaint on the City of New York Commission on Human Rights and the Corporation Counsel

of the City of New York.

## PARTIES

10.     Plaintiff Charlotte Bennett was an employee of the State of New York in the New York State Executive Chamber from on or around January 24, 2019, until she was forced to resign effective on or about November 10, 2020.

11.     Defendant Andrew M. Cuomo is a resident of the State of New York.  Defendant Cuomo was the Governor of the State of New York from January 1, 2011, until his resignation effective August 24, 2021.  Defendant Cuomo was Plaintiff's supervisor from May 2019 to June 2020 and was her employer within the meaning of N.Y. Exec. Law § 292(5) and within the meaning of N.Y.C. Admin. Code §§ 8-102 and 8-107 et seq.

12.     Defendant Jill DesRosiers is a resident of the State of New York.  She served as Chief of Staff to Defendant Cuomo from in or around January 2019 until in or around December 2020.  Defendant DesRosiers aided and abetted Defendant Cuomo's sexual harassment of Plaintiff and retaliated against Plaintiff for opposing discrimination in violation of federal, state, and city law.

13.     Defendant Judith Mogul is a resident of the State of New York, in the County of New York.  She served as Special Counsel to Defendant Cuomo from in or around January 2019 until her resignation effective in or around August 2021.  Defendant Mogul discriminated against Plaintiff and aided and abetted Defendant Cuomo's sexual harassment of Plaintiff.

14.     Defendant Melissa DeRosa is a resident of the State of New York.  She served as Defendant Cuomo's top-ranking aide, Secretary to the Governor, from in or around April 2017 until her resignation effective August 24, 2021.  Defendant DeRosa discriminated against Plaintiff and aided and abetted Defendant Cuomo's sexual harassment of Plaintiff.

## FACTUAL ALLEGATIONS

15.     Plaintiff started working for the State of New York on or around January 24, 2019, as a Briefer.  At that time, Plaintiff was 23 years old.  In that role, Plaintiff researched and organized materials for inclusion in the Governor's daily briefing book and reported to the Governor's Director of Scheduling, Annabel Walsh.

16.     As a Briefer, Plaintiff worked on the 38th floor of the Executive Chamber's New York City office, where female staffers typically wore business casual attire.  Plaintiff usually wore business attire pants, as opposed to dresses, and almost never wore high-heeled shoes to work.  Female staffers who worked on the 39th floor of the New York City office, however, where Defendant Cuomo's local office was located, were pressured to wear more traditionally feminine attire, including dresses and high heels, when Defendant Cuomo was in the office.  Plaintiff also observed Defendants DeRosa and DesRosiers, as well as other female staffers who worked on the 39th floor, wearing dresses and high heels when Defendant Cuomo was in the office.  It was open knowledge that Defendant Cuomo preferred to work with women who were pretty and dressed in a stereotypically feminine and sexy manner and female employees were pressured to conform to meet this preference.

17.     On May 8, 2019, Plaintiff asked Ms. Walsh to consider her for an open position as a Senior Briefer and Ms. Walsh said that she would.  During the same conversation, Ms. Walsh also asked Plaintiff if she was interested in serving as Defendant Cuomo's Executive Assistant, since his current Executive Assistant was leaving the Executive Chamber.  Plaintiff said that she was. Ms. Walsh instructed her to prepare for an interview with Defendant Cuomo.

18.     Later that day, Plaintiff told several coworkers she was being considered for the position of Defendant Cuomo's Executive Assistant, which would require her to work on the 39th

floor of the New York City office. Plaintiff and her coworkers discussed the fact that she would have to wear high-heeled shoes for her interview with Defendant Cuomo and, were she hired, she would have to wear high-heeled shoes to work.

### Defendant Cuomo Hired Plaintiff as his Executive Assistant and Subjected Her to Critical, Sex-Based Comments and Humiliating Assignments

19.     Plaintiff met with Defendant Cuomo and Ms. Walsh in Defendant Cuomo's New York City office on May 9, 2019. Plaintiff wore high-heeled shoes. During the interview, Defendant Cuomo asked Plaintiff about where she grew up, where she went to school, her current position in the Executive Chamber, and her prior work experience. At the end of the interview, which lasted approximately ten minutes, Defendant Cuomo asked Plaintiff to attend an event with him the following day to begin what Plaintiff understood would be a week-long "trial" period for the position. Plaintiff agreed and attended the event, as planned.

20.     Over the next several days, Plaintiff shadowed Defendant Cuomo's outgoing male Executive Assistant, and gradually took on the responsibilities of the role. As Defendant Cuomo's Executive Assistant, she worked at a desk directly outside the office of the Director of the Governor's Offices Stephanie Benton, which contained an interior door to Defendant Cuomo's office, and directly next to Defendant Cuomo's main office door. Her job responsibilities included a variety of administrative tasks, such as transferring phone calls and taking dictation. Since Defendant Cuomo divided his time between the New York City and Albany offices of the Executive Chamber, Plaintiff would perform these responsibilities both in-person, when Defendant Cuomo was in New York City, and over the phone, when Defendant Cuomo was in Albany or traveling. Plaintiff was also responsible for covering Ms. Benton's desk, which was closest to Defendant Cuomo's office, when Ms. Benton was not present.

21.     Defendant Cuomo hired Plaintiff as his Executive Assistant on or around May 15, 2019.  Though she also continued her work as a Briefer, she relocated to the Executive Assistant's desk on the 39th floor of the New York City office.  As a result, she felt compelled to wear dresses or other traditionally feminine attire, including high-heeled shoes, when Defendant Cuomo was in the office.

22.     On May 16, 2019, one of Plaintiff's first full days on the job, Defendant Cuomo called her into his office and asked her, "Do you honor your commitments?"  Plaintiff found the inquiry to be strange but responded that she did.  Defendant Cuomo asked her to provide an example.  Plaintiff told him she had honored her commitment to school by graduating from college.  Apparently unsatisfied, Defendant Cuomo asked her for another example.  Plaintiff told him she had quit her previous job and moved in with her parents to care for her ex-boyfriend when he suffered a traumatic brain injury.  Defendant Cuomo asked her a handful of follow up questions, which she answered briefly.

23.     During the same conversation, Defendant Cuomo asked Plaintiff if she currently had a boyfriend.  She told him she did not.  Defendant Cuomo also asked her about the duration of her longest romantic relationship, which Plaintiff told him had lasted one and a half years.  These questions were inappropriate and made Plaintiff uncomfortable.

24.     During the same conversation or a subsequent one that same day, which also took place in Defendant Cuomo's office, Defendant Cuomo gave Plaintiff a printout of the lyrics to "Danny Boy," an Irish ballad historically sung by a woman about the male title character.  He instructed her to memorize the lyrics.  This "assignment" was not work related; it was issued to amuse the Governor.  On approximately three to five occasions over the next several hours,

Defendant Cuomo, exerting his authority over Plaintiff, leaned out his office door and asked Plaintiff to recite the lyrics, which she did.

25.     Later that day, Defendant Cuomo called Plaintiff into Ms. Benton's office, where he was standing with Ms. Benton and Defendant DeRosa, and demanded Plaintiff sing "Danny Boy" in front of all of three of them.  Plaintiff found this humiliating and began reciting the lyrics in a speaking voice.  Defendant Cuomo interrupted her and insisted she sing "Danny Boy" to him.  Defendant DeRosa interjected, "This is hazing."  Plaintiff agreed with Defendant DeRosa and refused to sing the song.  Defendant Cuomo began singing the song and instructed Plaintiff to join in, which she felt she had no choice but to do.  After about 30 seconds, Plaintiff stopped singing and left the office, humiliated.  Defendant DeRosa did not intervene in or otherwise protect Plaintiff from this sexist hazing.

26.     On information and belief, Defendant Cuomo never forced his outgoing Executive Assistant or other male Executive Chamber employees to memorize and sing the lyrics to "Danny Boy"—or any other song—for his amusement during their employment.

27.     On July 1, 2019, Ms. Benton told Plaintiff that Defendant Cuomo was impressed with her work and wanted her to staff him during travel, a responsibility held by a member of the press team who had left the Executive Chamber.  Plaintiff said that she would and, over the next several weeks, traveled with Defendant Cuomo to appearances and events throughout New York State on approximately three occasions.

28.     On July 30, 2019, Plaintiff assumed the position of Senior Briefer, a promotion from her previous position.

29.     On August 7, 2019, after a month of working two jobs—as Defendant Cuomo's Executive Assistant and a member of the briefing team—in addition to traveling with Defendant

Cuomo, Plaintiff concluded this heightened workload was not sustainable and told Ms. Walsh she wanted to relinquish her travel responsibilities. Ms. Walsh agreed and reassigned Plaintiff's travel responsibilities to another staffer.

30. Two days later, on August 9, 2019, Plaintiff was working one-on-one with Defendant Cuomo in his New York City office when he once again turned the conversation to questions about Plaintiff's personal life. He asked Plaintiff about her parents and about her hobbies, which she told him included weightlifting, skiing, and running. Defendant Cuomo asked Plaintiff how much weight she could bench press and how many pushups she could do, and she estimated both. Defendant Cuomo also challenged Plaintiff to a "pushup competition" and, over the next two months, asked Plaintiff almost every time he saw her, sometimes multiple times per week, how many pushups she could do. Plaintiff found Defendant Cuomo's focus on her body to be disconcerting but responded to his questions to avoid angering him.

31. During their August 9, 2019, conversation, Defendant Cuomo asked Plaintiff, for a second time, whether she had a boyfriend. Plaintiff reiterated that she did not. Defendant Cuomo responded by joking that Plaintiff did not have a boyfriend because she was "too intimidating" and could "beat them all up," or words to that effect. His behavior and comments made Plaintiff uncomfortable.

32. On August 12, 2019, Defendant Cuomo signed into law New York State Senate Bill 6577, which amended the New York State Human Rights Law by, among other things, eliminating the requirement that workplace sexual harassment be "severe or pervasive" to be actionable under the law. At the time of signing, Defendant Cuomo stated in part:

> There has been an ongoing, persistent culture of sexual harassment, assault and discrimination in the workplace, and now it is time to act. . . . By ending the absurd legal standard that sexual harassment in the workplace needs to be 'severe or pervasive' and making it easier for workplace sexual harassment claims to be brought forward, we are

sending a strong message that time is up on sexual harassment in the workplace and setting the standard of equality for women.

*Governor Cuomo Signs Legislation Enacting Sweeping New Workplace Harassment Protections*, New York State Division of Human Rights (Aug. 12, 2019), https://dhr.ny.gov/newworkplaceharassmentprotections.

33.     In September or October 2019, Plaintiff asked Ms. Walsh for a pay raise based on her job performance over the last several months.  Plaintiff received a pay increase a few weeks later.

34.     On October 4, 2019, Defendant Cuomo began a work-related phone call with Plaintiff by singing the words, "Are you ready?" to the tune of "Do You Love Me?" by The Contours.  When Plaintiff told Defendant Cuomo she did not recognize the song, Defendant Cuomo sang several lines from the song: "Do you love me, do you really love me?  Do you love me, do you care?"  Defendant Cuomo's singing to her made Plaintiff uncomfortable and she laughed awkwardly.

35.     On October 14, 2019, while Plaintiff was covering Ms. Benton's desk and no other staffers were in earshot, Defendant Cuomo told Plaintiff to uphold her end of the "pushup competition" and do as many pushups as she could.  The request made Plaintiff uncomfortable and she made up excuses not to do pushups in front of the then-Governor, but he would not back down.  At Defendant Cuomo's insistence, Plaintiff stood, took off her high-heeled shoes, and did approximately 20-25 pushups on the floor of Defendant Cuomo's office before he instructed her to stop.  Afterwards, Defendant Cuomo told Plaintiff he was "intimidated" by her and commented something to the effect of, "Not many women can do pushups like that.  Actually, not many *men* can do pushups like that."

11

36.     On information and belief, Defendant Cuomo did not require Plaintiff's predecessor, or any other male Executive Chamber employees, to do pushups on the floor of his office or perform other such humiliating acts for his amusement.

37.     On or around October 25, 2019, Defendant Cuomo asked Plaintiff a series of pointed questions about the size of his hands. He asked her, for example, what "everyone" thought about the size of his hands. Given the common association between the size of a man's hands and the size of his penis, Plaintiff understood Defendant Cuomo to be encouraging her to comment on the size of his genitals, which made her extremely uncomfortable. She refused, and instead responded only with mundane, generic compliments about his hands. After a few minutes, Ms. Walsh intervened and started answering Defendant Cuomo's questions, herself, allowing Plaintiff to exit the conversation.

38.     On information and belief, Defendant Cuomo did not encourage Plaintiff's predecessor or other male Executive Chamber employees to comment on the size of his genitals.

39.     When Defendant Cuomo arrived at work on November 18, 2019, instead of his typical enthusiastic greeting, he merely commented that Plaintiff had worn her hair, which she usually wore down, in a bun. Though Defendant Cuomo typically made small talk with Plaintiff throughout the day, he ignored her, and though he usually said "goodbye" when he left for the evening, he walked past Plaintiff's desk without saying anything. Plaintiff said, "Goodbye, Governor," once he was a few steps beyond her desk.

40.     In response, Defendant Cuomo silently turned around and walked over to where Plaintiff was sitting behind her desk. Standing over Plaintiff and looking down at her, Defendant Cuomo asked her why she had worn her hair in a bun that day. Plaintiff replied that her hair had been messy when she had woken up that morning. Defendant Cuomo did not respond. Plaintiff

asked him something to the effect of, "What, you don't like my bun?" and Defendant Cuomo
turned around and continued down the hallway, once again making his displeasure known to
Plaintiff and her nearby colleagues.  Upset by his mistreatment of her, Plaintiff yelled out to the
other executive assistants sitting nearby, "Did you hear that?  He doesn't like my bun!"  Once
Defendant Cuomo was out of earshot, Plaintiff started crying and left the building.

41.     Over the next month, Defendant Cuomo addressed Plaintiff or referred to her as
"Bun" multiple times per week, a nickname she found to be demeaning.

42.     At some point in late 2019, Plaintiff overheard Ms. Benton tell Defendant Cuomo
she was completing New York State's sexual harassment training, which is mandatory for all
New York employees, on his behalf.  On information and belief, Ms. Benton in fact completed
the training for Defendant Cuomo and signed Defendant Cuomo's name on his training
attestation form. Defendant Cuomo did not personally complete the training for calendar year
2019.

43.     More than a year prior, on April 12, 2018, Defendant Cuomo had signed the
mandatory sexual harassment training into law as a component of the 2019 New York State
budget.  As a result, he was uniquely aware of his obligation to complete the training himself.

### Defendant Cuomo Subjected Plaintiff to Invasive Questions about her Relationships, Sex Life, and History as a Sexual Assault Survivor

44.     On January 19, 2020, while Plaintiff was working at the Capitol, Ms. Walsh
instructed Plaintiff to pick up a PowerPoint from Defendant Cuomo at the Executive Mansion,
where he was working.  Plaintiff walked to the Executive Mansion, provided her state-issued
employee identification card to the state troopers stationed there, and waited in their command
center for further instructions.  After a few minutes, Defendant Cuomo called the command
center and requested that Plaintiff meet him in the Mansion's pool house, which she did.

45.     When Plaintiff arrived at the pool house, Defendant Cuomo was sitting on the couch watching CNN and flipping through a PowerPoint.  He asked Plaintiff to take a seat on the couch, which she did.  He then said, "Tell me something," by which Plaintiff understood him to be asking about what was going on in the Executive Chamber that day.  Plaintiff told him Chamber staff were "stressed and tired" because of his upcoming presentation about the Executive Budget.

46.     Apparently unsatisfied, Defendant Cuomo told Plaintiff to tell him "*something interesting*."  Plaintiff mentioned a documentary she had watched.  But Defendant Cuomo once again insisted that she tell him "*something interesting*."  Unsure of what else to say, Plaintiff told Defendant Cuomo that his 2015 sexual assault legislation, "Enough is Enough," changed her life.

47.     Defendant Cuomo put down his pen, pushed his PowerPoint aside, and asked Plaintiff to elaborate.  Plaintiff explained that her college boyfriend had sexually assaulted and physically attacked her and that she had reported his conduct to their school.  She also explained that the school's investigation of her report had been a horrible experience and that she believed the school's sexual assault policy was problematic.

48.     While she felt comfortable identifying herself as a sexual assault survivor in the context of discussing the Enough is Enough legislation, she did not invite a more personal discussion about her sexual assault experience.  Nonetheless, Defendant Cuomo asked Plaintiff several follow up questions about the school's sexual assault policy and its investigation into her report.  He also asked Plaintiff "what actually happened"—that is, about the details of her assaults.  Defendant Cuomo's questions made Plaintiff extremely uncomfortable, but she felt she could not decline to respond and briefly described an incident in which her then-boyfriend ejaculated on her clothing without her consent.  Defendant Cuomo responded with something to

the effect of, "Well, some people have it much worse." This statement was deeply distressing to Plaintiff.

49.     Plaintiff also told Defendant Cuomo that she had been sexually assaulted prior to college and implied that one of her first sexual experiences was not consensual. Defendant Cuomo asked Plaintiff how old she was at the time of that experience. Again, his question made Plaintiff extremely uncomfortable, but she did not feel she could decline to respond.

50.     At the end of their conversation, which lasted more than an hour, Defendant Cuomo and Plaintiff walked out of the pool house together and Plaintiff returned to the Capitol with the PowerPoint.

51.     On March 22, 2020, Defendant DesRosiers sent an email to Plaintiff requesting that she relocate to Albany indefinitely to assist with the State's COVID-19 response. Plaintiff agreed and traveled to Albany the next day. She moved into a hotel along with approximately ten other Executive Chamber staffers and began performing her job primarily from the Capitol building. She did not interact with Defendant Cuomo in-person until mid-May.

52.     Early on the morning of May 15, 2020, Plaintiff walked to the Capitol to drop off a briefing memo for Defendant Cuomo. When she arrived at Defendant Cuomo's office, he was laying on his couch with his feet up. Plaintiff placed the briefing on his coffee table and left the room. Defendant Cuomo called after her. She turned around, re-entered the room, and stood in his doorway to face him. He asked her how long she had been in Albany. She told him she had been there for approximately two months and they briefly discussed the COVID-19 pandemic.

53.     Defendant Cuomo then asked Plaintiff who she was "hitting on." Defendant Cuomo's question made Plaintiff very uncomfortable, and she responded that she was not hitting on anyone. Defendant Cuomo next asked Plaintiff who was hitting on her, and Plaintiff

responded that no one was hitting on her.  Defendant Cuomo proceeded to ask about her romantic interest in several male staffers by name, but Plaintiff refused to comment on any of them.  His persistent questions about her romantic interests were inappropriate and made Plaintiff extremely uncomfortable.

54.     Defendant Cuomo asked Plaintiff what else was "new" and she told him she was writing a keynote speech for her college *alma mater*.  He asked her to sit down, which she did in a chair opposite the couch, and he sat up from prone lying position so they faced one another across the coffee table.  Defendant Cuomo asked Plaintiff what the speech was about and Plaintiff began to explain that the speech was about the pain she experienced in reporting her sexual assault to her school.

55.     Defendant Cuomo cut her off mid-sentence and said something to the effect of, "It's not about pain.  It's about injustice."  Without breaking eye contact with Plaintiff, Defendant Cuomo proceeded to repeat words to the effect of, "You were raped!  You were abused!  You were assaulted!  You were betrayed!" for 10-15 seconds.  Defendant Cuomo's statements were traumatizing to Plaintiff and the only response she could muster was to nod her head and periodically say, "Yes."  Though Defendant Cuomo could tell based on Plaintiff's reaction that his comments were disturbing to her, he nevertheless continued to talk to her about the contents of her speech.

56.     Plaintiff attempted to change the subject by asking Defendant Cuomo how the pandemic was affecting him.  He responded that he was stressed, unhappy, and wanted a girlfriend to spend time with him in Albany.  He told Plaintiff he wanted to ride into the mountains with a woman on the back of his motorcycle and named some beautiful celebrities he

was interested in doing that with.  Defendant Cuomo's comments about his romantic preferences made Plaintiff extremely uncomfortable.

57.     Defendant Cuomo and Plaintiff discussed a few other topics, including the waning viewership of Defendant Cuomo's daily press conferences. Plaintiff left his office shortly thereafter.

## Defendant Cuomo Made Sexual Advances Toward Plaintiff

58.     A few weeks later, on June 5, 2020, while Plaintiff was working at the Capitol, Ms. Benton instructed her and another executive assistant to put on their masks and go into Defendant Cuomo's office to take dictation, which they did.  Plaintiff and the other executive assistant sat down in chairs across from Defendant Cuomo, who was seated behind his gubernatorial desk, and turned on their tape recorders.  Defendant Cuomo began dictating a proposal about police reform to the other executive assistant.

59.     After a few seconds, Defendant Cuomo stopped dictating and said that the way Plaintiff's mask moved in and out when she breathed reminded him of the monsters in the movie "Predator."  Plaintiff laughed uncomfortably in response.  Defendant Cuomo then commented something to the effect of, "If I were investigated for sexual harassment, I would have to say I told her she looked like a monster."

60.     Defendant Cuomo resumed dictating the proposal to the other executive assistant. When he finished a few minutes later, the other executive assistant left to type up her notes, leaving Plaintiff alone with Defendant Cuomo.

61.     Before Plaintiff could leave, Defendant Cuomo asked Plaintiff about her speech at her *alma mater*.  Plaintiff started to respond but Defendant Cuomo interrupted her and asked her

to turn off her tape recorder, which she did.  Plaintiff told Defendant Cuomo the speech had gone well and they discussed the fact that she had delivered it on her 25th birthday.

62.     During this conversation or another one-on-one conversation later that same day, also in Defendant Cuomo's office while Plaintiff was supposed to be taking dictation, Defendant Cuomo made a series of sexualized and inappropriate comments to Plaintiff that made her extremely uncomfortable.  Defendant Cuomo whispered while discussing these topics, as though trying to prevent nearby staffers from hearing.

63.     Defendant Cuomo told Plaintiff he was "lonely" and lamented that he had been in Albany without any company.  He told Plaintiff it had been a long time since he had hugged someone.  Plaintiff agreed that the pandemic was a lonely time and pointed out that Defendant Cuomo had been able to spend time with his daughters.  Defendant Cuomo then asked her how long it had been since she had hugged someone.  Plaintiff told him she had not hugged her parents since March, a result of the ongoing COVID-19 pandemic.  Defendant Cuomo responded with something to the effect of, "No, I mean really *hugged* somebody?"  Plaintiff understood Defendant Cuomo to be asking about a romantic hug and told him it had been "a while."

64.     Defendant Cuomo, for the second time, told Plaintiff he wanted a girlfriend to spend time with in Albany.  He told Plaintiff he was bored, stressed, and having trouble sleeping.  Trying to deflect what appeared to be a sexual advance, Plaintiff suggested that he invite his friends to his house for a party.  Defendant Cuomo responded with something to the effect of, "Then what?"  Unsure how to respond, Plaintiff said nothing.

65.     Defendant Cuomo also asked Plaintiff, for the second time, about the duration of her longest relationship.  Plaintiff told him, for the second time, that it had lasted about one and a

half years.  He asked her when her most recent relationship had ended and she told him it had

ended recently.

66.     Then, Defendant Cuomo asked Plaintiff if she had been monogamous in her most

recent relationship.  Though the question made Plaintiff extremely uncomfortable, she felt she

could not refuse to answer.  She told Defendant Cuomo she had not been monogamous in that

relationship.  Defendant Cuomo responded by suggesting that her "issues" with monogamy were

related to her history of sexual assault.

67.     Defendant Cuomo proceeded to ask Plaintiff if she had "trouble" maintaining

healthy relationships. He asked if she enjoyed herself physically during sex, saying he was

asking because of her history of sexual assault.  Defendant Cuomo's graphic and patently

inappropriate questions made Plaintiff extremely uncomfortable, but she felt she could not refuse

to respond.  Plaintiff stated generally that it took her a long time to feel safe in her relationships

but did not respond directly to his comments about her sex life.  Defendant Cuomo also

suggested to Plaintiff that, because of her past, she felt she needed to have "control" in her

relationships and that once she had a more "serious" relationship and an opportunity to "heal,"

she would feel differently about monogamy.  It appeared to Plaintiff that he was attempting to

groom her to have sex with him.  Plaintiff did not respond directly to his comments.

68.     Defendant Cuomo then asked Plaintiff if she had "slept with" older men.  Again,

though Defendant Cuomo's question made her extremely uncomfortable, she felt she could not

refuse to answer.  Plaintiff told him that she had and Defendant Cuomo jumped on that answer to

ask Plaintiff if she thought age mattered in a relationship.  Plaintiff hesitated to respond, then

started to give a noncommittal answer.  Defendant Cuomo interrupted her and said that he did

not think age mattered in a relationship and would be willing to date someone as long as she was

over the age of 21 years old.  Plaintiff understood this to be Defendant Cuomo propositioning her sexually.

69.     At some point during their conversation, relating to the topic of Plaintiff's 25th birthday, Plaintiff showed Defendant Cuomo a picture of a tattoo she wanted to get for her birthday.  She told Defendant Cuomo that she wanted it on her shoulder blade.  Defendant Cuomo responded that she should get the tattoo on her butt, instead, so that others would not see it when she wore a dress.  Defendant Cuomo also asked Plaintiff how many piercings she had.  Plaintiff told him she had 16 piercings and pointed out the earrings in her ears.  Defendant Cuomo then asked her suggestively whether she had piercings "anywhere else," and Plaintiff responded she did not.  He also told Plaintiff he liked her eyeliner, which she wore in a "winged" style.  These comments the then Governor made about Plaintiff's body and physical appearance made her extremely uncomfortable.

70.     Altogether, Plaintiff spent approximately two hours in Defendant Cuomo's office that day, during the height of the pandemic, during which time Defendant Cuomo dictated only a single page of text.

71.     When Plaintiff finally left Defendant Cuomo's office, Ms. Benton stopped her and asked her what she had been doing inside for such a long time.  Afraid to say anything about Defendant Cuomo's inappropriate line of questioning, Plaintiff responded that they were discussing current events.

72.     When Plaintiff returned to her desk, she was visibly upset.  The other executive assistant who had been taking dictation saw her and asked her if she was okay.  Afraid to say anything about Defendant Cuomo's inappropriate line of questioning, Plaintiff responded that Ms. Benton was mad at her because she had spent so much time in Defendant Cuomo's office.

73.     The next morning, which was a Saturday, Plaintiff received an email from either Defendant DesRosiers or Ms. Walsh instructing her to perform a task at the Capitol, where Defendant Cuomo was working.  Plaintiff was concerned about seeing him in light of their conversations the previous day but believed she could complete the task without running into him.

74.     When Plaintiff arrived at the Capitol, she ran into Ms. Benton, who told Plaintiff to come with her to Defendant Cuomo's office suite, where Defendant Cuomo was working. Plaintiff did as she was directed and sat down at one of the desks outside Defendant Cuomo's office.  Shortly thereafter, Defendant DeRosa and Ms. Benton instructed Plaintiff to stay in the office suite until Defendant Cuomo finished working and left the Capitol, once again leaving Plaintiff alone with Defendant Cuomo.

75.     It was clear to Plaintiff that she was there because Defendant Cuomo wanted to be alone with her and she started to panic.  She sent text messages to a close friend describing her conversation with Defendant Cuomo the previous day and expressing her fear and concern at having been left alone with him.  Over the course of the next nearly two hours, Plaintiff waited outside Defendant Cuomo's office while he worked.  Defendant Cuomo called Plaintiff into his office on two occasions, both times to ask for help with his iPhone, but did not otherwise assign her any work.

76.     Finally, Defendant Cuomo called Plaintiff into his office a third time and told her he was getting ready to leave.  He asked her if she had found him a girlfriend yet, and Plaintiff responded that she had not.  Plaintiff understood this comment to be a sexual advance. Defendant Cuomo also commented that she seemed "friendlier" than she had the day before— when he was asking her probing and inappropriate questions about her relationships and sex

life—and even asked her if she had been hung over.  Plaintiff responded that she had not been hung over.  Finally, Defendant Cuomo told Plaintiff, who was wearing shorts, that she looked like Daisy Duke, a fictional character from the American television series of The Dukes of Hazzard.  Referring to a woman as Daisy Duke is commonly understood to be a reference to her as a sex symbol.  It was clear to Plaintiff that Defendant Cuomo was testing the waters with his flirtatious remarks and had timed the conversation to provide an opportunity for her to leave with him.  She did not express any interest in doing so and exited the office at her first opportunity.  She then left the Capitol shortly thereafter.

77.     In the hours following this interaction, Plaintiff considered the fact that Defendant Cuomo or one of his aides could summon her to the Capitol—or even to the Executive Mansion—to staff Defendant Cuomo by herself at any time of the day or night, putting her in even more uncomfortable situations like the ones she had already experienced.  Plaintiff also feared that if she was alone with Defendant Cuomo, he would escalate his advances toward her. As a result, she came to the painful conclusion that she no longer could work as his Executive Assistant and resolved to speak to Defendant DesRosiers about resigning her position at her next opportunity.

78.     On June 7, 2020, Plaintiff traveled to New York City to staff Defendant Cuomo during a press conference the following day.

79.     On June 8, 2020, Plaintiff interacted briefly with Defendant Cuomo in the New York City office.  Defendant Cuomo greeted Plaintiff by calling her "Wings," in reference to her winged eyeliner.  The comment was flirtatious and inappropriate.  Plaintiff returned to Albany the next day.

**Plaintiff Reported Defendant Cuomo's Sexual Harassment to Defendant DesRosiers and Was Immediately Transferred to an Inferior Position**

80.     Around midafternoon June 10, 2020, Plaintiff sent a text message to an Executive Chamber staffer whom she trusted and asked to speak with him outside the Capitol. He agreed, and they met across the street from the Capitol. Plaintiff told the staffer Defendant Cuomo had asked her prying questions about her sex life and told her he was lonely and wanted a girlfriend, which had made her extremely uncomfortable. Plaintiff asked the staffer for his advice about what to do next and they agreed that she should report Defendant Cuomo's behavior to Defendant DesRosiers.

81.     A couple of hours later, Plaintiff went to Defendant DesRosiers's office to report Defendant Cuomo's sexual harassment. During a meeting that lasted only a few minutes, Plaintiff told Defendant DesRosiers that Defendant Cuomo had "crossed a boundary" with her and stated that he had told her he was lonely and wanted a girlfriend and asked her repeated questions about her sex life. Plaintiff told Defendant DesRosiers that she no longer felt comfortable serving as Defendant Cuomo's Executive Assistant and requested a transfer to a position in which she would not have to interact with him. At no point during this conversation did Defendant DesRosiers ask Plaintiff the details about what had occurred, explain to Plaintiff the sexual harassment policies of the Executive Chamber, or seek to assure Plaintiff that she would be protected against retaliation because of her report.

82.     Defendant DesRosiers "apologized" for Defendant Cuomo's behavior, but she did not ask Plaintiff any follow up questions about it. She also asked Plaintiff if she would be willing to remain in the Executive Chamber or if she preferred to take a position at a state agency. Ms. Bennett responded that she would be willing to remain in the Executive Chamber. At no point did Defendant DesRosiers encourage Plaintiff to remain in her position or assure her

that corrective action would be taken.  At the end of the short meeting, Defendant DesRosiers told Plaintiff to check in with her in two days about a new position.

83.     Defendant DesRosiers relayed Plaintiff's report of sexual harassment to Defendants DeRosa and Mogul on or around that same day, and Defendant DeRosa and/or Defendant Mogul informed Defendant Cuomo of Plaintiff's complaint shortly thereafter.

84.     Plaintiff returned to Defendant DesRosiers's office at the end of the day on Friday, June 12, 2020.  Defendant DesRosiers told her she could serve as a Health Policy Advisor on the Executive Chamber's health policy team, reporting to Assistant Secretary for Health Megan Baldwin, and that she could start the following Monday.  On information and belief, Defendant Cuomo approved Plaintiff's transfer to the Executive Chamber's health policy team.

85.     Defendant DesRosiers also asked Plaintiff if she could tell Defendant DeRosa and Ms. Benton that "something" had happened between Plaintiff and Defendant Cuomo, which she said she would describe as an "awkward encounter."  Fearful of retaliation if others in the Executive Chamber found out she had reported Defendant Cuomo's sexual harassment of her, Plaintiff agreed but repeated that she did not want Defendant Cuomo to learn of her report.  As noted above, not only had Defendant DesRosiers already informed Defendants DeRosa and Mogul about Ms. Bennett's complaints of sexual harassment, but Defendant Cuomo had been informed, as well.  Shortly thereafter, Defendant DesRosiers informed Ms. Benton that Ms. Bennett would be moving to a new position because she was no longer comfortable staffing Defendant Cuomo.

86.     On June 15, 2020, Plaintiff reported to the Capitol for her first day of work as a Health Policy Advisor, but Ms. Baldwin was not available to meet with her until the following day.

87.     Plaintiff met with Ms. Baldwin about her new position on June 16, 2020.  During this meeting, Ms. Baldwin asked Plaintiff when she would start her new position; Plaintiff had started the day before, yet Ms. Baldwin did not know.  Ms. Baldwin told Plaintiff she would be working on women's and LGBTQ+ health issues and provided background on the different agencies, organizations, and individuals that also worked on those issues.  Ms. Baldwin instructed Plaintiff to spend the next few weeks familiarizing herself with her portfolio but identified few concrete job responsibilities or assignments at that time.  Ms. Baldwin sent an email to the health policy team announcing Plaintiff's new role the following day.

88.     On the morning of June 19, 2020, Ms. Benton called Plaintiff and invited her to a small gathering for Executive Chamber staff with Defendant Cuomo at the pool house of the Executive Mansion later that day.  Plaintiff was worried that there may not be an actual gathering and that she may somehow end up alone with Defendant Cuomo.  Plaintiff therefore contacted another staffer to confirm whether there was an event with people at the Executive Mansion. She learned that other staff had received an official invitation over email the previous day. Plaintiff felt she could not refuse the phone invitation and attended the gathering.  Though she tried to avoid Defendant Cuomo, altogether, she interacted with him briefly when he arrived at the pool house and was greeting staffers with enthusiastic hugs.  When he reached Plaintiff, Defendant Cuomo gave her a short, awkward hug, which made Plaintiff uncomfortable. Defendant Cuomo avoided making eye contact with her.  This behavior contrasted sharply with

Defendant Cuomo's usual approach to Plaintiff and suggested to her that he knew she had reported his sexual harassment of her to Defendant DesRosiers.

89.     Over the next week, Plaintiff experienced increasing anxiety and symptoms of depression, including tearfulness and midday fatigue despite sleeping at night.  Plaintiff sought medical care and her physician increased the dosage of her anti-depressant medication.

90.     On June 29, 2020, Plaintiff told several Executive Chamber staffers she had left her role as Defendant Cuomo's Executive Assistant because Defendant Cuomo had made sexual advances toward her.  She told them she had reported Defendant Cuomo's behavior to Defendant DesRosiers and that Defendant DesRosiers had arranged for her new position with the Executive Chamber's health policy team just two days later.

91.     The next day, on June 30, 2020, one of these staffers relayed Plaintiff's comments to Defendant DesRosiers, who in turn relayed them to Defendants DeRosa and Mogul.  Almost three weeks after Plaintiff first reported Defendant Cuomo's sexual harassment of her to Defendant DesRosiers, Defendants DesRosiers and Mogul made plans to interview Plaintiff about her complaint later that day.

**Plaintiff Detailed Defendant Cuomo's Sexual Harassment to Defendants DesRosiers and Mogul and was Constructively Discharged**

92.     Around 6:00 pm that same day, Defendant DesRosiers approached Plaintiff at her desk, where Ms. Baldwin was sitting nearby, and asked Plaintiff to come with her to her office. Once there, Defendant DesRosiers told Plaintiff she needed to tell Defendant Mogul "everything" that had happened between Defendant Cuomo and her.  Plaintiff agreed and Defendant DesRosiers called Defendant Mogul and put her on speakerphone.

93.     Over the course of approximately 90 minutes, Plaintiff detailed Defendant Cuomo's conduct, described above, including that Defendant Cuomo asked her whether she was

interested in other Executive Chamber staffers; told her he was "lonely," was "looking for a girlfriend," and wanted to "get on a motorcycle and take a woman into the mountains"; told her repeatedly, "You were raped!  You were abused! You were assaulted! You were betrayed!"; told her when she was wearing a mask in his office that she reminded him of the monsters in the movie "Predator" and that, if he were investigated for sexual harassment, he would have to tell investigators he told her she looked like a monster; asked Plaintiff whether she cared about age differences in relationships and told her he was willing to date someone as long as she was over the age of 21 years old, knowing Plaintiff was then 25 years old; twice asked Plaintiff to find him a girlfriend; asked Plaintiff whether and how her history of sexual assault affected her relationships or ability to enjoy herself physically during sex; asked Plaintiff if she was monogamous in her past relationships; told Plaintiff she should get a tattoo on her butt; and told Plaintiff she looked like Daisy Duke.  Plaintiff told Defendants DesRosiers and Mogul that Defendant Cuomo's comments made her extremely uncomfortable.

94.     Plaintiff became very emotional, cried and even started shaking while describing some of these events.  She also told Defendants DesRosiers and Mogul that she felt Defendant Cuomo was "grooming" her, which is the process of establishing an emotional connection or relationship of trust with an individual prior to exploiting her sexually.

95.     Defendants DesRosiers and Mogul took contemporaneous notes during the interview.  Both concluded that Plaintiff was credible.   Defendant DesRosiers was concerned by what Plaintiff had told her and believed that what Plaintiff had experienced was not "trivial."

96.     At the end of the interview, Plaintiff told Defendants DesRosiers and Mogul she was afraid of what might happen if Defendant Cuomo knew she had reported his sexual harassment of her and did not want him to find out.  Defendant Mogul told Plaintiff she needed

time to process the information Plaintiff had shared and would contact her about what would

happen next.  Neither Defendant DesRosiers nor Defendant Mogul assured Plaintiff she would

be protected from retaliation because of her report and neither told her the truth – that Defendant

Cuomo had already been told about her sexual harassment complaint.

97.     Defendant Mogul knew that Executive Chamber supervisors who learned of

conduct potentially constituting sexual harassment were required to report that conduct to the

Governor's Office of Employee Relations ("GOER") for investigation.  Nevertheless, Defendant

Mogul conveyed some or all of the substance of Plaintiff's interview directly to Defendant

Cuomo—the subject of the report—and Defendant DeRosa on or around that same day.

98.     Defendant DeRosa knew that it was GOER's responsibility to conduct sexual

harassment investigations.  She understood the definition of sexual harassment as she was a

major proponent inside the Executive Chamber of amending the New York State Human Rights

Law to eliminate the "severe or pervasive" requirement.

99.     When Plaintiff finally returned to her desk, Ms. Baldwin asked about her meeting

with Defendant DesRosiers.  Plaintiff told Ms. Baldwin that Defendant Cuomo had been

inappropriate with her and that this was the reason for her transfer to the health policy team.  She

also told her that Defendant Mogul had interviewed her about Defendant Cuomo's conduct.

100.    The next day, on July 1, 2020, Plaintiff received an email from the Executive

Chamber staffer she had confided in on June 10, 2020, with a copy of the Executive

Department's Equal Employment Opportunity Handbook ("the Handbook") attached.  The

Handbook, effective May 2020, "comprises the statewide anti-discrimination policy applicable to

State workplaces."  In his email, the staffer suggested Plaintiff "might need it."  As Plaintiff later

learned from the staffer, Defendant Mogul had requested a copy of the Handbook from him

earlier that day.

101.    Plaintiff reviewed the Handbook section on sexual harassment, which stated in

part:

> Actions that may constitute sexual harassment . . . may include, but are not limited to,
> words, signs, jokes, pranks, intimidation or physical violence that are of a sexual nature,
> or which are directed at an individual because of that individual's sex.  Sexual
> harassment also consists of any unwanted verbal or physical advances, sexually explicit
> derogatory statements or sexually discriminatory remarks made by someone which are
> offensive or objectionable to the recipient, which cause the recipient discomfort or
> humiliation, or which interfere with the recipient's job performance.

With respect to complaints of sexual harassment, the Handbook stated in part:

> Any complaint [of sexual harassment], whether verbal or written, must be investigated by
> [the Governor's Office of Employee Relations ("GOER")] . . . Furthermore, any
> supervisory or managerial employee who observes or otherwise becomes aware of
> conduct of a sexually harassing nature must report such conduct so that it can be
> investigated.

Based on the Handbook, Plaintiff concluded that Defendants DesRosiers and Mogul were

required to refer her complaint, which described conduct constituting sexual harassment by

Defendant Cuomo, to GOER for investigation.

102.    Having witnessed Defendant Cuomo's, and the other Defendants', tempers flare

when they were frustrated at work or angry at a perceived opponent, Plaintiff was terrified of the

retaliation she would face if GOER started investigating her complaint.  Plaintiff's fear was

reasonable.  In an effort to protect herself from retaliation, Plaintiff sent a text message to

Defendant Mogul requesting to speak with her later that day.  Defendant Mogul agreed and they

scheduled a time to speak, along with Defendant DesRosiers, that evening.

103.    During her phone call with Defendants Mogul and DesRosiers that evening,

Plaintiff expressed concern that the Handbook appeared to require GOER to investigate her

complaint and said she did not want her complaint investigated, because she did not want to anger Defendant Cuomo.  Rather than confirming an investigation was mandatory and assuring Plaintiff she would be protected from retaliation, as stated in the Handbook and required by New York State law, Defendant Mogul claimed Defendant Cuomo's actions did not rise to the level of sexual harassment because he was still "grooming" Plaintiff when she made her complaint.  As a result, no investigation was necessary.  Defendant Mogul commented that she hoped her own daughter would have handled the situation the same way Plaintiff had. This phone call ended shortly thereafter.

104.    In violation of New York State law, Defendant DesRosiers failed to refer Plaintiff's complaint of sexual harassment to GOER, even though Plaintiff first reported Defendant Cuomo's sexual harassment to her on June 10, 2020, and subsequently described all of Defendant Cuomo's above-detailed conduct to her over the course of approximately 90 minutes on June 30, 2020.

105.    In violation of New York State law, and despite knowing that a supervisor who learns of sexual harassment is obligated to report it to GOER, Defendant Mogul did not refer Plaintiff's complaint of sexual harassment to GOER, even though Defendant DesRosiers relayed Plaintiff's June 10, 2020, report of sexual harassment to her that same day and Plaintiff subsequently described all of Defendant Cuomo's above-detailed conduct to her over the course of approximately 90 minutes on June 30, 2020.

106.    In violation of New York State law, and despite knowing that it was GOER's responsibility to conduct sexual harassment investigations, Defendant DeRosa did not refer Plaintiff's complaint of sexual harassment to GOER, even though Defendant DesRosiers relayed Plaintiff's report of sexual harassment to her on or around June 10, 2020, and Defendant

DesRosiers also told her on June 30, 2020, that Plaintiff had told several Executive Chamber staffers that Governor Cuomo made sexual advances toward her.

107.    In late June or early July 2020, Executive Chamber staff were instructed to leave materials for Defendant Cuomo at the Executive Mansion trooper station instead of entering the Mansion, to avoid the chance of inappropriate interactions with him there.  Around the same time, the Executive Chamber also implemented a protocol under which female staffers would not staff Defendant Cuomo by themselves, to avoid his making inappropriate comments to women.

108.    Approximately one week later, on July 7, 2020, Defendant Cuomo replaced Ms. Baldwin as Assistant Secretary for Health, effective that fall.  Upon learning this news, Ms. Baldwin abruptly stopped coming to work for more than a week, leaving Plaintiff without a supervisor or meaningful work assignments.

109.    On July 11, 2020, after living in an Albany hotel for more than 100 days and experiencing escalating levels of anxiety, depression, and isolation, Plaintiff moved back to New York City.  She hoped that by leaving Albany, where she had been sexually harassed by Defendant Cuomo and forced to resign as his Executive Assistant, she could better manage her declining mental and physical condition.  She continued to commute to Albany, as necessary, and otherwise worked from the Chamber's New York City office or remotely from home.

110.    Unfortunately, however, Plaintiff's health continued to decline.  She experienced increased anxiety, depression, tearfulness, irritability, and difficulty concentrating.  She had increasing difficulty waking up in the morning, causing her to miss conference calls or other appointments, and was excessively sleepy during the day.  She also felt a steadily increasing sense of isolation, avoided the colleagues she had worked with as Defendant Cuomo's Executive Assistant, and withdrew from friends and family.

111.    In her new role, Plaintiff had little work.  She spent most of her time on introductory phone calls with public health stakeholders or observing meetings among her colleagues.  Though Ms. Baldwin eventually returned to work and would remain a member of the health policy team until she found a new position, she was largely unresponsive to Plaintiff's job-related questions and requests.  Plaintiff tried to keep herself busy by performing research on the public health issues in her portfolio and even assisted the briefing team, despite no longer being a Senior Briefer.  Throughout the month of July, Plaintiff told friends in text messages that she had a "bad feeling" about her new position and that "something about this [job] really doesn't feel right."  She also repeatedly told a friend she had "no tasks" at work.

112.    In mid-July, Plaintiff expressed concerns to Ms. Baldwin about not having enough work to do and asked to take on more work.  Ms. Baldwin suggested that Plaintiff speak to Director of Women's Affairs Emily Kadar about the possibility of working for her, instead, which Plaintiff did on several occasions over the next few weeks.  She never received any assignments from Ms. Kadar.

113.    Ms. Baldwin's replacement, Jennifer Rentas, began training with Ms. Baldwin in or around early August.  But Ms. Rentas gave Plaintiff very few assignments and Plaintiff continued to try to fill her time with self-directed research projects.

114.    Plaintiff continued to experience anxiety, depression, tearfulness, irritability, difficulty concentrating, and excessive sleepiness.  In mid-August, she sought treatment from a sleep specialist and was diagnosed with narcolepsy.  By the end of August, and in consultation with her therapist and medical provider, Plaintiff concluded that Defendant Cuomo's sexual harassment and her transfer to a "do nothing" position was damaging her health.  She further

concluded, in consultation with her medical providers that continuing work in the Executive Chamber was intolerable, and she needed to resign.

115.    On September 1, 2020, Plaintiff called Ms. Baldwin to inform her she intended to resign.  But Ms. Baldwin did not answer her call.

116.    The next morning, on September 2, 2020, Plaintiff sent a text message to Ms. Baldwin informing her that she "need[ed] to leave" the Executive Chamber.  Ms. Baldwin acknowledged Plaintiff's text message and stated she would call her later that day, but never did.

117.    The next day, on September 3, 2020, Plaintiff began the process of applying for medical leave under the Family Medical Leave Act ("FMLA").  She remained on paid leave through September 23, 2020.

118.    On September 24, 2020, Plaintiff traveled to the New York City office and notified Ms. Rentas in-person that she was resigning.  Ms. Rentas did not respond in substance to Plaintiff's resignation but, to Plaintiff's surprise, told her that she was resigning, as well. Plaintiff also notified a member of the briefing team and a member of the health policy team of her resignation that same day.

119.    On October 6, 2020, Defendant Mogul called Plaintiff on her State-issued cell phone from a number Plaintiff did not recognize.  As soon as Plaintiff picked up the call and realized it was from Defendant Mogul, she became emotional and started to cry.

120.    During the call, Defendant Mogul told Plaintiff that she and Defendant DesRosiers had heard "rumors" Plaintiff was resigning and asked her if the rumors were true. Plaintiff confirmed that they were and told Defendant Mogul she planned to inform Defendant DesRosiers of her resignation as soon as she was able to meet with her.

121.     Defendant Mogul then asked Plaintiff if "what happened with the Governor" was the reason she was leaving, and Plaintiff confirmed that it was.  At the end of the call, Defendant Mogul apologized for upsetting Plaintiff and told her she would inform Defendant DesRosiers that Plaintiff wanted to meet with her.

122.     Plaintiff notified Defendant DesRosiers of her resignation on October 23, 2020, during a meeting in Defendant DesRosiers's office.  During the meeting, Plaintiff told Defendant DesRosiers that Defendant Cuomo's conduct had left her anxious, lacking in confidence, and unable to perform her job effectively.  Defendant DesRosiers half-heartedly offered to find Plaintiff another job but acknowledged that she might want to "get away."  Plaintiff declined her offer and expressly told Defendant DesRosiers that she wanted to get away from Defendant Cuomo.  At the end of the meeting, Defendant DesRosiers instructed Plaintiff to use her remaining personal time off ("PTO"), then return her State-issued phone and identification.

123.     On November 5, 2020, Plaintiff elected to depart the Executive Chamber prior to her last day of PTO, on November 10, 2020.  She turned in her State-issued phone and identification on that day.  After returning the last reminders of her job in the Executive Chamber, Plaintiff decided to leave New York, altogether, and temporarily moved out of state.

124.     Defendant DesRosiers resigned from the Executive Chamber in late 2020 or early 2021.

**Plaintiff Made Public Her Allegations, Attorney General James Launched an Investigation into Plaintiff's and Others' Allegations of Sexual Harassment, and Defendant Cuomo Retaliated Against Plaintiff**

125.     On February 24, 2021, former Executive Chamber staffer Lindsey Boylan published a blog post describing Defendant Cuomo's sexual harassment of her.  Lindsey Boylan, *My story of working with Governor Cuomo*, Medium.com (Feb. 24, 2021),

https://lindseyboylan4ny.medium.com/my-story-of-working-with-governor-cuomo-e664d4814b4e.  Recognizing a similar pattern of abuse from her own time in the Executive Chamber, Plaintiff decided to make public her own experience of sexual harassment by Defendant Cuomo.

126.    On February 27, 2021, *The New York Times* published an article detailing some of Defendant Cuomo's sexual harassment of Plaintiff over the course of her employment.  Jesse McKinley, *Cuomo Is Accused of Sexual Harassment by a 2nd Former Aide*, N.Y. Times (Feb. 27, 2021), https://www.nytimes.com/2021/02/27/nyregion/cuomo-charlotte-bennett-sexual-harassment.html.

127.    After the article was published, Defendant Cuomo issued a press release insisting that he "never made advances toward [Plaintiff], nor did [he] ever intend to act in any way that was inappropriate."  *Statement from Governor Andrew M. Cuomo*, Office of the Governor, (Feb. 27, 2021), https://www.governor.ny.gov/news/statement-governor-andrew-m-cuomo-208. Defendant Cuomo's statement falsely portrayed Plaintiff as a liar. This stigmatization continues to cause Plaintiff emotional distress and reputational harm.

128.    The next day, Defendant Cuomo issued a second press release acknowledging that "some of the things I have said have been misinterpreted as an unwanted flirtation."  *Statement from Governor Andrew M. Cuomo*, Office of the Governor (Feb. 28, 2021), https://www.governor.ny.gov/news/statement-governor-andrew-m-cuomo-209.  This statement did not retract the disparaging comments Defendant Cuomo had made the previous day and mischaracterized his misconduct toward Plaintiff as "playful," "teas[ing]," and "banter."

129.    On March 1, 2021, Defendant Cuomo referred Plaintiff's allegations of sexual harassment to New York Attorney General Letitia James for investigation pursuant to N.Y.

Executive Law § 63(8).  On March 8, 2021, Attorney General James appointed Anne L. Clark, Esq., and Joon H. Kim, Esq., to conduct the investigation.

130.    Over the next four months, Plaintiff submitted to two lengthy interviews with investigators, one informal and one under oath, and provided hundreds of pages of documentary evidence in support of her allegations to the investigators.

131.    Meanwhile, Defendant Cuomo embarked on a campaign to publicly cast doubt on Plaintiff's allegations and those brought by other women.  During a press conference on March 8, 2021, Defendant Cuomo stated, "I never harassed anyone.  I never abused anyone.  I never assaulted anyone."  On April 26, 2021, Defendant Cuomo insisted during another press conference that he "didn't do anything wrong" with respect to Plaintiff's and others' allegations of sexual harassment against him.  During yet another press conference on May 3, 2021, Defendant Cuomo repeated his false denials about his treatment of Plaintiff and stated, "I did nothing wrong, period."

132.    Defendant Cuomo's public statements during the Attorney General's investigation, which falsely portrayed Plaintiff as a liar, caused Plaintiff significant emotional distress and reputational harm.  These falsehoods also subjected Plaintiff to vitriolic attacks by Defendant Cuomo's supporters on social media.  Defendant Cuomo's comments will harm Plaintiff's future employment prospects because they impugned her integrity as an employee.

133.    Throughout this time period, Defendant Cuomo consulted his brother, Chris Cuomo, and others outside the Executive Chamber about his public response to Plaintiff's and others' allegations of sexual harassment.  He also directed them to monitor social media for information about Plaintiff and the other complainants, and Chris Cuomo in fact circulated a disparaging tweet about Plaintiff to Defendant DeRosa and others in mid-March 2021.

134.     On or around July 28, 2021, shortly after her interview with investigators from the

Attorney General's office, Defendant Mogul announced her resignation from the Executive

Chamber, effective the following week.

**Attorney General James Concluded That Defendant Cuomo Violated Multiple Civil Rights
Laws and Defendant Cuomo Retaliated Against Plaintiff Through His Personal Attorney**

135.     On August 3, 2021, Attorney General James released a 168-page report detailing

Defendant Cuomo's sexual harassment of Plaintiff and ten other women, providing supporting

documentation, and concluding Defendant Cuomo violated multiple civil rights laws, including

the New York State Human Rights Law.  STATE OF NEW YORK OFFICE OF THE ATTORNEY

GENERAL, Report of Investigation into Allegations of Sexual Harassment by Governor Andrew

M. Cuomo (Aug. 3, 2021), *available at* https://ag.ny.gov/sites/default/files/2021.08.03_nyag_-

_investigative_report.pdf ("Attorney General Report").

136.     Among other things, the Attorney General Report concluded:

- Defendant Cuomo "sexually harassed a number of current and former New York

  State employees by . . . engaging in unwelcome and nonconsensual touching, as

  well as making numerous offensive comments of a suggestive and sexual nature

  that created a hostile work environment for women";

- The "Executive Chamber's culture—one filled with fear and intimidation, while

  at the same time normalizing the Governor's frequent flirtations and gender-based

  comments—contributed to the conditions that allowed the sexual harassment to

  occur and persist";

- Defendant Cuomo's sexually harassing conduct "adversely impacted [State

  employees'] work environment and the professional and personal fulfillment the

  each sought from their jobs"; and

- The Executive Chamber's "response to a number of the sexual harassment allegations violated its internal policies."

137.    The Attorney General Report concluded that Defendant Cuomo made multiple "inappropriate and offensive comments of a sexual nature" to Plaintiff, including those detailed above, and that he "had detailed conversations with [Plaintiff] about her experiences with sexual assault, and did so in a way that—on certain occasions—made her feel extremely uncomfortable, as if he were 'grooming' her." These comments, the Attorney General Report concluded, were "by any reasonable measure, gender-based, offensive, and harassing" and, "individually and collectively," constituted unlawful sexual harassment.

138.    The Attorney General Report also concluded Defendants Mogul's, DesRosiers's, and DeRosa's failures to refer Plaintiff's complaint of sexual harassment to GOER violated the Executive Chamber's internal sexual harassment policy.

139.    On or around August 8, 2021, Defendant DeRosa announced her resignation from the Executive Chamber but did not specify an effective date. She later clarified she would remain with the Chamber through August 24, 2021.

140.    Two days later, on August 10, 2021, Defendant Cuomo announced his resignation as Governor of the State of New York, effective August 24, 2021. In announcing his resignation, Defendant Cuomo once again cast Plaintiff and the other complainants as liars and suggested that he was the victim of a political plot to remove him from office. He stated, among other things, that "[t]he most serious allegations made against [him] had no credible factual basis in the [Attorney General Report]"; "this situation and moment are not about the facts . . . [they are] about politics"; and that he "truly believe[s] [the Attorney General's investigation] is politically motivated . . . unfair [and] untruthful . . . and . . . demonizes behavior [in a way] that is

unsustainable for society."  In making these statements, Defendant Cuomo sought to portray himself the victim of Plaintiff's and the other complainants' now-substantiated allegations.

141.   On August 20, 2021, Rita Glavin in her capacity as Defendant Cuomo's personal attorney held a press conference at which she called into question Plaintiff's credibility as a complainant in the Attorney General's investigation.  Ms. Glavin claimed to be in possession of unspecified "new information" relating to Plaintiff's credibility.  She stated further that she "w[ould] not get into what the information is out of respect to [Plaintiff], but this is material we will be submitting to the Attorney General."

142.   Two months later, on or around October 20, 2021, Ms. Glavin in her capacity as Defendant Cuomo's personal attorney posted to Defendant Cuomo's campaign website a document that regurgitated false allegations in a 2017 lawsuit that Plaintiff made a false complaint of sexual misconduct, which Plaintiff did not.  Rita M. Glavin, *Former Governor Andrew M. Cuomo's Application to Amend, Correct, and Supplement the August 3, 2021 'Report of Investigation into Allegations of Sexual Harassment by Governor Andrew M. Cuomo'*, AndrewCuomo.com (Oct. 20, 2021), https://bit.ly/3tNZzyh.  With even the most minimal due diligence, Ms. Glavin would have been able to determine that the unproven allegations made against Ms. Bennett were not well-grounded in law or fact.

143.   More than five months after the release of the Attorney General Report, on January 13, 2022, Ms. Glavin in her capacity as Defendant Cuomo's personal attorney held yet another press conference in which she reiterated the false allegations about Plaintiff in the 2017 lawsuit, stated repeatedly that Defendant Cuomo did not sexually harass Plaintiff, and implied that Plaintiff only participated in the Attorney General's investigation out of a desire for money.

144.    Ms. Glavin's comments, which falsely portrayed Plaintiff as a liar and a con artist, caused Plaintiff significant additional emotional distress and damage to her reputation.  Ms. Glavin's comments also will harm Plaintiff's future employment prospects as they impugned Plaintiff's integrity as an employee.

145.    On information and belief, Ms. Glavin made these retaliatory comments at the direction of Defendant Cuomo because of Plaintiff's participation in the Attorney General's investigation into her and others' allegations of sexual harassment against him.  The comments were intended to damage Ms. Bennett's professional reputation, to punish her for coming forward, and to silence her.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Discrimination in Violation of the Equal Protection Clause
Against Defendant Cuomo**

146.    Plaintiff hereby incorporates as though restated all of the factual allegations.

147.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution makes it unlawful to discriminate against a person on the basis of sex.

148.    Defendant Cuomo's actions were committed in the context of his role as Governor of the State of New York, and therefore committed under the color of state law.

149.    Defendant Cuomo discriminated against Plaintiff on the basis of her sex throughout her employment as his Executive Assistant by, *inter alia*, subjecting her to a sexually hostile work environment, which included subjecting her to unwelcome comments about her body and physical appearance, isolating Plaintiff and roping her into conversations about the size of his genitals by asking pointed questions about the size of his hands.  Defendant Cuomo told Plaintiff that he was "lonely" and wanted a girlfriend, asked Plaintiff if age differences mattered

to her in relationships and whether she had slept with older men, told Plaintiff he was willing to date someone as long as she was over the age of 21 years old, asked Plaintiff inappropriate questions about her history of sexual assault and whether that history affected her ability to maintain relationships or enjoy sex, and asked Plaintiff if she was monogamous in her relationships.  By these comments and Defendant Cuomo's actions, he made unwelcome sexual advances toward Plaintiff and thereby discriminated against her on the basis of her sex.

150.    Defendant Cuomo's conduct, described above, was intentional and made the workplace intolerable for Plaintiff.  Any reasonable person in Plaintiff's position would have felt compelled to resign.

151.    Defendant Cuomo's actions directly and proximately caused Plaintiff to suffer economic loss, including but not limited to salary and employee benefits, loss of future professional opportunities, and loss of future income, for which Plaintiff is entitled to an award of monetary damages and relief.

152.    Defendant Cuomo's actions directly and proximately caused Plaintiff to suffer emotional distress, including but not limited to anxiety, depression, and a stress-induced medical condition, for which Plaintiff is entitled to an award of monetary damages and relief.

153.    Defendant Cuomo sexually harassed Plaintiff with a conscious or reckless disregard of Plaintiff's rights under the Equal Protection Clause.

### SECOND CAUSE OF ACTION
**Retaliation in Violation of the Equal Protection Clause**
**Against Defendant Cuomo**

154.    Plaintiff hereby incorporates as though restated all of the factual allegations.

155.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution makes it unlawful to retaliate against a person for opposing discrimination on the basis of sex.

156.    Plaintiff opposed discrimination on the basis of sex by, *inter alia*, rebuffing Defendant Cuomo's sexual advances toward her in June 2020; reporting Defendant Cuomo's sexual harassment of her to Defendants DesRosiers and Mogul in June 2020; making public her allegations of sexual harassment against Defendant Cuomo in *The New York Times* on February 27, 2021; and participating in Attorney General James's investigation into her and others' allegations of sexual harassment against Defendant Cuomo by testifying both informally and under oath and providing hundreds of pages of documents to investigators.

157.    Defendant Cuomo's actions were committed in the context of his role as Governor of the State of New York, and therefore committed under the color of state law.

158.    Defendant Cuomo knew Plaintiff had opposed discrimination on the basis of sex as early as June 5, 2020, when Plaintiff first rebuffed his sexual advances, and no later than on or around June 10, 2020, when Defendants DesRosiers, Mogul, and/or DeRosa informed him Plaintiff had reported his sexual harassment of her to Defendant DesRosiers and requested a transfer to a position in which she would not have to interact with him.  Defendant Cuomo learned additional details about Plaintiff's complaint from Defendant Mogul after Plaintiff's June 30, 2020, interview on or around that same day; on February 27, 2021, when Plaintiff's allegations of sexual harassment were published in *The New York Times*; and on or around August 3, 2021, when Attorney General James released the findings of her investigation into Plaintiff's and others' allegations against him.

159.     Defendant Cuomo retaliated against Plaintiff by, *inter alia*, approving her hasty and disorganized transfer to an inferior position on the health policy team where she had little work or supervision and significantly diminished material responsibilities, in part as a result of Defendant Cuomo's replacing Plaintiff's supervisor shortly after Plaintiff's transfer, and from which Plaintiff was forced to resign approximately three months later; publicly casting doubt on Plaintiff's allegations of sexual harassment against him and impugning Plaintiff's credibility in his far-reaching media statements between March and May 2021; and directing Ms. Glavin's public comments about Plaintiff and her allegations during Ms. Glavin's August 20, 2021, press conference; in her October 20, 2021, posting to Defendant Cuomo's campaign website; and in her January 13, 2022, press conference.

160.     Defendant Cuomo's above-described conduct was deliberate and any person in Plaintiff's position would have felt compelled to resign.

161.     Defendant Cuomo's actions, both personally and through Ms. Glavin, directly and proximately caused Plaintiff to suffer economic loss, including but not limited to salary and employee benefits, loss of future professional opportunities, and loss of future income, for which Plaintiff is entitled to an award of monetary damages and relief.

162.     Defendant Cuomo's actions, both personally and through Ms. Glavin, directly and proximately caused Plaintiff to suffer emotional distress, including but not limited to anxiety, depression, and a stress-induced medical condition, for which Plaintiff is entitled to an award of monetary damages and relief.

163.     Defendant Cuomo retaliated against Plaintiff with a conscious or reckless disregard of Plaintiff's rights under the Equal Protection Clause.

**THIRD CAUSE OF ACTION**
**Retaliation in Violation of the Equal Protection Clause**
**Against Defendant DesRosiers**

164.     Plaintiff hereby incorporates as though restated all of the factual allegations.

165.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution makes it unlawful to retaliate against a person for opposing discrimination on the basis of sex.

166.     Plaintiff opposed harassment on the basis of sex by, *inter alia*, reporting Defendant Cuomo's sexual harassment of her to Defendant DesRosiers in June 2020.

167.     Defendant DesRosiers's actions and inactions were undertaken as part of her role as Chief of Staff to Defendant Cuomo, then-Governor of the State of New York, and were under the color of state law.

168.     Defendant DesRosiers retaliated against Plaintiff by arranging for her hasty and disorganized transfer to an inferior, "do nothing" position on the health policy team, where Plaintiff had little work or supervision and significantly diminished material responsibilities, and from which she was compelled to resign approximately three months later.

169.     Defendant DesRosiers's above-described conduct was deliberate and any person in Plaintiff's position would have felt compelled to resign.

170.     Defendant DesRosiers's actions directly and proximately caused Plaintiff to suffer economic loss, including but not limited to salary and employee benefits, loss of future professional opportunities, and loss of future income, for which Plaintiff is entitled to an award of monetary damages and relief.

171.    Defendant DesRosiers's actions directly and proximately caused Plaintiff to suffer emotional distress, including but not limited to anxiety, depression, and a stress-induced medical condition, for which Plaintiff is entitled to an award of monetary damages and relief.

172.    Defendant DesRosiers retaliated against Plaintiff with a conscious or reckless disregard of Plaintiff's rights under the Equal Protection Clause.

**FOURTH CAUSE OF ACTION**
**Sexual Harassment in Violation of the NYSHRL**
**Against Defendant Cuomo**

173.    Plaintiff hereby incorporates as though restated all of the factual allegations.

174.    The New York State Human Rights Law, N.Y. Exec. Law § 290, et seq. ("NYSHRL"), makes it unlawful for an employer to harass any individual on the basis of sex, regardless of whether the harassment is considered "severe or pervasive," if the harassment subjects the individual to inferior terms, conditions or privileges of employment.  N.Y. Exec. Law § 296(1)(h).

175.    Defendant Cuomo signed into law New York State Senate Bill 6577, which amended the NYSHRL by, among other things, eliminating the requirement that workplace sexual harassment be "severe or pervasive" to be actionable under the law and commented at the time of signing that the law would "mak[e] it easier for workplace sexual harassment claims to be brought forward."

176.    Defendant Cuomo knowingly failed to complete New York State's mandatory sexual harassment training, which he signed into law as a component of the 2019 New York State budget, for calendar year 2019.

177. At all times relevant to this matter, Defendant Cuomo was an "employer" within the meaning of the NYSHRL because he had authority to hire and fire employees, including Plaintiff.

178. Defendant Cuomo harassed Plaintiff on the basis of sex throughout her employment as his Executive Assistant by, *inter alia*, subjecting her to a sexually hostile work environment, which included subjecting her to unwelcome comments about her body and physical appearance, isolating Plaintiff and engaging her into conversations about the size of his genitals by asking pointed questions about the size of his hands. Defendant Cuomo told Plaintiff that he was "lonely" and wanted a girlfriend, asked Plaintiff if age differences mattered to her in relationships and whether she had slept with older men, told Plaintiff he was willing to date someone as long as she was over the age of 21 years old, asked Plaintiff inappropriate questions about her history of sexual assault and whether that history affected her ability to maintain relationships or enjoy sex, and asked Plaintiff if she was monogamous in her relationships. By these comments and Defendant Cuomo's actions, he made unwelcome sexual advances toward Plaintiff.

179. Defendant Cuomo's conduct, described above, was intentional and made the workplace intolerable for Plaintiff. Any reasonable person in Plaintiff's position would have felt compelled to resign.

180. Defendant Cuomo's actions directly and proximately caused Plaintiff to suffer economic loss, including but not limited to salary and employee benefits, loss of future professional opportunities, and loss of future income, for which Plaintiff is entitled to an award of monetary damages and relief.

181.    Defendant Cuomo's actions directly and proximately caused Plaintiff to suffer acute emotional distress, including but not limited to anxiety, depression, and a stress-induced medical condition, for which Plaintiff is entitled to an award of monetary damages and relief.

182.    Defendant Cuomo sexually harassed Plaintiff with malice or reckless indifference to Plaintiff's rights under the NYSHRL.

### FIFTH CAUSE OF ACTION
**Aiding and Abetting Sexual Harassment in Violation of the NYSHRL**
**Against Defendants DesRosiers, Mogul, and DeRosa**

183.    Plaintiff hereby incorporates as though restated all of the factual allegations.

184.    The NYSHRL makes it unlawful for any person to aid or abet harassment on the basis of sex, or attempt to do so.  N.Y. Exec. Law § 296(6).

185.    Defendants DesRosiers, Mogul, and DeRosa aided and abetted sexual harassment by maintaining and contributing to an office environment in which, *inter alia*, women were pressured to wear more traditionally feminine attire, including dresses and high heels, when Defendant Cuomo was in the office; Defendant Cuomo assigned female employees, but not male employees, to humiliating and demeaning tasks; and Defendant Cuomo subjected female employees, but not male employees, to sexualized comments and questions.

186.    Defendant DesRosiers also aided or abetted harassment on the basis of sex by arranging for Plaintiff's transfer to a "do nothing" position rather than meaningfully addressing Defendant Cuomo's sexual harassment of her, waiting three weeks after Plaintiff first reported Defendant Cuomo's sexual harassment of her to interview Plaintiff, and failing to refer Plaintiff's complaint to GOER for investigation, as required by the Handbook.

187.    Defendant Mogul also aided or abetted harassment on the basis of sex by waiting three weeks after Plaintiff first reported Defendant Cuomo's sexual harassment of her to

interview Plaintiff and by failing to refer Plaintiff's complaint to GOER, despite knowing that a supervisor who learns of sexual harassment is obligated to report it to GOER, as required by the Handbook.

188.     Defendant DeRosa also aided or abetted harassment on the basis of sex by failing to refer Plaintiff's complaint of sexual harassment to GOER, even though she knew that it was GOER's responsibility to conduct sexual harassment investigations, as required by the Handbook.

189.     Defendants' above-described conduct was deliberate and created an intolerable work environment.  Any reasonable person in Plaintiff's position would have felt compelled to resign as did Plaintiff.

190.     Defendants' actions directly and proximately caused Plaintiff to suffer economic loss, including but not limited to salary and employee benefits, loss of future professional opportunities, and loss of future income, for which Plaintiff is entitled to an award of monetary damages and relief.

191.     Defendants' actions directly and proximately caused Plaintiff to suffer emotional distress, including but not limited to anxiety, depression, and a stress-induced medical condition, for which Plaintiff is entitled to an award of monetary damages and relief.

192.     Defendants DesRosiers, Mogul, and DeRosa aided and abetted Defendant Cuomo's sexual harassment of Plaintiff with malice or reckless indifference to Plaintiff's rights under the NYSHRL.

**SIXTH CAUSE OF ACTION**
**Retaliation in Violation of the NYSHRL**
**Against Defendant DesRosiers**

193.     Plaintiff hereby incorporates as though restated all of the factual allegations.

194.    The NYSHRL makes it unlawful to retaliate against any person because she opposed harassment on the basis of sex.  N.Y. Exec. Law § 296(7).

195.    Plaintiff opposed harassment on the basis of sex by, *inter alia*, complaining of and reporting Defendant Cuomo's sexual harassment of her to Defendants DesRosiers in June 2020.

196.    Defendant DesRosiers retaliated against Plaintiff by arranging for her hasty and disorganized transfer to an inferior, "do nothing" position on the health policy team, where Plaintiff had little work or supervision and significantly diminished material responsibilities, and from which she was forced to resign approximately three months later.

197.    Defendant DesRosiers's above-described conduct was deliberate and any person in Plaintiff's position would have felt compelled to resign.

198.    Defendant DesRosiers's actions directly and proximately caused Plaintiff to suffer economic loss, including but not limited to salary and employee benefits, loss of future professional opportunities, and loss of future income, for which Plaintiff is entitled to an award of monetary damages and relief.

199.    Defendant DesRosiers's actions directly and proximately caused Plaintiff to suffer emotional distress, including but not limited to anxiety, depression, and a stress-induced medical condition, for which Plaintiff is entitled to an award of monetary damages and relief.

200.    Defendant DesRosiers retaliated against Plaintiff with malice or reckless indifference to Plaintiff's rights under the NYSHRL.

### SEVENTH CAUSE OF ACTION
**Retaliation in Violation of the NYSHRL**
**Against Defendant Cuomo**

201.    Plaintiff hereby incorporates as though restated all of the factual allegations.

49

202.    The NYSHRL makes it unlawful to retaliate against any person because she opposed harassment on the basis of sex.  N.Y. Exec. Law § 296(7).

203.    Plaintiff opposed harassment on the basis of sex by, *inter alia*, rebuffing Defendant Cuomo's sexual advances toward her in June 2020; reporting Defendant Cuomo's sexual harassment of her to Defendants DesRosiers and Mogul in June 2020; making public her allegations of sexual harassment against Defendant Cuomo in *The New York Times* on February 27, 2021; and participating in Attorney General James's investigation into her and others' allegations of sexual harassment against Defendant Cuomo by testifying both informally and under oath and providing hundreds of pages of documents to investigators.

204.    Defendant Cuomo knew Plaintiff had opposed harassment on the basis of sex as early as June 5, 2020, when Plaintiff first rebuffed his sexual advances, and no later than on or around June 10, 2020, when Defendants DesRosiers, Mogul, and/or DeRosa informed him Plaintiff had reported his sexual harassment of her to Defendant DesRosiers and requested a transfer to a position in which she would not have to interact with him.  Defendant Cuomo learned additional details about Plaintiff's complaint from Defendant Mogul after Plaintiff's June 30, 2020, interview on or around that same day; on February 27, 2021, when Plaintiff's allegations of sexual harassment were published in *The New York Times*; and on or around August 3, 2021, when Attorney General James released the findings of her investigation into Plaintiff's and others' allegations against him.

205.    Defendant Cuomo retaliated against Plaintiff by, *inter alia*, approving her hasty and disorganized transfer to an inferior position on the health policy team where she had little work or supervision and significantly diminished material responsibilities, in part as a result of Defendant Cuomo's replacing Plaintiff's supervisor shortly after Plaintiff's transfer, and from

which Plaintiff was forced to resign approximately three months later; publicly casting doubt on Plaintiff's allegations of sexual harassment against him and impugning Plaintiff's credibility in his far-reaching media statements between March and May 2021; and directing Ms. Glavin's public comments about Plaintiff and her allegations during Ms. Glavin's August 20, 2021, press conference; in her October 20, 2021, posting to Defendant Cuomo's campaign website; and in her January 13, 2022, press conference.

206.    Defendant Cuomo's above-described conduct was deliberate and any person in Plaintiff's position would have felt compelled to resign.

207.    Defendant Cuomo's actions, both personally and through Ms. Glavin, directly and proximately caused Plaintiff to suffer economic loss, including but not limited to salary and employee benefits, loss of future professional opportunities, and loss of future income, for which Plaintiff is entitled to an award of monetary damages and relief.

208.    Defendant Cuomo's actions, both personally and through Ms. Glavin, directly and proximately caused Plaintiff to suffer emotional distress, including but not limited to anxiety, depression, and a stress-induced medical condition, for which Plaintiff is entitled to an award of monetary damages and relief.

209.    Defendant Cuomo retaliated against Plaintiff with malice or reckless indifference to Plaintiff's rights under the NYSHRL.

### EIGHTH CAUSE OF ACTION
### Discrimination in Violation of the NYCHRL
### Against Defendant Cuomo

210.    Plaintiff hereby incorporates as though restated all of the factual allegations.

211.    The New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101 et seq., makes it unlawful for an employer to discriminate in the terms, conditions, or

privileges of employment against any individual on the basis of gender.  N.Y.C. Admin. Code § 8-107(1)(a)(3).

212.    At all times relevant to this matter, Defendant Cuomo was an "employer" within the meaning of the NYCHRL.  N.Y.C. Admin. Code § 8-102.

213.    Defendant Cuomo discriminated against Plaintiff on the basis of gender throughout her employment as his Executive Assistant by, *inter alia*, subjecting her to a sexually hostile work environment, which included subjecting her to unwelcome comments about her body and physical appearance, isolating Plaintiff and roping her into conversations about the size of his genitals by asking pointed questions about the size of his hands.  Defendant Cuomo told Plaintiff that he was "lonely" and wanted a girlfriend, asked Plaintiff if age differences mattered to her in relationships and whether she had slept with older men, told Plaintiff he was willing to date someone as long as she was over the age of 21 years old, asked Plaintiff inappropriate questions about her history of sexual assault and whether that history affected her ability to maintain relationships or enjoy sex, and asked Plaintiff if she was monogamous in her relationships.  By these comments and Defendant Cuomo's actions, he made unwelcome sexual advances toward Plaintiff and thereby discriminated against her based on her gender.

214.    Defendant Cuomo's conduct, described above, was intentional and made the workplace intolerable for Plaintiff.  Any reasonable person in Plaintiff's position would have felt compelled to resign.

215.    Defendant Cuomo's actions directly and proximately caused Plaintiff to suffer economic loss, including but not limited to salary and employee benefits, loss of future professional opportunities, and loss of future income, for which she is entitled to an award of monetary damages and relief.

216.     Defendant Cuomo's actions directly and proximately caused Plaintiff to suffer acute emotional distress, including but not limited to anxiety, depression, and a stress-induced medical condition, for which she is entitled to an award of monetary damages and other relief.

217.     Defendant Cuomo discriminated against Plaintiff with willful negligence, recklessness, or a conscious or reckless disregard of Plaintiff's rights under the NYCHRL.

### NINTH CAUSE OF ACTION
**Discrimination in Violation of the NYCHRL**
**Against Defendants DesRosiers, Mogul, and DeRosa**

218.     Plaintiff hereby incorporates as though restated all of the factual allegations.

219.     The NYCHRL makes it unlawful for employer, employee, or agent thereof to discriminate in the terms, conditions, or privileges of employment against any individual on the basis of gender.  N.Y.C. Admin. Code § 8-107(1)(a)(3).

220.     By the acts set forth herein, Defendants DesRosiers, Mogul, and DeRosa discriminated against Plaintiff on the basis of gender by maintaining and contributing to an office environment in which, *inter alia*, women were pressured to wear more traditionally feminine attire, including dresses and high heels, when Defendant Cuomo was in the office; Defendant Cuomo assigned female employees, but not male employees, to humiliating and demeaning tasks; and Defendant Cuomo subjected female employees, but not male employees, to sexualized comments and questions.

221.     Defendant DesRosiers also aided or abetted discrimination on the basis of gender by arranging for Plaintiff's transfer to a "do nothing" position rather than meaningfully addressing Defendant Cuomo's sexual harassment of Plaintiff, waiting three weeks after Plaintiff first reported Defendant Cuomo's sexual harassment of her to interview Plaintiff, and failing to refer Plaintiff's complaint to GOER for investigation, as required by the Handbook.

222.     Defendant Mogul also aided or abetted discrimination on the basis of gender by waiting three weeks after Plaintiff first reported Defendant Cuomo's sexual harassment of her to interview Plaintiff and by failing to refer Plaintiff's complaint to GOER, despite knowing that a supervisor who learns of sexual harassment is obligated to report it to GOER, as required by the Handbook.

223.     Defendant DeRosa also aided or abetted discrimination on the basis of gender by failing to refer Plaintiff's complaint of sexual harassment to GOER, even though she knew that it was GOER's responsibility to conduct sexual harassment investigations, as required by the Handbook.

224.     Defendants' above-described conduct was deliberate and created an intolerable work environment.  Any reasonable person in Plaintiff's position would have felt compelled to resign.

225.     Defendants' actions directly and proximately caused Plaintiff to suffer economic loss, including but not limited to salary and employee benefits, loss of future professional opportunities, and loss of future income, for which she is entitled to an award of monetary damages and relief.

226.     Defendants' actions also directly and proximately caused Plaintiff to suffer emotional distress, including but not limited to anxiety, depression, and a stress-induced medical condition, for which she is entitled to an award of monetary damages and other relief.

227.     Defendants DesRosiers, Mogul, and DeRosa engaged in discrimination of Plaintiff with willful negligence, recklessness, or a conscious or reckless disregard of Plaintiff's rights under the NYCHRL.

## TENTH CAUSE OF ACTION
### Retaliation in Violation of the NYCHRL
### Against Defendant DesRosiers

228.    Plaintiff hereby incorporates as though restated all of the factual allegations.

229.    The NYCHRL makes it unlawful for an employer to retaliate against any person because she opposed discrimination on the basis of gender.  N.Y.C. Admin. Code § 8-107(7).

230.    Plaintiff opposed discrimination on the basis of gender by, *inter alia*, reporting Defendant Cuomo's sexual harassment of her to Defendants DesRosiers in June 2020.

231.    Defendant DesRosiers retaliated against Plaintiff by arranging for her hasty and disorganized transfer to an inferior, "do nothing" position on the health policy team, where Plaintiff had little work or supervision and significantly diminished material responsibilities, and from which she was forced to resign approximately three months later.

232.    Defendant DesRosiers's above-described conduct was deliberate and any person in Plaintiff's position would have felt compelled to resign.

233.    Defendant DesRosiers's actions directly and proximately caused Plaintiff to suffer economic loss, including but not limited to salary and employee benefits, loss of future professional opportunities, and loss of future income, for which she is entitled to an award of monetary damages and relief.

234.    Defendant DesRosiers's actions directly and proximately caused Plaintiff to suffer emotional distress, including but not limited to anxiety, depression, and a stress-induced medical condition, for which she is entitled to an award of monetary damages and other relief.

235.    Defendant DesRosiers retaliated against Plaintiff with willful negligence, recklessness, or a conscious or reckless disregard of Plaintiff's rights under the NYCHRL.

## ELEVENTH CAUSE OF ACTION
### Retaliation in Violation of the NYCHRL
### Against Defendant Cuomo

236.    Plaintiff hereby incorporates as though restated all of the factual allegations.

237.    The NYCHRL makes it unlawful for an employer to retaliate against any person because such person has opposed any discrimination on the basis of gender.  N.Y.C. Admin. Code § 8-107(7).

238.    Plaintiff opposed discrimination on the basis of gender by, *inter alia*, rebuffing Defendant Cuomo's sexual advances toward her in June 2020; reporting Defendant Cuomo's sexual harassment of her to Defendants DesRosiers and Mogul in June 2020; making public her allegations of sexual harassment against Defendant Cuomo in *The New York Times* on February 27, 2021; and participating in Attorney General James's investigation into her and others' allegations of sexual harassment against Defendant Cuomo by testifying both informally and under oath and providing hundreds of pages of documents to investigators.

239.    Defendant Cuomo knew Plaintiff had opposed discrimination on the basis of gender as early as June 5, 2020, when Plaintiff first rebuffed his sexual advances, and no later than on or around June 10, 2020, when Defendants DesRosiers, Mogul, and/or DeRosa informed him Plaintiff had reported his sexual harassment of her to Defendant DesRosiers and requested a transfer to a position in which she would not have to interact with him.  Defendant Cuomo learned additional details about Plaintiff's complaint from Defendant Mogul after Plaintiff's June 30, 2020, interview on or around that same day; on February 27, 2021, when Plaintiff's allegations of sexual harassment were published in *The New York Times*; and on or around August 3, 2021, when Attorney General James released the findings of her investigation into Plaintiff's and others' allegations against him.

240.     Defendant Cuomo retaliated against Plaintiff by, *inter alia*, approving her hasty and disorganized transfer to an inferior position on the health policy team where she had little work or supervision and significantly diminished material responsibilities, in part as a result of Defendant Cuomo's replacing Plaintiff's supervisor shortly after Plaintiff's transfer, and from which Plaintiff was forced to resign approximately three months later; publicly casting doubt on Plaintiff's allegations of sexual harassment against him and impugning Plaintiff's credibility in his far-reaching media statements between March and May 2021; and directing Ms. Glavin's public comments about Plaintiff and her allegations during Ms. Glavin's August 20, 2021, press conference; in her October 20, 2021, posting to Defendant Cuomo's campaign website; and in her January 13, 2022, press conference.

241.     Defendant Cuomo's above-described conduct was deliberate and any person in Plaintiff's position would have felt compelled to resign as his employee.

242.     Defendant Cuomo's actions, both personally and through Ms. Glavin, directly and proximately caused Plaintiff to suffer economic loss, including but not limited to salary and employee benefits, loss of future professional opportunities, and loss of future income, for which she is entitled to an award of monetary damages and other relief.

243.     Defendant Cuomo's actions, both personally and through Ms. Glavin, directly and proximately caused Plaintiff to suffer emotional distress, including but not limited to anxiety, depression, and a stress-induced medical condition, for which she is entitled to an award of monetary damages and other relief.

244.     Defendant Cuomo retaliated against Plaintiff with willful negligence, recklessness, or a conscious or reckless disregard of Plaintiff's rights under the NYCHRL.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands prays this Court enters judgment in her favor and against the Defendants for the following relief:

1.      Enter a judgment in Plaintiff's favor and against Defendants Cuomo and DesRosiers for violations of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983;

2.      Enter a judgment in Plaintiff's favor and against Defendant Cuomo for sexual harassment in violation of the NYSHRL, N.Y. Exec. Law § 296(1)(h);

3.      Enter a judgment in Plaintiff's favor and against Defendants DesRosiers, Mogul, and DeRosa for aiding and abetting sexual harassment in violation of the NYSHRL, N.Y. Exec. Law § 296(6);

4.      Enter a judgment in Plaintiff's favor and against Defendants DesRosiers and Cuomo for retaliation against Plaintiff in violation of the NYSHRL, N.Y. Exec. Law § 296(7);

5.      Enter a judgment in Plaintiff's favor and against Defendant Cuomo for discrimination in violation of the NYCHRL, N.Y.C. Admin. Code § 8-107(1)(a)(3);

6.      Enter a judgment in Plaintiff's favor and against Defendants DesRosiers, Mogul, and DeRosa for aiding and abetting discrimination in violation of the NYCHRL, N.Y.C. Admin. Code § 8-107(6);

7.      Enter a judgment in Plaintiff's favor and against Defendants DesRosiers and Cuomo for retaliation in violation of the NYCHRL, N.Y.C. Admin Code § 8-107(7);

**8.**      Award Plaintiff compensatory damages for the economic loss, including but not limited to salary and employee benefits, loss of future professional opportunities, loss of future

income, and compensatory damages for the pain and suffering and acute emotional distress

Plaintiff suffered as a result of Defendants' unlawful actions;

      9.     Award Plaintiff punitive damages in an amount to be determined at trial;

      10.    Award Plaintiff prejudgment interest and post-judgment interest on all amounts

due;

      11.    Award Plaintiff reasonable attorneys' fees, litigation expenses, and costs; and

      12.    Award Plaintiff all other relief permitted under the above causes of action or

which the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.


Dated: September 14, 2022

Respectfully submitted,


/s/ Debra S. Katz
Debra S. Katz
Rachel E. Green (seeking pro hac vice)
Katz Banks Kumin LLP
11 Dupont Circle, NW
Suite 600
Washington, D.C. 20036
Ph:     (202) 299-1140
Fax:    (202) 299-1148
Email:  katz@katzbanks.com
        green@katzbanks.com


/s/ Laura S. Schnell
Herbert Eisenberg
Laura S. Schnell
Eisenberg & Schnell LLP
233 Broadway, Suite 2704
New York, New York 10279
Ph:     (212) 966-8900
Email:  lschnell@eisenbergschnell.com
        heisenberg@eisenbergschnell.com

*Attorneys for Plaintiff Charlotte Bennett*