# Exhibit R

**FORMER GOVERNOR ANDREW M. CUOMO'S APPLICATION
TO AMEND, CORRECT, AND SUPPLEMENT THE AUGUST 3, 2021
"REPORT OF INVESTIGATION INTO ALLEGATIONS OF
<u>SEXUAL HARASSMENT BY GOVERNOR ANDREW M. CUOMO"</u>**

Rita M. Glavin
GLAVIN PLLC

*Attorney for former Governor Andrew M. Cuomo*

## <u>TABLE OF CONTENTS</u>

I.    EXECUTIVE SUMMARY ................................................................................... 5

II.   THE REPORT CONTAINS MATERIAL OMISSIONS AND ERRORS THAT MUST BE
      ADDRESSED BECAUSE THE REPORT IS MATERIALLY MISLEADING AND
      UNRELIABLE .................................................................................................. 16

  1.  The March 1, 2021, Referral Pursuant to N.Y. Exec. Law § 63(8) and the Attorney
  General Office's Involvement in the Investigation and Report in Violation of that Referral .. 17

  2.  Lindsey Boylan ...................................................................................... 20

      A.    The Report's Findings ............................................................... 20

      B.    The Report's Glaring Omissions and Errors ........................................ 22

      C.    The Report Omits Evidence Regarding the Circumstances of Ms. Boylan's Departure
      from the Executive Chamber, Which Goes Directly to Ms. Boylan's Credibility .............. 23

      D.    The Report's Omission of Other Actions by Ms. Boylan, and The Timing of Those
      Actions, That Bear on Directly on Ms. Boylan's Credibility and Motivations ................... 26

      E.    Failure to Investigate Communications Between Ms. Boylan's Campaign and the
      Attorney General's Office in December 2020, Why Ms. Boylan's Communications
      Consultant Resigned, and Ms. Boylan's Campaign Motivations in Promoting and
      Embellishing Her Allegations ............................................................... 33

      F.    Omission of Ms. Boylan's Other False and Inflammatory Public Statements .......... 37

      G.    Omission of Material Evidence Regarding Ms. Boylan's "Jarring" Threat to Howard
      Zemsky To Induce Him to Change His Statement ............................................ 39

      H.    The Release of Three Memos Documenting the Circumstances of Ms. Boylan's
      Departure, and the Circulating of a Draft Letter Amongst a Small Group of Individuals Was
      Not Unlawful Retaliation and The Report Ignored Applicable Caselaw and Counsel's
      Lengthy Submission on this Issue ........................................................... 42

  3.  Charlotte Bennett .................................................................................. 47

      A.    The Report's Findings ............................................................... 47

      B.    The Report's Material Omissions and Errors. ....................................... 48

      C.    The Report Fails to Include and Consider Ms. Bennett's History of Making Sexual
      Misconduct Allegations ..................................................................... 53

  4.  Brittany Commisso ................................................................................ 61

      A.    The Governor Did Not Grope Ms. Commisso's Breast on November 16, 2020 or Any
      Other Day .................................................................................. 62

      B.    Ms. Commisso's April 7, 2021 *Times Union* Interview Describing the "Groping"
      Incident is Completely Undermined by Contemporaneous Documentary Evidence Omitted
      from the Report ............................................................................ 63

i

C.      Other Errors and Omissions in the Report Regarding the "Groping" Incident and Ms. Commisso's Evolving Version of Events ............................................................................. 67

D.      Testimony by Executive Assistants #2 and #3 Demonstrate Material Inconsistencies in how Ms. Commisso Described the November "Groping Incident" and Ms. Commisso's Evolving Version of Events ............................................................................. 71

E.      The Governor Did Not Grab or Rub Ms. Commisso's Butt ....................................... 80

F.      The Governor Did Not Kiss Ms. Commisso on the Lips ........................................... 86

G.      The Governor Did Not Sexually Harass Ms. Commisso ............................................ 87

H.      The Report Fails to Include and Explore Evidence Regarding Ms. Commisso's Motive to Fabricate and Embellish Her Interactions with the Governor ............................. 90

5.      Alyssa McGrath .................................................................................................. 92

   A.   The Report's Findings ............................................................................................ 92

   B.   The Report's Material Omissions and Errors ........................................................ 93

6.      Trooper #1 ......................................................................................................... 102

   A.   The Report's Findings .......................................................................................... 102

   B.   The Report Prescribes No Weight to The Governor's Testimony that He Did Not Know of Any Minimum Requirements for Serving on the PSU. ................................... 102

   C.   The Governor Alleged Comments to Trooper #1 .................................................. 104

   D.   The Governor Did Not Engage in Offensive Touching. ........................................ 108

7.      Kaitlin ............................................................................................................... 113

   A.   The Report's Findings .......................................................................................... 113

   B.   The Report Disregards the Governor's Testimony That He Suggested Kaitlin Be Interviewed for a Chamber Position Because of Her Work Talent and That He Was Not Involved in the Setting of Kaitlin's Salary. ............................................................ 114

   C.   The Report Disregards the Governor's Testimony Regarding His Comments When Kaitlin Was an Executive Chamber Employee .......................................................... 114

8.      Ana Liss ............................................................................................................. 117

   A.   The Report's Findings .......................................................................................... 117

   B.   The Report's Material Omissions and Errors ...................................................... 118

9.      Virginia Limmiatis ............................................................................................ 122

   A.   The Report's Findings .......................................................................................... 122

   B.   The Report's Material Omissions and Errors ...................................................... 124

10.     State Entity Employee #1 ................................................................................. 129

   A.   The Report's Findings .......................................................................................... 129

B.      The Report's Material Omissions and Errors ............................................................ 130

11.    State Entity Employee #2 ...................................................................................... 134

12.    Anna Ruch ............................................................................................................ 136

A.      The Report's Findings ........................................................................................ 136

B.      The Report's Material Omissions and Errors ........................................................ 137

13.    The Report's Material Omissions Served to Create An Appearance of a Hostile Work
Environment ....................................................................................................................... 141

III.    THE MANNER IN WHICH THE INVESTIGATION WAS CONDUCTED AND REPORT
ISSUED DID NOT COMPORT WITH BASIC FAIRNESS AND LACKED OBJECTIVITY.
................................................................................................................................. 144

IV.    CONCLUSION ............................................................................................................. 152

We submit this memorandum on behalf of former Governor Andrew M. Cuomo to amend, correct, and supplement the New York State Office of the Attorney General's August 3, 2021 "Report of Investigation Into Allegations of Sexual Harassment by Governor Andrew M. Cuomo" (the "Report").  In making this submission, we incorporate by reference the August 3, 2021 "Position Statement of Governor Andrew M. Cuomo Concerning the Sexual Harassment Allegations Made Against Him," which is attached as Ex. A;[1] as well as public presentations we gave in response to the Report on August 6, August 10, and August 20, 2021 addressing material omissions and errors in the Report and in the investigation.[2]

We further request that the Attorney General's Office appoint a truly independent party to consider this application given: (1) the Attorney General's initial failure to appoint independent reviewers without any bias or predisposition in this inquiry, as was required by the March 1, 2021 referral; (2) the Attorney General's admitted personal involvement in the investigation and production of the Report, which expressly violated the specific terms of the Governor's March 1, 2021 referral pursuant to N.Y. Exec. L. § 63(8) specifying that an independent law firm—not the Attorney General's office—"conduct an inquiry into allegations" of sexual harassment;[3] (3) the fact that this investigation was conducted in a hurried, biased and one-sided manner to reach a pre-determined outcome by failing to obtain and consider testimony and evidence that would have

---

[1] Our exhibits are lettered to avoid confusion with the Report's numbered exhibits.

[2] WGRZ-TV, *Gov. Cuomo's outside counsel Rita Glavin holds virtual briefing*, YOUTUBE (Aug. 20, 2021), https://www.youtube.com/watch?v=UpmviENazuA; Governor Andrew M. Cuomo, *Outside Counsel Rita Glavin Makes an Announcement*, YOUTUBE (Aug. 10, 2021), https://www.youtube.com/watch?v=otxfPhSoBkc;  Governor Andrew M. Cuomo, *Attorney Rita Glavin Holds Media Availability*, YOUTUBE (Aug. 6, 2021), https://www.youtube.com/watch?v=FP6_KMVBnNk.

[3] Ex. B (Mar. 1, 2021 Referral Letter).

undermined the pre-determined narrative; and (4) the resulting one-sided, materially misleading and flawed Report replete with material omissions and errors.

## I.   **EXECUTIVE SUMMARY**

The Attorney General's Report contained material omissions and errors and relied on resulting flawed and misleading factual findings to conclude that the Governor "sexually harassed a number of women." [4]   Immediate corrective action is required because of the harm to the Governor inflicted by the Attorney General's Report replete with errors and omissions, and the fact that other entities, such as the New York State Assembly and Joint Commission on Public Ethics ("JCOPE"), are now reviewing that flawed Report and must consider and address the omissions and errors rather than accepting the Report at face value.

On August 3, 2021, the Attorney General publicly proclaimed the Governor's culpability for sexual harassment both as a matter of fact and as a matter of law, while simultaneously refusing to provide the Governor access to the evidence and hindering any ability to challenge the caselaw and legal analysis upon which the Report relied.   This affront to due process, including the Attorney General avoiding any responsibility for having to defend the Report's findings and conclusions that ousted her political rival, must be addressed.

---

[4] Report at 1 ("[W]e find that the Governor sexually harassed *a number of* current and former New York State employees"; *id.* at 13 ("we reach the conclusion that the Governor sexually harassed *a number of* State employees"); *id.* at 16 ("*[A] number of individuals* have made allegations…includ[ing] several current or former members of the Executive Chamber, employees of other State agencies and State-affiliated entities, and members of the public"); *id.* at 119 n.1062 (noting that the Investigators are "relying on" the "complainants whose allegations are described…in this Report" to "form the basis of [their] conclusion that the Governor sexually harassed *a number of* them"); *id.* at 142 ("[W]e conclude that the Governor, *on multiple occasions*, engaged in conduct and conversations that were offensive and sexual in nature that constituted sex-based harassment."); *id.* at 165 ("[W]e have reached the conclusion that the Governor sexually harassed *a number of* State employees") (emphasis added); *see also NY Gov. Andrew Cuomo sexually Harassed Multiple Women, Report Finds: Letitia James Press Conference Transcript*, REV (Aug. 3, 2021), https://www.rev.com/blog/transcripts/ny-gov-andrew-cuomo-sexually-harassed-multiple-women-report-finds-letitia-james-press-conference-transcript (declaring on a press conference that same day that "the independent investigation has concluded that Governor Andrew Cuomo sexually harassed multiple women, and in doing so violated federal and state law").

The Report must be immediately amended, corrected, and supplemented.  For example:

- The Report should be amended, corrected, and supplemented to properly assess Lindsey Boylan's credibility, given that: 1) many of her allegations were found to have been corroborated by crediting the testimony of Howard Zemsky, who changed his story after he received a "disparaging" message from her that he found "jarring and "threatening"; 2)  the Report notably omits any discussion about Ms. Boylan's relationship with Mr. Zemsky and what they each testified to about their relationship and how it related to that "threatening" message; 3) the Report omits evidence regarding the actual circumstances of Ms. Boylan's departure from state employment; 4) the Report ignores, without explanation, the motives and timing of Ms. Boylan's allegations in relation to her campaign for Manhattan Borough President, including what she told various campaign staff and threats she made to former Executive Chamber (or "Chamber") staff to pressure them to go along with her allegations; 5) the Report does not indicate how Ms. Boylan's testimony addressed (or did not address) the praise she expressed  for the Governor on Twitter at the precise time she now claims he was harassing her, including her August 2018 tweet, which read: "Proud to work for a governor who takes women seriously"; and 6) Ms. Boylan conducted regular attacks on the Governor's character throughout the course of the investigation on Twitter by making false and inflammatory statements, including accusations that Governor Cuomo is a "rape culture king."

- The Report should also be amended, corrected and supplemented to specify what investigative steps were and were not taken regarding Ms. Boylan, including: interviews of her campaign staff such as Trip Yang, who discussed with the

Attorney General's Chief of Staff what Ms. Boylan had said and was doing regarding those allegations; any interview of Ms. Boylan's communications consultant who resigned days after Ms. Boylan made her allegations in December 2020 because it was "not a good fit," and what Ms. Boylan said and did not say to that communications consultant about her allegations; whether the Investigators subpoenaed records from Ms. Boylan's campaign relating to her allegations, including Ms. Boylan's emails and texts, as well as any drafts, records, and communications relating to her February 24, 2021 *Medium* essay making more detailed allegations against the Governor.

- The Report should be amended, corrected, and supplemented to include the Governor's detailed testimony that provides important context to his conversations with Charlotte Bennett and supports his contention that many of his conversations with Ms. Bennett were initiated by her; the evidence of Ms. Bennett's apparent history of making sexual misconduct allegations and consideration of that history in assessing her allegations; and whether the Investigators were aware of Ms. Bennett's history and whether they asked her about it during her informal or formal interviews.

- The Report should be amended, corrected, and supplemented to reflect Brittany Commisso's materially evolving version of events concerning the alleged breast "groping" incident that she stated occurred in November (now December), including analysis of the testimony by Executive Assistants #2 and #3 demonstrating inconsistencies in what she told them versus what she told others such as journalists and the Investigators, and Ms. Commisso's inconsistencies

regarding various details of that alleged incident over time; to assess the December 31, 2019 "selfie" that she claims was taken after the Governor groped her "butt" and made her so nervous she was shaking, including the fact that the offending "selfie" she took with the Governor appears to have been filtered and what Ms. Commisso said about her particular pose with the Governor and whether she filtered the photo; and the fact that Ms. Commisso chose not to confide in her close friend and co-worker, Alyssa McGrath, who was her emergency work contact, about the "groping" incident before confiding in Executive Assistants #2 and #3 in March 2021; and to include and explore the evidence regarding Ms. Commisso's motive to fabricate and embellish her interactions with the Governor.

- The Report should be amended, corrected, and supplemented to include: evidence that Alyssa McGrath and Ms. Commisso were the closest of friends, who vacationed together and were each other's "emergency contact" at work and what Ms. Commisso did and did not tell Ms. McGrath about her interactions with the Governor and the timing of those discussions; the evidence from witnesses that they sought out the Governor's attention and banter with them; why Ms. McGrath told Ms. Commisso she was "jealous" of Ms. Commisso's December 31, 2019 "selfie" with the Governor and wanted to be photoshopped into the photograph, and what Ms. Commisso's response was; and whether the Investigators subpoenaed all text and email communications from Ms. McGrath and Ms. Commisso relating to their interactions with and/or allegations about the Governor.

- The Report should be amended, corrected, and supplemented to meaningfully assess the Governor's testimony as to Trooper #1 and to reflect that he did not know

8

of any minimum service requirements for serving on the New York State Troopers Protective Services Unit; and to include evidence showing his alleged actions or comments were not gender-based.

- The Report should be amended, corrected, and supplemented with context that the Governor's comments to Kaitlin concerned her work-performance and were not gender-based.  Alternatively, given that the Report concedes her claims were time-barred, and would not constitute sexual harassment under the law, the Report should be amended to remove her allegations.

- The Report should be amended, corrected. and supplemented to include a reference to Ana Liss' statements to New York Magazine in March 2021 that while she was employed in the Executive Chamber, she "didn't think of [her] experiences [with the Governor] as sexual harassment," and that the conduct she alleges does not constitute sexual harassment. Alternatively, given that the Report concedes her claims would be time-barred under the law anyway, the Report should be amended to remove her allegations.

- The Report should be amended, corrected, and supplemented to:  include photos of the May 24, 2017 outdoor event at which Virginia Limmiatis was present along the Salmon River in Oswego County, which materially undermine any claim that the Governor touched Ms. Limmiatis in an inappropriate manner and provide critical context to the Governor's interactions with Ms. Limmiatis that day; as well as an assessment of Ms. Limmiatis's testimony about her interaction with the Governor that day, four years after-the-fact, against the photographic evidence of her encounter with the Governor that day.

- The Report should be amended, corrected, and supplemented to include: all photos of the September 14, 2019 outdoor event at Pier 40 at which State Entity Employee #1 was present, along with the Governor and his daughter and dozens of others, which do not show any untoward behavior by the Governor and show that the Governor was videoed and photographed throughout that event; analysis as to why State Entity Employee #1 who works for an entity "affiliated" with the state should be considered an employee for purposes of any liability; and that the Report's finding that the Governor "grabbed her butt" does not match up with the "contemporaneously memorialized" email she sent to herself describing the alleged incident.

- The Report should be amended and corrected to remove State Entity Employee #2's allegations in their entirety, given that the Governor's comments to her before and during a press conference during which she performed a live COVID-19 nasal swab test on the Governor were not gender-based, and could not be deemed inappropriate under any meaningful standard.

- The Report should be amended, corrected, and supplemented to: specify that Anna Ruch, a wedding guest at a wedding of the Governor's senior aide, was not interviewed formally under oath and even assuming the truth of her claims they do not approach anything close to sexual harassment. Alternatively, given that the Report finds she was not a state employee and thus her allegations were "not of workplace harassment," the Report should be amended to remove her allegations.

While we vehemently disagree that the Governor sexually harassed anyone, even assuming *arguendo* the truth of the allegations by all of the complainants (and we do not and we vigorously

contest many of the allegations), most of the complainants could not have been "sexually harassed" within the meaning of the law.[5]

Sexual harassment under current New York State law is defined as "an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions, or privileges of employment" and consists of more than "petty slights or trivial inconveniences."[6]  Indeed, the Report deliberately omitted testimony by numerous individuals, including male state employees, that much of the Governor's alleged conduct was not gender-based as he routinely hugged, touched and kissed men, commented on their appearance, and engaged with them about their personal lives and relationships.

The Report's flawed findings and the misleading manner in which the Report was written and organized, along with the Attorney General's prejudicial press conference repeating that the Governor "sexually harassed multiple women," misled the public about the Governor's conduct and created a false public narrative that the Governor "sexually harassed 11 women:"

- "Outside lawyers hired by the attorney general's office found that Cuomo *sexually harassed at least 11 women*."[7]

- "New York Governor Cuomo *Sexually Harassed 11 Women, Report Finds*."[8]

---

[5] This is true for all federal and New York State standards cited by the Report, including Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1983, and the New York State Human Rights Law ("NYSHRL").

[6] N.Y. Exec. L. § 296(1)(h).

[7] Ryan Tarinelli, *State Regulator Who Helped Cuomo with Sexual Harassment Allegations Taught Ethics Course at NYU Law*, N.Y. LAW JOURNAL (Sept. 2, 2021), https://www.law.com/newyorklawjournal/2021/09/02/state-regulator-taught-nyu-law-government-ethics-course-while-helping-cuomo-with-sexual-harassment-allegations/ (emphasis added).

[8] Jonathan Allen & Nathan Layne, *New York Governor Cuomo Sexually Harassed 11 Women, Report Finds*, REUTERS (Aug. 3, 2021) https://www.reuters.com/world/us/new-york-ag-says-probe-found-gov-cuomo-sexually-harrassed-multiple-women-broke-2021-08-03/  ("New York Governor Andrew Cuomo groped, kissed or made suggestive comments to 11 women in violation of the law, the state's attorney general said on Tuesday, prompting local prosecutors to launch a criminal investigation and reigniting calls for him to resign or be impeached.") (emphasis added).

- "Cuomo Urged to Resign After *Probe Finds He Harassed 11 Women*."[9]

- "The *report states that 11 women were sexually harassed* including state employees and a New York State Trooper assigned to the unit to protect the governor."[10]

- "Andrew M. Cuomo's future as the governor of New York is in doubt after the state attorney general released *a report on Tuesday that found that he had sexually harassed 11 women*, including nine current and former employees, in violation of state and federal law."[11]

- "[I]n a damaging report from the New York State attorney general this week, which not only *found that Mr. Cuomo sexually harassed 11 women*…"[12]

- "Statement from Attorney General's Office in Response to Attacks on *11 Women Harassed* by Governor Cuomo"[13]

- "The investigation *found that Cuomo sexually harassed 11 women,* nine of whom are current and former state

---

[9] Michael Sisak & Marina Villeneuve, *Cuomo Urged to Resign After Probe Finds He Harassed 11 Women*, AP NEWS (Aug. 3, 2021), https://apnews.com/article/andrew-cuomo-investigation-sexual-harassment-04b0e7ba80db368124a5e9c9bcf4dc0d ("The nearly five-month, non-criminal investigation, overseen by New York's attorney general and led by two outside lawyers, concluded that 11 women from within and outside state government were telling the truth when they said Cuomo had touched them inappropriately, commented on their appearance or made suggestive comments about their sex lives.") (emphasis added).

[10] Melissa Russo, *Cuomo Defiant After AG Probe Says 11 Women Were Sexually Harassed; Biden Calls for Resignation*, NBC NEW YORK (Aug. 3, 2021), https://www.nbcnewyork.com/news/local/attorney-general-expected-to-release-findings-of-probe-into-cuomo-harassment-allegations/3196087/

[11] Jonathan E. Bromwich, Dana Rubinstein & Brian M. Rosenthal, *5 Things to Know About the Cuomo Sexual Harassment Findings*, N.Y. TIMES (Aug. 4, 2021), https://www.nytimes.com/2021/08/04/nyregion/andrew-cuomo-future-takeaways.html (emphasis added).

[12] Luis Ferré-Sadurní and Jonah E. Bromwich, *How Cuomo and His Team Retaliated Against His Accusers*, N.Y. TIMES (Aug. 5, 2021), https://www.nytimes.com/2021/08/05/nyregion/cuomo-accusers-alphonso-david-roberta-kaplan.html (emphasis added).

[13] *Statement from Attorney General's Office in Response to Attacks on 11 Women Harassed by Governor Cuomo*, LETITIA JAMES NEW YORK STATE ATTORNEY GENERAL (Aug. 6, 2021), https://ag.ny.gov/press-release/2021/statement-attorney-generals-office-response-attacks-11-women-harassed-governor (emphasis added).

employees — and one of whom is a New York State trooper."[14]

- "A state attorney general report concluded that Andrew Cuomo fostered a toxic work environment and *sexually harassed 11 women*."[15]

- "[Cuomo] resigned in the wake of a *damning attorney general report that found Cuomo sexually harassed at least 11 women*."[16]

The Report never found that the Governor "sexually harassed 11 women" and the Report omits material evidence that would undermine a finding that the Governor sexually harassed even one of the eleven complainants included in the Report.  The issuance of the one-sided Report with its material omissions and misleading language caused the character assassination of the Governor publicly without reprieve.

On August 20, 2021, the Attorney General's Office made a public statement dismissing our very legitimate concerns and criticisms about the fairness and completeness of the Report, including material omissions and errors.  Specifically, in response to my public comments that we would provide the Attorney General with a submission requesting that the Office correct and supplement the Report, the Attorney General's Office stated:

> After multiple women made accusations that Governor Cuomo sexually harassed them, the governor, himself, requested that Attorney General James oversee an independent investigation.  That

---

[14] Dareh Gregorian, Teaganne Finn & Tom Winter, *Cuomo Sexually Harassed Multiple Women, Including Employees, New York Attorney General Finds*, NBC (Aug. 3, 2021), https://www.nbcnews.com/politics/politics-news/cuomo-sexually-harassed-multiple-women-including-employees-new-york-attorney-n1275806 (emphasis added).

[15] Luis Ferré-Sadurní, *A 2nd Cuomo Investigation is Expected to Confirm Harassment Claims*, N.Y. TIMES (Sept. 30, 2021), https://www.nytimes.com/2021/09/30/nyregion/andrew-cuomo-impeachment.html (emphasis added).

[16] Marina Villeneuve, *New York Health Chief, Defender of Cuomo Policies, Resigning*, AP NEWS (Sept. 23, 2021), https://apnews.com/article/andrew-cuomo-new-york-coronavirus-pandemic-health-nursing-homes-274e3d04248dd8400679563b3a789916 (emphasis added).

investigation was exhaustive, thorough, and without outside influence, period.

Given the multiple, ongoing criminal investigations into the governor's conduct, it would not be appropriate to respond further to these baseless attacks. The 168-page report and additional 486 pages of exhibits clearly corroborate the experiences of the complainants, yet the governor and his aides continue to undermine those who seek to expose this dangerous conduct.

We cannot allow survivors of sexual harassment to be further traumatized by these continued attacks, lies, and conspiracy theories.[17]

Despite the Attorney General's Office dismissing our legitimate concerns regarding the Report as "lies[] and conspiracy theories," we are providing this information to the Attorney General because, as the chief legal officer of the state and a member of the New York State bar, it is incumbent upon the Attorney General to appoint an independent reviewer to address the glaring omissions and errors in the Report.[18] Because of those omissions and errors, the Report is materially misleading and must be corrected and supplemented. Indeed, the Report—and the Attorney General's extraordinarily prejudicial press conference announcing the Report—directly

---

[17] *Statement from Attorney General's Office in Response to Rita Glavin's Comments*, LETITIA JAMES NEW YORK STATE ATTORNEY GENERAL (Aug. 20, 2021), https://ag.ny.gov/press-release/2021/statement-attorney-generals-office-response-rita-glavins-comments; *see also* Keshia Clukey, *Cuomo Lawyer to Ask N.Y. Attorney General to Correct Report*, BLOOMBERG (Aug. 20, 2021), https://www.bloomberg.com/news/articles/2021-08-20/cuomo-s-lawyer-to-ask-n-y-attorney-general-to-correct-report.

[18] Given the Attorney General's role as the chief legal officer of the state, the New York Rules of Professional Conduct are relevant in this regard. N.Y. COMP. CODES R. & REGS. tit. 22 § 1200.0 (2021). Rule 8.4(d) provides that "A lawyer or law firm shall not…engage in conduct that is prejudicial to the administration of justice." Rule 4.1 provides: "In the course of representing a client, a lawyer shall not knowingly make a false statement of fact or law to a third person." The prohibition of false statements under the Rules of Professional Conduct is "broad and includes misleading statements as well as affirmative false statements." *Matter of Giuliani*, 146 N.Y.S.3d 266, 269 (1st Dep't 2021) (citing *Matter of Antoine*, 74 A.D.3d 67, 72 (1st Dep't 2010); *Matter of Piepes*, 259 A.D.2d 135, 137 (2d Dep't 1999)); *see also* MODEL RULES OF PRO. CONDUCT, r. 4.1 cmt. [1] (AM. BAR ASS'N 2020) ("Misrepresentations can also occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements").

caused the Governor's resignation and disenfranchised the votes of 3.6 million New Yorkers who elected Governor Cuomo to a third term in 2018.

Within a few hours after the Attorney General's August 3, 2021, press conference—and certainly before anyone could have read and scrutinized the Report—the President, both U.S. Senators from New York, the Speaker of the U.S. House of Representatives, and numerous state legislators demanded the Governor's resignation.[19]  Further, the Report is the sole basis for the Joint Commission on Public Ethics' initiation of a potential substantial basis investigation of the Governor on whether a violation of N.Y. Exec. L. § 74(3) occurred based on the findings in the Report.  In addition, the New York State Assembly Judiciary Committee is considering and relying upon the Report as part of issuing its own investigatory report after suspending impeachment proceedings that had been accelerated because of the Report.[20]  Moreover, the flawed and misleading Report will almost certainly form the primary basis for civil lawsuits filed against New York State and the Governor, as multiple attorneys for the complainants have already promised.[21]

---

[19] *See, e.g.*, Michael Sisak & Marina Villeneuve, *Cuomo Urged to Resign After Probe Finds He Harassed 11 Women*, AP NEWS (Aug. 3, 2021), https://apnews.com/article/andrew-cuomo-investigation-sexual-harassment-04b0e7ba80db368124a5e9c9bcf4dc0d; Melissa Russo, *Cuomo Defiant After AG Probe Says 11 Women Were Sexually Harassed; Biden Calls for Resignation*, NBC NEW YORK (Aug. 3, 2021), https://www.nbcnewyork.com/news/local/attorney-general-expected-to-release-findings-of-probe-into-cuomo-harassment-allegations/3196087/.

[20] Given the Report's potential to mislead another entity, the Office has an obligation to act on this application because of the Attorney General's role as the State's chief legal officer. *Our Office*, LETITIA JAMES NEW YORK STATE ATTORNEY GENERAL, https://ag.ny.gov/our-office (last visited Oct. 20, 2021) ("[T]he Attorney General is both the 'People's Lawyer' and the State's chief legal officer. As the 'People's Lawyer,' the Attorney General *serves as the guardian of the legal rights* of the citizens of New York, its organizations and its natural resources.") (emphasis added); *see* N.Y. RULES OF PROF. CONDUCT (22 NYCRR 1200.0) r. 3.8 ("A prosecutor has the responsibility of a minister of justice and *not simply that of an advocate*.") (emphasis added).

[21] *See, e.g.*, Marlene Lenthang, *Cuomo accuser Lindsey Boylan to file lawsuit against embattled governor: Lawyer*, ABC NEWS (Aug. 5, 2021), https://abcnews.go.com/US/cuomo-accuser-lindsey-boylan-file-lawsuit-embattled-governor/story?id=79288632 ("'Our plan is to sue the governor and his and his coconspirators,' Boylan's attorney, Jill Basinger, told ABC News' 'Good Morning America'"); Debra Katz (@DebraKatzKMB), TWITTER (Sep. 1, 2021 11:03 a.m.), https://twitter.com/DebraKatzKMB/status/1433083139056979981 ("[T]he State of NY must make the victims of Cuomo's sexual harassment whole").

Given that prejudice, the Report must be corrected, amended and supplemented because of its glaring deficiencies, omissions, and errors.

In Section II, we address the Report's material omissions and errors, which caused the Report to be materially misleading to the public and require the chief legal officer of this state to appoint an independent reviewer to amend, correct and supplement the Report. In Section III, we address the biased and unfair manner in which Attorney General's two lead Investigators ("Investigators") conducted the investigation, which was not a fulsome and fair review aimed at uncovering all relevant facts regarding the allegations and presenting all the material and relevant evidence in an unbiased report.

## II.    THE REPORT CONTAINS MATERIAL OMISSIONS AND ERRORS THAT MUST BE ADDRESSED BECAUSE THE REPORT IS MATERIALLY MISLEADING AND UNRELIABLE

Set forth below are material omissions and errors we have identified to date in the Report, which render the Report materially misleading to the public and anyone that relies upon it (including any law enforcement body, court, or the New York State Assembly). Accordingly, we request that those omissions and errors be immediately addressed, and that the Report be corrected, amended and supplemented.

We note that Attorney General's Office has not responded to our August 6, 2021, and October 8, 2021 written requests for all the evidentiary materials underlying the Report, including all transcripts, notes, and memoranda memorializing the 179 interviews the Investigators purportedly conducted but have refused to release for scrutiny. This is disturbing given the Attorney General's public statement at her August 3, 2021, press conference:

> The investigators independently corroborated and substantiated these facts through interviews and evidence, including

contemporaneous notes and communications. *This evidence will be made available to the public along the with report.* [22]

The Attorney General has not lived up to her promise to make all the evidence available.  Thus, we reserve the right to make additional applications for corrections and amendments to the Report whenever we are finally given access to all the underlying evidence as the Attorney General promised on August 3, 2021.

We further note that we made a written request to the Assembly Judiciary Committee on August 5, 2021, for access to all of the evidence underlying the Report and they refused our request by letter dated August 8, 2021.  Not having access to the evidence completely hinders our ability to respond and deprives the Governor of any fair process.

1. ***The March 1, 2021, Referral Pursuant to N.Y. Exec. Law § 63(8) and the Attorney General Office's Involvement in the Investigation and Report in Violation of that Referral***

On March 1, 2021, after the Governor had numerous discussions with the Attorney General in which she lobbied for the Governor to refer the sexual harassment investigation solely to her office rather than a universally respected, independent former federal judge who had no aspirations to run for governor or any other political office, the Governor made a very specific referral to the Attorney General pursuant to N.Y. Exec. L. § 63(8).  The Governor's referral specified that the Attorney General must "select an independent law firm to conduct an inquiry into allegations of and circumstances surrounding sexual harassment claims made against the Governor."[23]  Because the Attorney General refused to disavow any intention to run for governor in 2022, and the

---

[22]  *NY Gov. Andrew Cuomo sexually Harassed Multiple Women, Report Finds: Letitia James Press Conference Transcript*, REV (Aug. 3, 2021), https://www.rev.com/blog/transcripts/ny-gov-andrew-cuomo-sexually-harassed-multiple-women-report-finds-letitia-james-press-conference-transcript (emphasis added).

[23]  Ex. B (Mar. 1, 2021 Referral letter).

Governor had already made clear his intention to run for a fourth term in 2022,[24] Governor Cuomo insisted that the investigation had to be entirely independent of the Attorney General and conducted by a law firm with no bias or predisposition.  The Attorney General was not to be personally involved in the investigation and report given her political conflict.  That did not occur, as the Attorney General's recent public comments made clear.

Specifically, on September 30, 2021, at the Ulster County Democratic Committee dinner, the Attorney General admitted that she was personally involved in the investigation and made her own credibility determinations of the witnesses.  With respect to the complainants, Ms. James reportedly stated:

> When they came into my office, and they told me about the fact that Albany was toxic . . . how they were harassed. . . *I believed them, because they were specific.  They gave me concrete examples.  And everyone in Albany, every politician that I knew said, "yeah, it was like that Tish,"* but it was *these young women who marched in, gave me the facts*, gave me the evidence, worked with the independent attorneys . . . . They're the heroes, not me, and not Mr. Cuomo. . . There are individuals, and one in particular, and his allies, who are trying to discredit and trying to undermine this investigation, and will argue that I politicized it.  *No. I put my head down. It was all about the facts, and all about the evidence.*[25]

The Report must be amended to reflect precisely: (1) what involvement the Attorney General and the senior staff of her Office played in the investigation and the Report, including

---

[24] *See e.g.*, Joseph Spector, *Cuomo 2022? Governor Hits at Running For a Fourth Term*, Democrat & Chronicle (Mar. 29, 2019), https://www.democratandchronicle.com/story/news/politics/albany/2019/03/29/cuomo-2022-governor-hints-running-fourth-term/3311851002/ ("Asked if that meant he will run for a fourth term, Cuomo initially laughed and then said, 'Well, it's state money raised for a re-election. So yes.'");
Michael Gormley, *'I Know This Job': Andrew Cuomo Will Run For 4th Term as New York Governor*, Governing (May 29, 2019), https://www.governing.com/archive/tns-cuomo-will-run-for-governor-2022.html ("I plan to run for a fourth term" and "I know this job, I work seven days a week at it, and I think we have accomplishments. And the older you get, the simpler it gets. I think I'm doing good things ...").

[25] Bernadette Hogan, *'Stay tuned': AG Letitia James Tells Dem Leaders on When She Will Decide Gov Run*, N.Y. Post (Oct. 1, 2021), https://nypost.com/2021/10/01/letitia-james-hints-at-run-for-new-york-governor/ (emphasis added).

conversations with the Investigators about the substance and structure of the Report; (2) the extent to which they expressed their opinions to the Investigators, including, but not limited to opining on investigative steps; and (3) the extent to which Investigators were under any pressure from them regarding the timing of the Report. [26]   At a minimum, Ms. James and her senior staff must be questioned about their precise involvement.  This is critically important because Ms. James has been planning for months to run for governor, while at the same time she was admittedly working with Investigators to make credibility determinations and issue a one-sided Report with her name on the cover page that she announced at a prejudicial press conference, that would oust her strongest political rival in the 2022 gubernatorial race.

The Report should also note that, contrary to Ms. James' explicit commitment to the Governor that she would not appoint a plaintiff's attorney as the "independent law firm" investigator in this matter because of the predisposition a plaintiff's attorney would bring in approaching claims of sexual harassment, Ms. James violated that commitment and appointed as the purportedly "independent law firm" Investigators: (1) a plaintiff's attorney who had represented many women in suing employers for sexual harassment, and who is a partner at a law firm with a practice focused on bringing lawsuits for harassment and discrimination; and (2) an attorney who had a long history of investigating the Governor and the Executive Chamber while a supervisor at the U.S. Attorney's Office for the Southern District of New York, including personally interviewing Governor Cuomo.  The Attorney General's Investigators were anything but independent, bringing to this investigation their own biases and predispositions about the

---

[26] The Report states that the "Special Assistants to the First Deputy Attorney General" themselves "made all substantive decisions regarding how to conduct the investigation, as well as all decisions regarding the analysis and conclusions reached in this Report, independently," even though they "periodically report[ed] to the Office of the NYAG, and we consulted on issues relating to the Office's practices and procedures."  Report at 15, 15 n.76.  Ms. James' recent comments completely contradict this statement.

subject matter of the investigation and the Governor and the Executive Chamber.  This was precisely what the March 1, 2021 referral was meant to guard against.

### 2. *Lindsey Boylan*
#### A. The Report's Findings

Through a series of public statements that began with tweets on December 5, 2020, and culminated in a February 24, 2021 *Medium* essay, Ms. Boylan was the first complainant to make public allegations of sexual harassment against the Governor.  Over the course of his 40 years in public life, including two FBI background checks, confirmations hearings and bruising political campaigns, the Governor had not been accused of sexual harassment until Ms. Boylan's claims in December 2020.  Ms. Boylan first made her statements approximately two weeks after she announced her political campaign for Manhattan Borough president.  Ms. Boylan claimed that she resigned from her state post due to sexual harassment and a hostile work environment, and she implied that she had been asked, and she refused, to sign a non-disclosure disagreement when she left state employment.  Her statements were inaccurate.

Without examining the very serious issues with Ms. Boylan's credibility and motives for making harassment allegations against the Governor, the Report credited Ms. Boylan's testimony and claims in their entirety and found that "[d]uring the period in which Lindsey Boylan served as Chief of Staff to the CEO of the Empire State Development Corporation ("ESD") and later as Deputy Secretary for Economic Development and Special Advisory to the Governor," the Governor "(1) commented on her appearance and attractiveness, including comparing her to a former girlfriend and describing her as attractive; (2) paid attention to her in a way that led her supervisor at ESD [Howard Zemsky] to say that the Governor had a 'crush' on her and to ask her whether she needed help in dealing with the Governor's conduct; (3) physically touched her on various parts of her body, including her waist, legs, and back; (4) made inappropriate comments,

including saying to her once on a plane, words to the effect of, 'let's play strip poker'; and (5) kissed her on the cheeks and, on one occasion, on the lips."[27]  Report at 4; *see also id.* at 65–77.

    As an initial matter, while people can disagree on the appropriateness of many of these allegations against the Governor,  even assuming the truth of her claims (and the Governor contests many of them), Ms. Boylan's allegations do not constitute sexual harassment or sexual misconduct, i.e., commenting on an employee's appearance, kisses on the cheek, nonsexual physical contact with a person's waist, leg or back, and another person's observation that he though the Governor had a "crush" on Ms. Boylan (the Governor did not).  *See e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in terms and conditions of employment"); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 177 (2d Cir. 2012) ("Casual contact that might be expected among friends—a hand on the shoulder, a brief hug . . . are unlikely to create a hostile environment in the absence of aggravating circumstances such as continued contact after an objection . . . [E]ven more intimate or more crude physical acts . . . may be considered insufficiently abusive to be described as severe when they occur in isolation . . .").  The Report must be amended to acknowledge this.  The two most serious allegations, that the Governor asked Ms. Boylan to play strip poker with him on a flight and that the Governor kissed her on the lips after a meeting in his Manhattan office during the workday with the door open and his assistant sitting right outside the office, did not happen and the Report omits evidence undermining those claims.

---

[27] The Report also finds that "the Governor and the Executive Chamber actively engaged in an effort to discredit her, including by disseminating to the press confidential internal documents that painted her in a negative light and circulating among a group of current and former Executive Chamber employees (although not ultimately publishing) a proposed op-ed or letter disparaging Ms. Boylan that the Governor personally participated in drafting."  Report at 4.  We address that finding *infra* at Section II, 2, H.

Beyond those factual findings, the Report wrongfully concluded that Executive Chamber employees engaged in unlawful retaliation against Ms. Boylan after the Executive Chamber released three memoranda documenting the actual circumstances of her departure from state employment to correct the record in response to Ms. Boylan's tweets that misrepresented why and how she left her state employment. The release of those three memoranda was proper under the law because the Executive Chamber had a right to defend itself against Ms. Boylan's public misrepresentations as part of her political campaign.

## B.  The Report's Glaring Omissions and Errors

The Report credited Ms. Boylan, finding that "most of the factual allegations [she] has made are not disputed and those that are have corroboration,"  Report at 76–77, despite that the Governor vehemently disputed Ms. Boylan's most serious claims, and the Investigators possessed material evidence that Ms. Boylan was not credible and made her harassment allegations to (1) advance a political campaign and (2) explain away the fact that her departure from state employment was entirely due to her own abusive and bullying behavior of employees at the Empire State Development Corporation ("ESD").  Indeed, the Report entirely omits the material fact that Elizabeth Fine, then-counsel to the ESD and current counsel to Governor Kathy Hochul, wanted Ms. Boylan terminated from ESD because of her toxic behavior and the ESD CEO, Howard Zemsky, authorized Ms. Boylan's termination even though she was his top deputy.

As discussed below, the Report omits key evidence that gravely undermines Ms. Boylan's allegations or would call into question her motives, and glosses over facts inconsistent with Ms. Boylan's narrative.  At times, the Investigators also failed to obtain critical evidence that would have undermined Ms. Boylan's allegations and credibility.  Further, the Report failed to meaningfully address relevant caselaw and a legal submission from outside counsel for the Executive Chamber demonstrating that the release of three memoranda relating to the

22

circumstances of Ms. Boylan's departure to refute her false narrative was perfectly proper, and the drafting of an unpublished letter was not unlawful retaliation. The omission of key evidence from the Report, failure to take material investigative steps relating to Ms. Boylan's allegations, and failure to address relevant caselaw on retaliation, further evidences the one-sided nature of the investigation and the Report.

C.   **The Report Omits Evidence Regarding the Circumstances of Ms. Boylan's Departure from the Executive Chamber, Which Goes Directly to Ms. Boylan's Credibility**

On December 5, 2020, more than two years after Ms. Boylan left state employment and while she was running for public office, Ms. Boylan issued a series of tweets about her departure from state employment that stated, among other things: "Most toxic team environment? Working for @NYGovCuomo;"[28] "I had to quit three times before it stuck. . . ."[29] ; "And I'm a privileged person. I could opt out and eventually did."[30]; and "Yes I did not sign whatever they told me to sign when I left. Nope!"[31]  Those tweets misrepresented the circumstances under which Ms. Boylan left her job.  On December 13, 2020, Ms. Boylan tweeted that the Governor "sexually harassed her for years," with the obvious implication from her tweets on December 5, 2020 that she "could opt out" from her job because of sexual harassment and a hostile work environment and refused to sign a non-disclosure agreement.  This was not true, and goes directly to Ms. Boylan's credibility, motive to lie and embellish, and the Report's unreliability.  Notably, the

---

[28] Lindsey Boylan (@lindseyboylan), TWITTER (Dec. 5, 2020, 1:00 p.m.), https://twitter.com/LindseyBoylan/status/1335282911331950596.

[29] Lindsey Boylan (@lindseyboylan), TWITTER (Dec. 5, 2020, 2:08 p.m.), https://twitter.com/LindseyBoylan/status/1335300029041553410.

[30] Lindsey Boylan (@lindseyboylan), TWITTER (Dec. 5, 2020, 2:09 p.m.), https://twitter.com/LindseyBoylan/status/1335300208830402561.

[31] Lindsey Boylan (@lindseyboylan), TWITTER (Dec. 5, 2020, 6:13 p.m.), https://twitter.com/LindseyBoylan/status/1335361707565314049.

Report makes no mention in the factual findings section relating to Ms. Boylan's tweets about being a privileged person who "could opt out and eventually did," and her obvious implication that she was asked to sign a non-disclosure agreement and did not. *See* Report at 65–77. Indeed, the Report never addresses what Ms. Boylan said to Investigators about those tweets in her testimony, or if the Investigators even inquired of her on those tweets.

The Report omits the details surrounding Ms. Boylan's departure from the Chamber. *See* Report at 73–76. Those details must be included because they go directly to Ms. Boylan's credibility and her willingness to lie to advance her own agenda. The Report vaguely and misleadingly states only that "a conflict [that] arose between Ms. Boylan and an assistant at ESD," which resulted in her resignation on September 26, 2018. Report at 74. The Report includes as Ex. 61 the memoranda concerning the ESD complaints about Ms. Boylan that led to her resignation, yet the Report deliberately redacted those memoranda to omit the necessary context that would reveal that the issue that caused Ms. Boylan to resign was *numerous* complaints within ESD and from *numerous* employees that Ms. Boylan was "abusive," a "bully" and did not follow agency procedures.[32]  *See* Report at Ex. 61. The Report must include unredacted versions of those memos and be amended to describe the facts surrounding Ms. Boylan's departure. The Report falsely minimized Ms. Boylan's serious professional issues at ESD.

Specifically, as the Governor (and others) testified and as is memorialized in internal memoranda but omitted from the Report, on or about September 20, 2018, senior management at ESD—including ESD counsel Elizabeth Fine—requested to terminate Ms. Boylan's employment because of *several* complaints received from *numerous* employees that Ms. Boylan was a "bully,"

---

[32] The release of a portion of Ms. Boylan's files by the Chamber to correct misstatements by Ms. Boylan does not constitute retaliation for the reasons outlined in a July 18, 2021 letter by counsel for the Chamber, attached hereto as Ex. C.

"yells," "treats them like children," and displayed a lack of professionalism that was felt "[o]n an agency-wide basis."  The memorandum noted: "On an agency-wide basis, L. Boylan is reported to be hostile and a bully."  The memorandum also reflected that an employee took time off to deal with health effects related to her interactions with Ms. Boylan, that an employee reported feeling like a "punching bag," and complaints that Ms. Boylan failed to follow office policies and procedures.  ESD's CEO, Howard Zemsky specifically authorized this request to terminate Ms. Boylan from ESD, and that is also reflected in an internal memo.

As a result of ESD's request to terminate Ms. Boylan, on September 26, 2018, Ms. Boylan met with Alphonso David, Counsel to the Governor, where he counseled her about those complaints.  While Mr. David did not request that Ms. Boylan tender her resignation or indicate that she was being fired or pushed out (and he told her as much), Ms. Boylan immediately resigned and left the meeting.  Several hours later, Ms. Boylan sent an email to Executive Chamber staff announcing her resignation effective immediately.  No one asked Ms. Boylan to sign any document as a condition of her departure.  The Report should be amended to include this fact, Ms. Boylan's December 5 tweet about be asked to sign something and refusing to do so, and whether the Investigators even asked Ms. Boylan about these details.

The Report also notably omits material facts that occurred after Ms. Boylan resigned on September 26, 2018.  First, *merely four days after Ms. Boylan resigned*, on September 30, 2018, Ms. Boylan reached out to Mr. David and asked for her job back.  Mr. David responded that it would be "complicated" for Ms. Boylan to return and that she would need to take "corrective action."  Report at 74.  Second, although the Report includes that Ms. Boylan subsequently attempted to directly contact the Governor in what the Governor understood was an effort to get her job back, *see id.*, the Report omits testimony regarding what exactly Ms. Boylan said to

25

Stephanie Benton in an effort to speak to the Governor, including, in sum and substance, that *Ms. Boylan loved the Governor*, wanted to talk to him, and had his best interests at heart.  The Governor never responded to Ms. Boylan's efforts to contact him after conferring with Mr. David.  Report at 74.  Third, Ms. Boylan did not get her job back despite her efforts to do so, and *the Governor has not spoken to Ms. Boylan since she worked at ESD*.  All of these specific details must be added to the Report and must be weighed in assessing Ms. Boylan's credibility, particularly whether Ms. Boylan's tweets in December 2020 were materially misleading to the public, i.e., "I had to quit three times before it stuck;" "I'm a privileged person and could opt out and eventually did" or "Yes I did not sign whatever they told me to sign when I left. Nope!"  The Report must be supplemented to include what Ms. Boylan told Investigators about the circumstances of her departure, her efforts to reach the Governor to get her job back and her intentions in doing so, and her claim that she was asked to sign a document when she was not.  To the extent the Investigators did not inquire of Ms. Boylan on these points, the Report should reflect that lack of inquiry because it goes to bias.

These details are also critically important in assessing whether the decision by Chamber employees to release three memos detailing Ms. Boylan's departure in response to her misleading tweets were "unlawful retaliation" as the Report found.

### D. The Report's Omission of Other Actions by Ms. Boylan, and The Timing of Those Actions, That Bear on Directly on Ms. Boylan's Credibility and Motivations

The Report omits mention of favorable tweets Ms. Boylan made about the Governor that are completely inconsistent with her allegations of harassment.  For example, on August 15, 2018—just one month after she claims (falsely) and with no corroboration that the Governor stepped towards her and inappropriately kissed her on the lips in a non-platonic way in his New

York City office after a meeting during the workday with the door open and his assistant Ms.

Benton sitting right outside the open door—Ms. Boylan tweeted:



33

Not only should this tweet have been included in the Report in assessing whether the "kiss on the

lips" happened, but Investigators should have questioned Ms. Boylan about this tweet in proximity

to the alleged offending kiss and included Ms. Boylan's testimony on the subject.  Despite this

contradictory tweet, the fact that there is no corroboration for this claim, and the improbability of

it occurring given the workday and Ms. Benton sitting right outside the open door of his office

while he met with Ms. Boylan, the Report still credited Ms. Boylan.  The Report also noticeably

[33] Lindsey Boylan (@lindseyboylan), TWITTER (Aug. 15, 2018, 3:05 p.m.), https://twitter.com/LindseyBoylan/status/1029806281752801280.

27

omits Ms. Benton's testimony about the alleged "kiss" that happened while she was sitting at her desk, which is in view of where Ms. Boylan claims this occurred.  The Report must be amended to state what Ms. Benton testified to regarding this allegation.

The Report should also have included the following tweet Ms. Boylan made about the Governor on September 14, 2018, in which she states, "So proud of my boss," at a time when she now claims she "truly fear[ed]" the Governor[34] and he had subjected her to sexual harassment for years.[35]



36

---

[34] Lindsey Boylan, *My story of Working With Governor Cuomo*, MEDIUM (Feb. 24, 2021), https://lindseyboylan4ny.medium.com/my-story-of-working-with-governor-cuomo-e664d4814b4e ("The Governor's behavior made me nervous, but I didn't truly fear him until December 2016.").

[35] Lindsey Boylan (@lindseyboylan), TWITTER (Dec. 13, 2020 9:16 a.m.), https://twitter.com/lindseyboylan/status/1338125549756182529?lang=en.

[36] Lindsey Boylan (@lindseyboylan), TWITTER (Sep. 14, 2018 8:40 p.m.), https://twitter.com/LindseyBoylan/status/1040762225965891584.

The Report also should have included additional favorable public statements Ms. Boylan made about the Governor after her negative departure from the Chamber and his refusal to contact her and intervene to get her job back.  As recently as March 2, 2020, Ms. Boylan tweeted about the Governor: "This is what we need in leadership.  Thankfully we have it. #coronavirus #Covid_19,"[37] and:



38

Again, the Report should have included these tweets and Ms. Boylan should have been asked about them, given the inflammatory allegations she first made against the Governor just nine

---

[37] Lindsey Boylan (@lindseyboylan), TWITTER (Mar. 20, 2020, 11:34 a.m.), https://twitter.com/LindseyBoylan/status/1241025305826992129.

[38] Lindsey Boylan (@lindseyboylan), TWITTER (Mar. 20, 2020, 11:56 a.m.), https://twitter.com/LindseyBoylan/status/1241030982582575106.

months later.  Moreover, an examination of the timing in which Ms. Boylan changed her attitude toward the Governor, is directly relevant to assessing her claims first made in December 2020.

Ms. Boylan only changed her tone towards the Governor in mid-March 2020, after she assumed (wrongly) that the Governor was personally attacking her when she was in the midst of a primary campaign against Congressman Jerry Nadler.  Specifically, on March 14, 2020, just one week after the Governor declared a state of emergency due to the COVID-19 pandemic, the Governor issued an Executive Order shortening the petition period for all primary election candidates as part of a battery of measures aimed at reducing the spread of the virus. [39]  Although the Executive Order applied to all primary candidates statewide and was intended to reduce transmission of a deadly virus in the earliest days of a global pandemic, Ms. Boylan appeared to take this order as a personal slight.  In response, she sent threatening text messages to the Governor's senior aides that stated, among other things:

---

[39] *Amid COVID-19 Pandemic, Governor Cuomo Signs Executive Order Temporarily Modifying Election Procedures to Reduce Spread of Coronavirus*, NEW YORK GOVERNOR (Mar. 14, 2020), https://www.governor.ny.gov/news/amid-covid-19-pandemic-governor-cuomo-signs-executive-order-temporarily-modifying-election.





40                                              41

While the Report notes this fact in passing, Report at 75, there is no reference to whether the Investigators asked Ms. Boylan about her threatening messages in March 2020, about why she did not reference any sexual harassment at the time she began making threats to Chamber staffers, and about whether her accusations of sexual harassment in December 2020 were retaliation for the actions she believed were taken to disadvantage her campaign. The Report must be supplemented to include whether Ms. Boylan was asked those questions, as it goes to the integrity, fulsomeness and fairness of the investigation and Report.

In addition, the Report ascribes no weight to the motives and timing of Ms. Boylan's allegations in assessing her credibility, made nearly two years after repeatedly praising the

---

[40] *See* Ex. D, Chamber_AG_35740.

[41] *See* Ex. E, Chamber_AG_35753.

Governor following her departure from the Executive Chamber, and just two weeks after announcing her bid for Manhattan Borough President following her unsuccessful bid to unseat Representative Nadler on November 23, 2020.  Indeed, the Report disperses in various sections, footnotes, and exhibits that Ms. Boylan urged Charlotte Bennett to publicly report her own allegations to help Ms. Boylan's campaign.  Buried in the Report at Ex. 55 is a digital message exchange between Lindsey Boylan and Charlotte Bennett on December 8, just three days after her December 5, 2020 initial tweet alleging harassment by the Governor and six days prior to her December 13, 2020 tweet detailing those allegations.  Ms. Boylan states, in response to Ms. Bennett's message to "please let me know if I can help with your campaign in any way—or with anything at all" that:

> I know both Ronan Farrow and Rebecca Traister are writing about.
> *It would really help if you were comfortable talking to one.  Would*
> *certainly help me.*  On your own terms.

Report at Ex. 55 (emphasis added).  The Report later notes, with no cite to Ex. 55, that "Ms. Bennett felt at times that Ms. Boylan was pushing her to go public with her allegations even though Ms. Bennett was not necessarily comfortable doing so at the time."  Report at 76.

The Report further finds that Ms. Boylan "reached out to some women who were former colleagues from the Executive Chamber . . . to seek their support in corroborating her story," some of whom "perceived" Ms. Boylan's communications as "threatening," "after they failed to respond in the way Ms. Boylan wanted them to."  *Id.*  Notably, the Report did not include precisely how many women Ms. Boylan reached out to, and what caused them to understand that Ms. Boylan's communications were "threatening" after they did not tell Ms. Boylan what she wanted to hear. All of this goes to Ms. Boylan's motive to lie and her credibility, as well as her willingness to try and influence testimony of potential witnesses.  The Report must be amended to include this detail.

### E.   Failure to Investigate Communications Between Ms. Boylan's Campaign and the Attorney General's Office in December 2020, Why Ms. Boylan's Communications Consultant Resigned, and Ms. Boylan's Campaign Motivations in Promoting and Embellishing Her Allegations

At least two witnesses testified to Investigators that shortly after Ms. Boylan began tweeting in December 2020 about the Governor and harassment, the Attorney General's chief-of-staff, Ibrahim Khan, had a series of specific conversations with Ms. Boylan's campaign consultant, Trip Yang, about Ms. Boylan's allegations.  Mr. Yang had been a political consultant to the Attorney General in her 2018 campaign and worked with Mr. Khan.  We understand that Mr. Yang discussed with Mr. Khan what Ms. Boylan told him about her tweets regarding the Governor, her allegations, and a potential legal strategy.  The Investigators should have interviewed both Mr. Khan and Mr. Yang about their communications regarding Ms. Boylan, what Ms. Boylan told Mr. Yang, and whether Ms. Boylan expressed an intent to use her allegations as part of a successful campaign strategy.  Yet, pursuing this avenue of investigation was impossible because Mr. Khan was the Attorney General's chief-of-staff and Mr. Yang, the Attorney General's former political consultant.  The Investigators, working for the Attorney General, were conflicted.

Further, Ms. Boylan's communications consultant, Lupe Todd-Medina, quit Ms. Boylan's campaign several days after Ms. Boylan's December 2020 tweets about the Governor.[42] A source has claimed that Ms. Boylan's allegations were the "straw that broke the camel's back" and "[t]he Cuomo incident was the final straw," causing Ms. Todd-Medina to resign.[43]  Ms. Todd-Medina also should have been interviewed regarding what Ms. Boylan told her about her allegations and tweets, given that Ms. Boylan's credibility and motivations are directly at issue here.  The fact that

---

[42] Michael Gartland, *Ex-gov aide Lindsey Boylan Loses Press Staffer Over Cuomo Sex Harass Allegations: Source*, N.Y. DAILY NEWS (Dec. 19, 2020), https://www.nydailynews.com/news/politics/new-york-elections-government/ny-nyc-boylan-cuomo-20201219-jpxunggpvbe75anuq22utzb5am-story.html.

[43] *Id.*

Investigators did not speak with Ms. Todd-Medina is also telling of how the Investigators treated the Governor differently than the complainants and that the Investigators did not want to uncover evidence to undermine a predetermined narrative.

In addition, the Investigators should have subpoenaed Ms. Boylan and Ms. Boylan's campaign—in the way the Governor and current and former staffers received broad document subpoenas from the Investigators—for all communications relating to Ms. Boylan's allegations against the Governor, including Ms. Boylan's efforts to reach out to former staffers. It appears that the Investigators did not issue any such subpoenas, and this would have been a basic investigative step, particularly given Ms. Boylan's efforts to recruit other women to make allegations and to use her own allegations as a campaign platform. This goes directly to Ms. Boylan's motive to embellish and lie in order to advance her political ambitions.

Similarly, the Investigators should have subpoenaed Ms. Boylan for all drafts and records pertaining to her February 24, 2021 *Medium* essay, in which Ms. Boylan made a series of more detailed allegations of harassment against the Governor and claimed that he had a romantic interest in her (he did not). In that same essay she doubled-down on the false narrative about her departure, asserting that she resigned in September 2018 after she "started speaking up for" herself and the environment around her "grew hostile."[44] It is clear that the Investigators did not compel the productions of records relating to the *Medium* essay from Ms. Boylan, even though the Investigators subpoenaed the Executive Chamber for all records relating to the harassment allegations, including records relating to any media response. The fact that the Investigators did not seek out all relevant information from Ms. Boylan and, as discussed in further detail *infra*, all

---

[44] Lindsey Boylan, *My Story of Working with Governor Cuomo*, MEDIUM (Feb. 24, 2021), https://lindseyboylan4ny.medium.com/my-story-of-working-with-governor-cuomo-e664d4814b4e.

the other complainants, demonstrates the investigation was never going to be independent, fulsome or fair.  The Report must include the facts of what investigative steps were *not* taken, such that the public can meaningfully assess the thoroughness and fairness of the investigation and reliability of the Report.

The Report also does not address Ms. Boylan's claim in her *Medium* essay that she began to "truly fear [the Governor]" in December 2016,[45] against the evidence from witnesses that Ms. Boylan complained about her "inability to access or speak directly with the Governor." Report at 73.  We understand that the Investigators were told that Ms. Boylan (despite her claim of "truly" fearing the Governor as early as 2016) regularly sought the Governor out.

Finally, with respect to Ms. Boylan's campaign, the Report omits that after Ms. Boylan first made her allegations against the Governor in December 2020, they became a central theme in her campaign.  It is noteworthy that Ms. Boylan's campaign finance records reflect that Cade Leebron—a writer who has written about rape, rape culture, assault, and trauma, and whose pieces have also been posted on *Medium*—was paid $10,500 by Ms. Boylan's political campaign in the weeks just prior to the publication of Ms. Boylan's *Medium* essay, and nearly $32,000 by the campaign in total.[46]  This timing raises questions about who authored Ms. Boylan's essay and its purpose, and what questions, if any, the Investigators asked Ms. Boylan about her essay.  The Report is silent on what Ms. Boylan had to say about her allegations and the timing of them with respect to her campaign and her motives.

---

[45] *Id.*

[46] Specifically, Ms. Leebron was paid $10,500 between January 25, 2021 and February 23, 2021, and an additional $21,466.67 between March 5, 2021 and June 2, 2021.  *See Search Candidate: Expenditures*, N.Y.C. CAMPAIGN FIN. BD., https://www.nyccfb.info/FTMSearch/Candidates/ Expenditures?ec=2021&cand=2465&ir=Leebron%2C%20Cade&trans=F (last accessed Oct. 14, 2021).

As her political campaign progressed, Ms. Boylan's rhetoric grew more severe towards the Governor, and she employed her allegations against the Governor as a campaign theme and to attract voter support.  None of this information is touched upon in the Report and must be included in weighing Ms. Boylan's credibility.  For example:

- March 6, 2021 tweet:  "Resign you disgusting monster, @NYGovCuomo";[47]

- March 18, 2021 published interview with Ronan Farrow for *The New Yorker* where Ms. Boylan discussed her claims of sexual harassment, "embracing her new role as one of Cuomo's most public and persistent critics," and her political campaign;[48]

- March 24, 2021 tweet:  "Abuser of power. Rape culture king. @NYGovCuomo";[49]

- March 26, 2021 speech posted to campaign Facebook page:  "I'm Lindsey Boylan.  I'm a candidate for Manhattan Borough President, but you likely know my name from the headlines.  Please know, like all survivors, I am so much lower than the person that you read about in the news.  It was an incredibly difficult decision to tell my story of harassment that I experienced while working for the governor of New York."[50]

---

[47] Lindsey Boylan (@lindseyboylan), TWITTER (Mar. 6, 2021, 9:34 p.m.), https://twitter.com/LindseyBoylan/status/1368389610276028421.

[48] Ronan Farrow, *Cuomo's First Accuser Raises New Claims of Harassment and Retaliation*, The New Yorker (Mar. 18, 2021), https://www.newyorker.com/news/news-desk/cuomos-first-accuser-raises-new-claims-of-harassment-and-retaliation.

[49] Lindsey Boylan (@lindseyboylan), TWITTER (Mar. 24, 2021, 12:32 p.m.), https://twitter.com/LindseyBoylan/status/1374761026596569088.

[50] Lindsey Boylan for Manhattan, FACEBOOK (Mar. 26, 2021), https://www.facebook.com/347949635853274/videos/469259011162904.

- May 10, 2021 speech:  "I'm Lindsey Boylan.  I'm running for Manhattan Borough President. . . [Y]ou may have heard of me recently.  I'm fighting my own battle against abuse of the system, abuse of power.  The Governor of New York is an abuser. . . ."[51]

The Report never grapples with the overwhelming evidence of Ms. Boylan's true motivations to make false and embellished claims against the Governor.  That omission is glaring, particularly given that the Attorney General herself told Melissa DeRosa on March 1, 2021 that others had informed Ms. James that Ms. Boylan was not credible.  The Attorney General was well aware of Ms. Boylan's credibility issues, yet Investigators ignored them in the Report.

### F. Omission of Ms. Boylan's Other False and Inflammatory Public Statements

After Ms. Boylan lost the Democratic primary in June 2021 to be Manhattan Borough president, Ms. Boylan continued a campaign of absurd public statements about the Governor that should have been addressed in the Report and weighed.  For example, during the Governor's testimony to Investigators on Saturday, July 17, 2021 at his New York City office, Ms. Boylan tweeted at 4:12p.m.: "Riddle me this, why was Judge Janet DeFiore meeting with @NYGovCuomo today, of all days, for 6 hours in NYC."[52]  This tweet was demonstrably false: the Governor did not meet with Chief Judge DiFiore at all that day.  Indeed, the Governor was giving testimony that entire day to the Attorney General's Investigators.  This false statement by Ms. Boylan should have been weighed by Investigators, and they should have asked Ms. Boylan about it because it evidenced that she had no issue publicly conveying false information.

---

[51] Ernest Chirico, FACEBOOK (May 10, 2021), https://www.facebook.com/1326935285/videos/10220051921631466.

[52] Lindsey Boylan (@lindseyboylan), TWITTER (July 17, 2021, 4:12 p.m.), https://twitter.com/LindseyBoylan/status/1416490902764277768.

Other tweets by Ms. Boylan in the weeks leading up to the Report bordered on the absurd and demonstrated her motives and agenda.  For example:  "Honestly, I don't care who stands next to the governor if they are about ending gun violence while not further criminalizing young black and brown men and disinvesting in their communities.  Just don't stand too close to him for too long if you're a younger woman."[53]

And:  "I just can't sleep.  I keep thinking about the ongoing, pervasive abuse of power that @NYGovCuomo exhibits daily.  Forget how it has affected me.  I can't stop thinking how it affects all New Yorkers, particularly our most vulnerable, on a daily basis.  It's rotten to the core."[54]  And: "When a monster tries to grab every branch on his way back down to earth. So embarrassing. [citing a N.Y. Post article regarding the nursing home probe]."[55]   All of these statements are directly relevant to Ms. Boylan's credibility, but the Report does not touch upon them.

Ms. Boylan's most recent false public statement after the Report was issued further demonstrates her lack of credibility and willingness to make false allegations.  On September 5, 2021, Ms. Boylan tweeted:

---

[53]      Lindsey Boylan (@lindseyboylan), Twitter (July 14, 2021, 6:49 p.m.), https://twitter.com/LindseyBoylan/status/1415443253453901837.

[54] Lindsey Boylan (@lindseyboylan), Twitter (July 17, 2021, 10:56 p.m.), https://twitter.com/LindseyBoylan/status/1416592755963404292.

[55] Lindsey Boylan (@lindseyboylan), Twitter (July 27, 2021, 4:26 p.m.), https://twitter.com/LindseyBoylan/status/1420118397912768516.



**Lindsey Boylan** ✔
@LindseyBoylan

I'll never forget when we were on the plane & Cuomo slapped Alphonso on the backside as he reached to hang his blazer in the back of the plane.

That's what he did to me, nonstop.

It's sad that people in the same fight are on opposing sides.

56

*The Governor never slapped Ms. Boylan on her backside, and Ms. Boylan had never before this tweet suggested he did so.* The fact that she made this recent false allegation—one we understand she never mentioned in her interviews with the Attorney General's investigators or her February 24, 2021 *Medium* essay alleging harassment by the Governor—must be addressed. We have brought this new false allegation by Ms. Boylan to the attention of the Assembly Judiciary Committee and requested that they address this in assessing Ms. Boylan's credibility.

### G. Omission of Material Evidence Regarding Ms. Boylan's "Jarring" Threat to Howard Zemsky To Induce Him to Change His Statement

---

56 Lindsey Boylan (@lindseyboylan), TWITTER (Sep. 5, 2021, 8:09 p.m.), https://twitter.com/lindseyboylan/status/1434670065312481283.

The Report credits Ms. Boylan's assertion that the Governor suggested they play strip poker on a plane with staff in October 2017 on the ground that "[Howard] Zemsky testified under oath that he recalls the Governor making such a comment, independently corroborating Ms. Boylan," Report at 76. Nonetheless, just *five pages earlier,* the Report acknowledges that (1) Mr. Zemsky initially "didn't have the slightest inkling of that," i.e., any such "strip poker" comment by the Governor, and (2) that after Ms. Boylan first made this allegation in her February 24, 2021 *Medium* essay, Mr. Zemsky signed onto a public statement with three other Chamber staffers who were on the flight that "this conversation did not happen." Report at 70 n.605.

Specifically, after Mr. Zemsky and three staffers publicly denied in February 2021 that the Governor made any such "strip poker" comment, Ms. Boylan sent Mr. Zemsky "a disparaging message" which he found "'jarring' and 'threatening.'" Report at 71. The Report did not include any details about that threat or message, which is a glaring omission.

Following Ms. Boylan's threatening message, Mr. Zemsky flip-flopped and testified to Investigators that he did recall the Governor making a strip poker comment on a flight, *despite the fact that Ms. Boylan testified that she did not recall Mr. Zemsky being on the flight in which the Governor purportedly made this comment.* Report at 71 n.606. In explaining his flip-flop, Mr. Zemsky said he reread Ms. Boylan's description of events in her essay and was somehow "struck [with] a note of familiarity." *Id.* at 71–72. Mr. Zemsky then testified that "he in fact did recall the Governor making a comment about 'strip poker' on a plane." *Id.*

The Report ascribes no weight to Ms. Boylan's "threatening" message and Mr. Zemsky's accompanying change in story, even though Ms. Boylan did not remember Mr. Zemsky being on the flight when this offending comment occurred. The Report fails to indicate what the "disparaging message" said, provide it as documentary evidence, weigh its effect on Mr. Zemsky's

or Ms. Boylan's credibility or motives, or even indicate whether the Investigators requested the underlying message from either Ms. Boylan or Mr. Zemsky.[57]  Despite Ms. Boylan's bid to have Mr. Zemsky change his story, the Report credits Mr. Zemsky's altered testimony.  This is not corroboration.  The Report should be corrected, supplemented, and amended to provide the "disparaging message," and properly assess Ms. Boylan and Mr. Zemsky's credibility.

Given the threatening message and Mr. Zemsky's testimony flip-flop, the relationship between Ms. Boylan and Mr. Zemsky requires scrutiny and the Report says little to nothing about it.  The Report must be amended to include what would seem to be critical background and context to their relationship.  Ms. Boylan worked in the Governor's administration from March 2015 through September 2018, serving as Chief of Staff and Executive Vice President at ESD, and then as Deputy Secretary for Economic Development and Special Advisor to the Governor beginning in April 2018.  Throughout her tenure with the state, Ms. Boylan reported to Mr. Zemsky and maintained a close working relationship with him.

Specifically, sometime in late 2017 and early 2018, complaints surfaced within ESD concerning Ms. Boylan and Mr. Zemsky.  These complaints were brought to the attention to Ms. Fine, then-counsel to ESD, and those concerns eventually were relayed to Alphonso David, then-counsel to the Governor.  The Report references in passing a meeting between Ms. Boylan and Mr. David that took place in January 2018 and "was related to issues within ESD and unrelated to the Governor" in which Ms. Boylan told Mr. David "that she had not been subject to sex discrimination, harassment or retaliation."  Report at 73.  The January 2018 meeting that Mr. David had with Ms. Boylan concerned those complaints.  The subject matter of this meeting is critical to

---

[57] The Report also notes—in a footnote—that Ms. Boylan did not even recall whether "Mr. Zemsky was on the plane when the Governor made a comment about strip poker."  Report at 71 n.606.

providing context to Ms. Boylan's relationship with Mr. Zemsky and should have been included in the Report—but is noticeably omitted.  The fact of those complaints and what was said at the January 2018 meeting is particularly important because the Report omitted the "jarring" and "threatening" message that Ms. Boylan sent to Mr. Zemsky in February 2021 to cause him to change his recollection in a way that might support Ms. Boylan's claims against the Governor.

Because the Report specifically mentions this January 2018 meeting between Ms. Boylan and Mr. David without providing the details, and the Report also omits the details of Ms. Boylan's "threatening" and "jarring" message to Mr. Zemsky in 2021 that caused him to flip-flop in his recollection in a manner to support Ms. Boylan, we request that the Report be amended to include precisely what Mr. Zemsky and Ms. Boylan told the Investigators about their relationship.  We presume that the Investigators asked all pertinent questions about their relationship, and Ms. Boylan and Mr. Zemsky's answers must be included in the Report along with the threatening message to Mr. Zemsky.

> **H. The Release of Three Memos Documenting the Circumstances of Ms. Boylan's Departure, and the Circulating of a Draft Letter Amongst a Small Group of Individuals Was Not Unlawful Retaliation and The Report Ignored Applicable Caselaw and Counsel's Lengthy Submission on this Issue**

The Report concluded that "the Executive Chamber engaged in prohibited retaliation against Ms. Boylan" by releasing three memos detailing the circumstances of Ms. Boylan's departure from state employment following her December 2020 public statements, and by circulating amongst a small group of individuals a draft op-ed regarding Ms. Boylan that was ultimately never released.  Report at 155.  Contrary to the Report's conclusion, the Executive Chamber's actions did not constitute unlawful retaliation, as argued in a July 18, 2021 letter prepared by outside counsel to the Chamber, which the Report disregards in two footnotes without

addressing all of the caselaw and arguments made in that letter.  Report at 156 n.1323, 157 n.1329.

The July 18, 2021 letter is attached at Ex. C.[58]  The Report must be amended to address *all* the

relevant caselaw on unlawful retaliation and points made in the Chamber's July 18, 2021

submission, as the Report's legal conclusions are seriously flawed.

### i.     Applicable Law

Title VII provides that "it shall be an unlawful employment practice for an employer to

discriminate against any of his employees . . . because [an employee] has opposed any practice

made an unlawful employment practice by this subchapter, or because [an employee] has made a

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing

under this subchapter."  42 U.S.C. § 2000e-3(a).  "To establish a *prima facie* case of retaliation, a

plaintiff must establish: '(1) that she participated in an activity protected by Title VII, (2) that her

participation was known to her employer, (3) that her employer thereafter subjected her to a

materially adverse employment action, and (4) that there was a causal connection between the

protected activity and the adverse employment action.'"  *Smith v. N.Y. & Presbyterian Hosp.*, 440

F. Supp. 3d 303, 340 (S.D.N.Y. 2020) (quoting *Kaytor* v. *Elec. Boat Corp.*, 609 F.3d 537, 552 (2d

Cir. 2010)); *see also Kelly v. Howard I. Shapiro & Associates Consulting Engineers, P.C.*, 716

---

[58] *See* Ex. C(July 18, 2021 letter). First, counsel noted that Ms. Boylan's employment with the Chamber had terminated two years before she made her allegations such that the Chamber's actions "had no impact on her current employment situation." *Id.* at 9. Second, there is no specific "current or future employment as to which Ms. Boylan can claim injury." *Id.* Third, given Ms. Boylan's campaign for Manhattan Borough President, "neither the release of the documents describing her conduct and her resignation, nor the draft Unpublished Letter, had had any tangible impact on her prospective employment opportunities." *Id.* Fourth, "nor could the release of the documents or the drafting of the Unpublished Letter have dissuaded a reasonable worker from engaging in protected activity— particularly given the context surrounding the release." *Id.* Next, that "the Chamber released the documents to correct the misleading narrative that Ms. Boylan had framed over the course of weeks," was permissible under Title VII and the NYSHRL. *Id.* at 11. Moreover, circulating the draft, unpublished letter "was a legitimate exercise to present strategic options for dealing with allegations they did not believe from a person they did not trust," and "it would be a dangerous precedent to hold an employer legally liable for merely contemplating proposed response strategies that were never actually implemented." *Id.* at 12. Thus, the Chamber's actions were "reasonable" and "measured and narrow" and within the legal bounds of applicable antiretaliation law. *Id.* at 12–13.

F.3d 10, 14 (2d Cir. 2013) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012).

A retaliation claim under the NYSHRL is construed under the same standard as Title VII. *Doran v. Ives*, 2021 WL 1614368, at *6 (S.D.N.Y. Apr. 26, 2021).[59]

"The antiretaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). For example, a former employee who allegedly was labeled as a "liar" by a former employer and was "screamed" at in front of colleagues did not state a claim for retaliation because there was no allegation that he suffered any professional, financial, reputational, or other harm. *Jaeger v. N. Babylon Union Free Sch. Dist.*, 191 F. Supp. 3d 215, 235 (E.D.N.Y. 2016). A plaintiff must allege that adverse action "could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination." *See Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 44 (2d Cir. 2019). If a *prima facie* case is presented, the employer "may rebut [it] by articulating a legitimate, non-discriminatory reason for the adverse employment action," and "the burden shifts back to the plaintiff to prove that the desire to retaliate was the but-for cause of the challenged employment action." *Smith*, 440 F. Supp. 3d at 340 (citing cases).[60] "[M]ere criticism of an employee's work performance does not rise to the level of an adverse employment action." *Feliciano v. City of New York*, 2015 WL 4393163, at *9 (S.D.N.Y. July 15, 2015) (a

---

[59] "In August 2019, the NYSHRL was amended to direct courts to construe the NYSHRL, like the NYCHRL, 'liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws including those laws with provisions worded comparably to the provisions of [the NYSHRL] have been so construed. *Doran v. Ives*, 2021 WL 1614368, at *6 (S.D.N.Y. Apr. 26, 2021) (citing *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 61 (S.D.N.Y. Dec. 18, 2020) (N.Y. Exec. L. § 300)).

[60] The NYCHRL applies the same standard, with limited exceptions which are immaterial for any allegation that Ms. Boylan was retaliated against. *See Maynard v. Montefiore Med. Cent.*, 2021 WL 396700, at *6 (S.D.N.Y. Feb. 4, 2021). Moreover, the Chamber, as an instrumentality of the State, is not subject to the NYCHRL under principles of sovereign immunity. *See* Ex. C at 8 n.3 (citing *Jattan v. Queens College of City Univ. of New York*, 64 A.D. 3d 540, 541–42 (2d Dep't 2009).

supervisor "excessively scrutinizing" employee "did not rise to the level of an adverse employment action" under Title VII, the NYSHRL or the NYCHRL).

As argued by outside counsel for the Executive Chamber, neither the release of the documents nor the drafting of the letter that was never published constituted retaliation or resulted in any actual "injury or harm" to Ms. Boylan with respect to her present or prospective employment.

First, the Chamber's actions had no impact on Ms. Boylan's current employment given that she had not worked for the Chamber for more than two years at the time of her allegations. Similarly, there is no identifiable current or future employment as to which Ms. Boylan can claim injury or tangible impact on her prospective employment opportunities, given that her public post-Chamber employment experience was ongoing as of the release of the records and she had been focused on her campaign for Manhattan Borough President. *Feliciano v. City of New York*, 2015 WL 4393163, at *9 (S.D.N.Y. July 15, 2015) (a supervisor "excessively scrutinizing" employee "did not rise to the level of an adverse employment action" under Title VII, the NYSHRL or the NYCHRL).

Second, neither the release of the documents nor the drafting of the letter could have dissuaded a reasonable worker from engaging in protected activity. Indeed, after the release of the files, others came forward with harassment allegations. *See Marchuk v. Faruqi & Faruqi, LLP*, 100 F. Supp. 3d 302, 311 (S.D.N.Y. 2015) (held that plaintiff had not presented credible evidence that the counterclaims and press release by the defendant had "in fact deterred [p]laintiff from maintaining her lawsuit or deterred anybody else from filing a lawsuit.") (citation omitted).

Third, the draft letter was never published, and was merely circulated among a close circle of trusted advisors. Boylan cannot credibly claim that the mere existence of a draft letter and

snippets of its contents addressing allegations she raised caused her any injury.  As the Supreme Court has made clear, "the significance of any given act of retaliation will often depend upon the particular circumstances."  *White*, 548 U.S. at 68.  Similarly, the Governor and the Executive Chamber had every right to defend against false accusations that a former employee made against them, just as Ms. Boylan had every right to make them. *Melman v. Montefiore Med. Cent.*, 946 N.Y.S.2d 27, 42 (1st Dep't 2012) ("an employer is entitled to defend itself against an employee's charges, even if the employee finds it searingly painful to hear himself criticized."); *see also Hughes v. Twenty-First Century Fox, Inc.,* 304 F. Supp. 3d 429, 449 (S.D.N.Y. 2018) (holding that it was a reasonable defensive measure for an employer expecting an allegation of sexual harassment to preemptively release a statement to the National Enquirer "to blunt the inflammatory force of [plaintiff's] allegations [in] a colorable defense to protect their business.")  Indeed, the Chamber released information for a legitimate, non-discriminatory reason—to correct the false narrative of a public attack against one public official by another public figure seeking her own election—and not to retaliate against her.  *See Summa v. Hofstra Univ.*, 708 F.3d 115, 129 (2d Cir. 2013) (A "plaintiff must show that retaliation was the determinative factor.").

Finally, Ms. Boylan did not have a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law.,"  Report at 137 (citing *Kelly*, 716 F.3d at 14), particularly given all the evidence we point to *supra* that the Report omitted or did not address.

### ii. The Report's Conclusions Improperly Dismissed the Executive Chamber's Outside Counsel Submission.

The Report summarily dismisses the Chamber's July 18, 2021 submission in two footnotes. Report at 156 n.1323, 157 n.1329.

First, the Report argues that "the Supreme Court has explicitly held that anti-retaliation protections extend 'beyond workplace-related or employment-related retaliatory acts and harm.'"

Report at 156 n.1323 (citing *White*, 548 U.S. at 67). It also states that the Chamber "has relied on cases that pre-date *White*, or lower courts cases that rely on outdated law." *Id.* (*citing Marchuk v. Faruqi & Faruqi LLP*, 100 F. Supp. 3d 302, 311 (S.D.N.Y. 2015) that purportedly relies on *Galabaya v. New York City Bd. of Educ.*, 202 F.3d 636 (2d Cir. 2000)). The Report mischaracterizes the Chamber's submission. To the contrary, the court in *Marchuk* cited *Galabaya*, but in the very next sentence, relied on the precedent from *White* expanding the scope of retaliatory conduct. 100 F. Supp. 3d at 311.

The Report goes on to characterize the Chamber's actions as retaliation that "falls short of its goal," Report at 157 n.1329. But the Report assumes that retaliation was the Chamber's "goal" and "intended result," when it clearly was not. The Chamber's goal was to correct false statements and mischaracterizations. Indeed, Manhattan District Attorney Cyrus Vance Jr. released information on circumstances surrounding a District Attorney candidate's departure from his office to correct the record during her run for office, stating, "[A]lthough our office does not typically comment on personal matters, we are compelled to defend our attorneys against the false accusations that [she] has made publicly."[61]

### 3. *Charlotte Bennett*
#### A. The Report's Findings

Charlotte Bennett, following conversations with Ms. Boylan after her December 2020 tweets, publicly made her allegations against the Governor in February 2021.[62] The Report finds that "[i]n a series of conversations in 2020," the Governor "made inappropriate comments," that "followed and coincided with discussions [Ms. Bennett] previously had with the Governor about

---

[61] *See* Deanna Paul, *Manhattan District Attorney Vance Says Candidate Is Distorting Her Record*, WALL STREET J. (Mar. 25, 2021), https://www.wsj.com/articles/vance-says-candidate-distorts-record-as-prosecutor-11616677201.

[62] *See, e.g.*, Jesse McKinley, *Cuomo Is Accused of Sexual Harassment by a 2nd Former Aide*, N.Y. TIMES (Feb. 27, 2021), https://www.nytimes.com/2021/02/27/nyregion/cuomo-charlotte-bennett-sexual-harassment.html.

her having been a survivor of sexual assault," including: "(1) telling Ms. Bennett, in talking about potential girlfriends for him, that he would be willing to date someone who was as young as 22 years old (he knew Ms. Bennett was 25 at the time); (2) asking her whether she had been with older men; (3) saying to her during the pandemic that he was 'lonely' and 'wanted to be touched'; (4) asking whether Ms. Bennett was monogamous; (5) telling Ms. Bennett, after she told him that she was considering getting a tattoo for her birthday, that if she decided to get a tattoo, she should get it on her butt, where it could not be seen; (6) asking whether she had any piercings other than her ears; and (7) saying that he wanted to ride his motorcycle into the mountains with a woman." Report at 3.

The Report should be supplemented, amended, and corrected to include the Governor's detailed testimony that provides context to his conversations with Ms. Bennett, as well as to include additional information concerning Ms. Bennett's history of making allegations of sexual misconduct and how that impacted Ms. Bennett's view of her interactions with the Governor and her retelling of those interactions.

### B.  The Report's Material Omissions and Errors.

The Report devotes 20 pages to claims made by Ms. Bennett about conversations and interactions she purported to have had with the Governor, and her characterizations of them, *see* Report at 44–65, but omits the Governor's detailed testimony that provided important context to his conversations with Ms. Bennett.

The Governor has never denied that he had personal conversations with Ms. Bennett on the topics Ms. Bennett has alleged.  *See* Report at 56 ("the Governor acknowledged that he had made statements similar to those described by Ms. Bennett, but disputed Ms. Bennett's

characterization of his intent."). What he has denied consistently is that he was "grooming" her,[63]
that he indicated or implied in any way that he was interested in dating her, or that he ever
propositioned her for sex. The Report acknowledges that Ms. Bennett volunteered to the Governor
"her history as a survivor of sexual assault," and specifically that "she had been sexually assaulted
in college, that she had a difficult experience reporting the assault, and that the experience
motivated her to work in politics." Report at 49–50. It also recognizes that during this
conversation the Governor informed her that "someone close to him had also been sexually
assaulted." *Id.* at 50. The Governor testified at length—all of which the Report omits—that his
discussions with Ms. Bennett were to help, not hurt, Ms. Bennett, because Ms. Bennett's story
closely resembled that of his close family member who also had been the victim of sexual assault.
Indeed, Ms. Bennett sent contemporaneous text messages that she is "safe don't worry totally safe
I'm just being paranoid." Report at 9 (citing to Ex. 7). Rather than explain the Governor's
perspective on the conversations in their Report, the Report ignores it.

Specifically, the Report omits the Governor's testimony that his family member had
experienced a situation that was "eerily identical to the situation [Ms. Bennett] was talking about,"
so "eerily identical" that his first thought when Ms. Bennett shared her own experience was, "is
there any way she knows about this other situation with my family member?"[64] Consistent with

---

[63] Ms. Bennett has stated that after her time in the Executive Chamber, she later understood the Governor's conduct
to be grooming. *See, e.g.*, Jesse McKinley, *Cuomo Is Accused of Sexual Harassment by a 2nd Former Aide*, N.Y.
TIMES (Feb. 27, 2021), https://www.nytimes.com/2021/02/27/nyregion/cuomo-charlotte-bennett-sexual-
harassment.html ("In retrospect, Ms. Bennett said, she viewed the May 15 meeting 'as the turning point in our
relationship.' 'Anything before it I now see differently,' she said. 'I now understand that as grooming.' *"); Charlotte
Bennett details alleged sexual harassment while working for Cuomo: "He is a textbook abuser"*, CBS NEWS (Mar.
5, 2021), https://www.cbsnews.com/news/cuomo-accuser-charlotte-bennett-sexual-harassment-claims-textbook-
abuser/ ("'Looking back on all of this, how would you describe Governor Cuomo?' O'Donnell asked. . . . Bennett
said she thinks Cuomo was grooming her").

[64] All references to the Governor's testimony if omitted from the Report refer to our notes of his testimony, given
that we have not been provided a copy of his transcript despite our many requests.

Ms. Bennett's description of their conversation as "emotional," when she described to the Governor what had happened to her, he testified and the Report omitted that he told her "in confidence" that "I understand what you're dealing with and it takes tremendous courage"; "I'm sorry for what you've gone through, and I respect you taking that energy and putting it in a positive place"; "the trick is to take the pain and turn it positive"; and "anything I can do to help, I will." Instead, the Report focuses on the Governor's disclosure of this close personal fact about his family member to Ms. Bennett and his use of the phrase "cone of silence," Report at 50. The Report entirely fails to explain that the Governor testified that he used this phrase to request that Ms. Bennett respect his family's privacy. The details that the Governor disclosed about his family to Ms. Bennett were "not public" and when he used the phrase "cone of silence," he was asking her "please don't share it because of the privacy of my family member." The Report should be amended to include the Governor's specific testimony for context and meaning.

The Report omitted that the Governor's subsequent conversations with Ms. Bennett reflected his understanding of what she had gone through, and his intention to do "anything [he could] do to help." As the Governor testified, but the Report failed to sufficiently address, the "filter" for him was "the possible consequences for a victim of assault and how it plays out." For example, the Report discusses a conversation in which the Governor "asked her if she had ever been with older men and whether she thought age mattered in relationships." *Id.* at 53. He testified that he asked that question about dating older men because he learned information that caused him to believe she might be in a damaging relationship. He wanted to "give her the opportunity"— because Ms. Bennett had already confided her experiences to him— "to talk about something that was going on here." When he perceived that she did not want to discuss the matter with him, he did not ask any further questions. The Report should be supplemented with this context. Along

those lines, the Report should acknowledge Ms. Bennett's contemporaneous interpretation of her interactions with the Governor as him acting "as a father figure" and not "anything sexual" were entirely consistent with the Governor's testimony and stated intentions.[65]

Similarly, the Report omits important details surrounding the conversation between Ms. Bennett and Governor Cuomo regarding Ms. Bennett's decision to get a tattoo, and why he offered a suggestion about where Ms. Bennett should put the tattoo.  While the Report notes that "*someone* had previously told [Governor Cuomo] . . . good advice to give sexual assault victims who wanted to get tattoos," Report at 56, the Report omits that that "someone" was a therapist who had advised the Governor in the context of his own family's experience on how to discuss potential tattoos with victims of sexual assault.  The Governor testified that a therapist told him that "a rape victim often feels indelibly marked post-victimization, and a tattoo can be like a scarlet letter that they are marked…[and] there are three things you can do when a person says they want to get a tattoo…[without] saying no…[1] wait and think…[2] there is now a tattoo that is 'semi-permanent'…or [3] put the tattoo where someone can't see it in case you want to reconsider it."  Consistent with that advice, the Governor elected the third option when he suggested to Ms. Bennett that she consider getting it in a place where no one could see it in case she did not want one later in life.  The Governor was adamant that he did not use the word "butt."  Report at 56.  The Governor also testified, *and the Report entirely omitted*, that he told Ms. Bennett that the New York State Police had a tattoo policy, such that a tattoo may not be visible while members are in uniform.  The Report should be supplemented with this important context for the Governor's testimony.  The Report's failure to include this information shows the biased and one-sided nature of the investigation, and the biased manner in which the Report was written.

---

[65] Jesse McKinley, *Cuomo Is Accused of Sexual Harassment by a 2nd Former Aide*, N.Y. TIMES (Feb. 27, 2021), https://www.nytimes.com/2021/02/27/nyregion/cuomo-charlotte-bennett-sexual-harassment.html

In fact, it was apparent during the Governor's testimony that the Investigators did not intend to include any of this specific context into the Report.  When the Governor testified about interacting with victims of sexual assault, saying, "I lived this in my life.  I know this.  I spent months with therapists and counselors going through this, and months of discussions.  I know this and how delicate it is," the Investigators called into question the Governor's recollection about Ms. Bennett, stating:

> you don't remember [the] date of [the] conversation, *barely* remember interactions with her, [she was] one of many assistants you've interacted with over the years, and you *know* you were helping her with the speech that included a reference to being raped, but you're also testifying you're certain you never repeated 'you were raped' three times?

The Governor responded:

> This is my testimony.  If your [close family member] was a victim of rape, you would remember how you talked to a rape victim about rape.  That's my testimony.

The Investigators dismissed the Governor's perspective during his testimony—and then deprived the public the opportunity to consider the experience that shaped his reaction to Ms. Bennett— when they omitted his testimony from the Report.  The Report should be supplemented with the specifics of the Governor's testimony.

With respect to Ms. Bennett's claims about the Governor asking her to find him a girlfriend, the Governor testified that Ms. Bennett approached him and told him she had been reviewing his social media accounts and "all these women want to date you."  The Governor testified that it was a running joke in 2020 amongst staff and his family that women wanted to date him given all the press from his COVID-19 daily briefings, and that the conversation with Ms. Bennett related to that.  This was omitted from the Report.  The Governor joked about her finding him a girlfriend in

that context, and there was no insinuation he wanted to date Ms. Bennett or have a romantic relationship with her, because he most certainly did not.

Finally, the Report concludes that the Governor's comments were "sexually suggestive in nature" and "by any reasonable measure, gender-based, offensive, and harassing." Report at 147. They were not. The above-referenced context that was entirely omitted in the Report undermines and disproves these conclusions. The comments could not be subjectively perceived to be hostile or abusive by Ms. Bennett under Title VII, who admitted she was "just being paranoid," Report at 9, Ex. 77, and that she had not perceived the conduct that way at the time: "I wasn't thinking about it as anything sexual."[66]  Ms. Bennett's after-the-fact determination that the interaction was harassment is not sufficient. *See* Report at Ex. 2 (Ms. Bennett described in the summer of 2020 that "[w]e had a lot of very meaningful conversations and I thought he was acting as my friend— I still feel that way"); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993) ("[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."); *Fattoruso v. Hilton Grand Vacations Co., LLC*, 873 F. Supp. 2d 569, 578 (2d Cir. 2012) (alleged unequal treatment insufficient under NYCHRL where "there is nothing that indicates that plaintiff was treated unequally based upon his gender") (quotations omitted); *Risco v. McHugh*, 868 F. Supp. 2d 75, 118 (S.D.N.Y. 2012) (granting summary judgment for defendant in Title VII racial hostile work environment claim where "discourtesy or rudeness" and a lack of "sensitivity does not, alone, amount to actionable harassment") (citations omitted) (quotations omitted).

### C.  The Report Fails to Include and Consider Ms. Bennett's History of Making Sexual Misconduct Allegations

---

[66] Jesse McKinley, *Cuomo Is Accused of Sexual Harassment by a 2nd Former Aide*, N.Y. TIMES (Feb. 27, 2021), https://www.nytimes.com/2021/02/27/nyregion/cuomo-charlotte-bennett-sexual-harassment.html.

The Report finds "the level of detail and consistency in Ms. Bennett's account, her demeanor, and the circumstances of her allegations to be credible," Report at 64, but the Report should have considered in the analysis Ms. Bennett's history of making sexual misconduct allegations. A federal lawsuit filed on October 30, 2017, by a male student, "John Doe," against Hamilton College alleged that Ms. Bennett made false sexual misconduct allegations against him, in coordination with three other women, which resulted in the ban of John Doe from campus and graduation.

That lawsuit alleged that, in the Spring of 2017, Ms. Bennett made false sexual misconduct allegations against him, in coordination with three other women, which resulted in the ban of John Doe from campus and graduation.  John Doe's lawsuit is *John Doe v. Hamilton College et al.*, No. 17 Civ. 1202, (N.D.N.Y.), and his civil complaint outlining his allegations against Ms. Bennett and others is attached as Ex. F. Specifically, in October of 2017, Hamilton College senior "John Doe" sued the college alleging that on May 9, 2017—twelve days before he was supposed to graduate—the college unlawfully banned him from campus and denied his status as a graduating senior.  *See* Ex. F (complaint filed in *John Doe v. Hamilton College et al.*, No. 17 Civ. 1202 (N.D.N.Y. Oct. 30, 2017), Dkt. 1 ("Complaint")). According to John Doe, the college took these actions based on false complaints of sexual misconduct—for events that all allegedly occurred in 2014—made against him by four female students who were acting "in concert and with a malicious purpose."  *Id.* at ¶ 2.

One of those four female students was Charlotte Bennett, and she is referred to throughout the Complaint as "Sally Smith" or "CB" in paragraphs 81, 82, 118, 119, 120-124, 126 of Doe's complaint. These four allegedly false complaints were made approximately two weeks apart in late April and early May 2017, shortly before John Doe was to graduate.  *Id.* at ¶¶ 100, 103, 125.  John Doe alleged that the complaints were intended to have him removed and expelled from Hamilton.  *Id.* at ¶¶ 124, 127, 134, 152.

54

The Complaint alleges that in April of 2017, two women—who were friends—filed false complaints with Hamilton College against John Doe of non-consensual sexual contact that purportedly occurred in 2014. *Id.* at ¶¶ 2, 91, 93-96. Following those initial two complaints, another female student, "LL," allegedly said she would consult with Ms. Bennett about the complaints in Ms. Bennett's capacity as a member of the student group "Sexual Misconduct and Assault and Reform Taskforce" ("SMART") and "someone familiar with the Title IX process." *Id.* at ¶ 118. SMART was formed in 2016 "to better equip all members of the Hamilton community to help prevent and combat sexual misconduct on campus," and Ms. Bennett published a piece about SMART in the Hamilton student newspaper on October 20, 2016, and opined that "women and girls do not feel safe at Hamilton, and that all perpetrators should be expelled." *Id.* at ¶¶ 79-81.

According to Mr. Doe, Ms. Bennett soon thereafter, in early May 2017, allegedly coordinated the filing of her own false complaint of sexual misconduct against Mr. Doe with another woman referred to as "Rachel Roe," at the urging of "LL," because Ms. Bennett "had been through the complaint process before and understood that multiple reports against the same individual would likely result in that individual's removal from campus." *Id.* at ¶¶ 120-122. The Complaint asserts that Ms. Bennett falsely alleged that she had had "non-consensual sexual contact" with Doe in January 2014—more than three years earlier. *Id.* at ¶ 120.

John Doe contends that Ms. Bennett knew her complaint was false because Ms. Bennett had "recorded a conversation between her and Doe sometime in or around the spring of 2014 in which she stated that Doe did not sexually assault her." *Id.* at ¶ 121. According to Mr. Doe, Ms. Bennett's 2014 recording "unequivocally proved that [Ms. Bennett's] allegations against Doe were fabricated." *Id.* at ¶ 158.

On May 9, 2017, the college allegedly informed John Doe that, as of May 14, 2017, he was banned from campus and declared ineligible for graduation, which was to take place on May 21, 2017.

*Id.* at ¶ 127.  According to Mr. Doe, "no one at Hamilton considered it all suspicious that, in the space of just two weeks, four separate women made complaints against Doe for sexual conduct that had all allegedly occurred over three years prior to the complaints."  *Id.* at ¶ 130.

Notably, Mr. Doe alleged: "Just days after Doe was banished from Hamilton and denied the opportunity to graduate with his class, [Ms. Bennett] withdrew her complaint against Doe." *Id.* at ¶ 134.  Another of the four women also withdrew her complaint against John Doe two days after Mr. Doe should have graduated.  *Id.* at ¶ 3, 135.  This woman purportedly withdrew her complaint after John Doe provided Hamilton College administrators with text messages from her, including one in which "she declared 'I had fun tonight' (the night she now claimed involved non-consensual sexual activity)."  *Id.* at ¶ 135.  As for the third complainant, the college ultimately found Doe not responsible for sexual misconduct.  *Id.* at ¶ 3.  As for the fourth complainant, John Doe alleged that the college erroneously concluded that he engaged in a non-consensual sexual act with her in the winter of 2014 because she was purportedly "incapacitated by alcohol at the time of her interaction with Doe and thus unable to consent."  *Id.* at ¶ 4.  John Doe further alleged a number of details about his 2014 encounter with the fourth woman that contradicted the college's finding against him.  *Id.* at ¶ 141–151, 161–165.

Hamilton College settled the lawsuit with John Doe on or about September 21, 2018, for undisclosed sum of money.  *See* Ex. G, *John Doe v. Hamilton College et al.*, Dkt. 40.

Ms. Bennett's May 2017 allegation of sexual misconduct by John Doe to Hamilton College was not the first time, however, that Ms. Bennett had made an allegation of sexual misconduct against a male student at Hamilton College.  At an October 10, 2016 student assembly meeting at Hamilton College, Ms. Bennett publicly spoke about another incident of sexual abuse that she reportedly endured during her sophomore year in college.  Ms. Bennett stated in pertinent part:

More importantly, though, my work is also informed by the two months of my life I spent in meetings and interviews as I pursued a formal investigation against my abusive ex-boyfriend. I allowed the administration to take my phone and review every single text I had sent to my friends, family, and perpetrator over the course of our relationship. I sat in over four hours of interviews describing events that I still have nightmares about. I was as transparent as I possibly could have been throughout the entire investigation. Even still, I find myself here today because I don't believe any of this was an adequate response to the violence I experienced my sophomore year at Hamilton.

I reported seven events of abuse, ranging from stalking, to dating violence, to sexual assault (if we want to water down this policy, I will specify that I reported both "non consensual sexual contact" and "non consensual sexual penetration"). Hamilton investigated all seven events. They only found him responsible for one incident. One. Out of seven. If this wasn't enough, my perpetrator violated our no-contact order. He only received six disciplinary points for walking through my living room while I was with my friends on a Saturday night. The man who sexually assaulted me, hit me, destroyed my personhood, and terrorized me over a period of nine months walked through my living room. Six points.

We know perpetrators of gender-based violence are likely to be repeat offenders. That being said, my abuser will return to campus in August 2017. In December of 2017, he will receive a Hamilton diploma. You may end up sitting next to him in Commons. You may share a table with him in the library. You could sit next to him in class, or find yourself at the same party as him. Are we really safe if these scenarios are even possible? Is this what fighting discrimination looks like? We are better than this. Hamilton is better than this.

. . . . I want to use my experience to help in any way I can before I graduate—this issue is much larger than me. It's about starting, and continuing, a campus conversation so we can advocate for survivors. I want to ensure any and every member of this community feels as through they will be represented and protected adequately if they experience sexual violence.[67]

---

[67] Ex. H (Oct. 10, 2016 meeting minutes).

Ms. Bennett later claimed on Twitter that when she spoke to the president of Hamilton College about her sexual assault, he "laughed in her face," which seems highly improbable given the sensitive nature of their conversation.   This also goes to how Ms. Bennett perceives various interactions.   Ms. Bennett's April 2019 tweet about her meeting with the Hamilton College president is set forth below:



68

_____

68 Charlotte Bennett (@_char_bennett), TWITTER (Apr. 19, 2019 4:19 p.m.),
https://twitter.com/_char_bennett_/status/1119334727121604608.

58

The Attorney General's 165-page Report devotes 20 pages to claims made by Ms. Bennett about conversations and interactions she purported to have had with the Governor, and her characterizations of them.[69]  The Report credited Ms. Bennett's claims in their entirety—despite the Governor having disputed many of Ms. Bennett's characterizations and various details she described regarding their interactions.[70]

The allegations in John Doe's lawsuit regarding Ms. Bennett are troubling given Ms. Bennett's allegations against the Governor.  Ms. Bennett only decided to make her allegations public after encouragement by Ms. Boylan.  In addition, the claims that Ms. Bennett alleged in February 2021 were markedly different than what the Special Counsel to the Governor testified Ms. Bennett told her in June 2020.   Although Ms. Bennett acknowledged that the Governor never touched her inappropriately, her characterizations of her conversations with the Governor—including that he "propositioned [Ms. Bennett] for sex"[71]—have been vigorously contested by Governor.   The Report makes no mention whether the Investigators: (1) possessed this information regarding Ms. Bennett's history of making sexual misconduct allegations; (2) spoke to Ms. Bennett about the facts underlying this lawsuit, or spoke to the attorneys for John Doe and with administrators at Hamilton College as to why it was alleged that she had fabricated sexual harassment allegations; and (3) considered all of this information in assessing Ms. Bennett's impressions and recollections

---

[69] Report at 44–65.

[70] The Report similarly discredits other witnesses whose accounts did not fit its prescribed narrative.  For example, Staffer #2 who testified that his text response to Ms. Bennett, "WHAT THE FUCK" and "OH MY GOD," was a reaction to Ms. Bennett having had the unusual opportunity to have a long, personal conversation with the Governor, rather than about the content of Ms. Bennett's conversation with the Governor.  Report at 51 n.411.  The Report discredits Staffer #2's testimony "given the plain text of the documents and general credibility issues regarding Staffer #2, including his failure to recall many events reported by other witnesses," without expounding on that "plain text" or the "many events."  *Id.*

[71] Jesse McKinley, *Cuomo Is Accused of Sexual Harassment by a 2nd Former Aide*, N.Y. TIMES (Feb. 27, 2021), https://www.nytimes.com/2021/02/27/nyregion/cuomo-charlotte-bennett-sexual-harassment.html ("'I understood that the governor wanted to sleep with me, and felt horribly uncomfortable and scared,' Ms. Bennett said."); Charlotte Bennett (@_char_bennett), TWITTER (May 13, 2021 12:54 p.m.), https://twitter.com/_char_bennett_/status/1392886064872820738.

of her interactions with the Governor. The Governor's testimony was very clear that he had no romantic interest in Ms. Bennett, wanted only to help her because of a close family member who was about the same age as Ms. Bennett and was also a sexual assault survivor, and was concerned about Ms. Bennett's personal well-being because of information the Governor learned about that concerned him regarding Ms. Bennett's relationships. The Report should be amended and supplemented to include this information concerning Ms. Bennett's history.[72] Ms. Bennett's claims against Governor Cuomo cannot be viewed in a vacuum given her history.

In addition, given the allegations Ms. Bennett made against the Governor, it was incumbent upon the Investigators to have fully analyzed Ms. Bennett's history of making sexual misconduct allegations, asked Ms. Bennett about those allegations, and considered the impact that may have had on Ms. Bennett's perspective in how she perceived and remembered her interactions with the Governor—versus how he understood and remembered their interactions.

For example, when Ms. Bennett spoke with the Special Counsel to the Governor and Governor's Chief of Staff about her interactions with the Governor in late June and early July 2020, she initially said that the Governor asked her who she "was sleeping with."[73] When the Special Counsel followed up on this question and the precise words that the Governor used, Ms. Bennett said that the Governor had asked her who she "was hanging out with,"[74] which demonstrates the lens through which Ms. Bennett viewed and interpreted the Governor's comments. Ms. Bennett never suggested to the Special Counsel in her conversations that the Governor had ever made sexual advances

---

[72] The Report also brushes off an instance of Ms. Bennett being untruthful—in an email to Ms. Benton and Ms. DeRosa complimenting them—as an act of "desperation." Report at 62–63. Nor does it include any explanation why Ms. Bennett was sending text messages complaining about the Governor on May 16, 2020 *only 7 days* after her "*first* substantive interaction" with him on May 9, 2020. *Id.* at 45–46 (citing Exs. 32, 33) (emphasis added).

[73] Ex. I (Chamber_AG_0739).

[74] *Id.*

toward her.[75]  In fact, when asked if he ever made a sexual advance, Ms. Bennett replied "No."[76]  Yet, after communicating with Ms. Boylan, in late February of 2021, Ms. Bennett publicly alleged that she believed the Governor's conversations with her indicated that he wanted "sleep" with her, had a romantic interest in her and was "grooming her." [77]  Indeed, the Special Counsel who spoke with Ms. Bennett in late June and early July 2020 testified to having been surprised by Ms. Bennett's allegations in February 2021 because of how starkly different she portrayed her interactions with the Governor to the Special Counsel.

Accordingly, we request that the Report be amended to include this information regarding Ms. Bennett's history of making sexual misconduct allegations, and well as whether the Investigators spoke with Ms. Bennett about those allegations—particularly the allegedly false allegation lodged in May of 2017.

### 4. Brittany Commisso

---

[75] Ex. J (Chamber_AG_0730).

[76] Id.

[77] See, e.g., Zack Fink, 'His resignation said it all': Charlotte Bennett says Cuomo isn't taking full responsibility as he prepares to step down, SPECTRUM NEWS (Aug. 20, 2021), https://www.ny1.com/nyc/all-boroughs/news/2021/08/20/charlotte-bennett--cuomo-accuser--speaks-out-in-exclusive-interview- ("the report came out and it corroborated everything that we had said in March…."); Charlotte Bennett (@CharlotteBennett), TWITTER (Aug. 15, 2021, 9:55 AM), https://twitter.com/_char_bennett_/status/1426905500197789702/photo/1 (responding to Speaker Heastie's decision to end the impeachment investigation, stating, "the Governor broke state and federal law."); KatzMarshall&Banks (@kmblegal), TWITTER (Aug. 10, 2021, 2:49 PM), https://twitter.com/kmblegal/status/1425167321581162496/photo/1 ("[the complainants] knew the pain and indignity of being sexually propositioned[.]"); Extended interview: Cuomo accuser Charlotte Bennett reacts to results of sexual harassment probe, CBS NEWS (Aug. 3, 2021), https://www.cbsnews.com/video/extended-interview-cuomo-accuser-charlotte-bennett-reacts-to-results-of-sexual-harassment-probe/ ("The Governor broke federal and state law when he sexually harassed me[.]"); Charlotte Bennett (@CharlotteBennett), TWITTER (May 13, 2021, 12:54 PM), https://twitter.com/_char_bennett_/status/1392886064872820738 ("When @NYGovCuomo propositioned me for sex, he broke the law. It is very simple: the issue is about his actions, it is not about my feelings. He broke the law (you know, the one he signed). Apologies don't fix that, and neither do denials."); "The governor's trying to sleep with me": Cuomo accuser recalls alleged harassment, CBS NEWS (Mar. 5, 2021), https://www.cbsnews.com/news/cuomo-acuser-charlotte-bennett-interview-sexual-harassment/ ("on June 5, 2020, Cuomo asked multiple questions that led her to the conclusion that 'The governor's trying to sleep with me.'"); Jesse McKinley, Cuomo Is Accused of Sexual Harassment by a 2nd Former Aide, N.Y. TIMES (Feb. 27, 2021), https://www.nytimes.com/2021/02/27/nyregion/cuomo-charlotte-bennett-sexual-harassment.html ("Asked if she felt Mr. Cuomo's questions and comments were an entreaty to a sexual relationship, Ms. Bennett said 'That's absolutely how it felt.'").

**A. The Governor Did Not Grope Ms. Commisso's Breast on November 16, 2020 or Any Other Day**

The Report finds unequivocally that the Governor groped Ms. Commisso's breast on November 16, 2020 in the Executive Mansion. Report at 24 ("On November 16, 2020 . . .) *id.* at 24 n.165 ("Executive Assistant #1 did not remember the exact date of the incident, but recalled that it was around when she was tasked with photographing a document, and provided a copy of the photograph to us that was dated November 16, 2020."); *id.* at 142 ("On November 16, 2020, the Governor hugged Executive Assistant #1 and then reached under her blouse and grabbed her breast."). Investigator Anne Clark also affirmatively stated this at Attorney General Letitia James' August 3, 2021 press conference announcing the Report: "On November 16th, 2020 in the executive mansion, the governor hugged Executive Assistant Number One and reached under her blouse to grab her breast."[78] This "factual finding" is wrong—the Governor never groped Ms. Commisso on November 16, 2020 or any other day, and Ms. Commisso was not honest with the Investigators.

The Report's finding is based almost exclusively on (1) Ms. Commisso's testimony that it occurred in November 2020 and specifically around "when she was tasked with photographing a document" that she recovered from her phone and the photo was dated November 16, 2020, and (2) Blackberry PIN messages by the New York State Troopers Protective Services Unit ("PSU") that showed that Ms. Commisso was at the Mansion on November 16, 2020—the only day in November 2020 that state records reflect Ms. Commisso was in the Executive Mansion.[79] The

---

[78] *NY Gov. Andrew Cuomo Sexually Harassed Multiple Women, Report Finds: Letitia James Press Conference Transcript*, Rᴇᴠ (Aug. 3, 2021), https://www.rev.com/blog/transcripts/ny-gov-andrew-cuomo-sexually-harassed-multiple-women-report-finds-letitia-james-press-conference-transcript.

[79] These messages are not appended to the Report.

evidence cited by the Report in support of this finding, however, is inaccurate, mischaracterized, and incomplete.

    **B.  Ms. Commisso's April 7, 2021 *Times Union* Interview Describing the "Groping" Incident is Completely Undermined by Contemporaneous Documentary Evidence Omitted from the Report**

Contemporaneous documentary evidence demonstrates that the "groping" incident Ms. Commisso publicly described in detail in an anonymous interview published by the Albany *Times Union* on April 7, 2021 did not happen.[80]  Ms. Commisso specifically told the *Times Union* that on a *"weekday in late November*," the Governor's assistant Stephanie Benton called Ms. Commisso and asked her to go to the Executive Mansion to assist the Governor with a "technical issue with his mobile phone."[81]  In that interview, Ms. Commisso made clear that she was only briefly at the Mansion on the day of this incident.[82]  Specifically, Ms. Commisso claimed she drove the short distance from the Capitol to the Mansion and went to the Governor's office on the second floor, where she alleged that the "governor came out from behind his desk, and began groping her in a sexually aggressive manner."[83]  She purportedly said to the Governor "What are you doing?," at which point "he slammed the door (shut)" and replied "I don't care."[84]  She alleges in the *Times Union* interview that the Governor, after slamming the door, then walked back to her and put his

---

[80] Brendan Lyons, *In Her Own Words: Woman Describes Cuomo's Alleged Groping at Mansion*, Times Union (Apr. 7, 2021), https://www.timesunion.com/news/article/cuomo-alleged-groping-victim-mansion-incident-16078748.php?IPID=Times-Union-HP-CP-Spotlight.

[81] *Id.*

[82] Ms. Commisso in her *Time Union* interview described that she arrived at the Mansion, "reached the office on the second floor" and "I remember I walked out and he walked back into his office. . . . I remember going downstairs and escorting myself out and going to my car and sitting there for a second and going, 'OK, I have to now go back into the Capitol, go back to my desk and do my job and pretend that, like, that didn't just happen." *Id.*

[83] *Id.*

[84] *Id.*

hand under her blouse, over her bra, and groped her breast.[85]  Ms. Commisso claimed that she did not know what to say, the Governor did not say anything, and she remembered walking out of his office after he groped her breast, going downstairs, leaving the Mansion and getting into her car.[86]

The contemporaneous documentary evidence from November 16, 2020—the only day in November 2020 that state records reflect Ms. Commisso was inside the Mansion—completely refutes the version of events she told the *Times Union*.  First, Ms. Commisso was at the Mansion that day to work on a speech—not to assist with "technical issue" with the Governor's phone as she told the *Times Union*.  Second, state records show that Ms. Commisso was at the Mansion for nearly *three hours*, during which the Governor had a full workday schedule, with other staffers present and actively engaged in preparing the Governor for a call with the Vice President and a number of Governors to discuss COVID-19.  Third, the documentary evidence indicates that Ms. Commisso was working out of the Executive Assistants' office on the first floor of the Mansion, rather than meeting with the Governor in his private office on the second floor.

Specifically, the documentary evidence—that the Report never even mentions—shows that Ms. Commisso arrived at the Mansion at 11:59 a.m. and left at 2:47 p.m.[87]  At 12:05 p.m., six minutes after Ms. Commisso arrived at the Mansion, Ms. Benton forwarded by email to Ms. Commisso a draft of a 17-page speech.[88]  While Ms. Commisso was at the Mansion, Executive Chamber employees Melissa DeRosa, Stephanie Benton, and Peter Ajemian were also there, along with Mansion staffers.[89]  At 2:00 p.m., the Governor had a Governors-only conference call with

---

[85] *Id.*

[86] *Id.*

[87] *See* Exs. K, L.

[88] Ex. M.

[89] Ex. N.

Vice-President Mike Pence.[90]  At 2:09 p.m., Ms. Commisso emailed the speech draft she had been working on while at the Mansion to Stephanie Benton.[91]  At 2:14 p.m. Ms. Benton forwarded the speech draft to senior staff.[92] Two minutes later, at 2:16 p.m., another executive assistant (who was at the Capitol) checked in with Ms. Commisso to see how it was going at the Mansion.[93]  Ms. Commisso replied two minutes later, stating, "pretty good right now actually… carol just came through with some cheese and crackers. so im happy now[.]"[94] The other executive assistant replied six minutes later to Ms. Commisso: "Gotta love the cheese!"[95]  Thirteen minutes later, Ms. Commisso emailed Ms. Benton: "Hey gov just came in and said he was good. Do you need me to do anything else for you before I head back to cap?"[96] This would indicate that Ms. Commisso was working out of the staff office on the first floor of the mansion and not visiting with the Governor in his second floor private office.  Two minutes later, Ms. Benton replied to Ms. Commisso: "Sounds good. TY!"[97] and a few minutes after that, Ms. Commisso left the Mansion to return to the Capitol.[98]

---

[90] Exs. O, P.

[91] Ex. Q.

[92] Ex. R.

[93] Ex. S.

[94] Ex. T.

[95] Ex. U.

[96] Ex. V.

[97] Ex. W.

[98] Ex. L.

The Investigators did not obtain (or conveniently ignored) all these electronic communications, which is inexcusable and astonishing given the Report's conclusive finding that the Governor groped Ms. Commisso on November 16, 2021.  Ms. Commisso mentioned none of these important details in her anonymous interview with the *Times Union*.  She was not at the Mansion to assist on a "technical issue" with the Governor's cellphone.  The Report must be amended to include the version of events that Ms. Commisso told the *Times Union*, and what the emails show, because the Report is materially misleading to the public and damaging to the Governor for failing to include the documentary evidence that absolutely refutes Ms. Commisso's version of events and the Report's findings.

Ms. Commisso's allegations are inconceivable, and most especially implausible on November 16, 2020.  We respectfully request that the Report include all the emails from November 16, 2020 documenting Ms. Commisso's activities that day, none of which involve being summoned to the Mansion by Ms. Benton (who was already at the Mansion with the Governor) to assist with a "technical issue" on his phone.  We also respectfully request that the Report note that the Attorney General's Investigators did not review all of Ms. Commisso's emails or text messages from November 16, 2020 or any other day in November 2020.  We assume if the Investigators had reviewed those messages (or subpoenaed them from Ms. Commisso), and no corroborating evidence was found, the Report would have included this fact in assessing Ms. Commisso's credibility.

In addition, the Report, in footnote 165, states that Ms. Commisso "did not remember the exact date of the incident, but recalled that it was around when she was tasked with photographing a document, and provided a copy of the photograph to [the Investigators] that was dated November 16, 2020."  Report at 24 n.165.  We request that the Report note that this particular detail about

Ms. Commisso claiming to be at the Mansion *to photograph a document* was not included in Ms. Commisso's April 7, 2020 published interview with the *Times Union*, and the Report be amended to add the critical fact that state records—which include Trooper PINS logging whoever enters and exits the Mansion on any given day—demonstrate that Ms. Commisso was not in the Mansion on any other day in November 2020.  What this footnote and Ms. Commisso's testimony to Investigators demonstrates is that Ms. Commisso was not telling the truth.  We also note that the Report makes no mention of what that particular document was, and we request that it be included in the Report and provided to us.

### C. Other Errors and Omissions in the Report Regarding the "Groping" Incident and Ms. Commisso's Evolving Version of Events

Perhaps because the Investigators were aware that Ms. Commisso was not at the Mansion to assist the Governor with a "technical issue" with his iPhone on November 16, as she attested was her reason for being at the Mansion to the *Times Union*, the Report is deliberately vague about why Ms. Commisso was at the Mansion on the day she was purportedly groped.  Indeed, the *Times Union* April 7 interview of Ms. Commisso makes no reference to Ms. Commisso's claim that the breast-groping incident occurred around the time she was tasked with "photographing a document" at the Mansion, which she retained on her phone and was dated November 16.  The Report simply states that Stephanie Benton "asked Executive Assistant #1 to assist the Governor at the Executive Mansion" and that as she "*finished her assignment* and prepared to the leave the Governor's personal office…and return to the Capitol," she was groped, and then "walked out…walk[ed] down the stairs, escort[ed] [her]self out the front door, and going back to [her] car."  Report at 24–25 (emphasis added).

Given that the Report makes no reference to Ms. Commisso going to the Mansion to assist with a "technical issue" with an iPhone—as opposed to "photographing a document"—we

respectfully request that the Report be amended to include Ms. Commisso's specific testimony to Investigators regarding what "her assignment" was at the Executive Mansion on that day. It most certainly was not to assist with an iPhone issue.

Moreover, the Report makes every effort to undermine the Governor's testimony that "[t]o touch a woman's breast who I hardly know, in the Mansion, with ten staff around, with my family in the Mansion, to say 'I don't care who sees us.' . . . I would have to lose my mind to do such a thing." Report at 26. The Report suggests that the Governor testified falsely that there were "ten staff around" in the vicinity of his second-floor office that day:

> …nor was there any evidence that there were 'ten' Mansion staff in the vicinity of his second-floor office that day. Indeed, our understanding is that the total number of Mansion staff potentially on the premises at any given time would have included groundskeepers, chefs, and others who may not all be there at one time—nor would they be in the vicinity of his private second-floor office.[99]

But the Report failed to mention the PSU Trooper PIN records demonstrating that staffers were indeed there that on November 16, including Ms. Benton, Ms. DeRosa, and Mr. Ajemian,[100] as well as the regular Mansion staff. This documentary evidence demonstrating that numerous staff were there must be added to the Report, which is materially misleading on this point.[101] The Investigators, during their July 17, 2021 interview of the Governor, *specifically told the Governor that this alleged breast-groping incident at the Mansion occurred on November 16, 2021.* For the Report to state that there was no evidence others were around that day was incorrect.

---

[99] Report at 26.

[100] Ex O.

[101] The Report also makes no mention of Ms. Commisso's email to Ms. Benton that the "gov just came in and said he was good," indicating that the Governor himself "came in" to wherever Ms. Commisso had been working, even though it finds that the groping happened in the Governor's "personal office," where he presumably would have already been. *See* Report at 24.

Further, the Report found—and Ms. Commisso told the *Times Union* on April 7, 2021 and CBS News on August 9, 2021—that the Governor "slammed the door (shut)," or that she "remember[s] him slamming (the door) so hard,"[102] or that "he walked over, *shut* the door. So hard to the point where I thought for sure, someone downstairs must think… They must think if they heard that what is going on. Came back to me. And that's when he put his hand up my blouse and cupped my breast over my bra."[103]   Notably, the Investigators never asked Ms. Benton, Ms. DeRosa or Mr. Ajemian whether they had heard the slamming of the door in the Mansion that day. Nor did the Investigators ask them about anything they remembered, saw or heard from that day. Nor does the Report indicate if any Mansion staff, who are always around during the day, were asked similar questions and what their responses were.

The fact that the Investigators did not ask witnesses who were at the Mansion about Ms. Commisso's specific claims must be included in the Report because it goes to the credibility of the investigation and what material investigative steps the Investigators did not take and the reliability of the Report's conclusions.  If the Investigators had asked those three senior staffers about that day, and showed them the documentary evidence about what the Governor was doing on that day, those staffers would have told the Investigators that the Governor works primarily out of a room on the first floor when engaging in the activities he did that day—not in his second floor office. In addition, we request that the Report include Ms. Commisso's testimony about precisely who, other than the Governor, Ms. Commisso saw in the Mansion that day. The Report says nothing on this issue.  As Ms. Commisso is aware, people were most certainly there when she went to the

---

[102] Brendan Lyons, *In Her Own Words: Woman Describes Cuomo's Alleged Groping at Mansion*.

[103] *Brittany Commisso Interview on Allegations Against Gov. Andrew Cuomo Transcript*, REV (Aug. 9, 2021) https://www.rev.com/blog/transcripts/brittany-commisso-interview-on-allegations-against-gov-andrew-cuomo-transcript.  (emphasis added).

Mansion, and those individuals must have been asked about what they saw and heard.  If they were not asked, the Report must be amended to state as much.

Moreover, we understand that Ms. Commisso was interviewed by the Investigators more than once, and she gave various differing versions of her interactions with the Governor when describing those interactions to others, including the Investigators.  Specifically, on March 12, 2021—three weeks before Ms. Commisso's April 7, 2021 *Times Union* interview was published—the Investigators interviewed Ms. Commisso informally and did not transcribe that interview.  She was then interviewed a second time under oath, which was transcribed, although we do not know the date of that interview because the Attorney General has not provided that information.  The Report mentions in footnote 168, without providing details, that Ms. Commisso's "recollection has varied" about when the Governor purportedly "slammed" the door relative to when he allegedly grabbed her breast (before or after) and cites to two separate portions of her interview transcript.  Report at 24 n.168.  We request that the Report include in the main text the precise quotes from Ms. Commisso's testimony about those details that "varied," so that the public can assess her credibility.  The Report should specify how many times her testimony varied on that issue and what precisely she said each time she was interviewed.

After the Report was publicly released on August 3, 2021, and we pointed in our publicly released August 3, 2021 position paper to the overwhelming documentary evidence that completely undermined the Report's conclusion that Ms. Commisso was groped on November 16, 2020, Ms. Commisso spoke again to the *Times Union* about when this alleged breast-groping incident occurred and provided yet another date in November.  Specifically, in an August 9, 2021 *Times Union* article Ms. Commisso claimed she told the Investigators that the incident did not take place on November 16, but "sometime around that date," and that she told the *Times Union* "in a

series of interviews in March and April that the alleged groping incident *took place on a workday later that month, possibly around November 25.*"[104]

The Report indicates that Investigators had access to PSU Trooper Blackberry PIN messages that logged the entry and exit of anyone entering the Mansion. *See* Report at 24, 79 n.691 ("Our review of Blackberry PIN message from the PSU Troopers who send messages for those covering the Governor on weekends at the Mansion confirmed that both Ms. McGrath and Executive Assistant #1 covered the Governor at the Executive Mansion on a regular basis during the pandemic."). Given Ms. Commisso's claim that the alleged groping incident took place on a workday "later that month, possibly around November 25," it is essential that the Report include a statement that the PSU Trooper PIN entries do not show Ms. Commisso was at the Mansion on November 25 or any day in November 2020 other than November 16.

### D. Testimony by Executive Assistants #2 and #3 Demonstrate Material Inconsistencies in how Ms. Commisso Described the November "Groping Incident" and Ms. Commisso's Evolving Version of Events

The Report's only cited evidence of "corroboration" of Ms. Commisso's breast-groping allegation is not, in fact, corroboration of the event she describes. There is no contemporaneous corroboration of this incident because this incident did not occur. Instead, the Report points out that Ms. Commisso, four months after the alleged "groping" incident, reacted negatively to a statement by the Governor that he had not touched anyone inappropriately, and that

---

[104] Brendan Lyons, *Cuomo accuser: 'I have a voice and now I've decided to use it'*, TIMES UNION (Aug. 9, 2021), https://www.timesunion.com/state/article/cuomo-groping-accuser-Brittany-Commisso-16371749.php ("But Commisso had told the attorney general's investigators that the incident did not take place on Nov. 16, but sometime around that date; she could not pinpoint the exact day — a distinction that appears in a footnote of the attorney general's report.") A footnote in the Report notes that Ms. Commisso "did not remember the exact date of the incident, but recalled that it was around when she was tasked with photographing a document, and provided a copy of the photograph to us that was dated November 16, 2020," Report at 24 n.165, a photograph that was not appended to the Report.

Executive Assistants #2 and #3 "corroborated her reaction."[105]  Notably missing from the Report was what Ms. Commisso specifically told Executive Assistants #2 and #3 on March 1, 2021, March 3, 2021, as well on Saturday, March 6, 2021 and Sunday, March 7, 2021.

Specifically, the Report states that on Monday, March 1, 2021, Ms. Commisso told Executive Assistants #2 and #3 "some details about how the Governor had touched her and had had inappropriate conversations with her."  Report at 30.  However, the Report notably omits precisely what Ms. Commiso said (and did not say) in this March 1 conversation.  We request that this information be included in the Report, because if Ms. Commisso had told them about any groping in the March 1 conversation, the Investigators most certainly would have included it.

 The Report then states that on Wednesday, March 3, 2021, after a public statement by the Governor regarding Ms. Bennett's allegations, Ms. Commisso confided in Executive Assistants #2 and #3 "about some of the inappropriate contact the Governor had had with her."  *Id.* at 29–30.  Again, the Report notably omits precisely what Ms. Commisso said (and did not say) in this March 3 conversation, where she gave a second version of events.  We request that this information be included in the Report because it is very clear that Ms. Commisso did not mention any groping incident—on either December 31, 2019 or in November 2020.  If Ms. Commisso had mentioned any "groping" on March 3, the Investigators surely would have included it in the Report.

The Report then states that Ms. Commisso was at a birthday dinner on Saturday evening, March 6 for her close friend Executive Assistant Alyssa McGrath and, while at this event, Ms.

---

[105] *See* Report at 32 ("*Her reaction* to the March 3, 2021 statement by the Governor that he had never touched anyone inappropriately was one that her colleagues observed and one that *corroborates her testimony that the Governor had in fact touched her inappropriately*."); *id*. at 32 ("Executive Assistants #2 and #3 believed she was credible and *corroborated her reaction to the Governor's March 3, 2021 public statement* responding to the sexual harassment allegations."); *id*. at 32 (finding "…*many of her interactions* with the Governor are independently corroborated by text exchanges with and the testimony of Ms. McGrath" without noting which interactions) (emphasis added).

Commisso told Executive Assistant #2 that the Governor had "grabbed [her] and reached up her shirt." Report at 31.  The Report also fails to specify all the details Ms. Commisso relayed to Executive Assistant #2 at that time, which would be Ms. Commisso's third version of events.  The next day, March 7, Ms. Commisso, along with Ms. Commisso's boyfriend, met with Executive Assistant #2 and her boyfriend, as well as Executive Assistant #3, and again discussed her interactions with the Governor (her fourth telling of her alleged interactions with the Governor). The Report similarly fails to specify all the details Ms. Commisso conveyed to that group in this next telling of the story.  The Report also does not mention whether the Investigators interviewed Ms. Commisso's boyfriend and Executive Assistant #2's boyfriend about exactly what Ms. Commisso told them regarding the alleged groping incident and her interactions with the Governor.  If they were not interviewed, the Report must include the fact that this important investigative step was not taken.

On Monday, March 8, Executive Assistants #2 and #3 reported via a telephone call to the Special Counsel to the Governor and the Acting Counsel to the Governor, that Ms. Commisso told them that the Governor *had pushed her up against a wall*, grabbed her breast and *then kissed her*. The Special Counsel took notes of that call, which the Report did not attach as an exhibit, and cites to the Special Counsel's testimony about that March 8 call in a footnote.  Report at 31 n.214.  The Special Counsel's contemporaneous notes from that conversation are as follows:



The Report notably does not include the fact that Executive Assistants #2 and #3 told the Special

Counsel and Acting Counsel to the Governor that Ms. Commisso claimed the Governor *also kissed*

*her* after allegedly groping her.

Ms. Commisso in her detailed interview published with the *Times Union*, her interviews

with the Investigators, and her recent August 9, 2021 televised interview on CBS, made no claim

about the Governor *pushing her up against a wall* and *kissing her* during the alleged breast

"groping" incident.  Indeed, the Special Counsel testified that she recalled Executive Assistants #2

74

and #3 describing to her on the March 8 call that the Governor had "forcefully thrown her up against the wall."  Report at 31 n.214.

On Friday, March 12—five days after she told Executive Assistants #2 and #3 about the alleged breast groping incident—the Attorney General's investigators informally interviewed Ms. Commisso and made no transcript of that interview (which would be Ms. Commisso's fifth telling of her interactions with the Governor).  The Report did not include any of the specific details of what Ms. Commisso told the Investigators on March 12 about the November 2020 incident, or any other incident.  Ms. Commisso's March 12 informal interview occurred *before* the Investigators interviewed Executive Assistants #2 and #3.  There is no question that Ms. Commisso did not tell the Investigators the same details she told Executive Assistants #2 and #3, i.e., the Governor *pushed her against a wall* and *then kissed her after groping her breast*.  If she had, the Investigators would have included that in the Report.

Ms. Commisso then had a second "formal" interview with the Investigators, which was transcribed and cited in the Report.  We do not know the date of this interview because the Investigators will not share it with us, but we presume it was after Executive Assistants #2 and #3 were interviewed.  In this second interview with the Investigators, Ms. Commisso was asked about having told Executive Assistants #2 and #3 on March 6 and 7 that the Governor had "pushed her up against the wall."  Ms. Commisso denied to the Investigators that this occurred and denied that she told this to Executive Assistants #2 and #3.  *Id.*  Rather than grapple with and credit what *both* Executive Assistants #2 and #3 said they heard Ms. Commisso report to them when she described this incident on March 6 and 7, the Report simply finds that both Executive Assistants #2 and #3 were "mistaken[]."  *Id.* at 31.  We can only assume that Report does not cite to or quote from the testimony of Executive Assistants #2 and #3 on this specific claim that Ms. Commisso said the

Governor *pushed her up against the wall*, groped her breast, *and then kissed her* because it undermines Ms. Commisso's later versions of this incident that she relayed to the *Times Union* and the Investigators in her informal March 12 interview.

We request that the Report be amended to include precisely what Executive Assistants #2 and #3 said that Ms. Commisso told them about her interactions with the Governor during every conversation leading up to their March 8, 2021 report to the Governor's Special Counsel and Acting Counsel.   We also request that you include in the Report the Special Counsel's contemporaneous notes from the March 8 call.  The failure to do so misleads the public about Ms. Commisso's credibility and Ms. Commisso's differing versions of what happened.

On March 7, Ms. Commisso retained a lawyer, Brian Premo.  Mr. Premo spoke with the Acting Counsel to the Governor, on March 9, 2021 and told her that Ms. Commisso planned to proceed civilly by filing an EEO complaint and would not pursue the matter criminally.  By proceeding civilly, this indicated Ms. Commisso was looking for a financial settlement and/or judgment.  Nonetheless, Acting Counsel referred the matter to the Albany Police Department on March 10, 2021.  Yet Ms. Commisso did not agree to an interview with the Albany Police Department.  Instead, months later, after the Report was made public and we pointed out the documentary evidence refuting the Report's findings regarding Ms. Commisso, she filed a criminal complaint with the Albany County Sheriff on August 9, 2021.  We request that these facts be included in the Report.  The Report specified that "criminal authorities, including the Albany Police Department, have been alerted to the most egregious allegations of physical touching, including the groping of [Brittany Commisso]."  Report at 147 n.1239.  The Report's failure to note that it was the Executive Chamber that alerted the Albany Police Department further evidences the one-sided nature of the Report.

On August 9, 2021, after the August 3, 2021 Report was issued, CBS news aired an interview of Ms. Commisso and, once again, she told another version of the November 2020 alleged "groping" incident, with more detail than appeared in the April 7 *Times Union* interview and the Report, as well as details she did not convey to Executive Assistants #2 and #3 because they did not report these details to the Special Counsel on March 8.  Ms. Commisso stated that, while in the Governor's private second floor office:

> . . . he gets up and he goes to give me a hug. <u>And I could tell immediately when he hugged me, *it was probably the most sexually aggressive manner than any of the other hugs that he had given me*</u>. It was then that I said, "Governor," my words were, "You're going to get us in trouble. And I thought to myself, that probably wasn't the best thing to say.  But at the time, I was so afraid that one of the mansion staff, that they were going to come up and see this and think, oh, is that what she comes here for? And that's not what I came there for.  And that's not who I am. And I was terrified of that. And when I said that he walked over, shut the door.  So hard to the point where I thought for sure, someone downstairs must think . . . They must think if they heard that what is going on.  Came back to me. And that's when he put his hand up my blouse and cupped my breast over my bra. . . . I exactly remember looking down, seeing his hand, which is a large hand. . . . It happened so quick.  He didn't say anything.   When I stopped it, he just pulled away and walked away.[106]

We request that the Report be amended to include that this version of the alleged November 2020 breast-groping incident is different than what she told Executive Assistants #2 and #3, the *Times Union* in the April 7 interview, and what the Report described Ms. Commisso told Investigators.

Moreover, in another interview with the *Times Union* published the same day, August 9, 2021, as the airing of the CBS interview, *Ms. Commisso added even more details to the alleged November 2020 groping incident that do not appear in the Report*.  Ms. Commisso stated that she

---

[106] *Brittany Commisso Interview on Allegations Against Gov. Andrew Cuomo Transcript*, REV (Aug. 9, 2021), https://www.rev.com/blog/transcripts/brittany-commisso-interview-on-allegations-against-gov-andrew-cuomo-transcript (emphasis added).

went the Mansion on a day in November 2020 to send a text from the Governor's iPhone to Stephanie Benton and then, immediately after she sent the text, *Ms. Commisso claimed that she called Ms. Benton from the Governor's iPhone to confirm she received the text.*[107] This new detail appears nowhere in the Report and goes to Ms. Commisso's evolving allegations and the Report's unreliability.

We further note that earlier this week, on October 11, 2021, the *Times Union* reported that—instead of November 2020 as Ms. Commisso insisted in various interviews—the alleged breast-groping incident now likely took place in *early December 2020* based on phone and other records obtained by the Assembly Judiciary Committee.  The *Times Union,* despite having interviewed Ms. Commisso extensively and reported on both April 7, 2021 and August 9, 2021 that Ms. Commisso affirmatively stated to them that the breast-groping incident happened in November 2020, reported that Ms. Commisso's lawyer is stating that she could not recall if the incident happened in November *or December 2020.*

State records reflect that the only day that Ms. Commisso was at the Mansion in early December 2020 was December 7, 2020.  Despite Ms. Commisso's new claim that after sending a text from the Governor's mobile phone to Ms. Benton, Ms. Commisso "immediately called Benton from that mobile phone to confirm her receipt of the text,"[108] the Governor's iPhone records do not show any such call placed to Ms. Benton.  There was a text message sent from the Governor's iPhone to Ms. Benton on December 7, 2020 while Ms. Commisso was at the Mansion that day.

[107]  Brendan Lyons, *Cuomo Accuser: 'I Have a Voice and Now I've Decided to Use it'* ("Commisso said after she completed the task and sent the text — which took seconds — she called Benton from Cuomo's phone to confirm she had received it.").

[108] Brendan Lyons, *Subpoenaed Records Support Timeline of Mansion Visit by Cuomo's Alleged Groping Victim*, TIMES UNION (Oct. 11, 2021), https://www.timesunion.com/state/article/Subpoenaed-records-support-account-of-mansion-16524725.php; *see* Lyons, *Cuomo accuser: 'I have a voice and now I've decided to use it'.*

However, *no phone call was placed to Ms. Benton from the Governor's iPhone as Ms. Commisso's now claims*.

Further, we request that the Report be amended to include the Governor's testimony regarding the only private interaction that the Governor recalled having with Ms. Commisso at the Mansion in late 2020. The Governor testified about this interaction in detail to the Investigators, and we included this interaction in our August 3, 2021 position paper. *See* Ex. A. The specific details of that interaction were entirely omitted from the Report.

Specifically, the only interaction that the Governor recalls having with Ms. Commisso bears no resemblance to her allegations. Ms. Commisso came to the Governor's office in the Executive Mansion and asked if she could speak to him about an important matter. She then told the Governor that she was divorcing her husband and needed a different work schedule to accommodate her increased childcare responsibility and shared that the divorce would create additional financial pressure on her. She was adamant with the Governor that she loved her job and did not want to be transferred to a different position because she could not work the required hours. The Governor, who experienced a divorce as a parent of young children, asked Ms. Commisso whether she had fully considered the situation, and shared that from his own experience, divorce can be very difficult, particularly when children are involved. Other staffers have sought the Governor's guidance from time to time on their own potential divorces, and the Governor has set points that he makes in these situations, which he shared with Ms. Commisso. He explained to Ms. Commisso that based on his own experience, when parents divorce, their divorce does not end the relationship because they will need to continue to work together for the good of their children. The Governor asked Ms. Commisso if she had pursued marital counseling. During this conversation, the Governor remembers Ms. Commisso became visibly emotional, and

she told the Governor that she felt that he was suggesting that she was a "bad parent" for wanting a divorce.  The Governor told her he supported whatever decision she made regarding the divorce. The Governor never noticed any change in Ms. Commisso's behavior towards him after this conversation.  The Governor never groped Ms. Commisso's breast as she has alleged.

Finally, we request that the Report be amended to note that Ms. Commisso chose not to confide in her closest friend in the Executive Chamber, Executive Assistant Alyssa McGrath, about the breast groping incident at any point prior to the week of March 8, 2021, when this allegation became public due to a *Times Union* story.  If she had, the Report most certainly would have included this.  Ms. Commisso did not include Ms. McGrath in the conversations she had with Executive Assistants #2 and #3 on March 1, 3, 6, and 7—despite that these four women all worked so closely together in the Chamber and Ms. Commisso socialized with Ms. McGrath more than any of the others.  Indeed, Executive Chamber records reflect that Ms. Commisso and Ms. McGrath were so close that they are listed as each other's "emergency contact" for any work emergency, and Ms. Commisso planned vacations with Ms. McGrath.  All these facts should be included and analyzed in the Report as they are relevant to Ms. Commisso's credibility.

### E.  The Governor Did Not Grab or Rub Ms. Commisso's Butt

The Report finds that on December 31, 2019, when Ms. Commisso was assisting the Governor in his second floor office at the Executive Mansion, the "Governor asked her to take a 'selfie' photograph with him," and as she took the selfie with her right hand, the Governor "moved his hand to grab her butt cheek and began to rub it…[for] at least five seconds."  Report at 22.  She claimed that she was "shaking so much during this interaction that her initial selfies with the Governor were very blurry."  Report at 23. This is false.

First, the Report renders to a footnote that Ms. Commisso claimed to Investigators that she "deleted the blurry photographs immediately because, when the Governor asked to see the

photographs, she was embarrassed by how blurry they were and did not want him to see how nervous she was."  Report at 23 n.150.  This simply does not ring true.  Moreover, it is telling that the Investigators were unable to retrieve those purportedly "deleted" photos.  *Id.*

Second, we ask that the Report be amended to assess the December 31, 2019 "selfie" that gave rise to this allegation when determining its weight.[109]  Ms. Commisso claimed that after she deleted the first few "blurry" photos because of her nervousness when taking the photo, "the two of them then sat down and took one more selfie, with the Governor's hand around [Ms. Commisso's] waist."  Report at 23.  Notably, the Report does not mention that the selfie shows that Ms. Commisso has her arm draped tightly around the Governor's neck and shoulder, with her body pressed against him—another example of the biased nature in which the Report was written. Further, the selfie photo does not show what Ms. Commisso alleges, including that she was "nervous" and "shaking so much during this interaction that her initial selfies with the Governor were very blurry."  Report at 23, 23 n.150.  This photo paints a very different story of their interaction that day:

---

[109] Photo excerpted below. Tamar Lapin, *Who is Brittany Commisso, the latest Andrew Cuomo accuser to go public?,* N.Y. POST (Aug. 9, 2021), https://nypost.com/2021/08/09/who-is-brittany-commisso-the-latest-cuomo-accuser-to-go-public/; *see also* Report at 23 n.152 (citing to Ex. 24, a blurred-out version of the photo given Ms. Commisso's anonymity at the time of the Report).



110

This photo shows Ms. Commisso smiling and sitting closely to the Governor, body pressed against him, with Ms. Commisso's arm around him, and her face leaning in to touch the Governor's. Although Ms. Commisso has stated she gets "hives"[111] when she is nervous, there is no indication of such a reaction in this photo. Moreover, it appears Ms. Commisso took the time to apply a filter to this photo to make herself (and the Governor) look better—which is entirely inconsistent with her claim about how she felt so uncomfortable and nervous while taking the photo. If the Investigators did not inquire of Ms. Commisso about applying a filter to this photo, the Report needs to include this fact. The December 31, 2019 selfie speaks a thousand words and does not corroborate Ms. Commisso's testimony about what happened that day.

---

[110] Lapin, *Who is Brittany Commisso, the latest Andrew Cuomo accuser to go public?*

[111] Report at 22.

The Report also fails to assess Ms. McGrath's telling and unsurprising reply text upon receiving this photo from her close friend Ms. Commisso:



Report at Ex. 25.

The Report redacts the texts above and below this exchange quoted in the Report.  *Id.*; *id.* at 23 n.152.  We request that those texts be unredacted so all of the texts between Ms. Commisso and

Ms. McGrath on December 31, 2019 are available for the public to consider.  The photo, and the

text exchange between Ms. Commisso and her close friend Ms. McGrath, corroborate the

Governor's testimony that Ms. Commisso asked to take the selfie with him and then said she

wanted to send it to Ms. McGrath to make her jealous.  The Governor testified:

| | |
|---|---|
| Mr. Kim: | Remember Brittany Commisso coming over to mansion to help on New Year's Eve in 2019? |
| Governor Cuomo: | No, not particularly. |
| Mr. Kim: | Mentioned the selfie.  How many occasions have you taken a selfie with her? |
| Governor Cuomo: | *Remember once, and remember her saying she would send to Alyssa McGrath and Alyssa [McGrath] would be so jealous. Which was peculiar to me, but I remember her saying that.* |
| Mr. Kim: | That day she said that, where were you? |
| Governor Cuomo: | Think in the mansion office. |
| Mr. Kim: | There to help you? |
| Governor Cuomo: | That's why. |
| Mr. Kim: | Remember with what? |
| Governor Cuomo: | No. |
| Mr. Kim: | How did discussion of selfie come up.  She raised? |
| Governor Cuomo: | *She asked if we could take a selfie.* |
| Mr. Kim: | You say? |
| Governor Cuomo: | I said okay. |
| Mr. Kim: | Where in mansion did you take it? |
| Governor Cuomo: | Don't remember. |
| Mr. Kim: | Remember if standing or sitting? |
| Governor Cuomo: | No. |
| Mr. Kim: | Remember at any point she had to delete it because it was blurry didn't come out well, took another? |
| Governor Cuomo: | No |
| Mr. Kim: | Just remember one selfie? |
| Governor Cuomo: | Yes. |
| Ms. Glavin: | Know how many times she hit the button? |
| Governor Cuomo: | No. |
| Mr. Kim: | Don't remember there being a blurry one? |
| Governor Cuomo: | No.  There's never just one selfie, why I don't take them.  Can't turn around camera, doesn't work, cropped head off. |

84

| | |
|---|---|
| Mr. Kim: | Remember taking one set of selfies or selfie standing up and another sitting down? |
| Governor Cuomo: | I don't remember. |
| | |
| Mr. Kim: | Where hands were in selfie? |
| Governor Cuomo: | No. |
| Mr. Kim: | On her butt? |
| Governor Cuomo: | No don't believe it was.  She wanted to take the selfies.   However we took them was however she wanted to. |
| Mr. Kim: | What did she say? |
| Governor Cuomo: | *She said would send to Alyssa McGrath, she'll be so jealous.* |
| Mr. Kim: | You said? |
| Governor Cuomo: | *Nothing, but thought it was peculiar she would send to Alyssa McGrath, who is her good friend to make her jealous.  Rang a little bit peculiar.* |
| Mr. Kim: | See her actually send to Alyssa McGrath? |
| Governor Cuomo: | Don't think so. |
| Mr. Kim: | Did she tell you what Alyssa McGrath said in response? |
| Governor Cuomo: | Don't think so. |
| Mr. Kim: | Seen it? |
| Governor Cuomo: | I think she showed – I don't remember. |
| Mr. Kim: | Did you tell her not to share with anyone? |
| Governor Cuomo: | No. |
| Mr. Kim: | Didn't say anything about selfie? |
| Governor Cuomo: | No not that I remember. |

Notably, the Investigators *did not show the Governor the selfie at issue during his testimony*, again underscoring the biased nature of the investigation and the Report.  There was no reason not to show the Governor the very picture he was being questioned about.

The Investigators should have assessed and reported on the nature of Ms. Commisso and Ms. McGrath's relationship, including how long they have known each other, how close they are as friends (including that they are each other's emergency contacts), and whether they competed for the Governor's attention.  By failing to engage in any assessment of the nature of their relationship and omitting evidence that would serve to credit the Governor's testimony that Ms.

Commisso had asked to take the selfie to make Ms. McGrath jealous, the Report pads its one-sided narrative that the Governor engaged in a "pattern of inappropriate conduct" with Ms. Commisso. He did not, and the Report should be amended with that context.

Further, the Report must include what Ms. Commisso specifically told Executive Assistants #2 and #3 on March 1, 3, 6 and 7 about the Governor's behavior that she deemed inappropriate, and whether she mentioned to them the December 31, 2019 alleged incident of inappropriate physical contact.  There is no question that, if Ms. Commisso had told Executive Assistants #2 and #3 about this alleged incident, they would have reported it on March 8 to the Special Counsel and told the Attorney General's investigators.  The fact that the Report makes no mention of what Ms. Commisso told Executive Assistants #2 and #3, or even her close friend Alyssa McGrath, about this incident requires the Report to be supplemented to include when Ms. Commisso first made this claim.  Any assessment of Ms. Commisso's credibility requires this to be made public, particularly given the nature of the photo taken on the couch that day and the fact it is clear Ms. Commisso was in no way uncomfortable.

**F.  The Governor Did Not Kiss Ms. Commisso on the Lips**

The Report finds, "[m]ost of the kisses were on her cheek—but, on at least one occasion in early 2020, the Governor quickly turned his head and kissed her on the lips," Report at 21, and undermines the Governor's testimony that he never kissed Ms. Commisso on the lips. The Governor affirmatively denied kissing Ms. Commisso on the lips multiple times throughout his eleven-hour testimony, stating, for example, he "feel[s] confident saying never kissed her on the lips," *id.*  The Governor testified:

| | |
|---|---|
| Mr. Kim: | Kissed any staff member on lips?…Brittany Commisso? |
| Governor Cuomo: | *Never*. |
| Mr. Kim: | You're sure? |
| Governor Cuomo: | *Yeah.* |

| | |
|---|---|
| Mr. Kim: | How? |
| Governor Cuomo: | *Limited interactions with her.* |
| … | |
| Mr. Kim: | Kiss her on cheek? |
| Governor Cuomo: | Don't recall, but sure I did. |
| Mr. Kim: | Once or both cheeks? |
| Governor Cuomo: | I don't remember. |
| Mr. Kim: | Mouth? |
| Governor Cuomo: | She may have fallen to Italian two-cheek kiss. *Never kissed her on the lips.* |
| Mr. Kim: | Even where one of you went in for cheek, but lips ended up touching? |
| Governor Cuomo: | Don't remember any of that. |

Despite the Governor's numerous affirmative denials, the Report simply notes "he *denied any recollection of kissin*g Ms. Commisso on the lips." Report at 21 (emphasis added). The Report should be corrected to accurately portray and meaningfully weigh the Governor's testimony. He denied having kissed her on the lips and there is absolutely no corroboration for Ms. Commisso's claim otherwise.

The Report finds that during some interactions with the Governor, Ms. Commisso would get "so nervous" that she would experience "hives on her neck." Report at 22. The Report notes that on one such occasion, "[Ms. Commisso] ran into a member of the Executive Mansion's staff after leaving the Governor's office while feeling wide-eyed and while her hives were still present," *id.* at 22 n.143, but "[the Investigators] were not able to corroborate this interaction." *Id.* The Report must be supplemented with the identity of the staff member, what this witness said that did not corroborate Ms. Commisso's testimony, and when this purported incident occurred.

### G. The Governor Did Not Sexually Harass Ms. Commisso

The Report further finds the Governor "engaged in a pattern of inappropriate conduct" with Ms. Commisso, including "inquiring multiple times about whether she had cheated or would cheat on her husband" and calling her and her friend Ms. McGrath "mingle mamas." Report at 1. The Report is wrong and should be corrected.

87

The Report completely discredits the Governor's testimony that Ms. Commisso herself "volunteered on a number of occasions that she was seeing other people."  Although the Report notes that he testified that "it was [Ms. Commisso] who volunteered information about her social and marital life, and that he participated only to go along with her conversations," it offers no reasoning as to why Ms. Commisso's denial "that this was the case, and specifically [her noting] that she only spoke about her romantic relationships when the Governor asked, rather than volunteering such information," should be credited over the Governor's testimony.  *Id*. at 19–20.  As the Governor testified, he jokingly called Ms. McGrath and Ms. Commisso "mingle mamas" *only in response to them telling him that they were "single and ready to mingle" on their trip to Florida.  Id.* at 19.  Indeed, the Governor testified—and the Report did not include—that Ms. Commisso volunteered to the Governor that she planned to meet with an old boyfriend while she was in Florida with Ms. McGrath, and that she also had a boyfriend in Saratoga.

In addition, the Report notably omits the specific testimony of numerous Executive Chamber witnesses that Ms. Commisso welcomed the Governor's conduct towards her, which the December 31, 2019 selfie photo certainly corroborates.  All the Report states is that "[w]hile certain witnesses within the Executive Chamber raised questions about whether [Ms. Commisso] welcomed the Governor's conduct toward her, based on their view of [Ms. Commisso's] personality, we did not find that her outgoing personality. . . .undermined her allegations that the Governor touched and spoke to her in an unwelcome and offensive way."  Report at 32.  We request that Report be amended to include the specific testimony of every witness who said they believed Ms. Commisso welcomed the Governor's conduct towards her and precisely why, including what they said about her personality.

The Report also concludes that text message exchanges between Ms. McGrath and Ms. Commisso "independently corroborated" "many of" Ms. Commisso's allegations.  Report at 32. Yet, the Report attached just a handful of text messages between them, but not those that purportedly corroborate "many of" Ms. Commisso's allegations, including her claims that the Governor acted physically inappropriate with her.[112]  We request access to all of the text messages between Ms. Commisso and Ms. McGrath that in any way refer to or relate to the Governor beyond the handful attached as exhibits to the Report.  We further request that the Report be amended to state that none of the text messages attached as exhibits to the Report corroborate Ms. Commisso's claims that the Governor was physically inappropriate with her.  In addition, if the Investigators did not subpoena Ms. McGrath and Ms. Commisso for all text messages referring or relating to the Governor, the fact that this investigative step was not taken should be noted in the Report.

Finally, the Report concludes that Ms. McGrath's testimony "corroborated *much* of [Ms. Commisso's] sworn testimony," Report at 16 n.84, but omits what specific portions of the testimony were corroborated.  As noted *supra*, Ms. Commisso chose not to confide in Ms. McGrath on March 1, 3, 6 or 7 about her purported inappropriate interactions with the Governor, and the Report makes no reference to Ms. Commisso confiding in Ms. McGrath about the two most significant physical interactions with the Governor alleged by Ms. Commisso, i.e., the December 31, 2019 "selfie" photo interaction and the November 2020 alleged breast-groping incident before Ms. Commisso's claims were reported to the Special Counsel and Acting Counsel to the Governor. Thus, the Report's statement that Ms. McGrath corroborated "much" of Ms. Commisso's testimony is materially misleading, and the Report must be amended to state that Ms. McGrath

---

[112] Report at Exs. 16 ("What did he write lol mingle mama [emoji]"); 25 (in response to the New Years Eve selfie, Ms. McGrath wrote "Um where is my pic!! / I'm officially jealous!!!! / I need to be photoshopped in to the right of him [emoji]" / "Love this so much"); 26 ("He brought up the selfie and definitely only supposed to stay between you and me").

does not corroborate Ms. Commisso's testimony about December 31, 2019 and November 2020 groping claims.   The Report is also materially misleading by its failure to explain the extraordinarily close relationship of Ms. Commisso and Ms. McGrath.

### H. The Report Fails to Include and Explore Evidence Regarding Ms. Commisso's Motive to Fabricate and Embellish Her Interactions with the Governor

Governor Cuomo, Stephanie Benton and Melissa DeRosa (and perhaps others) gave testimony to the Investigators about issues in Ms. Commisso's personal life in the weeks before she first made her allegations against the Governor.   Specifically, Ms. Commisso expressed concerns in late 2020 and early 2021 to the Governor and others about maintaining her job as an Executive Assistant to the Governor and her need for more income as a result of her divorce and childcare situation.

As noted above, the Report completely omits the Governor's detailed testimony about the private interaction he recalled having with Ms. Commisso in late 2020 about her personal and financial situation.   He testified that Ms. Commisso asked to speak to him at the Mansion sometime in late 2020 and during that conversation she told him that she was divorcing her husband and needed a different work schedule to accommodate her increased childcare responsibilities resulting from the divorce.[113]   After Ms. Commisso raised the issue, the Governor, who experienced a divorce as a parent of young children, asked her whether she had fully considered the situation, and shared that from his own experience, divorce can be very difficult, particularly when children are involved.[114]   The Governor testified that Ms. Commisso was "concerned about job security

---

[113] The Reports footnotes a one-sentence summary of this detailed testimony by the Governor.  Report at 27 n.182 ("Governor Cuomo and Ms. Benton testified that Executive Assistant #1 told them—possibly around November 2020—that, following her separation from her husband, she was concerned about money and wanted to keep her job and be considered for overtime shifts.")

[114] Ex. A at 19–20.

because she was getting a divorce," and told the Governor that "she had to leave in the afternoons" given she had joint custody of her young child, and was "worried about money." He testified that his response was to the effect of "we can figure it out," and that "there are a lot of single mothers in government."

The Governor further testified that Ms. Commisso said that "she didn't want to move her job" as his one of his four Executive Assistants because of her need for a different schedule, and she "want[ed] to keep the same job" and work more "overtime on the weekends." The Governor thought this situation was "beyond [him]," so he "just left that alone" because that was something her supervisor or Ms. Benton would have to address.

The Governor sensed during this conversation that Ms. Commisso was upset that he would not say to her "you can have the same job on whatever schedule she was talking about, and get the overtime on the weekends to make up the money that she would lose," but the Governor testified that he did not want to say "don't worry you have the job, you will stay in the Governor's office," because that was not up to him. The Report omits and gives no weight to this detailed testimony, even though Ms. Commisso's concerns about her income and job were corroborated by her own testimony. Report at 27 ("Executive Assistant #1 testified that she needed the income (including the overtime pay received from working on weekends), particularly as she was going through a divorce and was focused on not risking losing her job."); *id.* at 29 ("odds are you are going to be the one to go and I liked my job"). The Governor testified that this is the only private interaction action he remembers with Ms. Commisso in late 2020.

Subsequent to her conversation with the Governor, in late 2020 and early 2021, Ms. Commisso spoke with her supervisors about her family and work situation. In those conversations, Ms. Commisso told them what she had told the Governor—she would need to leave work early at

times due to childcare responsibilities—and she also asked for a raise and more overtime hours on weekends when she was available.  No promises were made to Ms. Commisso by her supervisors about her work situation, and she was told by a supervisor in early 2021 that a raise was not possible at the time because of budget constraints.

The Report should be amended to include evidence of Ms. Commisso's concerns regarding her job security and income in the weeks before she first made her allegations in March 2021, and analysis of Ms. Commisso's motives and the timing of her allegations in light of those concerns. Notably, after Ms. Commisso first made her allegations about the Governor in early March 2021, the Chamber took steps to ensure that Ms. Commisso was insulated from any retaliation, including maintaining the Executive Assistant position she had been so concerned about no longer having.

### 5. *Alyssa McGrath*
#### A.  The Report's Findings

The Report finds that the Governor "made inappropriate comments and engaged in harassing conduct" in his "interactions with another executive assistant, Alyssa McGrath," who has been in that role since 2018, including: "(1) regularly asking about her personal life, including her marital status and divorce; (2) asking whether Ms. McGrath would tell on Executive Assistant #1 if she were to cheat on her husband—and whether Ms. McGrath herself planned to 'mingle' with men—on the two women's upcoming trip to Florida, and then calling the two women "mingle mamas; and (3) staring down her loose shirt and then commenting on her necklace (which was inside her shirt) when Ms. McGrath looked up."  Report at 5; *see also id.* at 77–81.  The Report makes these findings relying almost entirely on Ms. McGrath's testimony and discounts the Governor's testimony that provided relevant context about the friendly work relationship Ms. McGrath shared with the Governor.  *See* Report at 77–81.

Even assuming *arguendo* the truth of Ms. McGrath's claims about her interactions with the Governor, the Governor's behavior with Ms. McGrath over three years was unremarkable and does not constitute sexual harassment in violation of the law. *See, e.g.*, *Husser v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 253, 276–78 (E.D.N.Y. 2015) (no hostile work environment under Title VII, NYSHRL or NYCHRL for twelve comments over three-year period because they were not sufficiently severe or pervasive and "no more than…petty slights and trivial inconveniences").

### B. The Report's Material Omissions and Errors

#### i. The Governor Did Not Make Inappropriate Comments to Ms. McGrath

The Report summarily finds that "[t]he Governor would engage in playful and flirtatious behavior with [Ms. Commisso and Ms. McGrath], showing them special attention almost every time they spoke with him," citing to Ms. McGrath's own impression of how she was being treated, and referring to the following photographs of the Governor with Ms. McGrath and Ms. Commisso at holiday parties which purport to show the Governor "holding both of them tight, with his hands on their sides right under their breasts."  Report at 79–80, 79 n.692.  Nothing about those photos is remarkable or demonstrative of inappropriate conduct by the Governor towards Ms. McGrath, and the Report's observation of the Governor's hands "on their sides right under their breasts" demonstrates nothing more than the bias of the Report in insinuating something untoward by the Governor.  The Governor, like other politicians, has taken thousands of similar photos.



Report at Ex. 17



Report at Ex. 18



Report at Ex. 19

 

Report at Ex. 20                    Report at Ex. 21



Report at Ex. 22



Report at Ex. 23

The Report ignores that Ms. McGrath and Ms. Commisso were close friends who very much sought out the Governor's attention.  For example, as discussed *supra*, Ms. McGrath's response to receiving the December 31, 2019 selfie of Ms. Commisso and the Governor was:

> Um where is my pic!!
> I'm officially jealous!!!!
> I need to be photoshopped in to the right of him [emoji]
> Love this so much

Report 23 n.152.  The Report must include what Ms. McGrath told the Investigators (assuming they asked) about why she was "jealous," and "need[ed] to be photoshopped in" to the picture. The Report must also include what Ms. Commisso specifically said to Ms. McGrath about this photo.

The Report should be supplemented to include all text messages between Ms. McGrath and Ms. Commisso evidencing the nature of their friendship, and their enjoyment of and competition for the Governors' attention.  The Report should include analysis of the nature of Ms.

98

McGrath's and Ms. Commisso's close friendship as evidenced by those contemporaneous text messages, and how that dynamic must be factored into Ms. McGrath's credibility analysis that she felt the Governor's behavior towards her was inappropriate.  Moreover, as noted *supra*, if all text messages relating to the Governor were not subpoenaed from Ms. McGrath, the Investigators must explain why that important investigative step was not taken.

Similarly, the Report finds by citing to Ms. McGrath's own testimony, that "[d]uring conversations with them, the Governor also asked Ms. McGrath and Executive Assistant #1 questions about their personal and marital lives . . . . [including] why Ms. McGrath was no longer wearing a wedding ring . . . and whether she planned to 'mingle' with men on a planned trip to Florida with [Ms. Commisso] and called the two women 'mingle mamas' for the remainder of the day."  Report at 80.  As explained *supra*, the Governor testified that he had jokingly called Ms. McGrath and Ms. Commisso "mingle mamas" only in response to them telling him that they were "single and ready to mingle" on their trip to Florida.  Report at 19.  The Report failed to include the Governor's testimony that provided context to his comments:

| | |
|---|---|
| Mr. Kim: | Talk to Brittany Commisso about Alyssa McGrath's marriage? |
| Governor Cuomo: | No.  They would talk in front of each other, I think Alyssa McGrath was already divorced. |
| Mr. Kim: | They would talk in front or with you? |
| Governor Cuomo: | . . . They said going to Florida together with one other friend, leaving husbands and kids behind, and were "single and ready to mingle," except they weren't single and I said "yeah you're the mingle mamas," my joke, playful response. |

The Report should be supplemented to include the Governor's testimony in light of Ms. McGrath's and Ms. Commisso's friendship when assessing Ms. McGrath's allegations.  Further, the Report should include any testimony (assuming the Investigators even asked) that the Governor also

engaged male state employees with questions about their personal lives, bantered with them about relationships and teased them at times about their appearance.  His comments to Ms. Commisso and Ms. McGrath were not gender-based, as the Report found.  As for the Report's inclusion of Ms. McGrath's testimony that the Governor made some type of "suggestive comment" to Ms. McGrath and Ms. Commisso "when he saw the two women doing a stretch [in the office] that was intended to relieve muscle pain in the groin area," Report at 80, this borders on the absurd to have even been included in the Report.  The details of the "suggestive comment" were omitted, and the Report never considers that most co-workers might have made a joking comment to two employees doing such stretches together in the office during the workday.

Second, the Report implies that there was something improper about the Governor saying a "short Italian phrase to Ms. McGrath" with a "smirk" and "said things to her in Italian that she could not understand," but the Report never once specifies the Italian words or phrases that were allegedly used.  Report at 77 & 78 n.675.  The Report simply cites to hearsay that Ms. McGrath testified that "her father told her that the Governor's comment had been about how Ms. McGrath was beautiful," without quoting her specific testimony.  *Id.*  The Governor does not dispute having spoken Italian phrases to Ms. McGrath and there was nothing inappropriate about doing so.

Third, the Report finds that the Governor "was staring down into Ms. McGrath's shirt," and "asked her what was on her necklace, which was hanging between [her] breasts and the shirt." Report at 78.  The Report gives no weight to the Governor's testimony that he "did not recall ever looking down [her] shirt," that it was "impossible to do so from across his desk," and that "he may have complimented her on her necklace 'to sort of make her feel more at ease.'"  *Id.*  The Report should be corrected to meaningfully weigh the Governor's testimony.  Moreover, the Report must acknowledge that it is entirely possible that Ms. McGrath thought the Governor was looking down

her shirt when, in fact, he was not.  Nothing about that interaction is remarkable or worthy of inclusion in the Report.

Fourth, the Report's conclusions that the Governor's comments to Ms. Commisso and Ms. McGrath—including "wanting to go out with two assistants and calling them 'mingle mamas,'" "willing to cheat on her partner," Report at 144–45, 147, amounted to "unlawful sexual harassment" —is without basis in the law.  These comments did not happen in the manner alleged, and even if they did, they were isolated and part of banter that does not come close to conduct that might constitute a hostile work environment.   Indeed, the Report describes the Governor's interactions with Ms. Commisso and Ms. McGrath as "playful and flirtatious behavior."  Report at 79.  *See Perry v. John A. Guerrieri, DDS PLLC*, 2021 WL 480239, at *5 (W.D.N.Y. Feb. 10, 2021) ("the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers, are not protected by [Title VII].") (quoting *Redd*, 678 F.3d at 176); *Feliciano v. Alpha Sector, Inc.*, 2002 WL 1492139, at *8–*9 (S.D.N.Y. July 12, 2002) (no hostile work environment under Title VII where worker told plaintiff he wanted to date her and that she was beautiful and once tried to hug her at work).

Finally, the Report must explicitly acknowledge that, after Ms. Commisso's allegations first became public in a *Times Union* article published on March 10, 2021,[115] Ms. McGrath then decided to go public to the *New York Times* with her own allegations in an article published on March 19, 2021.[116]   The Report must also be amended to include whether the Investigators inquired of Ms. Commisso and Ms. McGrath about any conversations they had with each other

---

[115] Brendan Lyons, *Female Aide Said Cuomo Aggressively Groped Her at Executive Mansion*, TIMES UNION (Mar. 10, 2021), https://www.timesunion.com/news/article/Female-aide-said-Cuomo-aggressively-groped-her-at-16015863.php.

[116] Jesse McKinley, *Cuomo Faces New Claims of Sexual Harassment From Current Aide*, N.Y. TIMES (Mar. 19, 2021), https://www.nytimes.com/2021/03/19/nyregion/alyssa-mcgrath-cuomo-harassment.html.

regarding their allegations between March 8, 2021 and March 19, 2021, and their decision to do interviews with the press about their allegations.

### 6. *Trooper #1*

#### A. The Report's Findings

The Report finds that in "early November 2017, the Governor briefly met…Trooper #1…at an event…[and] spoke with a senior member of his protective detail (Senior Investigator #1) about seeking to have Trooper #1 join the…PSU," after which Trooper #1 was hired "despite not meeting the requirement to have at least three years of State Police service to join the PSU."  Report at 2; *see id.* at 33–44.  The Report finds that "[a]fter Trooper #1 joined the PSU, the Governor sexually harassed her on a number of occasions, including by: (1) running his hand across her stomach, from her belly button to her right hip, while she held a door open for him at an event; (2) running his finger down her back, from the top of her neck down her spine to the middle of her back, saying "hey, you," while she was standing in front of him in an elevator; (3) kissing her (and only her) on the cheek in front of another Trooper and asking to kiss her [on the cheek] another occasion, which she deflected; and (4) making sexually suggestive and gender-based comments, including (a) asking her to help him find a girlfriend and describing his criteria for a girlfriend as someone who "[c]an handle pain," (b) asking her why she wanted to get married when marriage means "your sex drive goes down," and (c) asking her why she did not wear a dress."  *Id.* at 2.  The Report's "factual findings" omit and/or bury other relevant evidence and context pertinent to the Governor's alleged actions.

#### B. The Report Prescribes No Weight to The Governor's Testimony that He Did Not Know of Any Minimum Requirements for Serving on the PSU.

The Report states that the "Governor played a role in having [Trooper #1] hired for the PSU, even though she did not meet the minimum requirements for joining that unit at the time" to

fit its narrative that the Governor sought a female trooper out for any reason other than to "increase diversity." Report at 33–35, *see id.* at 43 ("the truth was . . . she did not meet the three-year service requirement"). The Report, however, prescribes no weight to the Governor's testimony that "he was not, at any point, aware of any minimum requirements for serving on the PSU, although he noted that if there were any such requirements, he would not support them because they would interfere with the need for greater diversity in the PSU"—a point which was corroborated by Senior Investigator #1. Report at 35 ("the Governor's statement that he supported Trooper #1's transfer to the PSU to increase diversity among PSU members is corroborated by Senior Investigator #1's statement that diversity was an important factor in PSU recruitment generally and Trooper #1's recruitment.").

For its finding, the Report cites to an email from Senior Investigator #1 to Trooper #1, "attaching a vacancy notice with a two-year service requirement (as opposed to three years)," and noting "Ha ha they changed the minimum from 3 years to 2. Just for you." Report at 2 (citing Ex. 1), 34. But that attached "vacancy notice" merely provides: "TROOPERS MUST HAVE A MINIMUM OF TWO (2) YEARS OF SERVICE AS A UNIFORM TROOPER," without any citation to a rule, statute, or handbook for that requirement. The Report otherwise does not cite to or attach as an exhibit any Trooper, PSU, or New York State Police handbook or specific rule for that requirement, or a purported change to that presumed requirement, and should be supplemented to include that evidence to the extent it exists.

Nor does the Report include any evidence whether others with the same amount of experience as Trooper #1 also joined the PSU despite those purported requirements. Specifically, in Ex. 31 of the Report, "DUFFY, WILLIAM (TROOPERS)" stated in a December 18, 2020 email: "[redacted] *joined the Protective Services Unit in January 25, 2018, along with another*

*Trooper with the same exact amount of experience.*"   Report at Ex. 31 (emphasis in original).  The Report should be supplemented to include whether the Investigators interviewed that other trooper who was also hired with "the same exact amount of experience," whether that trooper was female, what the circumstances were, or whether others with similar experiences were also hired.

Similarly, to undermine the Governor's testimony that he "encouraged the PSU to hire two women who were at the RFK Bridge event," the Report cites to anonymous "Senior Investigator #1's" statement that he did not recall observing the Governor speak to another female trooper at the same event at which he met Trooper #1, Report at 35, without addressing the possibility that the Governor could have spoken with a second trooper outside of Senior Investigator #1's presence.  Instead, the Report finds that "the Governor's statement…was inconsistent with Senior Investigator #1's recounting of the event," further framing its narrative that the Governor singled out Trooper #1 for any reason other than diversity.  *Id.*  The Report should be corrected.

Finally, the Report notably omits testimony from at least one witness that Trooper #1 was recommended to the Governor by a member of the PSU after the Governor had asked about Trooper #1.  This testimony, by a Trooper on the PSU, must be included because it corroborates the Governor's testimony as to why he wanted her assigned to his detail: he was impressed by her, wanted a more diverse detail, and she came well-recommended to him by another member of the PSU.  The failure to include this testimony makes the Report materially misleading on the circumstances surrounding Trooper #1's assignment to PSU.

### C.  The Governor Alleged Comments to Trooper #1.

The Report finds that the Governor made a series of "[o]ffensive comments" to Trooper #1, Report at 35–38, relying primarily on Trooper #1's account.  The comments, taken in context, did not constitute sexual harassment.

The Governor credibly testified that he did not recall inviting Trooper #1 for a tour of the Mansion, talking to Trooper #1 about finding him a girlfriend, talking to Trooper #1 about age differences in relationship, or talking to Trooper #1 about her clothing.  The Governor's lack of recollection on these points was inconsequential because these comments would not constitute sexual harassment despite the Report's conclusions to the contrary.  *See e.g.*, *Faragher*, 524 U.S. at 788 (concluding that "offhand comments" are not actionable).  As for talking to Trooper #1 about marriage, the Report notably omits any reference to the Governor's testimony that he did "make jokes about marriage" to staffers, made jokes about marriage and divorce, and that he spoke to both male and female staffers about their personal lives and relationships—none of which was gender-based.  Having read the Report, what the Governor specifically recalls is that Trooper #1 spoke to him about her engagement to another police officer, on another police force, and conversed with the Governor about her husband-to-be, the marriage planning, and her family's reaction to the marriage and her fiancé.  Nothing about the Governor's conversations with Trooper #1 about her upcoming marriage were inappropriate, remarkable, or gender-based.  As the Governor publicly stated on August 10, 2021:  "I got to know her over time, and she's a great professional and I would sometimes banter with her when we were in the car.  We spent a lot of time driving around the state.  This female trooper was getting married, and I made some jokes about the negative consequences of married life.  I meant it to be humorous."[117]

In addition, the Governor does not doubt that he made joking comments to people—and Trooper #1 may have been one of them—about finding him a girlfriend during 2020 while he was giving the daily COVID-briefings to the nation.   There were regular public jokes about the

---

[117] Julia Jacobo, *Gov. Andrew Cuomo's Full Resignation Remarks: 'The Best Way I Can Help Now is if I Step Aside'*, CNN (Aug. 10, 2021), https://abcnews.go.com/US/gov-andrew-cuomos-full-resignation-remarks-best-now/story?id=79382423.

Governor being single, people calling themselves "Cuomosexual," and many women conveyed messages about wanting to date him, including comedian Chelsea Handler.  This was a running joke with the Governor among his family and staff, and even Troopers.  Nor does the Governor doubt that he joked about any girlfriend who would have to be someone who can "handle pain," because he understands—as do many people—that he is not the easiest person to get along with. Any reference to "handling pain" was a jocular, self-deprecating statement about his own shortcomings.  The Report's utter failure to grapple with context and human interactions, and the Report's exaggeration of the Governor's purported comments into something they were not meant to be is telling of the one-sided nature and motive behind the writing of the Report.  The Report should be supplemented to provide this context.

Further, the Report was wrong when it concluded that the Governor "sought [Trooper #1] out at events," including "at the opening of the Moynihan Hall in January 2021," when he "sought her out specifically to wish her a happy new year."  Report at 38.  Not only is the Report's date of that event incorrect—it was on December 30, 2020 and not "in January 2021,"[118] but the Report's characterization of this interaction is not corroborated by photographic evidence of that event that was omitted from the Report. [119]  The photo of Trooper #1 and the Governor from the event instead shows that upon entering or exiting the event, the Governor saw Trooper #1 when they were both wearing masks, quickly bumped elbows with her, and kept walking.[120]

---

[118] Contemporaneous public videos and schedules for the Governor—to which the Investigators had access—confirm the opening of the train station was on December 30, 2020.  *See, e.g.*, Denis Slattery, *Cuomo Cuts Ribbon at Penn Station's New Light-Filled Moynihan Train Hall*, N.Y. DAILY NEWS (Dec. 30, 2020), https://www.nydailynews.com/news/politics/new-york-elections-government/ny-penn-station-cuomo-moynihan-20201230-pidmvutvkrer3k4oadwatm3tuq-story.html.

[119] Ex. X.

[120] *Id.*



Ex. X

The Report's date should be corrected, and it should be supplemented with that photographic evidence. As for the allegation that the Governor sought Trooper #1 out to wish her "Happy New Year," even if true, the Report distorts a common, human interaction into something improper.

Likewise, in addressing the allegation that the Governor commented on Trooper #1's attire, the Report footnotes the fact that: "The Detail Commander said he did not recall the Governor asking Trooper #1 about her attire; nor did he recall sending a PIN with such a message." Report at 36 n.257. That footnote should be in the main text, and the Report must consider whether the fact that the Detail Commander did not recall this could very well mean that the Governor's comment to Trooper #1 was not remarkable or objectively offensive, as the Report suggests.

Indeed, there was testimony by a number of witnesses—male and female—that the Governor made comments about their appearance and they did not take offense.

### D.  The Governor Did Not Engage in Offensive Touching.

The Report further finds that the Governor engaged in "unwelcome touching of different parts of Trooper #1's body," including "running his hand across her stomach," "running his finger down her back," and "kissing her… on the cheek," Report at 38–42, but completely disregards the Governor's testimony that he "denied that he has ever purposely touched Trooper #1 on her stomach or run his fingers down Trooper #1's back," and "may have kissed her on the cheek at a Christmas Party." *Id.* at 42.

As the Governor publicly stated on August 10, 2021:

> The trooper also said that in an elevator I touched her back and while I was walking past her in a door way I touched her stomach.  Now I don't recall doing it, but if she said I did it, I believe her.  At public events, troopers will often hold doors open or guard the doorways. When I walk past them, I often will give them a grip of the arm, a part on face, a touch on stomach, a slap on the back. It's my way of saying "I see you. I appreciate you, and I thank you." I'm not comfortable just walking past and ignoring them.  Of course, usually they are male troopers.  In this case, I don't remember doing it at all. I didn't do it consciously with the female trooper. I did not mean any sexual connotation.  I did not mean any intimacy by it. I just wasn't thinking.  It was totally thoughtless in the literal sense of the word, but it was also insensitive.  It was embarrassing to her, and it was disrespectful.  It was a mistake plain and simple. I have no other words to explain it.  I personally want to apologize to her and her family.  I have the greatest respect for her and for the New York State Police.[121]

Once again, the Report does not account for context, and address the way the Governor treated other Troopers on his detail.  The Governor testified that he did kiss long-time Troopers on the cheek, hugged them, and teased them, none of it being gender-based.  The Report did not include

---

[121] Jacobo, *Gov. Andrew Cuomo's Full Resignation Remarks: 'The Best Way I Can Help Now is if I Step Aside'*.

this testimony, nor evidence from interviews of other men who worked for the Governor who told Investigators that he would joke with them, did comment on their appearance at times, and would touch them (including hugging and kissing them).  Indeed, we question whether the Interviewers stopped asking these questions to male state employees because they did not want to elicit answers to undercut the narrative that the Governor's actions were gender-based.

While the Governor does not recall touching Trooper #1's back in an elevator and saying, "Hey you," and he does not dispute that this could have occurred, not only would this conduct not be remarkable but the third person in that elevator, Senior Investigator #1, "had not seen the interaction."  Report at 38–39, 39 n.287 (citing only to Trooper #1's testimony and *not* the Senior Investigator's own testimony).  The Report also glosses over that the Trooper who was sitting at a desk on the 38th floor of 633 Third Avenue and with Trooper #1 purportedly shared what had happened "did not recall this conversation.'"  *Id.* at 39 n.287.  Despite the fact that two out of three individuals in the elevator did not recall the incident, and that one Trooper did not recall a contemporaneous recounting of the incident, the Report nevertheless makes the factual finding that it in fact occurred precisely as Trooper #1 described.  The Report should be amended to properly weigh varying accounts, and also take into account the Governor's testimony that he similarly touched male troopers as a greeting.

Moreover, the Report is misleading that the September 23, 2019 allegation that the Governor touched Trooper #1's stomach was "fully corroborated" by "Senior Investigator #2." Report at 40.  The Report only cites to Trooper #1's own testimony for Senior Investigator #2's account, namely that Senior Investigator #2 "saw the Governor touch Trooper #1 in the stomach," and that "[h]e told us he checked in with her later in the day."  *See* Report at 40, 40 n.311–13 (citing to Trooper #1's testimony transcript for the proposition that "Senior Investigator #2

109

corroborated [her] account"). As for the Report's finding that "a number of PSU members recalled hearing about this incident from Trooper #1 after it happened," the Report only cites to two PSU members, one of whom had an entirely different recollection of the interaction. That PSU member "remembered hearing about this event…that the Governor asked Trooper #1 when he put his hand on her stomach *if she was pregnant*, which Trooper #1 denied." Report at 40 n.303 (emphasis added). The Report only cites to one other PSU member as "recall[ing] hearing about this incident, who said that "Trooper #1 told her about this incident the same day it happened," without further detail as to what Trooper #1 described that day, and whether it corroborated her account, the other PSU member's account, or was another account entirely. Report at 40 n.305. The Report should be supplemented, amended, and corrected to properly weigh varying accounts.

Moreover, the September 23, 2019 event at which the Governor touched Trooper #1 on the stomach "as she held the door open for the Governor as he left the event," Report at 40, was an outdoor event to break ground on the new "Belmont Park Arena." The Report omitted any description of the event, and the Report must describe the event to provide context to this interaction. It was an outdoor event with hundreds in attendance, and both photographers and attendees taking pictures of the Governor throughout the appearance. Some photos of the event provide this context:





Ex. Y.

With this context in mind, this supports the Governor's claim that any physical contact with

Trooper #1 that day would have been fleeting and "thoughtless" in the literal sense of the word.

111

The Report should provide detail on precisely what door the Trooper held open (i.e., a car door) because that also provides context to the kind of contact and the incidental nature of it.

Finally, the Report implies something sinister about the Governor's conduct in kissing Trooper #1 on the cheek or asking to kiss her on the cheek. The Governor testified that this conduct is not gender-based, but that more recently he has begun asking permission to kiss women on the cheek so as not to offend them.[122]

Assuming *arguendo* that the Governor touched Trooper #1 in the manner alleged, the incidents were not gender-based and would be episodic, one-off occurrences that do not rise to the level of sex-based harassment. *See Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81 (1998) (Title VII "does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same or opposite sex."); *id.* (emphasizing "the social context in which particular behavior occurs and is experienced by its target); *Russo v. New York Presbyterian Hosp.*, 972 F. Supp. 2d 429, 451 (E.D.N.Y. 2013) (under the NYCHRL, "a plaintiff must still establish that she suffered a hostile work environment *because of her gender.*") (emphasis in original) (citing cases); *Das v. Consol. Sch. Dist. of New Britain*, 369 Fed. App'x 186, 189–90 (2d Cir. 2010) ("unless an incident of harassment is sufficiently severe, [the] 'incidents [comprising a hostile work environment claim under Title VII] must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive'"); *see also Russo*, 972 F. Supp. 2d at 452–53 (granting summary judgment where surgeon's alleged conduct of brushing against female employee when allowing her to pass by him in hospital's small office, and temporarily preventing her from retrieving medical equipment by trapping her with his leg, did not amount to hostile work environment based on gender in violation of NYCHRL or

---

[122] The Governor testified, in part, "But a few years ago, with people I don't know, I would start asking, may I kiss you?"

112

NYSHRL); *Pitter v. Target Corp.*, 2020 WL 8474858, at *9 (N.D.N.Y. Sept. 1, 2020) (recommending finding that plaintiff's contentions that the defendant made "unwanted physical contact with her, including touching plaintiff's lower back and shoulders" were "insufficient to establish a claim for sexual harassment" under the Title VII standard), recommendation adopted, 2020 WL 7767629, at *3 (N.D.N.Y. Dec. 30, 2020); *Moore v. Verizon*, 2016 WL 825001, at *11–*12 (S.D.N.Y. Feb. 5, 2016) (allegations that defendant "once poked Plaintiff in the back" did not rise "to the type of severe and pervasive conduct necessary to establish a hostile work environment claim under the Title VII standard).

### 7.  *Kaitlin*[123]
#### A.  The Report's Findings

The Report finds that the Governor saw Kaitlin at a fundraising event on December 12, 2016 where the two took photos in a "dance pose" when she was not an Executive Chamber employee, and was later hired by the Executive Chamber for a salary of $120,000.  Report at 5; *see also id.* at 85–93.  The Report finds that when she worked at the Executive Chamber, the Governor: "(1) instruct[ed] her to act like a sponge' to soak up knowledge . . . (2) asked about how certain members of his staff, known as the 'mean girls' were treating her; (3) commented on her appearance on a number of occasions, including saying that an outfit she wore made her look like a 'lumberjack' and commenting on her not being 'ready' for work if she was not wearing makeup or was not dressed nicely; and (4) on one occasion, asked her to look up car parts on eBay on his computer, which she had to bend over to do, while wearing a skirt and heels, as the Governor sat directly behind her in his office."  *Id.* at 5.  The Report disregards the Governor's testimony providing context to these allegations and should be corrected to properly weigh varying accounts.

---

[123] The Report notes that Kaitlin's last name has not been publicly reported.  Report at 5.

Further, this conduct, even assuming the truth of it, does not constitute sexual harassment under the law.

**B. The Report Disregards the Governor's Testimony That He Suggested Kaitlin Be Interviewed for a Chamber Position Because of Her Work Talent and That He Was Not Involved in the Setting of Kaitlin's Salary.**

The Report undermines the Governor's testimony to support its narrative that he sought Kaitlin out for any reason other than her work abilities.  Specifically, the Report finds that when Kaitlin was working in the private sector at a lobbying firm, she attended a reception with many others on December 12, 2016, where she met the Governor.  She described that when they met, he "pulled her in close to his body" and took a picture in a "dance pose," and "singled [her] out" and said that "he was going to have [her] work at the state level."  Report at 85.  The Report overlooks the Governor's testimony that he "frequently" assumes that "funny, entertaining pose" for photographs, and only after "her bosses" said she was a "superstar" did he suggest that Executive Chamber staff interview her if she was interested in an executive assistant position because "best talent" was needed in state government.  *Id.* at 86.

The Report also points to Kaitlin's salary of $120,000 as being "so high that it was laughed at during [her] interview for the position," misleading the reader to draw an inference that the Governor somehow was involved in setting her salary.  *See* Report at 5, 86–87.  Buried in a footnote, however, the Report notes that the Governor "had nothing to do with her salary" and that Chamber employees involved in her interview testified that they had no knowledge that the Governor was involved in setting her salary.  Report at 87 n.772.  The Report should be corrected to accurately reflect the Governor's involvement in her hiring.

**C. The Report Disregards the Governor's Testimony Regarding His Comments When Kaitlin Was an Executive Chamber Employee.**

The Report completely ignores the Governor's testimony and concludes that Kaitlin's account is credible, engaging in no meaningful analysis of her credibility beyond citing to her general "level of detail and consistency . . . her demeanor, and the circumstances of [her] allegations."  Report at 93.  The Investigators never even asked the Governor about Kaitlin's allegations that he spoke to her "in a suggestive way," or that he, in response to her offering her cellphone number to him, responded in a manner that she thought he was "insinuating that she 'was coming onto [him] based on the look he gave [her],'" *id.* at 88, to give him an opportunity to respond.  This should be reflected in the Report to demonstrate the lack of fairness the Investigators showed to him.

First, the Report finds that the Governor instructed her to "act like a 'sponge' and soak up knowledge," which the Governor acknowledged he did, Report at 87, but omitted the Governor's testimony that his comment was work-related.  It arose in the context of him having "asked her a number of times to please learn how to transfer a call because it's hard to conduct business when a person keeps dropping calls," that that was his "main interface with her, and that "she wasn't good at what she was supposed to be doing."  *See* Report at 89.  That context showing that the comment concerned her work-performance—rather than her gender—should be added to the Report.

Second, the Report finds that the Governor commented on her appearance, including referring to a shirt she wore as a "lumberjack" shirt, and commenting on her not being "ready," for work, and offers no weight to the Governor's testimony that "[he] did not remember" commenting on her appearance," and that "[he] could have said that about a lumberjack shirt," Report at 87.  The Report omits the Governor's testimony that provided context to his joke about a "lumberjack shirt" that was not gender-based: "I once wore a shirt like that into the Adirondack

115

press office and they made fun of me for wearing a lumberjack-type shirt because I was in the Adirondacks, which was the quintessential Adirondack shirt you would wear, so I may have said that."  As for the Report's finding that she had to "bend over" to "look up car parts on eBay on his computer," Report at 5, the Governor testified that he was sure he "asked [Kaitlin] to come help [him] with the computer on occasion" and recalled an incident "where [Kaitlin] was bent over the computer and [he] was sitting behind her[,]" noting that Kaitlin was bent over "a little bit because . . . the computer is . . . desk level" and the Governor "had to look at the screen [] to tell her what to click."  *Id.* at 88.  While Kaitlin claimed she thought that the Governor called her to his desk "as a pretext to be close to her and watch her from behind," Report at 88, the Investigators never even bothered to ask this question directly to the Governor.  His answer would have been absolutely not.

        The Report accepts Kaitlin's characterization of her departure from the Executive Chamber even though it was at odds with that of Ms. DesRosiers, with no explanation.  Kaitlin told the Investigators that "[a]fter about a year of working in the Executive Chamber, *Ms. DesRosiers approached Kaitlin* about transferring to another state agency, noting that 'what they were doing was not fair to [her],'" which Kaitlin understood to mean that Ms. DesRosiers thought it was unfair that Kaitlin "had been asked to leave her job at a lobbying firm to come to the Executive Chamber to perform administrative tasks and have very little substantive work." Report at 90 (emphasis added).  In fact, Ms. DesRosiers offered a very different perspective on this same situation, claiming that it was Kaitlin who sought to leave the Executive Chamber.  Instead of highlighting this divergence in memory, the Report footnotes Ms. DesRosiers' testimony and elevates the credibility of Kaitlin's statement over that of Ms. DesRosiers. Report at 90 n.803.  Again, this

demonstrates the one-sided nature and bias of the Report.  Ms. DesRosiers' testimony should be included in the main text.

Finally, even assuming *arguendo* the truth of Kaitlin's allegations, her allegations do not rise to the level of sexual harassment under applicable standard.  First, the Report concedes that her claims are time-barred, but nevertheless includes them in the Report.  Report at 143 n.1220, 145–47.  Second, the Report finds that "she has never characterized her experience working in the Chamber as sexual harassment." Report at 91.  She therefore could not have subjectively perceived the environment to be abusive.  *See Harris*, 510 U.S. at 21–22 ("[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.").  Finally, the Report made no attempt to argue that the Governor's comments to Kaitlin were anything more than isolated, work-performance related comments that were not gender-based.  *Kim v. Goldberg, Weprin, Finkel, Goldstein, LLP*, 987 N.Y.S.2d 338, 344 (1st Dep't 2014) (conduct that consisted of "isolated remarks or incidents" was not "severe or pervasive enough to create an objectively hostile or abusive environment" under the NYSHRL and was "nothing more than 'petty slights and trivial inconveniences'" under NYCHRL) (citations omitted).  Accordingly, the Report should be amended to remove Kaitlin's allegations or unequivocally state that the Governor's conduct was not sexual harassment.  The fact that the Report chose to include Kaitlin's allegations and then describe them and make findings in a misleading manner, again shows the biased nature of the Report.

### 8.  *Ana Liss*

#### A.  The Report's Findings

The Report finds that "[d]uring the time Ana Liss worked as an aide in the Executive Chamber from 2013 to 2015, the Governor: (1) addressed her almost exclusively as 'sweetheart'

or 'darling'; (2) on occasion, kissed her on the cheeks and hand, touched and held her hands, and slid his hand around her lower waist; (3) commented on how she looked 'lovely'; and (4) asked whether she had a boyfriend." Report at 5–6; *see also id.* at 81–85. The Governor testified that he "did not remember Ms. Liss." Report at 85. Relying almost entirely on Ms. Liss's own account and along with a single photograph, the Report concluded that Ms. Liss was "credible in substance and in demeanor" and that her "testimony was corroborated in relevant part by photographs and other witnesses." *Id.* The Report should be amended, corrected, and supplemented to meaningfully weigh varying accounts.

### B.  The Report's Material Omissions and Errors

First, the Report finds that "a former colleague . . . recalled that he formed the impression that Ms. Liss had been moved to sit closer to the Governor because she was a young, beautiful, blonde woman . . . and . . . was there to be eye candy," and "another former colleague said it was widely considered that Ms. Liss's office had been moved because of her appearance." Report at 81–82. But the Report includes no citations to interviews or conversations with either of these anonymized "former colleagues" as to how or why they formed these impressions, and whether they were accurate. That testimony should be included in the Report. Further, the Report should be amended to note that Ms. Liss's office was not near the Governor's office; in fact, it was a number of offices away from the Governor's. Moreover, the Report should note (because the Investigators never asked), that the Governor rarely walked over to the side of the Chamber office where Ms. Liss sat.

Second, the Report finds that a "longtime aide" who, according to Ms. Liss, told Ms. Liss that the Governor "liked her, which [Ms. Liss] interpreted to mean that her 'appearance was attractive to the Governor.'" Report at 82. But that aide only stated that she "*may* have told Ms. Liss that the Governor seemed to like her," and the Report fails to reference any testimony or

118

interview of the "long-time aide," what the long-time aide meant by "liked her," and whether Ms. Liss's interpretation of that comment was correct. *Id.* (emphasis added). The Report should be supplemented with that specific testimony, and if the Investigators did not ask the Report should note that fact.

The Report also finds that "[o]n multiple occasions afterwards, the Governor kissed and touched Ms. Liss both in the office and at work parties, including a celebration in or around May 2014, after the passage of the budget," Report at 82. However, the Report offers no corroboration of any kind by any colleagues, staff, or other party attendees who would have witnessed these alleged interactions, especially when Ms. Liss claims "people [were] talking about it." *Id.* at 83. Instead, the Report crafts a narrative entirely on the basis of information provided by Ms. Liss and nameless "colleagues" who worked with her six years ago at the Chamber, based on their belief Ms. Liss was "eye candy" and that the Governor "approached her, kissed her on the cheek, and slipped his hand around her lower waist," and requested that their photo be taken. *Id.* at 82–83. That photo, which the Report states "showed the Governor with his hand around her waist," *id.* at 82–83 & Ex. 66, also shows Ms. Liss's hand reciprocally around his waist. Even though Ms. Liss was under the impression that "people [were] talking about" this encounter, her former supervisor "did not recall this encounter." *Id.* at 83, 83 n.729.



Report at 83 n.728 & Ex. 66.

Nothing about this photo is evidence of sexual harassment or inappropriate behavior by the Governor.

Moreover, the Report finds that Ms. Liss testified that the Governor "almost always" addressed her as "sweetheart" or "darling," Report at 83–84, but hides elsewhere in the Report that the Governor testified he "had been changing his behavior 'recently' because of 'shifting norms,' but 'there are times' when he still slips" and refers to staffers with endearing terms.  *Id.* at 121, 121 n.1068 ("there are times that I slip").

120

Finally, we request that the Report include a finding that this alleged conduct by the Governor, even assuming *arguendo* the truth of the allegations, was not sexual harassment. First, the Report conceded that her claims are time-barred, but nevertheless includes them in the Report. Report at 143 n.1220, 146–47. Second, the Report finds that "the Governor subjected her to unwelcome and non-consensual kissing, touching, and comments." Report at 5–6, 82. Yet the Report omits any reference to Ms. Liss' statements to *New York Magazine* in March 2021 that, while she was employed in the Executive Chamber, she "didn't think of [her] experiences [with the Governor] as sexual harassment,"[124] and in fact continued to value mementos she acquired while employed in the Executive Chamber, including a duffel bag emblazoned with the name "Cuomo"[125] and photo of her with the Governor at the very moment she claims he was making her uncomfortable, which remained framed on her desk as recently as March 2021, when she made her allegations.[126] *See* Report at 83, Ex. 66. The Report also ignores tweets Ms. Liss had sent to the Governor after she left his administration, wishing him happy birthday, wishing him to get well, praising his leadership, and including heart emojis.[127] The Report should be amended to

---

[124] Rebecca Traister, *Abuse and Power Andrew Cuomo's governorship has been defined by cruelty that disguised chronic mismanagement. Why was that celebrated for so long?*, N.Y. MAG. (Mar. 12, 2021), https://nymag.com/intelligencer/article/andrew-cuomo-misconduct-allegations.html.

[125] *Id.*

[126] Jimmy Vielkind et al., *Cuomo Faces New Accusations of Inappropriate Behavior From Third Former Aide*, WALL ST. J. (Mar. 6, 2021), https://www.wsj.com/articles/third-former-andrew-cuomo-aide-describes-inappropriate-workplace-treatment-11615081956?mod=hp_lead_pos2 ("Ana Liss keeps in her office a framed picture of her and Gov. Andrew Cuomo, taken at a 2014 reception, showing his arm around her waist.").

[127] *See, e.g.*, Ana Liss (@analiss), TWITTER (Oct. 14, 2014, 11:52 p.m.), Ex. Z at 1 ("@NYGovCuomo rocking @ Letterman the same night as the #FooFighters"); Ana Liss (@analiss), TWITTER (Oct. 7, 2015, 10:26 a.m.), Ex. Z at 2 ("@NYGovCuomo has set a strong example for U.S. Policymakers. The #NYSAFEAct for gun regulation was passed in 2013."); Ana Liss (@analiss), TWITTER (Dec. 22, 2015, 4:29 p.m.), Ex. Z at 3 ("The governor of New York says he injured his hand…[get well soon and back to ballin' @NYGovCuomo"); Ana Liss (@analiss), TWITTER (June 18, 2015, 2:34 p.m.), Ex. Z at 4 ("Big TY to @JohnMaggiore6 & friends/colleagues @NYGovCuomo office for lovely sendoff…working 4 @Cornell as of Mon 😢💕"); Ana Liss (@analiss), TWITTER (Mar. 20, 2020, 10:48 a.m.), Ex. Z at 5 (stating "This guy 🥰 " to video of Governor Cuomo giving

include all these details because the Report's description and findings with respect to Ms. Liss are misleading without those details.

Given that Ms. Liss conceded in March 2021, that she "didn't think of [her] experiences [with the Governor] as sexual harassment" while she was working at the Executive Chamber, she could not have been perceived the environment to be subjectively hostile or abusive to rise to the level of a hostile work environment under Title VII.  Thus, her claim fails.  *See Harris*, 510 U.S. at 21–22 ("[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.").

We also note that the Report fails to consider the timing of Ms. Liss's allegations and her relationship to another complainant, Karen Hinton, who is mentioned in a footnote 130 of the Report.  Ms. Liss, who worked for Ms. Hinton's husband Howard Glaser, first made public her allegations on March 6, 2021, which is the same day that Karen Hinton made public her claim that the Governor inappropriately hugged her twenty years ago.[128]

### 9. *Virginia Limmiatis*
#### A.  The Report's Findings

The Report found that Ms. Limmiatis—who was not an Executive Chamber employee— in May 2017 "attended a conservation event in upstate New York on behalf of her employer . . . at

---

speech); Ana Liss (@analiss), Twitter (Dec. 6, 2020), Ex. Z at 6 (wishing the Governor happy birthday in Italian: "HBD and tanti auguri to the Gov!").

[128] *See* Jimmy Vielkind, Deanna Paul & Khadeeja Safdar, *Cuomo Faces New Accusations of Inappropriate Behavior From Third Former Aide*, Wall. St. J. (Mar. 6, 2021), https://www.wsj.com/articles/third-former-andrew-cuomo-aide-describes-inappropriate-workplace-treatment-11615081956; Amy Brittain, Josh Dawsey, Hannah Knowles & Tracy Jan, *Cuomo's Behavior Created 'Hostile, Toxic' Workplace Culture for Decades, Former Aides Say*, Wash. Post (Mar. 6, 2021), https://www.washingtonpost.com/politics/cuomo-toxic-workplace/2021/03/06/7f7c5b9c-7dd3-11eb-b3d1-9e5aa3d5220c_story.html.

which the Governor spoke," where she was wearing a "shirt that had the name of the Energy Company written across the chest."  Report at 3–4; *see also id*. at 99–102.  The Report found:

> After the formal program, Ms. Limmiatis *joined a rope line* to meet the Governor.  When the Governor reached her, Ms. Limmiatis *held out her hand* for a handshake.  Governor walked up close to Ms. Limmiatis and pressed his first two fingers of *his right hand* on each letter of the Energy Company's name printed across the chest of Ms. Limmiatis' shirt.  The Governor pressed his fingers on each letter before sliding his fingers to the next letter, while saying "[Energy Company] I know you."  The Governor leaned in so *his cheek was touching Ms. Limmiatis' cheek*, and said something along the lines of, "I'm going to say I see a spider on your shoulder."  Ms. Limmiatis looked down to see that there was no spider or bug[129] on her, but the Governor brushed his hand in the area between her shoulder and breast below her collarbone. Ms. Limmiatis testified that she was too shocked and appalled during the interaction to say anything, and understood the Governor knew he had "done something wrong and that he had to create a cover story."  The Governor continued down the rope line and Ms. Limmiatis looked around to see if anyone else had noticed, but it appeared no one had.

Report at 99–100 (emphasis added).  The Attorney General's investigators asked the Governor if he recalled this event on May 24, 2017 and, understandably, given the number of events the Governor attends, the Governor testified that did not recall the event.[130]  Report at 101.  Notably, the Attorney General's investigators did nothing to refresh the Governor's recollection of the event, such as showing the Governor the many photos taken from that event.

---

[129] The Investigators asked the Governor at his testimony if he ever recalled "running his hand across someone's chest saying, 'now I'm going to have to say *I swatted a bee*," but the Report's finds that he said, "*I see a spider on your shoulder.*"  Report at 99–102.  Nowhere does it state whether this inconsistency was made by the Investigators or in Ms. Limmiatis' testimony.

[130] Notably, the Report devotes nearly an entire page to quoting a prepared statement Ms. Limmiatis read during her testimony, but nowhere does it mention that the Governor was only asked *seven questions* about the entirety of Ms. Limmiatis' allegations towards the end of a long, 11-hour testimony with no efforts to refresh his recollection by, for example, photos the Investigators possessed or details of the event.

The Report "found Ms. Limmiatis to be credible both in demeanor and in the substance of her allegations," which were "substantially corroborated by individuals whom Ms. Limmiatis spoke to contemporaneously about her experience." Report at 102. However, Ms. Limmiatis' allegations were not corroborated by contemporaneous photographs from this event, which the Attorney General's Office was in possession of, but noticeably chose to omit from the Report. [131] Tellingly, the Investigators chose to not show those photographs to the Governor during his testimony and ask him about the photos that captured his interaction with Ms. Limmiatis. The Report should be amended to state that the Investigators did not show the Governor any photographs of the event in which he interacted with Limmiatis. The Investigators failure to do so shows the biased manner in which the investigation was conducted and lack of fairness.

### B.  The Report's Material Omissions and Errors

The public event at which Ms. Limmiatis, and dozens of others, met Governor Cuomo took place on May 24, 2017 along the Salmon River in Oswego County. The Report does not provide important specifics about this event, including that it was an outdoor event attended by dozens of people where an official photographer followed the Governor around taking photographs of him throughout the event. That information should be included in the Report.

The Report did not include a single photo of the hundreds of photos taken at that event, including a series of photos that capture and *do not corroborate* this single interaction between the Governor and Ms. Limmiatis.[132] We request that the Report be supplemented to include all the

---

[131] The Report notes: "Subsequent to Ms. Limmiatis' testimony, we obtained photographs of the event from the Executive Chamber and conducted follow-up interviews with Ms. Limmiatis. Ms. Limmiatis identified the photographs as almost certainly being from the May 24, 2017 event, and explained that it was difficult for her to even review the photographs because they brought a flood of negative emotions about the incident, including shame." Report at 100 n.899. This footnote is misleading because it implies that the photographs somehow corroborate Ms. Limmiatis—when those photos most certainly do not.

[132] Ex. AA.

photos taken that day, which provide critical context to the Governor's interactions with Ms. Limmiatis and numerous other attendees at the event. Set forth below are pictures from the event that show Ms. Limmiatis greeting the Governor and then trailing him as she took photos of the Governor with her cellphone after she met him—a fact that the Report does not include.





Ex. AA

125





Ex. AA



Ex. AA

The omitted photos do not show Ms. Limmiatis standing in a "rope line" to meet the Governor, as she testified. Instead, the photos show Ms. Limmiatis standing in a group of scattered individuals at the event as the Governor greeted people who approached him, including Ms. Limmiatis.

The omitted photos also do not show the Governor's "press[ing] his first two fingers of *his right hand*" on Ms. Limmiatis' shirt, as Ms. Limmiatis testified. Instead, the photos show the Governor's right hand is at his side during his interaction with her, and certainly not close to Ms. Limmiatis' shirt or chest. Ex. AA. The photos also do not show the Governor's cheek "touching Ms. Limmiatis' cheek" or his head anywhere hers. *Id.* The photos show Ms. Limmiatis holding the Governor's left shoulder and smiling back at the Governor. *Id.* At best, the photos show that Governor's left hand may have brushed Ms. Limmiatis' shoulder (not her chest), and that any contact was incidental. Indeed, following their meeting, Ms. Limmiatis trailed the Governor,

taking photos of him as he greeted many others at the event.  *Id.*  These photographs bear no resemblance to the interaction the Report credits and should be included and described in the Report.

The Report also finds that "shortly after the rope line, Ms. Limmiatis approached *three* other attendees of the event, and told them about the Governor's conduct," but provides an account by only one of those purported attendees, Attendee #1, who the Report found "recounted the events in a manner consistent . . . with . . . Ms. Limmiatis' testimony."  Report at 100 (citing to Ex. 71), 100 n.903.  The Report fails to provide any account, citation, or declaration by the two other attendees, but notes that "unlike Attendee #1, these two attendees did not recall Ms. Limmiatis being outwardly upset at the event."  Report at 100 n.903.  We request that the Report include precisely what those other two attendees stated.  We also request that the Report note that members of the Governor's security detail were with him throughout this event, and we believe they were not questioned about these photographs and whether they saw any inappropriate physical contact by the Governor at this event.  This must be included in the Report.

Finally, we request that Report include a finding that, even assuming *arguendo* the truth of Ms. Limmiatis allegations, this alleged conduct by the Governor on May 24, 2017 does not constitute sexual harassment under applicable law.  As a preliminary matter, the Report concedes that Ms. Limmiatis was not "employed by the state" and thus her allegations are "not of workplace harassment."  Report at 142; *see also Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1738–39 (describing "Title VII's command" that it is 'unlawful … for an *employer* to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'") (citing 42 U.S.C. § 2000e-2(a)(1)) (emphasis

added).  Even if she were, this brief single incident n a public place with dozens of people around, does not meet any applicable legal standard for sexual harassment.  *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 60 (2d Cir. 2004) (allegations "not sufficiently severe to overcome its lack of pervasiveness" under Title VII where "the episodes of harassment…were few and occurred over a short span of time").

### 10. State Entity Employee #1
#### A.  The Report's Findings

The Report found that in "September 2019, the Governor attended an event in New York City sponsored by a New York State-affiliated entity," and "he posed for pictures with other attendees, including with an employee of that State-affiliated entity ('State Entity Employee #1'), who was a woman."  Report at 3; *see also id.* at 93–97.  "While the picture was being taken, the Governor put his hand on State Entity Employee #1's butt, *tapped it twice, and then grabbed her butt.*"  *Id.* at 3 (emphasis added).  The Governor testified that he did not recall the event and denied that he would have touched anyone on the butt at an event. [133]  *Id.* at 97.

The Report finds credible State Entity Employee #1's allegation "that the Governor grabbed her butt without her consent" citing that she "testified . . . with a compelling level of detail in a consistent manner. *Her written description of the incident . . . matched her testimony*, as did messages she sent to her friends and family…[and] multiple co-workers and a friend . . . corroborated that [she] had told them the key details of the incident in a manner consistent with her testimony."  Report at 97.

---

[133] We have identified this event as the Revive Mother Nature event at Pier 40 on the West Side of Manhattan on September 14, 2019 given the Investigators' questioning at the Governor's testimony.  Despite having access to photos of the event, the Investigators only asked the Governor during his eleven hours of testimony whether he recalled an event in September 2019, referred him to a schedule from September 14, 2019 that noted an event called "Revive Mother Nature Initiative Announcement at Pier 40", and did not provide any photos to refresh his recollection of this event.

## B.  The Report's Material Omissions and Errors

Notably, State Entity Employee #1's testimony did not match her contemporaneous "written description of the incident."  Specifically, the Report claims that her account of her interaction was "contemporaneously memorialized" in an email that State Entity Employee #1 sent to herself the day after this incident that the Governor "put his hand on State Entity Employee #1's butt, tapped it twice, *and then grabbed her butt*."  Report at 3 (citing to Ex. 4).  While the Report included that email in one of its three appendices, the Report notably does not quote from it—and it must.  The email stated, in pertinent part:

> My boss and I stood on either side of Governor Cuomo and we took a couple pictures with the Governor's photographer.  When departing from taking the picture, Governor Cuomo **tapped my butt cheek two times (to quick pats)** with what felt to be the palm of his hand.  I was very surprised and so as I made a few steps forward with my boss, [   ] I told her immediately that Governor Cuomo patted my butt.

Report at Ex. 4 (emphasis added).  State Entity Employee #1's contemporaneous email describing the interaction *makes no mention that the Governor "grabbed her butt," as the Report found.*  The Report must be corrected to quote from this email in the main text, and note that State Entity Employee #1 made no mention of the Governor having "grabbed her butt" in that email.  Without this correction, and including a quote from that contemporaneous email, the Report is materially misleading about this purported interaction.

To the extent the Report relies on State Entity Employee #1's testimony almost two years after the alleged incident for that finding, her testimony was that the Governor "then moved his fingers upward to '*kind of grab that area between [her] butt and [her] thigh*'"—not that he "grabbed her butt."  Report at 94 (citing to State Entity Employee #1's testimony) (emphasis added).  The Report must be corrected in this regard as well, as the Report is misleading to make a finding that the Governor "grabbed her butt."

130

Moreover, the Report—to further frame its narrative—characterizes the Governor as having "grabbed State Entity #1's arm and asked for a photograph," Report at 93, when State Entity #1's contemporaneous email makes no mention of the Governor grabbing her arm: "my boss and I introduced ourselves and said thank you to Governor Cuomo and he suggested that we [redacted] take a picture with him," Report at 95, Ex. 4.

Further, the Report did not include a single photo in the approximately 150 official photos taken at this September 14, 2019 outdoor event even though the Investigators had access to those photos.[134]  *See, e.g.*, Ex. BB.  The event should be specifically described in the Report, i.e., an outdoor, September 14, 2019 "Revive Mother Nature Initiative Announcement" at Pier 40, Hudson River Park, so that readers have context to this individual's interaction with the Governor that day. The photos and videos from that event provide context to the Governor's interactions with many constituents that day outside in a very public setting, where he was accompanied by his daughter and numerous still photo and video cameras documented his every move.

The Investigators chose to "anonymize" certain individuals including State Entity Employee #1, because "in [their] judgment, the specific identity was not necessary to understand the context."[135]  Report at 1 n.2.  Although we cannot pinpoint who State Entity Employee #1 is

---

[134] The Report states that State Entity Employee #1 "identified certain photographs that were taken that day, including one photograph with the Governor taken, she believed, prior to the time the Governor grabbed her butt," but does not append those photos.

[135] *See also* Report at 17–18 (no citation to any transcript when finding that "a colleague of Executive Assistant #1 was present and corroborated" the allegation that the Governor asked Ms. Commisso to take her zip-up hoodie off); *id.* at 24 (no cite for assertion that "we learned during our interviews that Governor Cuomo had asked two other women in the Executive Chamber, on separate occasions, to take a selfie with him and then instructed each woman to send the selfie to a different woman in the Executive Chamber."); *id.* at 30 (no citation to any transcript or identification of "other witnesses" who "described noticing a general change in Executive Assistant #1's demeanor in March 2021" that she was "now noticeably more reserved and somber.") *id.* at 46 (indicating that after a meeting with the Governor, "a colleague told Ms. Bennett that the Governor had been testing Ms. Bennett for her temperament, confidence, ability to handle herself, anxiety, and memory," without identifying this "colleague" or citing to any document other than Ms. Bennett's transcript); *id.* at 82 (concluding Ms. Liss's allegations as credible

given that anonymization (and we request that you make that information available to us), nothing in the many photographs or videos from that event suggests any untoward behavior by the Governor with anyone in attendance that day. *See* Ex. BB. The Report should identify State Entity Employee #1, and include any photos of her interaction with the Governor.

The Report also finds that "messages she sent to her friends and family . . . [and] multiple co-workers and a friend . . . corroborated that [she] had told them the key details of the incident in a manner consistent with her testimony," none of which were appended to the Report even though "she provided [the Investigators] with screenshots of the messages." Report at 95, 97. Without that first-hand evidence, readers are left to accept as fact the Report's second-hand description of those messages, when the Report already severely mischaracterized an email that it did include in the Report. We respectfully request that those messages be included as exhibits to the Report in the same manner as the Report included other relevant text messages.

Moreover, the Report gives no weight to State Entity Employee #1's supervisor's contemporaneous reaction to State Entity Employee #1's allegation: *she "ask[ed] questions focusing on the Governor's intent,"* Report at 95 (emphasis added), presumably that any "tap" was accidental. State Entity Employee #1's supervisor was standing next to her as the photos were being taken, specifically the "Governor stood between State Entity Employee #1" and the supervisor. *Id.* at 93–94. The Report should provide additional details as to the supervisor's reaction and what she witnessed while standing next to State Entity Employee #1 as the alleged incident occurred.[136]

---

based entirely on the account and testimony of a "longtime aide" without any reference to testimony or that the aide "recalled that she may have told Ms. Liss that the Governor seemed to like her").

[136] The Report—to further frame its narrative—characterizes the Governor as having "grabbed State Entity #1's arm and asked for a photograph," Report at 93, when State Entity #1's contemporaneous email makes no mention of a

Finally, the Report must include a finding that, even assuming *arguendo* the truth of State Entity Employee #1's allegations (and we disagree with any allegation that the Governor grabbed this person's butt), this alleged conduct by the Governor on September 14, 2019 does not constitute sexual harassment under state or federal law.  As a preliminary matter, the Report provides no caselaw or analysis for its assumption that an employee of the anonymous "New York State-*affiliated* entity" "created by State legislation" is a "State Entity Employee" for purposes of workplace harassment here.  Report at 3, 93.  Indeed, the Report presumes—without citing to any caselaw—that the proper inquiry for purposes of determining liability is whether an individual is an employee of the "state," rather than of the Executive Chamber.  At a minimum, this issue warranted analysis and discussion in the Report. The Report also strategically anonymizes State Entity Employee #1, thereby precluding any meaningful analysis as to whether her "state affiliated entity" employer qualifies as an "employer" of the "state" or the Executive Chamber by its "affiliation" for purposes of workplace harassment.  *See, e.g.*, *Strauss v. New York State Dep't of Educ.*, 805 N.Y.S.2d 704, 709 (3d Dep't 2005) (finding that plaintiff had not demonstrated that the State Education Department and the Department of Labor were a single employer creating an employment relationship for purposes of determining liability under Title VII and the NYSHRL).

This brief interaction with a citizen who works for a state-affiliated entity—as opposed to a state entity[137]—in a public place with dozens of people around, does not meet any legal standard for sexual harassment. *See* 42 U.S.C. § 2000e-2 (requiring an employment relationship to state a

---

grabbing of her arm: "my boss and I introduced ourselves and said thank you to Governor Cuomo and he suggested that we, [redacted] take a picture with him," *Id.* at 95, Ex. 4.

[137] The Report is misleading in repeatedly calling this woman "State Entity Employee #1" when she did not work for a state entity.  *Compare* Report at 93 ("State Entity Employee #1 is an employee of a *State-affiliated entity* created by State legislation) (emphasis added) *to id.* at 142 (referring to State Entity Employee #1 as "an employee of a State entity") *and id.* at 146 ("We conclude the above-described conduct . . . constituted sexual harassment that created a hostile work environment for *State employees*.") (emphasis added).

hostile work environment claim); N.Y. Exec. L. § 296 (same); *Gulino v. N.Y. State of Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006) ("[T]he existence of an employer-employee relationship is a primary element of Title VII claims").

If anything, the Governor had fleeting physical contact with this individual as he posed for pictures. He did not intentionally "grab" anyone's butt, and the contemporaneous email of State Entity Employee #1 corroborates this fact. Even if there was an employment relationship—and there was not—any single incident of "tapping" of her butt while taking a photo would have been accidental. Indeed, the only case to which the Report cites for its finding (Report at 147) makes clear that under Title VII, "even more intimate or more crude physical acts—a hand on the thigh, a kiss on the lips, *a pinch of the buttocks*—may be considered insufficiently abusive to be described as 'severe' when they occur in isolation." *See Redd*, 678 F.3d at 177 (citation omitted) (emphasis added).

### 11. State Entity Employee #2

The Report finds that "on March 17, 2020, a then-Director at New York State's Department of Health ("State Entity Employee #2"), who is also a doctor, participated in a press conference with the Governor, during which she performed a live COVID-19 nasal swab test on the Governor." Report at 6; *see also id.* at 97–99. "As they were preparing for the press conference . . . the Governor requested that State Entity Employee #2 not put the swab up his nose 'so deep that you hit my brain,'" and State Entity Employee #2 replied that she would be 'gentle but accurate,' to which the Governor responded, '[G]entle but accurate, I've heard that before.'" *Id.* at 6. During this press conference—at which the Doctor was wearing personal protective equipment including a plastic face-shield, face mask, plastic gloves and a large wraparound

medical gown—the Governor jokingly stated, "Nice to see you, Doctor—you make that gown look

good." *Id.*

Here is the photograph of the Governor receiving the live nasal swab COVID test from

State Entity Employee #2 on May 17, 2020:



138

The Doctor claimed that she felt the Governor stood too close to her during their interaction that

day and behaved in a "flirtatious" manner, and that his comments made her "uncomfortable." *Id.*

at 98–99.

Simply put, State Entity Employee #2's interaction with the Governor should never have

been included in the Report. The Governor's behavior—even assuming *arguendo* the truth of her

---

138 Robert Harding, *Cuomo Tested for COVID-19 During Briefing, NY Reaches 40K Testing Goal (Video)*, AUBURN
PUB (May 17, 2020), https://auburnpub.com/news/local/govt-and-politics/cuomo-tested-for-covid-19-during-
briefing-ny-reaches-40k-testing-goal-video/article_3168dec3-d37b-5353-96c3-06c7fab81eed.html.

claims—was in no way inappropriate nor remarkable.  The decision to include this irrelevant interaction demonstrates the lack of objectivity in drafting the Report.  The Report concludes without basis that the Governor's single, isolated "comment would not have been made to a physician who was a man," Report at 146, in an attempt to make it a gender-based comment when it was not.  The Report should be amended to include testimony that the Governor made similar remarks to both genders.  We respectfully request that the Office remove from the Report all reference to State Entity Employee #2's interaction with the Governor.  Alternatively, we request that the Office amend the Report to affirmatively state that the Governor's conduct in this instance did not constitute sexual harassment under any applicable law.

Moreover, the Report is wrong when it found that on "March 17, 2020" State Entity Employee #2 performed the live COVID-19 nasal swab demonstration on the Governor.  It was May 17, 2020, and this error should be corrected.

### 12. Anna Ruch

#### A.  The Report's Findings

The Report finds that "on September 14, 2019, at the wedding party of one of the Governor's senior aides, the Governor approached a guest, Anna Ruch"—who was not an Executive Chamber employee—"shook her hand, and then quickly moved his hands to her back, touching her bare skin where there was a cutout in her dress."  Report at 6; *see also id.* at 102–103.  "Ms. Ruch, feeling uncomfortable, grabbed the Governor's wrist and removed his hand from her back.  At that point, the Governor purportedly remarked, 'Wow, you're aggressive,' after which the Governor allegedly cupped her face in his hands and said, 'Can I kiss you?'  Without waiting for a response, and as Ms. Ruch tried to move and turn her face away, the Governor kissed her left cheek."  *Id.* at 6.  Relying solely on "pictures taken" that the Report asserts "corroborate her general description," the Report finds Ms. Ruch credible "both in her demeanor and in the substance of

her allegations," without a single quote or cite to any testimony by either Ms. Ruch or any other witness at the wedding.  *Id.* at 103.  The Report should be supplemented with that testimony.

### B.  The Report's Material Omissions and Errors

As a preliminary matter, this fleeting interaction between the Governor and a guest at a wedding—who is not a state employee—has no place in the Report.  There was nothing untoward or remarkable about the Governor's conduct with Ms. Ruch, even assuming *arguendo* Ms. Ruch's account is accurate.

Further, the Report should specify that the investigators interviewed Ms. Ruch informally and not under oath, and that her interview was not transcribed. [139]  Thus, to the extent the Report includes purported quotes from Ms. Ruch to the investigators, the lack of any transcript or on-the-record testimony should be made clear.

Moreover, the Report finds credible Ms. Ruch's allegation that the Governor "kissed her left cheek," Report at 102, even though in texts Ms. Ruch sent her friend just two days after the incident, she asked, "Sorry last thing, *he kissed me on the cheek right?*  Because I remember . . ." *Id.* at 103 (citing Ex. 73).  The Report then cuts off the remainder of Ms. Ruch's text and conversation after "Because I remember," instead of providing that context and assessing Ms. Ruch's recollection in its credibility analysis.[140]  Although Ms. Ruch seems to have relied upon her friend's recollection of the interaction, the Report makes no mention of any interview of or

---

[139] Given the lack of citations to Ms. Ruch's testimony, it appears the Investigators chose to interview her informally, not under oath.  *See* Report at 1 n.3 ("Where on-the-record testimony was taken of witnesses, we cite to the page and line numbers of the transcripts. This Report also includes information obtained from interviews conducted, as well as documents collected during the investigation, some of which are attached to an Appendix and cited to as Exhibits").

[140] The text message refers to photos taken of Ms. Ruch and the Governor at the wedding by a professional wedding photographer, which the Report does not append as an exhibit, instead basing the entirety of its corroboration on blurry photos of the encounter that it chooses to include in the Report.  Report at 103 n.912 & Ex. 73.

testimony by that friend.  The complete text messages and the testimony of her friend—and their effect on Ms. Ruch's account—must be included in the Report.  If Ms. Ruch's friend was not interviewed, that fact must be included in the Report. We request that you make all of the relevant text messages available to us and the public.

In addition, the Report frames the interaction as the Governor seeking Ms. Ruch out. Specifically, it describes that "when the Governor reached them . . . he quickly moved his hand to her back, touching her bare skin . . . so she . . . removed his hand from her back" when in fact, it was Ms. Ruch's friend who "suggested that they try to take a picture with him.  Report at 102. Media reports of the interaction stated that it was Ms. Ruch who approached the Governor and asked him for a photo: "Ruch's friend verified the account to CNN, saying Ruch asked Cuomo for a photo during a crowded wedding reception in New York in 2019."[141]  We ask that this quote from CNN be included in the Report for context regarding the Governor's interaction with Ms. Ruch.

Finally, in describing the Governor's interaction with Ms. Ruch, the Report includes a footnote referencing an unremarkable interaction the Governor had with constituent Sherry Vill. Report at 103 n.915.  The Governor met Ms. Vill at her home on May 28, 2017 when he surveyed flood damage in Monroe County.  Ms. Vill's son and husband, as well as others were present. The Governor greeted Ms. Vill with a kiss on the cheek—as he did for other constituents he met that day.  Ms. Vill recently complained *for the first time* that she was uncomfortable with the Governor putting his hands on her face, kissing her cheek, and calling her "beautiful" during their brief

---

[141]  Paul LeBlanc and Gregory Krieg, *Cuomo Made Unwanted Advance Toward Woman During 2019 Wedding, Witness Says*, CNN (Mar. 2, 2021) https://www.cnn.com/2021/03/02/politics/andrew-cuomo-anna-ruch/index.html.

interaction.[142]   While Ms. Vill's interaction with the Governor was recorded by a photographer, the Report chose not to include the photos with Ms. Vill from that day:



143

The Report also did not mention Ms. Vill's June 6, 2017 and August 6, 2017 positive Facebook posts about her meeting with the Governor:

---

[142] Report at 103 n.915 ("She also told us that the Governor told her she was 'beautiful.'").

[143] Teri Weaver, *New accuser says Cuomo inappropriately kissed her in her Greece, N.Y. home*, SYRACUSE POST-STANDARD (Mar. 29, 2021), https://www.syracuse.com/state/2021/03/new-accuser-says-cuomo-inappropriately-kissed-her-in-her-greece-ny-home.html.





144

Because the Report included Ms. Vill's description—four years later—of her interaction with the Governor in 2017, the Report must include the photos of that unremarkable interaction as well what Ms. Vill contemporaneously posted on Facebook about the Governor and her positive views about their interaction at that time. Without those photos and Ms. Vill's positive posts, the Report is materially misleading about their interaction.

Including the Anna Ruch wedding interaction, along with a reference to Ms. Vill's recent claim, served only to prejudice the public against the Governor. Both interactions should be deleted from the Report—as they do not constitute sexual harassment under any law, and the

---

144 Ex. CC.

Report was to address sexual harassment allegations only.  The Report concedes that Ms. Ruch was not "employed by the state" and thus her allegations "were not of workplace harassment." Report at 142.  Including these allegations is misleading and supports the incorrect narrative that the Governor sexually harassed "multiple" women.  Alternatively, the Report must be amended to affirmatively state that the Governor's interactions with Ms. Ruch and Ms. Vill did not violate any law.  Further, the appropriateness of those interactions may be subject to varying interpretations, but were not sexual harassment under the law or sexually-driven or gender-based.

### 13. The Report's Material Omissions Served to Create An Appearance of a Hostile Work Environment

The Report includes a catch-all finding that "under the totality of the circumstances" the Governor made "less overtly sexual comments that were nonetheless gender-based, [and] created a hostile work environment" to further support its distorted narrative.  Report at 148.  Specifically, it finds that the Governor engaged in "hugs, kisses, and other touching" of "staff members" that made them "uncomfortable or were unwelcome, including kissing [Ms. Commisso] at least once on the lips, kissing Ms. Boylan on the lips on one occasion, kissing Trooper #1 on the cheek in the presence of her colleague, a man, while she was working on the Governor's protective detail, kissing various staff members . . . on the cheeks and forehead, and engaging in uncomfortably close hugs with [Ms. Commisso] . . . [as well as] touching [staff members'] arms, legs, back, kissing their hands, and squeezing their waists for pictures," Report at 143.  Critically, the Report's one-sided factual findings were framed to support its flawed legal findings, which in turn created a misleading narrative that the Governor "sexually harassed 11 women."  He did not.  He did not sexually harass a single woman.

The Report focuses exclusively on how the Governor behaved with women, but makes no mention of the Governor's similar behavior with men.  The Report omitted key testimony that

would have demonstrated that the Governor treated both female and male employees equally, and many of the allegations were not gender-based.  The Investigators asked numerous witnesses about whether the Governor kissed and hugged men, or commented on the men's appearance.  Those witnesses said, yes, the Governor did hug and kiss male employees, and would comment about their appearance on occasion.  Yet, none of this evidence was included in the Report.  In making findings that the Governor's alleged behavior was gender-based, it was incumbent upon the Investigators to include what they were told by witnesses about the Governor's treatment of men. Further, we assume the Investigators also must have asked about conversations the Governor had with male employees, including conversations about their personal lives.  That must be included in the Report.  If the Investigators did not fully explore the Governor's conduct with respect to men, that should be included in the Report given the Report's conclusion about the Governor's conduct being "gender-based."

As discussed *supra*—and was omitted from the factual findings of the Report—the Governor regularly hugged male and female staff members alike, kissed them on their cheeks, put his arms around them when taking photos with them at events, as is commonplace with politicians. *See, e.g.*, Report at 4 (couched as making comments "on the basis of [Ms. Boylan's] gender" but omits testimony that he commented on men and women's appearance alike); *id.* at 3, 52–53 (insinuating that "he was lonely" was a gender-based comment but omitting the Governor's testimony that he "denied telling Bennett that he was 'lonely,' explaining that, at the time, he was talking to people about the 'concept of loneliness in COVID,' but was not referring to his own circumstances"); *id.* at 7, 121 n.1068 (glosses over Governor's testimony that he often hugs and kisses people, mostly on the cheek," both men and women); *id.* at 8 (acknowledges that the Governor "did not dispute that he sometimes commented on staff members' appearance and attire

(although generally only to compliment)" and hides the ball that "staff members" would include members of both sexes); *id.* at 9 (assumes "gender-based comments"); *id.* at 12 (concedes that "certain . . . did not take issue with the Chamber's culture . . . expressed surprise at the harassment allegations . . . " but omits any examples); *id.* at 120 (glossing over that "witnesses also observed that the Governor often touched *people*" not "women").

In addition, we request that the Report be supplemented to include all details underlying the Report's finding that: "A number of former and current Executive Chamber staff, particularly the senior staff, as well as State Troopers on the PSU, denied having witnessed or experienced any conduct by the Governor that could be characterized as sexual or otherwise inappropriate." Report at 121. Specifically, the Report must include the precise number of those former and current staff, as well as the PSU troopers. Also, the Report must include quotes from the interviews of those individuals—assuming the Investigators chose to transcribe those interviews—describing the basis for that conclusion. Absent this information, the Report is misleading and incomplete.

Further, we request that the Report distinguish between work and social interactions between the Governor and staffers with whom he has worked for many years. For example, the Report provides an example from Ms. Benton's testimony that she sat on the Governor's lap at an event for Executive Chamber and state agencies' heads. Report at 122. This description omits the fact that this was an informal evening social event. Omitting such context prevents the public from understanding the nature of the interaction and professional but familiar relationship between the Governor and Ms. Benton.

Finally, the Report's argument that "claiming that the gender-based behavior is simply a function of being old-fashioned or culturally more affectionate is not a defense to sexual harassment," Report at 148, misses the mark. The Report assumes his "old fashioned or culturally

more affectionate" conduct was gender-based, but the Governor has been familial with both males and females, and with people of all backgrounds—not just women.  Such non-gender-based hugging, kissing, or one-off contact to take professional photos at events is not workplace harassment.  *See, e.g.*, *Fattoruso*, 873 F. Supp. 2d at 578 (alleged unequal treatment insufficient under NYCHRL where "there is nothing that indicates that plaintiff was treated unequally based upon his gender") (quotations omitted); *see also Hsueh v. N.Y. State Dep't of Fin. Servs.*, 2017 WL 3671179, at *5 (S.D.N.Y. Aug. 24, 2017) (staring at plaintiff's "face, chest, and legs multiple times," "grabb[ing]" plaintiff's arm, asking for plaintiff's phone number, standing close to her on an elevator, and "kiss[ing] her between her ear and cheek" insufficient under Title VII  given that "many of these incidents are innocuous and without any clear gender overtones").

## III.   THE MANNER IN WHICH THE INVESTIGATION WAS CONDUCTED AND REPORT ISSUED DID NOT COMPORT WITH BASIC FAIRNESS AND LACKED OBJECTIVITY.

The manner in which the Attorney General's Investigators conducted this "investigation" did not comport with basic fairness considerations and resulted in a biased, incomplete, and misleading Report. The Investigators did not act objectively in assessing the allegations, and treated the complainants differently than other witnesses.  The manner in which the investigation was conducted, the approach to the questioning of the Governor and others who had favorable things to say about him and perhaps unfavorable things to say about some complainants, and the lack of transparency with the evidence and any ability for the Governor to respond, demonstrates that this investigation had a predetermined outcome and was designed to force the Governor out of office by impeachment or resignation.  Many of these fairness concerns were address in the August 4, 2021 letter to the Investigators by outside counsel to the Chamber, which we attach as Ex. DD. and request that you address those concerns in an amended Report or include that letter in an amended Report.

144

First, while the Investigators were conducting interviews during the five-month investigation, the Investigators treated the complainants differently than other witnesses. In particular, the Investigators warned some witnesses—primarily Executive Chamber employees—to refrain from discussing with anyone their testimony or otherwise be guilty of a misdemeanor in violation of Exec. L. § 63(8). The Investigators did not always provide that same warning to the complainants, who were often interviewed informally as an initial matter without being subject to penalties of perjury and a transcription of their testimony, and then a second time formally under oath. The number of interviews for the complainants allowed for ironing out of inconsistencies without a formal record as to those inconsistencies. Given that disparate treatment, while the Governor and others refrained from publicly addressing the allegations during the five-month investigation, the complainants and their attorneys discussed the substance of their allegations in public social media posts and in interviews with various news outlets:

- Ms. Boylan made her initial accusations on December 13, 2020 on Twitter, followed by a February 24, 2020 self-published article on *Medium* detailing her accusations.[145] Since then, she has continued to populate her Twitter with additional accusations against the Governor and statements that impugn the Governor's character beyond the scope of her personal allegations. For example, she has repeatedly deemed him the "Rape culture king" or associated him with rape culture.[146]

---

[145] Lindsey Boylan, *My Story of Working with Governor Cuomo*, MEDIUM (Feb. 24, 2021), https://lindseyboylan4ny.medium.com/my-story-of-working-with-governor-cuomo-e664d4814b4e.

[146] Lindsey Boylan (@lindseyboylan), TWITTER (March 27, 2021, 9:31 a.m.), https://twitter.com/LindseyBoylan/status/1375802624184877059; Lindsey Boylan (@lindseyboylan), TWITTER (March 24, 2021, 12:32 p.m.), https://twitter.com/LindseyBoylan/status/1374761026596569088; Lindsey Boylan (@lindseyboylan), Twitter (March 11, 2021, 10:47 p.m.), https://twitter.com/LindseyBoylan/status/1370219914775121920; Lindsey Boylan (@lindseyboylan), TWITTER (Feb. 15, 2021, 4:17 p.m.), https://twitter.com/LindseyBoylan/status/1361424498495528961.

- Ms. Liss has been featured in five television or radio interviews detailing her allegations against the Governor and describing the work culture of the Executive Chamber as toxic.[147]

- Ms. Bennett has given four interviews regarding her allegations, which included a claim that the Governor was "grooming" her.[148]

- Debra Katz, the attorney representing Ms. Bennett, made a statement on April 8, 2021 that "By failing to report Ms. Bennett's allegations as required under the executive order signed by Governor Cuomo, Judith Mogul and Jill DesRosiers fostered a toxic culture of enablement and abuse, which led to the aggressive groping of this woman, who was simply trying to do her job.  This behavior was completely preventable."[149]

---

[147] Evan Dawson & Megan Mack, *Connections: Monroe County Official Describes the Culture of the Cuomo Administration,* WXXI AM NEWS (Mar. 26, 2021), https://www.wxxinews.org/post/connections-monroe-county-official-describes-culture-cuomo-administration; *Two of Gov. Cuomo's Accusers Reflect*, WNYC RADIO (Mar. 15, 2021), https://www.wnyc.org/people/ana-liss/; Adam Chodak, *Cuomo Accuser Ana Liss: Governor's Problems are 'Tip of the Iceberg'*, ROCHESTER FIRST (Mar. 12, 2021), https://www.rochesterfirst.com/cuomo-investigation/cuomo-accuser-ana-liss-governors-problems-are-the-tip-of-the-iceberg/; *Cuomo Accuser Ana Liss Shares Experience, Discusses 'Toxic' Work Environment*, CBS NEWS (Mar. 10, 2021) https://newyork.cbslocal.com/video/5378215-cuomo-accuser-ana-liss-shares-experience-discusses-toxic-work-environment/; Adam Chodak, *Local Cuomo Accuser Ana Liss on Time in Governor's Office: 'It was Toxic, Retaliatory, Hostile'*, ROCHESTER FIRST (Mar. 8, 2021) https://www.rochesterfirst.com/cuomo-investigation/ana-liss-governor-andrew-cuomo-rochester-monroe-county-aide-employee-accusations-inappropriate-behavior-investigation/.

[148] *See* Charlotte Bennett (@CharlotteBennett), TWITTER (May 13, 2021, 12:54 PM), https://twitter.com/_char_bennett_/status/1392886064872820738 ("When @NYGovCuomo propositioned me for sex, he broke the law. It is very simple: the issue is about his actions, it is not about my feelings. He broke the law (you know, the one he signed). Apologies don't fix that, and neither do denials."); Bernadette Hogan & Bruce Golding, *Gov. Cuomo's Top Aides 'Enabled' Sexual Harassment, Says Accuser*, N.Y. POST (Apr. 8, 2021), https://nypost.com/2021/04/08/gov-cuomos-top-aides-enabled-sexual-harassment-accuser/?utm_source=twitter_sitebuttons&utm_medium=site%20buttons&utm_campaign=site%20buttons; Jesse McKinley, *Cuomo Aide Says Governor 'Groomed' Her For Months Before Groping*, N.Y. TIMES (Apr. 7, 2021), https://www.nytimes.com/2021/04/07/nyregion/cuomo-sexual-harassment.html; Maria Kramer, *Exclusive: Debra Katz, Attorney For Cuomo Accuser Charlotte Bennett, Accuses Governor Of Witness Intimidation*, CBS NEWS N.Y. (Mar. 22, 2021), https://newyork.cbslocal.com/2021/03/22/exclusive-debra-katz-charlotte-bennett-attorney-interview/; Jesse McKinley, *Cuomo is Accused of Sexual Harassment by a 2nd Former Aide*, N.Y. TIMES (Mar. 16, 2021), https://www.nytimes.com/2021/02/27/nyregion/cuomo-charlotte-bennett-sexual-harassment.html ("Asked if she felt Mr. Cuomo's questions and comments were an entreaty to a sexual relationship, Ms. Bennett said 'That's absolutely how it felt.'"); *"The governor's trying to sleep with me": Cuomo accuser recalls alleged harassment*, CBS NEWS (Mar. 5, 2021), https://www.cbsnews.com/news/cuomo-acuser-charlotte-bennett-interview-sexual-harassment/ ("on June 5, 2020, Cuomo asked multiple questions that led her to the conclusion that 'The governor's trying to sleep with me'.").

[149] *Cuomo accuser, Charlotte Bennett, says other groping incident involving Cuomo staffer could have been avoided*, WGRZ BUFFALO (Apr. 8, 2021), https://www.wgrz.com/article/news/local/cuomo-accuser-charlotte-

- Alyssa McGrath gave an extensive interview to the New York Times, outlining her accusations and alluding to communications with Brittany Commisso.[150]

- Brittany Commisso gave an interview to the Times Union detailing her claims of sexual harassment and groping.[151]

The complainants thereby skewed public opinion during the months preceding the public issuance of the Report.  This process also afforded the complainants the opportunity to further develop their individual narratives with the knowledge of details of allegations made by other complainants, further compounding the possibility of ironing out inconsistencies from informal interviews to the those subsequently taken under oath.

Second, with respect to the Investigator's disparity in the questioning of witnesses, as set forth in the August 4, 2021 letter from the Executive Chamber's outside counsel to the Investigators:

> Once witness interviews began, the bias was also evidence from the questions posed by you and your colleagues and the subject matters you chose to pursue or neglect.  For example, during the course of 18 interviews in which we represented individual Executive Chamber employees, we often observed that the questions were frequently leading, posed with an air in incredulity, and seemingly designed to push witnesses into particular answers that seemed less favorable to the Governor or the Chamber.[152]

---

bennett-says-other-groping-incident-involving-cuomo-staffer-could-have-been-avoided/71-7b0df781-df4c-499c-84f6-ca363a413af9.

[150] Jesse McKinley, *Cuomo Faces New Claims of Sexual Harassment from Current Aide*, N.Y. TIMES (Mar. 19, 2021), https://www.nytimes.com/2021/03/19/nyregion/alyssa-mcgrath-cuomo-harassment.html?action=click&module=Alert&pgtype=Homepage.

[151] Brendan Lyons, *In her own words: Woman describes Cuomo's alleged groping at mansion*, TIMES UNION (Apr. 7, 2021), https://www.timesunion.com/news/article/cuomo-alleged-groping-victim-mansion-incident-16078748.php?IPID=Times-Union-HP-CP-Spotlight.

[152] Ex. DD at 8.

147

Indeed, during the Governor's July 17, 2021 interview, the Investigators' manner of questioning was like a plaintiff's counsel taking a deposition of a defendant, as opposed to a truly independent counsel seeking to "act judiciously and follow the facts where they lead"[153] as the Investigators promised at the start of the investigation.  The manner of questioning was designed to elicit kernels of information helpful to a preordained narrative, as opposed to getting at the truth and full circumstances.  For example, the Investigators chose not to share photographs with Governor Cuomo of various interactions during his testimony, although they shared those same photographs with the complainants.  The Investigators made a point not to refresh the Governor's recollection. At times, the Investigators' manner of questioning appeared to be a pop quiz to surprise him and catch him off-guard by asking him whether he recalled minute details from events that occurred years ago, never taking into account the number of people that the Governor encounters and hundreds of events he attends each year.  The Governor should have been treated the same as the complainants in this process.  He should have been given an informal interview initially, and then an interview that was transcribed and taken under oath.  The Governor also should have been treated the same as the complainants in terms of the manner of questioning.

Moreover, with respect to how the Investigators treated witnesses, as we have publicly stated, an attorney for a former Chamber employee called me after her client's "informal" interview to express grave concerns about the manner of questioning and the motivations of the Investigators.  This attorney wanted me to know that the Investigators actively sought to push her client in a certain direction, expressed unhappiness with answers that did not support what was clearly a bias the Investigators had against the Governor, tried to minimize the import of favorable

---

[153] *Id.* at 9 (citing Peltz & Neumesiter, *Lawyers investigating Cuomo have taken on political figures*, AP NEWS, (Mar. 8, 2021), https://apnews.com/article/new-york-andrew-cuomo-trump-investigations-archived5e19b4d024c90929eee282dca57380f).

evidence this witness had about the Governor, and minimized legitimate concerns this witness expressed about a particular complainant's credibility.

Third, the Investigators acted as prosecutors, judge, and jury by refusing to provide the Governor an opportunity to review and respond to the Report prior to its public issuance, and effectively precluding the Governor from presenting a defense after its release on August 3, 2021. It is common policy or practice for investigators, including the New York Inspector General,[154] the United States Department of Justice's Office of the Inspector General,[155] and the United States Department of Justice's Office of Professional Responsibility,[156] to provide the subject of an

---

[154] *See*, *e.g.*, STATE OF NEW YORK OFFS. OF THE INSPECTOR GEN., INVESTIGATION OF THE NEW YORK STATE DEPARTMENT OF MOTOR VEHICLES POLITICAL SUBDIVISION PROGRAM 13 (2021), https://ig.ny.gov/system/files/documents/2021/03/03.04.21.dmvpsd2761.014.2019-alb.pdf (DMV "fully cooperated with the Inspector General's review and has examined its findings"); STATE OF NEW YORK OFFS. OF THE INSPECTOR GEN., INVESTIGATION OF THE NEW YORK STATE OFFICE OF MENTAL HEALTH HUTCHINGS PSYCHIATRIC CENTER 2 (2016), https://ig.ny.gov/sites/g/files/oee571/files/2017-02/OMHHPCFinalReport10.31.16.pdf ("In response to the Inspector General's report, OMH advised it was in agreement with the findings and recommendations . . . .").

[155] *See Application of Standards of Quality by the OIG*, *OIG Audits*, U.S. DEP'T OF JUST. OFF. OF THE INSPECTOR GEN., https://oig.justice.gov/foia/guidelines (last accessed Oct. 14, 2021) (" . . . a copy of each internal audit report is provided in draft to the Department component that was the subject of the audit for review and comment prior to final dissemination. The audited entity's comments are published in the final report."); *see also*, *e.g.*, U.S. DEP'T OF JUST. OFF. OF THE INSPECTOR GEN., AUDIT OF THE DEPARTMENT OF JUSTICE POLICY ON BODY WORN CAMERAS i (2021), https://oig.justice.gov/sites/default/files/reports/21-085.pdf ("In May 2021, we provided a draft of this report to DOJ and the Components for review . . . ."); U.S. DEP'T OF JUST. OFF. OF THE INSPECTOR GEN., AUDIT OF THE DRUG ENFORCEMENT ADMINISTRATION'S LABORATORY INFORMATION MANAGEMENT SYSTEM SUPPORT CONTRACTS App. 3 (2021), https://oig.justice.gov/reports/audit-drug-enforcement-administrations-laboratory-information-management-system-support (appending "The Drug Enforcement Administration's Response to the Draft Audit Report" to investigatory report).

[156] *See Policies and Procedures*, U.S. DEP'T OF JUSTICE, OFFICE OF PRO. RESP., https://www.justice.gov/opr/policies-and-procedures (last visited Oct. 14, 2021) ("If OPR determines that the subject attorney committed professional misconduct, prior to issuing a final report, the subject attorney, pursuant to a confidentiality agreement, and the component head may review the draft report, comment on the factual findings, and offer arguments as to why OPR should alter its conclusions. OPR will consider the comments and incorporate them into the final report, to the extent OPR considers it appropriate."); *see also*, *e.g.*, U.S. DEP'T OF JUST. OFF. OF PRO. RESP., EXECUTIVE SUMMARY OF REPORT vi (2020), https://www.justice.gov/opr/page/file/1336471/download ("The subjects reviewed and provided comments on their respective interview transcripts and on OPR's draft report."); U.S. DEP'T OF JUST. OFF. OF PRO. RESP., REPORT OF INVESTIGATION INTO THE CONDUCT OF FORMER UNITED STATES ATTORNEY R. BOOTH GOODWIN II 5 (2018), https://www.justice.gov/opr/page/file/1207181/download ("On March 22, 2018, OPR sent its draft report to the USAO, Ruby, and Goodwin, and provided them with an opportunity to review and comment on the draft report.").

investigation an opportunity to review and respond to the investigation's findings before they are made public.  That process functions to protect the subjects of investigations, the public, and the investigators themselves to ensure the "factual accuracy" of reports.[157]  Indeed, in "high profile and sensitive matters"—which would include sexual harassment allegations against the Governor of New York—agencies recognize the need for "*extra care*" to "assure that … reports are objective and accurate."[158]  The Investigators did not follow that process here.  Any attempts to point out errors and omissions in the Investigators' process and Report *after* its public issuance were automatically disregarded by the media frenzy that was perpetuated by the manner in which the investigation was conducted and Report issued and announced in the Attorney General's press conference.

Fourth, the Governor has not—to this day—been provided the materials underlying the Report despite repeated written requests for them, and was therefore deprived of the opportunity to adequately respond defense prior to his resignation.  The Report acknowledges that the Investigators "issued over 70 subpoenas for documents and other information, and received over 74,000 documents," "interviewed 179 individuals and took testimony under oath from 41 of them," and that "[f]or certain individuals, [they] both conducted an interview and took the testimony of the individual."[159]  Report at 15 & 15 n.77.  The Investigators selectively incorporated only 111 documents in the Report, out of the "over 74,000 documents it received," *none* of which are copies

---

[157] U.S. DEP'T OF JUST. OFF. OF THE INSPECTOR GEN., *Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services* 7, https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf.

[158] *See Office of Oversight and Review Reports*, U.S. DEP'T OF JUST. OFF. OF THE INSPECTOR GEN., https://oig.justice.gov/foia/guidelines (last accessed Oct. 14, 2021).

[159] Nor does the Report mention that the Governor's (and perhaps others') testimony was videotaped, much less make a copy of the videos available, presumably because the Governor's testimony responding to the allegations would be perceived by the public as credible.

of transcripts of formal depositions or notes of informal interviews underlying the inquiry and Report.  As explained *supra*, despite requests to both the Committee and the Attorney General, we have not been provided with those materials underlying the Report, including all transcripts, notes and memoranda of interviews.  We have not even been provided with a transcript of the Governor's testimony.   Without these underlying materials, we are forced to simply "trust" what the Investigators said about the evidence.  We cannot verify what exculpatory information was omitted from the Report, point out inconsistencies, and adequately respond and mount a defense—even if we had the forum to do so.

Moreover, rather than providing a balanced analysis of what their investigation uncovered factually and the full circumstances surrounding the allegations, the Investigators made affirmative factual findings and credibility determinations without gathering and analyzing all evidence available to them, and without explaining the material evidence they failed to obtain and why. Specifically, as set forth above, the Investigators' material omissions from the Report—including of all evidence how the Governor has behaved similarly with both men and women—furthered a misleading narrative of gender-based conduct, which was then used to make flawed legal conclusions that the Governor sexually harassed "multiple" women.  Indeed, the Investigators attempted to draw a distinction between "concluding that the Governor engaged in unlawful sexual harassment," and "not reach[ing] . . . a conclusion as to whether the conduct amounts to or should be the subject of criminal prosecution," Report at 147 n.1239, disavowing any responsibility for having to defend those legal findings that were not supported by a complete factual record with evidence made available to the Governor.  This is especially concerning given that the Governor was not given an opportunity to present another side to those one-sided findings that served to oust him.   By making affirmative, legal conclusions based on a flawed, one-sided recitation of

purported facts that omitted material evidence and details, and without allowing any presentation from the Governor or allowing his access to all underlying evidence, the Investigators entirely disregarded fairness and process considerations.  In essence, the Attorney General's Report made factual findings without any opportunity for the evidence gathered to be reviewed and scrutinized, and then legal conclusions without ever having to defend them in any legal process.  The Attorney General publicly proclaimed her political rival was culpable for sexual harassment both as a matter of fact and as a matter of law, while simultaneously refusing to provide the Governor access to the evidence and any ability to challenge the caselaw and legal analysis upon which the Attorney General relied.  This is, quite simply, an unacceptable aberration from any sense of fairness or due process.

## IV.    **CONCLUSION**

As set forth above, in great detail, the investigation and the Report were flawed in fundamental respects, resulting in a flawed, misleading and unreliable Report.  Because of the glaring omissions and errors, the Report must be corrected, supplemented, and amended.  The Attorney General must therefore appoint an independent reviewer to consider this application to ensure that this flawed and misleading Report is corrected, supplemented and amended.

Dated:          October 20, 2021
                New York, New York


                            Rita M. Glavin
                            GLAVIN PLLC

                            *Attorney for former Governor Andrew M. Cuomo*

152