Gregory Morvillo, Esq.
**MORVILLO PLLC**
90 Broad Street
New York, New York 10004
Telephone: 646.831.1531
Email: gm@morvillopllc.com
*Attorneys for defendant Melissa DeRosa*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHARLOTTE BENNETT,<br><br>              Plaintiff,<br><br>       v.<br><br>ANDREW M. CUOMO, MELISSA DEROSA, JILL DEROSIERS, and JUDITH MOGUL,<br><br>              Defendants. | Civil No. 1:22-cv-07846<br><br><br>**REPLY DECLARATION OF GREGORY MORVILLO, ESQ.** |

GREGORY MORVILLO, of full age, hereby declares as follows:

1.      I am an attorney-at-law of the State of New York, a member of the bar of this Court, and a partner of the law firm Morvillo PLLC, attorneys for defendant Melissa DeRosa.

2.      I respectfully submit this Reply Declaration in further support of the motion brought by Ms. DeRosa to dismiss, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Complaint filed by plaintiff Charlotte Bennett.

3.      Attached as *Exhibit A* are true and complete copies of pages 418 through 424 of the transcript of the deposition of Ms. DeRosa taken on July 5, 2021.

I declare under penalty of perjury that the foregoing statements made by me are true and correct.

Dated: January 30, 2023                                      *s/Gregory Morvillo*
                                                                                  Gregory Morvillo

# EXHIBIT A

```
In the Matter of the            )
Independent Investigation       )
under New York Executive        )
Law Section 63(8)               )
                                )
_____
```

HIGHLY CONFIDENTIAL

VIDEO RECORDED TESTIMONY OF MELISSA DEROSA

New York, New York

Monday, July 5, 2021

Reported Stenographically By:
PATRICIA A. BIDONDE
Registered Professional Reporter
Realtime Certified Reporter
JOB #:  365722

1   governor were raised, were there any changes
2   in the policies of the executive chamber?
3           A.    Judy instituted a change --
4           MR. HECKER:  Go ahead.
5           A.    -- where briefers, instead of
6   going into the house, left the book with the
7   gate, with the trooper at the gate.
8                 And then one of the people from
9   the house would come pick it up and deliver it
10  to the governor, or a trooper would bring it
11  into the house and leave it in the bin.
12          Q.    Were there any other changes made
13  to the executive chamber policies after
14  Charlotte Bennett's allegations?
15          A.    Judy didn't think -- she thought
16  that it was important that there were always
17  two people together if it was a junior staff
18  person so that there couldn't be any
19  misperceptions or any conversations that could
20  happen.
21          Q.    Sorry.  Judy thought that there
22  should be two people at all times where?
23          A.    Like, staffing the governor, if
24  you're going to have a junior staff person, so
25  that you would eliminate the possibility that

```
 1  there could ever be a potential misperception.
 2        Q.    So the new policy was that the
 3  governor would always be staffed by two
 4  people?
 5        A.    That was what Judy had
 6  recommended.  I don't know if it was really
 7  institutionalized.
 8        Q.    And you're understanding the
 9  basis for that recommendation was to avoid a
10  misperception?
11        A.    Yes.
12        Q.    Is that your position, that
13  Ms. Bennett misperceived her conversation with
14  the governor?
15        A.    I don't -- my opinion on this is
16  irrelevant.
17        Q.    I think you should answer the
18  question.  Was your opinion that Ms. Bennett
19  had misperceived the conversation with the
20  governor?
21        A.    Parts of it, yes.
22        Q.    And the parts of it are the parts
23  that you described to Mr. Kim earlier.  Is
24  that right?
25        A.    Yes.
```

```
 1        Q.    The parts where he was trying to
 2   play therapist with her because he viewed her
 3   ███████████?
 4        A.    Yes.
 5        Q.    But the other parts she didn't
 6   misperceive?
 7        A.    I didn't know.
 8        Q.    Okay.  And this policy about
 9   staffing the governor always with two people,
10   did that just apply when there was a woman
11   junior staffer?
12        A.    I'm not sure.
13        Q.    And who else was involved in
14   coming up with this policy, this new policy?
15        A.    I think it was Judy's
16   recommendation.  And I think she talked to
17   Jill about it.
18        Q.    Did you talk to Jill about it?
19        A.    I don't remember if Jill was in
20   the conversation I had with Judy or if it was
21   separate.  But Jill handled a lot of the
22   staffing, so ...
23        Q.    Did you talk to the governor
24   about it?
25        A.    No.
```

```
 1        Q.    Why not?
 2        A.    I don't know.
 3        Q.    And you said -- you intimated
 4   that it never really was instituted.  Did I
 5   understand that right?
 6        A.    I said I don't know.
 7        Q.    You don't know if it was
 8   instituted or not.  Who would know that?
 9        A.    Jill, Stephanie.
10        Q.    Did it matter to you if this was
11   instituted?
12        A.    I don't know what that means.
13        Q.    So counsel made a recommendation
14   that a staffing protocol for the governor be
15   changed.  Did you ensure that that
16   recommendation was followed?
17        A.    There was one instance when I was
18   aware that it wasn't being followed, and I
19   took action on it.
20        Q.    Okay.  And what was the instance
21   when you became aware it wasn't being
22   followed?
23        A.    There was a time when ▮▮▮▮
24   ▮▮▮▮ and [Staffer #2] were back meeting
25   with the governor.  And I called [EA#2] and
```

```
 1   asked what was happening in the office, and
 2   she said that Staffer #2 -- that S#2 and
 3   ▓▓▓▓▓ had been back there, and then S#2 had
 4   left and ▓▓▓▓▓ was back there.
 5        Q.   Sorry, I missed who you
 6   called -- you called EA#2
 7        A.   Yes.
 8        Q.   Okay.  And then what happened
 9   after that?
10        A.   I called the governor and said
11   that I didn't think that she should be back
12   there alone; that if S#2 wasn't there
13   anymore, that you should continue the
14   conversation with her later.
15        Q.   Did you tell him why?
16        A.   No.
17        Q.   And what did he say?
18        A.   "Okay."
19        Q.   And then what happened?
20        A.   I believe she left the office.
21        Q.   The governor must have told her
22   to leave?
23        A.   I think he wrapped up the
24   meeting.  I wasn't there in person.
25        Q.   Okay.  Have you ever heard of
```

1  something called the Graham-Pence rule?
2       A.   Yes.
3       Q.   What is the Graham-Pence rule?
4       A.   That the vice president -- former
5  vice president not be left alone with a woman.
6       Q.   Is what Judy was recommending
7  essentially the Graham-Pence rule for the
8  governor?
9       A.   Sounds similar, yes.
10      Q.   Did you have any concerns about
11 Judy recommending what is essentially the
12 Graham-Pence rule for the governor?
13      A.   She was doing it out of his
14 protection.  And previously I know that when
15 he was at HUD, he had a very similar policy.
16 We also don't close the door to the conference
17 room.
18           We don't close the door to the
19 inner office so that -- I mean, it's as much
20 for his protection as it is anybody else's so
21 that there's always a witness to things.
22      Q.   Do you have any concerns that the
23 Graham-Pence rule is gender discriminatory?
24      A.   No.
25      Q.   Why not?

1   A.   Because -- I mean, if -- yes, if
2   it applies only to women, sure, but ...
3   Q.   And was it being applied in
4   this -- to the governor only for women?
5   A.   I don't remember if it was
6   specifically to men and to women, but I think
7   it was just if there was going to be a
8   staffer, there should two.
9   Q.   Right.  But you just told me
10  that, in essence, what was happening is the
11  Graham-Pence rule for Governor Cuomo.  Right?
12  A.   Well, as you were describing it.
13  Q.   What do you --
14        THE WITNESS:  Can I take a break,
15     please?
16        MS. KENNEDY PARK:  Yeah, of
17     course.  Sure.
18        THE VIDEOGRAPHER:  The time is
19     4:51 p.m.  This concludes Media 8.  Off
20     the record.
21        (Recess taken from 4:51 p.m. to
22     5:07 p.m.)
23        THE VIDEOGRAPHER:  The time now
24     is 5:07 p.m.  This begins Media 9.  On
25     the record.

Melissa DeRosa   Highly Confidential
July 05, 2021

```
 1

 2              C E R T I F I C A T E

 3   STATE OF NEW YORK    )

 4                        : ss.

 5   COUNTY OF NASSAU     )

 6

 7          I, PATRICIA A. BIDONDE, a Notary

 8   Public within and for the State of New

 9   York, do hereby certify:

10          That MELISSA DEROSA, the witness

11   whose deposition is hereinbefore set

12   forth, was duly sworn by me, and that

13   such deposition is a true record of the

14   testimony given by the witness.

15          I further certify that I am not

16   related to any of the parties to this

17   action by blood or marriage, and that I

18   am in no way interested in the outcome

19   of this matter.

20          IN WITNESS WHEREOF, I have

21   hereunto set my hand this day,

22   July 8, 2021
                    _____
23
                    PATRICIA A. BIDONDE
24                  Stenographer
                    Registered Professional Reporter
25                  Realtime Certified Reporter
```

U.S. Legal Support | www.uslegalsupport.com