

GREGORY MORVILLO
(646) 831-1531
GM@MorvilloPLLC.com
www.MorvilloPLLC.com

November 3, 2023

**VIA ECF**
Honorable Sarah L. Cave, U.S.M.J.
United States District Court for the
 Southern District of New York
500 Pearl Street
New York, New York 10007

    Re: <u>Bennett v. Cuomo et al.</u>, 22-cv-7846

Dear Judge Cave:

    The undersigned represents Defendant Melissa DeRosa in the above-captioned action.[1] We write respectfully to submit Ms. DeRosa's arguments in opposition to plaintiff Charlotte Bennett's motion to quash two Rule 45 subpoenas *duces tecum* (the "Subpoenas") served upon Debra S. Katz, Esq. and her law firm, Katz Banks Kumin LLP ("KBK," and together with Katz and Bennett, "Movants") and in support of Ms. DeRosa's cross-motion to enforce the Subpoenas.

I. **BACKGROUND**

    On March 15, 2021, Bennett sat for an interview by special deputies to the New York Attorney General ("NYAG") as part of the NYAG's investigation of sexual harassment claims against former Governor Andrew Cuomo. The NYAG prepared a memorandum of the interview (the "Memo").[2] The Memo attributes to Katz (and thus KBK) statements that waived the attorney-client privilege between Katz, KBK, and Bennett. Seventeen of Katz's statements serve as factual predicates for the Subpoenas,[3] as set forth in the attached <u>Table</u>. The information Katz revealed could only have come from communications with Bennett,[4] or otherwise reflected Katz's thoughts and opinions.[5] Each Subpoena Request is supported by a specific statement attributed to Katz and is narrowly tailored to seek relevant and material discovery.

    Katz's statements addressed several aspects of Bennett's allegations, including her alleged interactions with the Governor. For instance, the Memo recounts an incident where Bennett wore

---

[1] Gruppuso Legal and Gelber & Santillo also represent Ms. DeRosa in this matter.
[2] Declaration of Gregory Morvillo ("Morvillo Decl."), *Exhibit A*.
[3] Morvillo Decl., *Exhibit B*.
[4] *See, e.g.,* Memo at 11 (*Katz stating* what "Bennett understood"), 12 (*Katz stating* what "Bennett experienced"), 18 (*Katz stating* what "Bennett was trying to [do]" and "experienced"), 23 (*Katz stating* what "Bennett wishes").
[5] *See, e.g.,* Memo at 7 (*Katz opining* on Bennett's physical and mental condition), 8 (*Katz comparing* Bennett's compensation to that of others in Executive Chamber), 10 (*Katz opining* on the singing of "Danny Boy" as "evidence of an environment where employees were expected to do anything the Governor asked them to do"), 12 (*Katz revealing her conversations* with a former state employee and that employee's thoughts), and 22 (*Katz opining* on Bennett's psychiatrist's notes).

her hair in a "bun" in the office on November 18, 2019, and states Katz "noted that although Bennett ha[d] had inappropriate encounters with the Governor, <u>this was the first event that Bennett experienced as sexual harassment</u>." Memo at 12 (emphasis added). That statement contradicts the Complaint, which alleges an incident five months earlier as sexual harassment, when Governor Cuomo allegedly asked Bennett to sing the song "Danny Boy" in front of his assistant and DeRosa. *Id.* ¶¶ 24, 25. The Complaint claims DeRosa remarked, "This is hazing." *Id.* Governor Cuomo thereafter beckoned Bennett to join him as he sang the song, which she did. *Id.* Katz's statement to the NYAG admits, contrary to the Complaint, that Bennett did not experience the "Danny Boy" event as sexual harassment. This is one example of why the communications between Bennett and Katz/KBK are critically important to determining the viability of Bennett's claims against DeRosa.

## II. <u>ARGUMENT</u>

### A. Movants Offer No Evidence That Any Responsive Document is Privileged.[6]

Second Circuit law instructs that "[a] party invoking the attorney-client privilege must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *Pritchard v. Cty. of Erie (In re Cty. of Erie)*, 473 F.3d 413, 419 (2d Cir. 2007). "[B]ecause it renders relevant information undiscoverable," a court must "construe the privilege narrowly … and apply it 'only where necessary to achieve its purpose.'" *Id.* at 418 (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)). Likewise, the work-product doctrine "provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial." *Mercator Corp. v. United States (In re Grand Jury Subpoenas Dated March 19, 2002 & August 2, 2002)*, 318 F.3d 379, 383 (2d Cir. 2002).

Accordingly, "[t]he law is clear in this circuit that a person claiming the attorney-client privilege has the burden of establishing all the essential elements thereof." *von Bulow v. von Bulow*, 811 F.2d 136, 146 (2d Cir. 1987) (citing *In re Horowitz*, 482 F.2d 72 (2d Cir.), *cert. denied*, 414 U.S. 867 (1973)). *See also United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 214 (2d Cir. 1997). The proponent of the work-product protection bears the same burden. *Mercator Corp. v. United States (In re Grand Jury Subpoenas Dated March 19, 2002 & August 2, 2002)*, 318 F.3d 379, 384 (2d Cir. 2002). "The burden is a heavy one, because privileges are neither 'lightly created nor expansively construed.'" *Id.* (quoting *United States v. Nixon*, 418 U.S. 683, 710 (1974)). Therefore, "'[t]hat burden is not, of course, discharged by mere conclusory or ipse dixit assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed.'" v*on Bulow*, 811 F.2d at 146 (quoting *In re Bonanno*, 344 F.2d 830, 833 (2d Cir. 1965)). "[B]lanket assertions seeking to invoke an attorney-client privilege" are insufficient and do not satisfy the proponent's evidentiary burden. *Id.* at 147. Rather, facts sufficient to prove that a privilege applies must be shown by "competent evidence," *id.*, ordinarily "through affidavits, deposition testimony, or other admissible evidence," *Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg*, 171 F. Supp. 3d 136, 143 (S.D.N.Y. 2016) (quotation marks and citations omitted). A rule that permitted conclusory assertions of privilege would impermissibly shift the burden to the adverse party "to show why the documents are not privileged." *United States v. Davis*, 131 F.R.D. 391, 402 (S.D.N.Y. 1990). Ordinarily, the applicability of the privilege must be determined on a document-by-document basis. *See, e.g., Bloomingburg Jewish*

---

[6] Although Movants argue that nothing Katz told the NYAG was privileged, Movants also argue that they are withholding responsive documents because they contain privileged or protected information—such as the information Katz disclosed to the NYAG. Setting aside the illogic of their position, because Movants are withholding documents under a claim of privilege or work-product protection, they must prove that the privilege or protection attaches to each of the withheld documents, as required by Second Circuit law.

*Educ. Ctr.*, 171 F. Supp. 3d at 147 (instructing that "[r]esolution of the privilege must be made on a document-by-document basis in light of the particular contents of each document"); *Flynn v. CNN Inc.*, 2022 WL 17820854, at *2-3 (S.D.N.Y. Dec. 5, 2022) (this Court determining the applicability of the attorney-client privilege on a document-by-document basis); *In re Gorsoan Ltd.*, 2020 U.S. Dist. LEXIS 104025, at *22-23 (S.D.N.Y. June 15, 2020); *In re Leslie Fay Cos. Sec. Litig.*, 161 F.R.D. 274, 284 (S.D.N.Y. 1995) (ordering law firm to produce subpoenaed documents to the extent that it could not show on a document-by-document basis that the ACP or the WPD protected the document from disclosure).

Here, Movants have submitted **no** evidence to satisfy their burden to show that the attorney-client privilege or the work-product doctrine protects any document. Movants' conclusory assertions that "the Subpoenas seek information entirely protected by attorney-client privilege and work-product doctrine" are insufficient under Second Circuit law. *See, e.g.*, *von Bulow*, 811 F.2d at 146 (affirming finding that respondents' "blanket assertions" of privilege did not meet evidentiary burden); *In re Grand Jury Subpoena Dated July 6, 2005*, 256 F. App'x 379 (2d Cir. 2007); *Bloomingburg Jewish Educ. Ctr.*, 171 F. Supp. 3d at 143; *Bowne, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 472 (S.D.N.Y. 1993); *Davis*, 131 F.R.D. at 402-03 (ordering party to produce documents, where party made only "conclusory assertions of privilege"). Through their conclusory statements, Movants seek to accomplish precisely what Second Circuit law prohibits. Accordingly, the Court should deny Movants' motion.

### B. Movants' Argument Has No Merit.

The Court should also deny Movants' motion because the argument upon which it rests has no merit.[7] Katz voluntarily disclosed, in Bennett's presence and without objection, the substance and contents of Bennett's communications with Katz and thereby waived the privilege. Movants misconstrue the seminal case on privilege, *Upjohn Co. v. United States*, 449 U.S. 383 (1981), to such a grave extent that to adopt Movants' argument would wholly eviscerate the privilege.

*Upjohn* recognized that "[t]he privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts <u>by those who communicated with the attorney</u>." *Id.* at 396 (emphasis added). Because the privilege does not attach to <u>the client's</u> personal knowledge, the privilege does not allow <u>the client</u> to withhold facts personally known to <u>the client</u> on the basis that <u>the client</u> communicated those facts to her attorney. *Upjohn* teaches that <u>the client</u> does not waive her attorney-client privilege when <u>she</u> discloses facts personally known to <u>her</u>. But *Upjohn* did not hold that the attorney can simply disclose facts learned from the client without waiving the privilege. Quite the contrary, *Upjohn* <u>preserved</u> the privilege's foundation: a client may communicate factual information to her attorney, understanding that the attorney <u>cannot freely disclose it</u>.[8]

---

[7] As a threshold matter, Movants do <u>not</u> address withholding of documents responsive to Requests 2, 3, 4, 7, and 10, which are based upon Katz's disclosure of <u>her apparent thoughts and opinions</u>, not purported "facts." *See, supra,* n.5 & accompanying text. Moreover, because Movants believe that Katz's disclosure of allegedly unprivileged "facts … could not implicate waiver," they ignore the issue of waiver altogether. *See, e.g.*, *Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 391 (S.D.N.Y. 2015) ("The party invoking the privilege also has the burden to show that the privilege has not been waived."); Fed. R. Evid. 502(b) (disclosure operates as waiver absent showing that "(1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error …."). Nor do Movants argue that the Subpoenas seek documents beyond the scope of any waiver. Accordingly, at the very least, the Court should order Movants to produce all documents responsive to Requests 2, 3, 4, 7, and 10.

[8] This is why an attorney representing a corporation explains to its employees that the attorney represents the corporation and not the individual, so the individual is not under the misimpression that the attorney must keep

Indeed, to say that factual information is never privileged would eviscerate the privilege. As the Second Circuit explained in *United States v. Cunningham*,

> The privilege attaches not to the information but to the communication of the information. Thus, [the client] may be examined as to any fact, but may not, absent a waiver, be compelled to say whether or not he communicated that fact to his counsel. Likewise, his counsel may not be examined as to communications from [the client] and <u>may not be examined as to facts he learned only from such confidential communications</u>.[9]

*Cunningham* means that absent a waiver, as exists here, the information communicated by the client to the attorney is not discoverable from the attorney. But here, Katz voluntarily revealed the substance of Bennett's communications, thereby waiving the privilege and making them discoverable.

Moreover, notably absent from Movants' submission is any response to the argument made at the Court conference that an attorney, who learns through a privileged communication with his client that his client robbed a bank, cannot tell his barber or a passerby that his client robbed a bank, on the premise that what the client told him were just unprotected "facts." The lack of a response is not surprising, because such a position is unsupportable, and yet it is what Movants seek this Court to embrace. The Second Circuit's teaching in *Cunningham* dispels any notion that an attorney can willy-nilly disclose—without waiving the privilege—factual information communicated to him by the client.[10] That is undeniably what occurred here.

Neither *Solomon v. Scientific American, Inc.*, 125 F.R.D. 34 (S.D.N.Y. 1988), nor *ACLU v. NSA*, 925 F.3d 576 (2d Cir. 2019), supports Movant's argument that Katz did not waive the privilege when she made the statements to the NYAG. *Solomon* is distinguished on four bases. First, a particular and identified document (a so-called "intake memo") was at issue—unlike here, where Movants have failed to identify any document that they are withholding under a claim of privilege or work product protection. Second, the question before the court in *Solomon* was whether that document was kept confidential—whereas here, the contents of Bennett's communications with her attorneys were intentionally disclosed by the attorney. Third, the movant in *Solomon* submitted competent evidence to support its claim of privilege and confidentiality; here, Movants have not. Fourth, the facts underlying the alleged waiver were materially different. In *Solomon*, the party seeking discovery of the

---

the facts learned from the individual confidential—as would be required if there were an attorney-client relationship between the two. These are commonly called *Upjohn* warnings.

[9] 672 F.2d 1064, 1073 n.8 (2d Cir. 1982) (emphasis added). *See also Camp v. Berman*, 2015 WL 3917538, at *4 (S.D.N.Y. June 25, 2015) (holding that "facts that [attorney] learned exclusively from confidential communications with [] his client [] in the course of providing legal advice to [the client]" are protected by attorney-client privilege and, in the absence of waiver, denying motion to compel attorney to answer questions seeking such information); *Nypl v. JP Morgan Chase & Co.*, 2020 WL 2128870, at *2 (S.D.N.Y. May 5, 2020) (citing *Cunningham* and *Camp* and ordering that, absent waiver, "[c]ounsel may not be deposed about facts learned solely from [privileged] communications"). Furthermore, the Second Circuit has held that factual information learned by the attorney in the course of her investigation is, absent waiver, protected work product. *Doe v. United States (In re Grand Jury Subpoena Dated October 22, 2001)*, 282 F.3d 156, 161 (2d Cir. 2002) (rejecting district court's "exaggerated view in suggesting that work product has no application to facts" and declaring "we see no reason why work product cannot encompass facts as well [as an attorney's opinion and strategies]").

[10] Had the NYAG asked <u>Katz</u>, "Was the 'bun' interaction the first time that Ms. Bennett experienced sexual harassment?", Katz could <u>not</u> have answered the question without revealing the information she received through a privileged communication. Had Katz answered the hypothetical question, "Yes, it was," in Bennett's presence and without her objection, Katz would have waived the privilege regarding her communication with Bennett in which she learned that fact. But Katz argues that, because she <u>volunteered</u> the information, there is no waiver. This position is nonsensical.

"intake memo" contended that the contents of the <u>memo</u> had been disclosed. Here, what Katz disclosed were the contents of the <u>privileged communications themselves</u>, not the contents of a document. The issue before this Court is not about disclosure in the form of a letter sent on behalf of the client or a pleading filed on behalf of a client, which is imputed to the client herself. Here, in a fact-finding interview of Plaintiff—a circumstance more akin to a deposition than to a pleading—Katz interjected information that Bennett assertedly conveyed to her in confidence. The facts presented here were <u>not</u> presented in *Solomon*, and it is thus inapposite.

*ACLU* is likewise inapposite. There, the ACLU argued that the federal government had waived, through the doctrines of "official acknowledgment" and "public reliance," the privilege as to information redacted from a 108-page legal memorandum from the Office of Legal Counsel to the Attorney General. *Id.* at 585, 589, 590. Waiver through "official acknowledgment" and "public reliance" are not at issue here. "The 'official acknowledgment' doctrine … precludes the Government from withholding *information* on the basis that it is classified after the Government has disclosed substantially the same information." *Id.* at 590 (emphasis in original). The Second Circuit's statement that "informational disclosures have no effect on whether a communication is protected by attorney-client privilege" was thus made in the context of <u>a client's disclosure</u> not her attorney's. The "public reliance" doctrine—*i.e.*, the principle that "the attorney client privilege may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy"—does not apply either. *ACLU* did not hold that the privilege does not attach to factual information conveyed in confidence by a client to her attorney. Nor did it hold that the attorney does not waive the privilege by disclosing to a third party what her client told her in confidence.

What Katz did here was no different than what Alan Dershowitz did in *In re von Bulow*, 828 F.2d 94 (2d Cir. 1987), or what the hypothetical attorney did when he told his barber that his client robbed a bank. Katz disclosed the contents of purportedly privileged communications with her client. Indeed, it is incredible that Movants could assert that "the consequences of finding [that] privilege" protected the information she conveyed to the NYAG "would be disastrous," when exactly the opposite is true. Movants are asking the Court to conclude that factual information communicated by a client to an attorney in confidence for the purpose of obtaining legal advice is **not** privileged under any circumstances. But that is precisely what the privilege protects, because <u>the disclosure by Katz revealed both the contents and the fact of the communication</u>. The Court must find that the information that Katz disclosed—which she learned only from confidential communications with her client, and which constitutes the essence of those communications—is privileged, to uphold and protect the privilege, rather than destroy it as Movants would have the Court do.[11]

For these reasons, DeRosa respectfully submits that the Court should deny Movants' motion, grant her cross-motion, and order Movants to produce all documents responsive to the Subpoenas.

Respectfully submitted,

*/s/ Gregory Morvillo*
Gregory Morvillo

---

[11] Movants attempt to distinguish *In re von Bulow*, 828 F.2d 94 (2d Cir. 1987), by arguing that because Katz purportedly did not "excerpt[], quote[], or even reference[] any communications with [Bennett]," she did not waive the privilege by revealing the contents of her purportedly privileged communications with Bennett. According to Movants' logic, an attorney is only disclosing a privileged "communication" if the attorney refers to it as such; otherwise, the attorney is only disclosing "facts." But there are no "magic words" that trigger a waiver of the privilege. Movants do not (and cannot) cite any legal authority to support their "magic words" position that unless an attorney prefaces a disclosure by saying, for example, "my client told me," then the attorney's disclosure does not waive the privilege.

**TABLE**

| Katz Statement | Subpoena Request |
|---|---|
| "*Katz stated* that Bennett first traveled with the Governor on his helicopter for a Pride event in Albany on June 30, 2019." Memo at 6 (emphasis added). | 1. All Documents and Communications between Katz and Bennett concerning Bennett's travel with Cuomo to Albany, New York on or about July 1, 2019. |
| Speaking about Ms. Bennett's alleged physical and mental condition in August 2019, "*Katz added* that Bennett was so obviously exhausted at this point that a staffer left flowers for Bennett on her desk with a note that says 'you got this' to cheer Bennett up." Memo at 7 (emphasis added). | 2. All Documents and Communications between Katz and Bennett concerning Bennett's physical and/or mental state or health in August 2019. |
| Speaking about Ms. Bennett's compensation in or from January 2019 to October 2019, "*Katz noted* that this was $80,000 less than what Kaitlin ▬▬▬ ('▬▬'), who had fewer responsibilities, was paid." Memo at 7 (emphasis added).<br><br>"*Katz noted* that Bennett, despite her low salary, was expected to buy the Governor coffee every day without being reimbursed." Memo at 8 (emphasis added). | 3. All Documents and Communications between Katz and Bennett concerning Bennett's compensation as an employee of the State of New York in 2019. |
| Speaking about the alleged recitation and singing of the lyrics to "Danny Boy" by Ms. Bennett and the Governor, "*Katz stated* that the incident was evidence of an environment where employees were expected to do anything the Governor asked them to do." Memo at 10 (emphasis added). | 4. All Documents and Communications between Katz and Bennett concerning the events of May 16, 2019, involving Bennett's recitation and/or singing of the lyrics to the song "Danny Boy." |
| Speaking about an alleged conversation between Ms. Bennett and Gov. Cuomo concerning his hands, "*Katz added* that Bennett understood this conversation to be sexual in nature and Bennett confirmed that she understood that he was trying to get her to say something about the size of his penis." Memo at 11 (emphasis added). | 5. All Documents and Communications between Katz and Bennett concerning Bennett's interaction with Cuomo during which he asked Bennett questions about his hands. |

| Katz Statement | Subpoena Request |
|---|---|
| Speaking about an alleged conversation between Ms. Bennett and Gov. Cuomo concerning Ms. Bennett wearing her hair in "a bun" in the office, "*Katz noted* that although Bennett has had inappropriate encounters with the Governor, this was the first event that Bennett experienced as sexual harassment." Memo at 12 (emphasis added). | 6. All Documents and Communications between Katz and Bennett concerning Bennett's interaction with Cuomo on or about November 18, 2019, during which he commented about Bennett wearing her hair in a "bun." |
| "*Katz noted that she has spoken* to a former employee who did not know whether the Governor looking down her shirt constituted sexual harassment." Memo at 12 (emphasis added). | 7. All Documents and Communications between Katz and any Person concerning Cuomo's allegedly looking down such Person's shirt and/or whether such conduct would constitute sexual harassment. |
| Speaking about Ms. Bennett's alleged interaction with the Governor on June 5, 2020, "*Katz noted* that Bennett was trying to protect herself by making this an academic discussion, but that in reality Bennett experienced the conversation as if the Governor were trying to interview her to be his girlfriend." Memo at 18 (emphasis added). | 8. All Documents and Communications between Katz and Bennett concerning Bennett's interaction with Cuomo on June 5, 2020. |
| "*Katz volunteered* that Schacter sent Bennett emails talking about the working environment in the Executive Chamber [redacted in Memo]." Memo at 2 n.2 (emphasis added). | 9. All Documents and Communications between Katz and Schacter, and all Communications between Katz and Bennett concerning Schacter. |
| "*Katz noted* that she has seen Bennett's psychiatrist notes from June 25, 2020; *she described them* as showing that Bennett was suffering psychologically as a result of these work events." Memo at 22 (emphases added). | 10. All Documents and Communications concerning Bennett's psychiatrist's notes from June 25, 2020. |

| Katz Statement | Subpoena Request |
|---|---|
| "*Katz noted* that Mogul was trying to flatter Bennett at this point, saying, 'you're very smart, coming to us. I would hope that my daughter would do the same thing in your situation.'" Memo at 23 (emphasis added).<br><br>"*Katz noted* that the press had made references to Bennett being happy with DesRosiers's and Mogul's handling of the complaints and that this is false. *Katz stated* that particularly now that allegations have come to light that the Governor groped an employee, Bennett wishes that DesRosiers and Mogul had done something to stop the Governor's conduct." Memo at 23 (emphases added). | 11. All Documents and Communications between Katz and Bennett concerning Bennett's phone conversation with Mogul and DesRosiers on July 1, 2020.<br><br>12. All Documents and Communications between Katz and Bennett concerning Mogul's and DesRosiers's respective responses (and/or lack thereof) to Bennett's allegations of sexual harassment and/or discrimination conveyed by Bennett to Mogul and DesRosiers on July 1, 2020. |
| "*Katz stated* that Bennett has also been in touch with other former staffers, including Commisso, McGrath, and Kaitlin ▬▬ who have been called and talked to Bennett about their experiences." Memo at 26 (emphasis added). | 13. All Documents and Communications between Katz and Bennett concerning Bennett's communications with Commisso, McGrath, and ▬▬ concerning their respective employment experiences with the State of New York. |
| "*Katz stated* that Benton was the protector of the Governor and saw other women as sexual rivals. Katz further stated that the Governor was aware of this dynamic and encouraged the rivalry." Memo at 26 (emphases added). | 14. All Documents and Communications between Katz and Bennett concerning Cuomo's alleged personal relationships with certain women staff members.<br><br>15. All Documents and Communications between Katz and Bennett concerning any characterization or discussion of any "sexual rivalry" in the Executive Chamber during the period of Bennett's employment with the State of New York. |
| All preceding statements | 16. All Documents memorializing or evidencing the Communications described in Requests ##1-15. |