UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHARLOTTE BENNETT,

                Plaintiff,

       -v-

ANDREW M. CUOMO, MELISSA DEROSA, JILL
DESROSIERS, and JUDITH MOGUL,

                Defendants.

CIVIL ACTION NO.: 22 Civ. 7846 (VSB) (SLC)

**OPINION & ORDER**

**SARAH L. CAVE,** United States Magistrate Judge.

## I. INTRODUCTION

Before the Court is the motion of Plaintiff Charlotte Bennett ("Ms. Bennett") to quash two document subpoenas (the "Subpoenas") served by Defendant Melissa DeRosa ("Ms. DeRosa") on Ms. Bennett's counsel, Debra Katz ("Ms. Katz"), and her law firm, Katz Banks Kumin LLP ("KBK"). (ECF No. 121 ("Ms. Bennett's Motion")). Ms. DeRosa opposes the Motion and cross-moves to compel responses to the Subpoenas. (ECF No. 129 ("Ms. DeRosa's Motion," with Ms. Bennett's Motion, the "Motions")). At the Court's direction, Ms. Bennett prepared and submitted a privilege log (the "Log") for the eleven (11) documents responsive to the Subpoenas (the "Documents"). (ECF No. 139). Following an in camera review of the Documents, the Court holds that they are protected by the attorney-client privilege and/or the work-product doctrine, and that no waiver occurred. Accordingly, Ms. Bennett's Motion is GRANTED and Ms. DeRosa's Motion is DENIED.

## II. <u>BACKGROUND</u>

### A. <u>Factual Background</u>

Ms. Bennett, a former aide to Defendant Andrew M. Cuomo, the former Governor of the State of New York ("Mr. Cuomo"), alleges that throughout her employment from May 2019 until June 2020, Mr. Cuomo "subjected her to sexualized comments about her appearance, assigned her humiliating and demeaning tasks, and beginning in early June 2020, subjected her to invasive and unwanted questions about her personal life, romantic and sexual relationships, and history as a survivor of sexual assault." (ECF No. 1 ¶ 2 (the "Complaint")). Ms. Bennett alleges that she informed Defendants Jill DesRosiers ("Ms. DesRosiers"), Judith Mogul ("Ms. Mogul"), and Ms. DeRosa, who were Mr. Cuomo's Chief of Staff, Special Counsel, and Secretary, respectively, about Mr. Cuomo's conduct, but they failed to act, and further discriminated and retaliated against her. (Id. ¶¶ 12–14, 81–85, 91–106, 164–72, 183–200, 218–35). On October 23, 2020, Ms. Bennett resigned, and on November 5, 2020, turned in her State-issued phone and identification and moved out of New York. (Id. ¶¶ 122–23).

In February 2021, Ms. Bennett "decided to make public her [] experience of sexual harassment by" Mr. Cuomo. (ECF No. 1 ¶ 125). On February 27, 2021, <u>The New York Times</u> published an article describing instances of Mr. Cuomo's alleged sexual harassment of Ms. Bennett during her employment. (Id. ¶ 126). On March 1, 2021, Mr. Cuomo, then still Governor, referred Ms. Bennett's allegations to the Office of New York Attorney General Letitia James (the "OAG") for an investigation (the "OAG Investigation").[1] (Id. ¶ 129). "Over the

---

[1] A more detailed description of the OAG Investigation and a parallel investigation by the New York State Assembly Judiciary Committee appears in the July 21, 2023 memorandum and order issued by the

next four months, [Ms. Bennett] submitted to two lengthy interviews with investigators, one informal and one under oath, and provided hundreds of pages of documentary evidence in support of her allegations to the investigators." (Id. ¶ 130). The informal interview was held on March 15, 2021 (the "Interview") and was memorialized in a memorandum prepared by an attorney at Vladek, Raskin & Clark, P.C., a law firm appointed to lead the OAG Investigation. (ECF No. 130 (the "Memorandum")).[2]

On August 10, 2021, Mr. Cuomo announced his resignation as Governor. (ECF No. 1 ¶ 140).

**B. Procedural Background**

**1. Ms. Bennett's Claims**

On September 14, 2022, Ms. Bennett filed the Complaint, which asserts eleven claims. (ECF No. 1 ¶¶ 146–244). Against Mr. Cuomo, Ms. Bennett asserts claims for sex discrimination and retaliation in violation of the Equal Protection Clause of the Fourteenth Amendment; sexual harassment and retaliation under the New York State Human Rights Law, N.Y. Exec. L. §§ 290, 296(7) ("NYSHRL"); and sex discrimination and retaliation under the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, et seq. ("NYCHRL"). (ECF No. 1 ¶¶ 146–63, 173–82, 201–17, 236–44). Against Ms. DesRosiers, Ms. Bennett asserts claims for retaliation under the Equal Protection Clause, NYSHRL, and NYCHRL; aiding and abetting sexual harassment under the

---

Honorable Taryn A. Merkl. See Cuomo v. N.Y. State Assembly Judiciary Comm., Nos. 22-MC-3027 (LDH) (TAM), 22-MC-3044 (LDH) (TAM), 2023 WL 4714097, at *1–2 (E.D.N.Y. July 21, 2023).

[2] Ms. DeRosa submitted a heavily-redacted copy of the Memorandum under seal for the Court's review. (ECF No. 130). Ms. Bennett advised the Court that she "is concerned about how the Memorandum was obtained, and [Ms.] DeRosa has so far refused the shed any light on the matter." (ECF No. 121 at 2 n.3). Because the parties agree that the Court should review the Memorandum in connection with deciding the Motions and do not dispute its contents, the Court need not resolve the question of its provenance.

NYSHRL; and sex discrimination in violation of the NYCHRL.  (Id. ¶¶ 164–72, 183–200, 218–35).

Against Ms. Mogul and Ms. DeRosa, Ms. Bennett asserts claims for aiding and abetting

sexual harassment under the NYSHRL and sex discrimination under the NYCHRL.  (Id. ¶¶ 183–92,

218–27).

### 2.   The MTDs and Pretrial Discovery

On November 18, 2022, Defendants[3] filed motions to dismiss the Complaint, which are

pending before the Honorable Vernon S. Broderick.  (ECF Nos. 27; 31; 32; 37 (the "MTDs")).  Judge

Broderick denied Defendants' request to stay discovery pending a decision on the MTDs, finding

that they had "not made a strong showing that [Ms.] Bennett's claims are unmeritorious or that

responding to discovery will be particularly burdensome."  (ECF No. 69 at 10).

On June 28, 2023, Judge Broderick entered a case management plan and scheduling order

setting, inter alia, a fact discovery deadline of February 27, 2024.  (ECF No. 76 ¶ 7).  Since Judge

Broderick referred the matter to the undersigned on August 18, 2023 for general pretrial

supervision (ECF No. 82; ECF min. entry Aug. 18, 2023), the Court has held several conferences

and issued post-conference orders addressing disputes concerning party and non-party

discovery.  (See, e.g., ECF Nos. 83; 85; 87; 95; 97; 98; 104; 105; 127; 135; 144; 150; 162; 164;

ECF min. entry Aug. 22, 2023; ECF min. entry Oct. 20, 2023; ECF min. entry Jan. 4, 2024).

### 3.   The Subpoenas and the Motion

On September 14, 2023, Ms. DeRosa served the Subpoenas on Ms. Katz and KBK.

(ECF Nos. 100 at 1; 101-1 at 1–29; 118 at 1–28).  The Subpoenas each include 16 requests

(the "Requests") seeking "[a]ll documents and communications between" Ms. Katz or KBK

---

[3] "Defendants" refers to Mr. Cuomo, Ms. DeRosa, Ms. DesRosiers, and Ms. Mogul.

and Ms. Bennett (the "Communications") on several topics, including, <u>e.g.</u>, Ms. Bennett's travel to Albany with Mr. Cuomo on July 1, 2019; Ms. Bennett's "physical and/or mental state or health in August 2019; Ms. Bennett's interaction with Mr. Cuomo on June 5, 2020; and Mr. Cuomo's "alleged personal relationships with certain women staff members." (ECF No. 118 at 12–14, 27–28).  In response to the Subpoenas, Ms. Bennett asserted that, apart from "only one discoverable document," all the Communications were protected by the attorney-client privilege and/or the work-product protection (together, the "Privileges"), and requested that Ms. DeRosa withdraw the Subpoenas.  (ECF No. 100 at 1–2).  On September 22, 2023, Ms. DeRosa responded that she refused to withdraw the Subpoenas and that Ms. Katz's "many statements [] during the [I]nterview [] effectuated a waiver" of the attorney-client privilege as to the Communications.  (ECF No. 100-1 at 30).  In support, Ms. DeRosa quoted portions of the Memorandum referencing statements by Ms. Katz during the Interview, as follows:

| **Katz Statement** | **Subpoena Request** |
| --- | --- |
| "<u>Katz stated</u> that Bennett first traveled with the Governor on his helicopter for a Pride event in Albany on June 30, 2019."  Memo at 6 (emphasis added). | 1.    All Documents and Communications between Katz and Bennett concerning Bennett's travel with Cuomo to Albany, New York on or about July 1, 2019. |
| Speaking about Ms. Bennett's alleged physical and mental condition in August 2019, "<u>Katz added</u> that Bennett was so obviously exhausted at this point that a staffer left flowers for Bennett on her desk with a note that says 'you got this' to cheer Bennett up."  Memo at 7 (emphasis added). | 2.    All Documents and Communications between Katz and Bennett concerning Bennett's physical and/or mental state or health in August 2019. |
| Speaking about Ms. Bennett's compensation in or from January 2019 to October 2019, "Katz noted that this was $80,000 less than | 3.    All Documents and Communications between Katz and Bennett concerning Bennett's compensation as an employee of the State of New York in 2019. |

| | |
|---|---|
| what Kaitlin [], who had fewer responsibilities, was paid." Memo at 7 (emphasis added).[4]<br><br>"Katz noted that Bennett, despite her low salary, was expected to buy the Governor coffee every day without being reimbursed." Memo at 8 (emphasis added). | |
| Speaking about the alleged recitation and singing of the lyrics to "Danny Boy" by Ms. Bennett and the Governor, "Katz stated that the incident was evidence of an environment where employees were expected to do anything the Governor asked them to do." Memo at 10 (emphasis added). | 4.    All Documents and Communications between Katz and Bennett concerning the events of May 16, 2019, involving Bennett's recitation and/or singing of the lyrics to the song "Danny Boy." |
| Speaking about an alleged conversation between Ms. Bennett and Gov. Cuomo concerning his hands, "Katz added that Bennett understood this conversation to be sexual in nature and Bennett confirmed that she understood that he was trying to get her to say something about the size of his penis." Memo at 11 (emphasis added). | 5.    All Documents and Communications between Katz and Bennett concerning Bennett's interaction with Cuomo during which he asked Bennett questions about his hands. |
| Speaking about an alleged conversation between Ms. Bennett and Gov. Cuomo concerning Ms. Bennett wearing her hair in "a bun" in the office, "Katz noted that although Bennett has had inappropriate encounters with the Governor, this was the first event that Bennett experienced as sexual harassment." Memo at 12 (emphasis added). | 6.    All Documents and Communications between Katz and Bennett concerning Bennett's interaction with Cuomo on or about November 18, 2019 during which he commented about Bennett wearing her hair in a "bun." |
| "Katz noted that she has spoken to a former employee who did not know whether the Governor looking down her shirt constituted sexual harassment." Memo at 12 (emphasis added). | 7.    All Documents and Communications between Katz and any Person concerning Cuomo's allegedly looking down such Person's shirt and/or whether such conduct would constitute sexual harassment. |
| Speaking about Ms. Bennett's alleged interaction with the Governor on June 5, 2020, "Katz noted that Bennett was trying to protect herself by making this an academic discussion, but that in reality Bennett experienced the conversation as if the | 8.    All Documents and Communications between Katz and Bennett concerning Bennett's interaction with Cuomo on June 5, 2020. |

---

[4] This individual's identity has not been made public and the Court has since ordered that this portion of ECF No. 100-1 be sealed. (ECF No. 113).

| | |
|---|---|
| Governor were trying to interview her to be his girlfriend." Memo at 18 (emphasis added). | |
| "Katz volunteered that Schacter sent Bennett emails talking about the working environment in the Executive Chamber [redacted in Memo]." Memo at 2 n.2 (emphasis added). | 9.     All Documents and Communications between Katz and Schacter, and all Communications between Katz and Bennett concerning Schacter. |
| "Katz noted that she has seen Bennett's psychiatrist notes from June 25, 2020; she described them as showing that Bennett was suffering psychologically as a result of these work events." Memo at 22 (emphasis added). | 10.     All Documents and Communications concerning Bennett's psychiatrist notes from June 25, 2020. |
| "Katz noted that Mogul was trying to flatter Bennett at this point, saying, 'you're very smart, coming to us.  I would hope that my daughter would do the same thing in your situation.'" Memo at 23 (emphasis added). | 11.     All Documents and Communications between Katz and Bennett concerning Bennett's phone conversation with Mogul and DesRosiers on July 1, 2020. |
| "Katz noted that the press had made references to Bennett being happy with DesRosiers's and Mogul's handling of the complaints and that this is false.  Katz stated that particularly now that allegations have come to light that the Governor groped an employee, Bennett wishes that DesRosiers and Mogul had done something to stop the Governor's conduct." Memo at 23 (emphasis added). | 12.     All Documents and Communications between Katz and Bennett concerning Mogul's and DesRosiers's respective responses (and/or lack thereof) to Bennett's allegations of sexual harassment and/or discrimination conveyed by Bennett to Mogul and DesRosiers on July 1, 2020. |
| "Katz stated that Bennett has also been in touch with other former staffers, including Commisso, McGrath, and Kaitlin [], who have been called and talked to Bennett about their experiences." Memo at 26 (emphasis added). | 13.     All Documents and Communications between Katz and Bennett concerning Bennett's communications with Commisso, McGrath, and [] concerning their respective employment experiences with the State of New York. |
| "Katz stated that Benton was the protector of the Governor and saw other women as sexual rivals.  Katz further state that the Governor was aware of this dynamic and encouraged the rivalry." Memo at 26 (emphasis added). | 14.     All Documents and Communications between Katz and Bennett concerning Cuomo's alleged personal relationships with certain women staff members. 15.     All Documents and Communications between Katz and Bennett concerning any characterization of any "sexual rivalry" in the Executive Chamber during the period of Bennett's employment with the State of New York. |

| All preceding statements | 16. All Documents memorializing or evidencing the Communications described in Requests ##1–15. |

(ECF No. 18 at 31–33).

On October 6, 2023, Ms. Bennett requested a conference to set a briefing schedule concerning the Motion. (ECF No. 100). Ms. DeRosa joined in Ms. Bennett's request for a conference, but for the purpose of seeking permission to move to enforce the Subpoenas. (ECF No. 103). Following a conference with the parties on October 20, 2023, the Court set a briefing schedule for the Motion. (ECF No. 114; ECF min. entry Oct. 20, 2023). On October 27, 2023, Ms. Bennett filed her Motion, on November 3, 2023, Ms. DeRosa filed her Motion, and on November 8, 2023, Ms. Bennett filed a reply. (ECF Nos. 121; 129; 132).

Following a preliminary review of the Motions, the Court ordered: (1) Ms. Bennett to prepare and serve the Log, which was to reflect "communications (i) responsive to the Subpoenas and (ii) dated between the date on which Ms. Bennett engaged Ms. Katz and/or KBK to represent her in connection with the Interview and March 15, 2021"; (2) Ms. Bennett and Ms. DeRosa to meet and confer to select exemplars for the Court's in camera review; and (3) Ms. Bennett to submit to the Court the Log and exemplars. (ECF No. 133). On December 6, 2023, Ms. Bennett submitted the Log and Documents, noting that "she found only eleven documents responsive to the Subpoenas in the time period designated by the Court." (ECF No. 139).

### III. DISCUSSION

**A. Legal Standards**

    **1. Federal Rule of Civil Procedure 26**

Federal Rule of Civil Procedure 26 permits a party to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). "A party may seek a protective order if the discovery sought would subject the party to annoyance, embarrassment, oppression or undue burden or expense." Abdelsayed v. N.Y. Univ., No. 17 Civ. 9606 (VSB) (KHP), 2019 WL 2336533, at *2 (S.D.N.Y. June 3, 2019); see Fed. R. Civ. P. 26(c)(1) (providing that court may enter protective order "for good cause").[5]

    **2. Federal Rule of Civil Procedure 45**

Federal Rule of Civil Procedure 45 permits a party to serve a subpoena on a non-party to produce documents. See Fed. R. Civ. P. 45(a)(1)(D). A party whose personal rights are implicated by a subpoena may move to quash or modify the subpoena if, inter alia, it "requires disclosure of privileged or other protected matter, if no exception or waiver applies[.]" Fed. R. Civ. P. 45(d)(3)(A)(iii).

On a motion to quash asserting that privilege prevents disclosure, "[t]he party invoking a privilege bears the burden of establishing its applicability to the case at hand." Atwell v. City of

---

[5] Unless otherwise indicated, internal citations and quotation marks are omitted from case citations.

N.Y., No. 07 Civ. 2365 (WHP), 2008 WL 5336690, at *1 (S.D.N.Y. Dec. 15, 2008); see United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO, 119 F.3d 210, 214 (2d Cir. 1997) (explaining that the burden to establish privilege rests with the party asserting it); ResQNet.com, Inc. v. Lansa, Inc., No. 01 Civ. 3578 (RWS), 2004 WL 1627170, at *2 (S.D.N.Y. July 21, 2004) ("The burden of persuasion in a motion to quash a subpoena and for a protective order is borne by the movant.").  Motions "to quash a subpoena are . . . entrusted to the sound discretion of the district court."  In re Fitch Inc., 330 F.3d 104, 108 (2d Cir. 2003) (per curiam).  Further, the district court "has broad latitude to determine the scope of discovery and to manage the discovery process."  Hutchins v. Palmer, No. 12 Civ. 5927 (JFB) (AKT), 2015 WL 13713335, at *13 (E.D.N.Y. Mar. 31, 2015); see, e.g., EM Ltd. v. Rep. of Argentina, 695 F.3d 201, 207 (2d Cir. 2012).

### 3.  The Privileges

#### a.  Attorney-Client Privilege

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law."  Upjohn Co. v. U.S., 449 U.S. 383, 389 (1981).  Under federal law, the attorney-client privilege applies only if all the following are met:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 441 (S.D.N.Y. 1995) (quoting United States v. United Shoe Mach. Corp., 89 F. Supp. 357, 358–59 (D. Mass. 1950)). Under New York law, for the privilege to apply, the communication must have been made "for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship."   Spectrum Sys. Int'l Corp. v. Chem. Bank, 78 N.Y.2d 371, 377–78 (1991). The communication must also "be primarily or predominantly of a legal character."  Id. at 378. In evaluating whether the privilege applies, the "critical inquiry" is "whether, viewing the lawyer's communication in its full content and context, it was made in order to render legal advice or services to the client."  Id. at 379.

The party invoking the attorney-client privilege bears the burden of demonstrating that the privilege applies.  See In re Grand Jury Proc., 219 F.3d 175, 182 (2d Cir. 2000) ("In re Grand Jury I"); United States v. Adlman, 68 F.3d 1495, 1500 (2d Cir. 1995) ("Adlman I"); Bowne of New York City, Inc. v. AmBase Corp., 150 F.R.D. 465, 470–71 (S.D.N.Y. 1993); Spectrum, 78 N.Y.2d at 377.  To meet this burden, the party asserting the attorney-client privilege must show that the communications were "(1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance." Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. U.S. Dep't of Just., 697 F.3d 184, 207 (2d Cir. 2012). This burden "is not discharged by mere conclusory or ipse dixit assertions."  In re Grand Jury Subpoenas dated Jan. 4, 1984, 750 F.2d 223, 225 (2d Cir. 1984).  "Any ambiguities as to whether the essential elements have been met are construed against the party asserting the privilege." Koumoulis v. Indep. Fin. Mktg. Grp., Inc., 295 F.R.D. 28, 38 (E.D.N.Y. 2013), aff'd, 29 F. Supp. 3d 142 (E.D.N.Y. 2014).  As this Court has explained, "the privilege attaches not only to

communications by the client to the attorney, but also to advice rendered by the attorney to the client, at least to the extent that such advice may reflect confidential information conveyed by the client." In re Keurig Green Mt. Single-Serve Coffee Antitrust Litig., No. 14 MD 2542 (VSB) (SLC), 2020 WL 8465433, at *2 (S.D.N.Y. Oct. 30, 2020) (quoting Bank Brussels, 160 F.R.D. at 441– 42). The mere fact, however, that a document was transmitted between an attorney and a client does not render the document privileged. See Dep't of Econ. Dev. v. Arthur Anderson & Co. (U.S.A.), 139 F.R.D. 295, 300 (S.D.N.Y. 1991). Rather, it "must contain confidential communication relating to legal advice." Id.; see Renner v. Chase Manhattan Bank, No. 98 Civ. 926 (CSH), 2001 WL 1356192, at *1 (S.D.N.Y. Nov. 2, 2001) (rejecting argument that "any reference to any communication between [a client] and one of his attorneys on any document shields that entire document from disclosure, whether or not the document reveals communications made by [the client] to his attorneys in confidence and for the purpose of obtaining legal advice"). Conversely, "the mere fact that a document contains some public or nonconfidential information does not necessarily make the document discoverable." Astra Aktiebolag v. Andrx Pharm., Inc., 208 F.R.D. 92, 103 (S.D.N.Y. 2002). Similarly, "just as facts cannot be invested with privilege merely by communicating them to an attorney, so [too] the confidentiality of the communication is not [necessarily] destroyed by disclosure of the underlying facts." Solomon v. Sci. Am., Inc., 125 F.R.D. 34, 37 (S.D.N.Y. 1988).

"The attorney-client privilege was designed 'to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and [the] administration of justice.'" TVT Recs. v. Island Def Jam Music Grp., 214 F.R.D. 143, 144 (S.D.N.Y. 2003) (quoting Upjohn, 449 U.S. at 389). "Because the privilege

'stands in derogation of the public's right to every [person]'s evidence . . . it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.'" TVT Recs., 214 F.R.D. at 144 (quoting In re Grand Jury I, 219 F.3d at 182); see Brown, 474 F. Supp. 3d at 648 ("The privilege is narrowly construed because it renders relevant information undiscoverable."); accord Coventry Cap. US LLC v. EEA Life Settlements Inc., No. 17 Civ. 7417 (VM) (SLC), 2021 WL 4312026, at *3 (S.D.N.Y. Sept. 22, 2021).

Finally, "[i]t is well-established that the attorney-client privilege is waived if the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the communication to a third party or stranger to the attorney-client relationship." Denney v. Jenkens & Gilchrist, 362 F. Supp. 2d 407, 412 (S.D.N.Y. 2004). Thus, the party invoking the attorney-client privilege must also show "'that the communications between client and attorney were made in confidence and have been maintained in confidence.'" Id. (quoting In re Horowitz, 482 F.2d 72, 81–82 (2d Cir. 1973)).

### b.  Work-Product Protection

"Federal law governs the applicability of the work product doctrine in all actions in federal court." Wultz v. Bank of China Ltd., 304 F.R.D. 384, 393 (S.D.N.Y. 2015). "[D]ocuments and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative" are eligible for work-product protection. Fed. R. Civ. P. 26(b)(3)(A). For the work-product doctrine to apply, the party claiming protection bears the burden of establishing "that the material at issue '(1) [is] a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by [its] representative.'" Pilkington N. Am., Inc. v. Mitsui Sumimoto Ins. Co. of Am., 341 F.R.D. 10, 13 (S.D.N.Y. 2022)

(quoting Allied Irish Banks, P.L.C. v. Bank of Am., N.A., 252 F.R.D. 163, 173 (S.D.N.Y. 2008)).

In response to a challenge to the work-product protection, the party asserting the protection

must "submit evidence, by way of affidavit, deposition testimony or otherwise, establishing only

the challenged elements of the applicable privilege or protection, with the ultimate burden of

proof resting with the party asserting the privilege or protection." A.I.A. Holdings, S.A. v. Lehman

Bros., Inc., No. 97 Civ. 4978 (LMM) (HBP), 2002 WL 31385824, at *6 (S.D.N.Y. Oct. 21, 2002),

supplemented by, 2002 WL 31556382 (S.D.N.Y. Nov. 15, 2002); see Kingsway Fin. Servs., Inc. v.

Pricewaterhouse-Coopers LLP, No. 03 Civ. 5560 (RMB) (HBP), 2007 WL 473726, at *4

(S.D.N.Y. Feb. 14, 2007) ("The party asserting the protection of the work-product doctrine bears

the burden of proof.").  The party asserting the protection can meet this burden "only by an

evidentiary showing based on competent evidence . . . and [it] cannot be 'discharged by mere

conclusory or ipse dixit assertions.'" Bowne v. N.Y.C., Inc., 150 F.R.D. 465, 470 (S.D.N.Y. 1993)

(quoting von Bulow v. von Bulow, 811 F.2d 136, 146 (2d Cir. 1987)).

Concerning the second prong, "[i]n anticipation of litigation" means that "in light of the

nature of the document and the factual situation in the particular case, the document can fairly

be said to have been prepared or obtained because of the prospect of litigation." United States

v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998) ("Adlman II").  "Documents prepared in

anticipation of litigation are work product, even when they are also intended to assist in business

dealings." Schaeffler v. United States, 806 F.3d 34, 43 (2d Cir. 2015).  But "[d]ocuments prepared

in the ordinary course of business, or that would have been created whether or not litigation was

anticipated, are not protected by work-product immunity."  In re Copper Mkt. Antitrust Litig.,

200 F.R.D. 213, 221 (S.D.N.Y. 2001).  A party's "consider[ation of] the possibility of litigation . . . is

insufficient to trigger the protection of the work product doctrine[.]"  Gucci Am., Inc. v. Guess?, Inc., 271 F.R.D. 58, 75 (S.D.N.Y. 2010); see Kingsway, 2007 WL 473726, at *5 (collecting cases); In re Grand Jury Proc., No. 11 MD 189, 2001 WL 1167497, at *15 (S.D.N.Y. Oct. 3, 2001) ("In re Grand Jury II") (explaining that "a generalized desire to avoid litigation is insufficient to meet the 'in anticipation of litigation' requirement").  "Rather, the party must have taken 'affirmative steps in anticipation of litigation.'"  Brook v. Simon & Ptrs., LLP, No. 17 Civ. 6435 (GBD) (SLC), 2021 WL 5919207, at *4 (S.D.N.Y. Dec. 15, 2021) (quoting Gucci, 271 F.R.D. at 75).

In contrast to the attorney-client privilege, "the protection afforded work product is not waived merely because the material is disclosed to a third party."  Bank of Am., N.A. v. Terra Nova Ins. Co., 212 F.R.D. 166, 169 (S.D.N.Y. 2002).  A party does, however, "waive[] the work product protection by taking actions inconsistent with . . . its purpose, such as disclosing work product to its adversary, or by placing privileged documents 'at issue' in a litigation[.]"  N.Y. Times Co. v. U.S. Dep't of Just., 939 F.3d 479, 494 (2d Cir. 2019).  "[C]ourts find that the work-product privilege is waived only if disclosure to the third party 'substantially increases the opportunity for potential adversaries to obtain the information.'"  Cellco P'ship d/b/a Verizon Wireless v. Nextel Commc'n, Inc. No. 03 Civ. 725 (KAJ) (RO), 2004 WL 1542259, at 81 (S.D.N.Y. July 9, 2004) (quoting In re Grand Jury Subpoenas Dated Dec. 18, 1981 & Jan. 4, 1982, 561 F. Supp. 1247, 1257 (E.D.N.Y. 1982)).

The work-product protection is not absolute, however.  "A finding that a document was prepared 'because of the prospect of litigation . . . does not necessarily mean that the document will be protected against discovery,' but instead that the 'document is eligible for work-product' protection."  Brook, 2021 WL 5919207, at *5 (quoting Adlman, 134 F.3d at 1202–03).  Pursuant to Federal Rule of Civil Procedure 26(b)(3)(A), "work product materials are discoverable if (i) they

are otherwise discoverable under Rule 26(b)(1), and (ii) the party seeking them shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Rackwise, Inc. v. Foley Shechter Ablovatskiy, LLP, No. 19 Civ. 11094 (AT) (SLC), 2020 WL 7342743, at *8 (S.D.N.Y. Dec. 14, 2020) (citing Fed. R. Civ. P. 26(b)(3)(A)). "A substantial need exists 'where the information sought is essential to the party's defense, is crucial to the determination of whether the defendant could be held liable for the acts alleged, or carries great probative values on contested issues.'" Gucci, 271 F.R.D. at 74–75 (quoting Nat'l Cong. for Puerto Rican Rts. v. City of New York, 194 F.R.D. 105, 110 (S.D.N.Y. 2000)). "Even when a showing of substantial need has been made, the court must 'protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.'" Brook, 2021 WL 5919207, at *5 (quoting Fed. R. Civ. P. 26(b)(3)(B)).

## B. **Application**

As an initial matter, the Court observes—and Ms. DeRosa does not dispute—that Ms. Bennett has standing to move to quash the Subpoenas because she is seeking to protect the privilege between herself and her counsel. See Nova Prods., Inc. v. Kisma Video, Inc., 220 F.R.D. 238, 241 (S.D.N.Y. 2004) (explaining that non-recipient of subpoena has standing to quash if "seeking to protect a personal privilege or right"). In addition, Ms. DeRosa's argument that Ms. Bennett "offer[s] no evidence that any responsive document is privileged[,]" (ECF No. 129 at 2–3), is moot given Ms. Bennett's subsequent submission of the Log and the Documents. Accordingly, the Court first analyzes whether the Documents are protected by the

Privileges, before turning to whether Katz waived the Privileges with respect to any of the Documents during the Interview.

### 1. **Attorney-Client Privilege**

Bennett asserts that the attorney-client privilege protects five of the Documents from disclosure, specifically Documents 1–5.[6]  One point about which the parties do agree is that the attorney-client privilege "protects communications, not underlying facts."  (ECF No. 121 at 3; see ECF No. 129 at 3 (Ms. DeRosa acknowledging that "Upjohn recognized that '[t]he privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney.'" (emphasis omitted) (quoting Upjohn 449 U.S. at 395))).  See Putnam At Tinton Falls, LLC v. Annunziata, No. 20 MC 281 (NSR), 2021 WL 5919418, at *3 (S.D.N.Y. Dec. 15, 2021) (noting that "the attorney-client privilege is 'of course limited to communications—not underlying facts[,]'" and holding that privilege protected communications between attorney and client relating to formation of trust "but not as to any underlying facts relating to the [t]rust") (quoting Spectrum, 78 N.Y.2d at 377); Am. Broad. Co. v. Aereo, Inc., Nos. 12 Civ. 1540 (AJN) (HBP), 12 Civ. 1543 (AJN) (HBP), 2013 WL 5526282, at *5 (S.D.N.Y. Oct. 7, 2013) ("[I]t is beyond question that the attorney-client privilege protects only communications with counsel, not the underlying facts that are communicated to counsel.").  In reviewing each of the Documents designated as protected by the attorney-client privilege, the Court's focus is thus "'whether the communication is one that was made by a client to an attorney for the purpose of obtaining legal advice or services.'"  Astra Aktiebolag, 208 F.R.D. at 103 (quoting In re Spalding

---

[6] The Court refers to the Documents in the order in which they appear on the Log.  Documents 1 and 5 are designated as protected by the attorney-client privilege only.  Documents 2—4 are designated as protected by both Privileges.

<u>Sports Worldwide, Inc.</u>, 203 F.3d 800, 805 (Fed. Cir. 2000)).  "The request for confidential legal assistance need not be expressly stated when the request is implied."  <u>Id.</u>

### a.  <u>Document 1</u>

This document, which Ms. Bennett identified as responsive to Request No. 5, is a series of text messages on March 15, 2021 between Ms. Bennett and KBK attorneys in which the attorneys are preparing for and following up on a discussion with Ms. Bennett about the alleged incidents of sexual harassment involving Mr. Cuomo.  This exchange occurred on the same day as the Interview.  Implicit in the exchange is Ms. Bennett's request for, and in return, Katz and KBK's provision of, legal advice in connection with the Interview.  Accordingly, the Court finds that this document is protected by the attorney-client privilege.  <u>See</u> <u>Astra Aktiebolag</u>, 208 F.R.D. at 104 (holding that communications between attorney and client relating to "advice solicited by or given to" client regarding legal proceedings were protected by attorney-client privilege).

### b.  <u>Document 2</u>

This document, which Ms. Bennett identified as responsive to Request No. 7, is a series of text messages on March 12, 2021 between Ms. Bennett, KBK attorneys, and a litigation support consultant[7] discussing upcoming meetings and the substance of a call that Ms. Bennett had with a former co-worker regarding Mr. Cuomo's alleged behavior.  The Court infers that Ms. Bennett communicated this information for the purpose of soliciting Katz's legal advice in preparation for the Interview.  Accordingly, the Court finds that this document is protected by the attorney-client privilege.

---

[7] According to the Log, KBK engaged the litigation support consultant "to assist in all matters related to the Firm's representation of Charlotte Bennett."

### c. **Document 3**

This document, which Ms. Bennett identified as responsive to Request No. 8, is a series of text messages on March 3, 2021 between Ms. Bennett, KBK attorneys, and the litigation support consultant shortly after Ms. Bennett decided to publicize her allegations about Mr. Cuomo's sexual harassment.  (See ECF No. 1 ¶¶ 125–26).  The exchange relates to preparation for an upcoming interview and reflects queries to and responses from Ms. Bennett to enable KBK to provide legal advice to her.  Accordingly, the Court finds that this document is protected by the attorney-client privilege.  See Solomon, 125 F.R.D. at 36 (holding that privilege protected client's communication of his memory of "events that had taken place").

### d. **Document 4**

This document, which Ms. Bennett identified as responsive to Request No. 11, is a series of texts between Ms. Bennett, KBK attorneys, and the litigation support consultant on March 8, 2021 reflecting queries about and strategies for Ms. Bennett's potential legal claims against Mr. Cuomo.  Accordingly, the Court finds that this document is protected by the attorney-client privilege.  See Astra Aktiebolag, 208 F.R.D. at 104 (holding that privilege protected documents reflecting strategy discussions between attorneys and clients).

### e. **Document 5**

This document, which Ms. Bennett identified as responsive to Request No. 11, is a series of text messages between Ms. Bennett and a KBK attorney between March 1, 2021 and March 10, 2021 in which the attorney solicited documents and information from Ms. Bennett and discussed strategy regarding, inter alia, an upcoming interview.  The Court finds that this

communication was for the purpose of enabling the attorney to provide legal advice to Ms. Bennett and is therefore protected by the attorney-client privilege.

### 2. Work-Product Protection

Ms. Bennett asserts that the work-product protection applies to nine of the Documents, specifically Documents 2–4 and 6–11.[8]  As noted above, in determining whether the protection applies, the focus of the Court's inquiry is whether the communications were "prepared or obtained because of the prospect of litigation."  Adlman II, 134 F.3d 1202.  The litigation that is anticipated may include civil litigation as well as government investigations.  See id. at 1202–03 (explaining "because of" litigation standard district court was to apply to assess whether memorandum prepared in anticipation of challenges by federal government agency was protected work product); In re Weatherford Int'l Secs. Litig., No. 11 Civ. 1646 (LAK) (JCF), 2013 WL 12185082, at *4 (S.D.N.Y. Nov. 19, 2013) (finding that documents prepared in anticipation of government investigation as well as civil litigation were protected work product).

### a. Documents 2, 3, and 4

As noted above, Documents 2, 3, and 4 are text chains dated March 12, 2021; March 3, 2021; and March 8, 2021, respectively, within days of the commencement of the OAG Investigation.  (See ECF No. 1 ¶ 129).  These communications reflect efforts by KBK attorneys to investigate and gather facts from Ms. Bennett in connection with the OAG Investigation as well as Ms. Bennett's potential claims against Defendants.  The Court finds that these communications

---

[8] Documents 6–11 are designated as protected by the work-product protection only, while Documents 2–4 are designated as protected by both Privileges.

occurred because of the pending OAG Investigation and in anticipation of related litigation, and therefore, constitute protected work product.

### b.  Documents 6, 7, 8, 9, and 10

Documents 6, 7, 8, 9, and 10, which Ms. Bennett identified as responsive to Request No. 16, are Word documents prepared by a KBK attorney between March 1, 2021 and March 12, 2021 that reflect the attorney's investigation of Ms. Bennett's experience working for Mr. Cuomo, the alleged incidents of sexual harassment, and the existence and location of potentially relevant documents.  Each of these Documents reflects the attorney's "mental impressions, conclusion, opinions, or legal theories[.]"  In re Grand Jury I, 219 F.3d at 190. Accordingly, the Court finds that each of these Documents constitutes protected work product.

### c.  Document 11

Document 11, which Ms. Bennett identified as responsive to Request Nos. 1, 2, 3, 4, 5, 6, 8, 11, and 12, is a transmittal email from Ms. Bennett to KBK and attached chronology dated March 11, 2021 (the "Chronology") that Ms. Bennett prepared recounting her experience working for Mr. Cuomo, the incidents of alleged sexual harassment, and her internal complaints about his behavior to Ms. DesRosiers and others.  The Chronology appears to have been "intended as the equivalent of an 'intake interview,' to apprise the lawyer of everything the client knew while it was fresh in [her] memory, as a basis for decision and action in furtherance of [her] rights."  Solomon, 125 F.R.D. at 36 (holding that client's memorandum recounting conversations and events was confidential notwithstanding attorney's incorporation of the contents in letter to adversary).  Although the Chronology could equally be considered protected by the attorney-

client privilege, given the closeness in time to the Interview, the Court also deems it to be protected work product.

*       *       *

Accordingly, the Court finds that each of the Documents are communications that are protected by one or both Privileges.

### 3. Waiver

#### a. Legal Standard

The Privileges "are not absolute and may be waived by disclosure and/or implication." Perry v. City of New York, No. 13 Civ. 1015 (VSB), 2016 WL 11807719, at *4 (S.D.N.Y. Feb. 11, 2016); see von Bulow v. von Bulow, 114 F.R.D. 71, 75 (S.D.N.Y. 1987) ("[T]he [attorney-client] privilege applies only to private communications between the attorney and client which are not subsequently disclosed to others."), aff'd in part, vacated in part on other grounds, 828 F.2d 94 (2d Cir. 1987).  Just as a client's publication "of his previously confidential conversations with an attorney" has been deemed a waiver of "the protection of the attorney-client privilege[,]" so too "[a]n attorney's disclosure of communications with his [or her] client will constitute a waiver of the attorney-client privilege if the client has encouraged or acquiesced in the disclosure, while no waiver will occur if the attorney's disclosure was made in the face of opposition or ignorance on the part of the client." von Bulow, 114 F.R.D. at 76 (emphasis added).  In von Bulow, the court found that the attorney waived the attorney-client privilege with respect to particular topics where the client had "fair notice" and "actively encouraged" the attorney's publication of a book that made "previously confidential communications public." Id.

"[D]ue to the strong public policies served by the [P]rivileges," however, "any rule that results in the waiver of this privilege should be formulated with caution."  Perry, 2016 WL 11807719, at *4.  The Second Circuit has recognized that "implied waiver may be found where the privilege holder asserts a claim that in fairness requires examination of protected communications."  In re Grand Jury I, 219 F.3d at 182.  The Court is also mindful that "[s]erving discovery on opposing counsel is disfavored for good reason[,]" i.e., "the risk that proceeding with [discovery from] adverse counsel would encounter privilege and work-product issues[,]" as is the case here.  Sec. & Exch. Comm'n v. Contrarian Press, No. 16 Civ. 6964 (VSB), 2020 WL 7079484, at *5 (S.D.N.Y. Dec. 2, 2020) (quoting In re Chevron Corp., 749 F. Supp. 2d 141, 164 (S.D.N.Y. 2010)).

### b.  The Parties' arguments

Ms. Bennett argues in the first instance that, because Katz only disclosed in the Interview "'the underlying facts to which the privilege never attached[,]'" there was no waiver. (ECF No. 121 at 4 (quoting Solomon, 125 F.R.D. at 38)).  Ms. Bennett maintains that, unlike von Bulow, she "did not allow her counsel to disclose[] numerous confidential communications" between herself and KBK.  (Id. (quoting von Bulow, 114 F.R.D. at 73)).  Nor, she argues, does the Memorandum suggest that Katz "excerpted, quoted, or even referenced any communications with Ms. Bennett."  (Id. at 5).

Ms. DeRosa argues that Katz "voluntarily revealed the substance of [Ms.] Bennett's communications, thereby waiving the privilege and making them discoverable."  (ECF No. 129 at 4).  She contends that, "because the disclosure by Katz revealed both the contents and the fact

of the communication[,]" this case is analogous to <u>von Bulow</u>, where the attorney's acts effected a waiver.  (<u>Id.</u> at 5).

In reply, Ms. Bennett reiterates that because Katz "disclosed only underlying facts," the concept of waiver is not implicated.  (ECF No. 132 at 2).  Ms. Bennett adds that, in the Interview, Katz was "acting as an advocate," and just as she "could have made the very same statements to a factfinder in an opening statement in court without waiving privilege, she did not waive privilege when speaking to the [OAG] as factfinder."  (<u>Id.</u> at 3).

### c.  <u>Application</u>

As an initial matter, the Court notes that, because the Documents are the "only [] documents responsive to the Subpoenas in the time period designated by the Court" (ECF No. 139), the limited question before the Court is whether Katz's statements during the Interview effected a waiver of the Privileges with respect to the Documents.  Similarly, because Katz and KBK did not locate any documents responsive to Requests 9, 10, 13, 14, and 15, the Court does not determine whether Katz's statements during the Interview effected a waiver of the Privileges as to the subjects of those Requests.

The Court finds that Katz's statements during the Interview did not waive the Privileges with respect to the Documents.  First, the Court agrees with Ms. Bennett that the guiding principle—which is undisputed—is that the attorney-client privilege does not protect "the underlying facts that are communicated to counsel."  <u>Am. Broad. Co.</u>, 2013 WL 5526282, at *5.  The privilege <u>only</u> protects against the "disclosure of <u>communications</u>" between Ms. Bennett and her counsel.  <u>Upjohn</u>, 449 U.S. at 395 (emphasis added).  As is evident from the excerpts of the Memorandum above, each of Katz's statements disclosed an underlying <u>fact</u>—<u>e.g.</u>, that

"Schacter sent [Ms.] Bennett emails talking about the working environment in the Executive Chamber," that Ms. Bennett "first traveled with the Governor" on June 30, 2019, that another staffer "left flowers for [Ms.] Bennett . . . to cheer [her] up,"—regarding Ms. Bennett's experience working for Mr. Cuomo.  (ECF No. 118 at 31–32).  Because the attorney-client privilege did not attach to <u>facts</u> that Ms. Bennett shared with her attorneys, waiver did not occur.

Second, Ms. DeRosa's arguments fail to appreciate the Supreme Court's recognition in <u>Upjohn</u> that "[a] fact is one thing and a communication concerning that fact is an entirely different thing."  449 U.S. at 395–96.  Here, as discussed above, Katz's interjections during the Interview only involved the disclosure of unprivileged facts; they did not involve the disclosure of privileged communications concerning those facts, including the communications contained in the Documents.  <u>See</u> <u>Am. Broad. Co.</u>, 2013 WL 5526282, at *6 (explaining that "the attorney-client privilege [was] not implicated in the absence of a question to [the client] about what they told their counsel or, perhaps, what their counsel told them").  Nor did Katz's statements "disclose the existence of" any confidential communications with Ms. Bennett "or refer to any sources for the facts stated," including any of the Documents.  <u>Solomon</u>, 125 F.R.D. at 37.  Thus, Katz's "disclosure of the underlying facts" about Ms. Bennett's experience working for Mr. Cuomo did not "destroy[]" the confidentiality of the communications between Ms. Bennett and her attorneys.  <u>Id.</u>  As a result, Ms. DeRosa's heavy reliance on <u>von Bulow</u>, where the attorney's disclosure of confidential <u>communications</u> with the client waived the attorney-client privilege, is misplaced.   114 F.R.D. at 76–77; <u>cf.</u> <u>United States v. Stewart</u>, No. 15 Cr. 287 (LTS), 2016 WL 11617117, at *2 (S.D.N.Y. July 22, 2016) (finding attorney-client privilege waived where

disclosures included not "merely [] unprivileged facts" but also the privileged communications themselves).

Third, as to the work-product Documents, for waiver to occur, the voluntary disclosure must have been "inconsistent with the protection."  Costabile v. Westchester, N.Y., 254 F.R.D. 160, 164 (S.D.N.Y. 2008).  Thus, "[w]ork product may be shown to others when there is some good reason to show it [but] once a party voluntarily discloses work product to an adversary, the need for the privilege disappears."  Id.  Here, in addition to the fact that Katz did not disclose any work-product communications during the Interview, the OAG "was certainly not in an adversarial position with respect to" Ms. Bennett, who was among the complainants on whose behalf that office was investigating Mr. Cuomo's alleged behavior.  Id. at 166; see Cuomo, 2023 WL 4714097, at *1 (discussing referral to OAG to investigate allegations of sexual harassment against Mr. Cuomo).  Thus, even if the Court were to infer that Katz had disclosed during the Interview any of the work-product Documents—which it does not—that disclosure would not waive the protection.

## IV. CONCLUSION

For the reasons set forth above, Ms. Bennett's Motion is GRANTED and Ms. DeRosa's Motion is DENIED.

The Clerk of the Court is respectfully directed to close ECF No. 121.

Dated:      New York, New York
            January 8, 2024

SO ORDERED.

SARAH L. CAVE
**United States Magistrate Judge**

26