O58UBENC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CHARLOTTE BENNETT,

4                   Plaintiff,

5            v.                              22 Civ. 7846 (VSB)(SLC)

6   ANDREW M. CUOMO, MELISSA
    DEROSA, JILL DESROSHIERS,
7   and JUDITH MOGUL,

8                                            Conference

9             Defendants.

10  ------------------------------x
                                            New York, N.Y.
11                                          May 8, 2024
                                            3:00 p.m.
12
    Before:
13
                        HON. SARAH L. CAVE,
14
                                            U.S. Magistrate Judge
15
                        APPEARANCES
16
    KATZ BANKS KUMIN
17       Attorneys for Plaintiff
    BY:  DEBRA KATZ (by telephone)
18       LAURA SCHNELL
         KAYLA MORIN
19
    SHER TREMONTE
20       Attorneys for Defendant ANDREW W. CUOMO
    BY:  THERESA TRZASKOMA
21       ALLEGRA NOONAN
         BRACHAH GOYKADOSH
22

23  OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL
         Attorneys for OFFICE OF THE ATTORNEY GENERAL
24  BY:  ANDREW AMER
         SERENA LONGLEY
25       JAMES COONEY
         MICHAEL JAFFE

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O58UBENC

1                      APPEARANCES CONTINUED:

2    CLEARY GOTTLIEB STEEN & HAMILTON LLP
          Attorneys for CLEARY
3    BY:  ANDREW WEAVER

4    VLADECK, RASKIN & CLARK P.C.
          Attorneys for YANNICK GRANT
5    BY:  YANNICK GRANT

6    GLAVIN PLLC
          Attorneys for Defendant ANDREW M. CUOMO
7    BY:  RITA GLAVIN (by telephone)

8    MORVILLO PLLC
          Attorneys for Defendant MELISSA DeROSA
9    BY:  GREGORY MORVILLO (by telephone)

10   ORRICK HERRINGTON & SUTTCLIFFE LLP
          Attorneys for Defendant JUDITH MOGUL
11   BY:  MICHAEL DELIKAT (by telephone)

12   ORIN SCHWAB
          Attorney for Defendant JILL DesROSIERS
13

14

15

16

17

18

19

20

21

22

23

24

25

O58UBENC

1           (Case called)

2           THE COURT:  We'll start with you, Ms. Katz.  Can you

3   hear us?

4           MS. KATZ:  Yes.  Debra Katz here.  Thank you.

5           THE COURT:  Mr. Cuomo's counsel?

6           MS. TRZAKOMA:  Good afternoon, your Honor.

7           Theresa Trzaskoma, from Sher Tremonte, on behalf of

8   former Governor Cuomo.

9           MS. NOONAN:  Good afternoon, your Honor.

10          Allegra Noonan, also on behalf of Governor Cuomo, from

11  Sher Termonte.

12          THE COURT:  Good afternoon.

13          And we do we have Ms. Glavin on the phone?

14          MS. GLAVIN:  Yes, your Honor.

15          Rita Glavin, Glavin PLLC on behalf of the former

16  governor.

17          THE COURT:  And Ms. or Mr. Goykadosh?

18          MR. AMER:  For the Attorney General's Office, Andrew

19  Amer.

20          THE COURT:  Okay.

21          MS. LONGLEY:  Good afternoon, your Honor.

22          My name is Serena Longley, also on behalf of the New

23  York State Office of the Attorney General.

24          THE COURT:  Okay.  Good afternoon.

25          All right.  Ms. DeRosa's counsel?

O58UBENC

```
1              MR. MORVILLO:  Good afternoon.

2              I'm Gregory Morvillo, on behalf of Ms. DeRosa.

3              Thank you for allowing me to appear by telephone.

4              THE COURT:  Of course.

5              Ms. Mogul's counsel?

6              MR.  DELIKAT:  Good afternoon, your Honor.

7              Michael Delikat, on behalf of Judy Mogul.

8              THE COURT:  Okay.  Good afternoon.

9              Cleary's counsel?

10             MR. WEAVER:  Good afternoon, your Honor.

11             Andrew Weaver of Cleary Gottlieb Steen & Hamilton, on

12    behalf of Cleary.

13             THE COURT:  Good afternoon.

14             And Vladek's counsel?

15             MR. GRANT:  Good afternoon.

16             Yannick Grant on behalf of Vladeck Raskin.

17             THE COURT:  All right.  Great.  Thank you.

18             Anyone else that I missed who would like to state

19    their appearance?

20             MS. SCHNELL:  Laura Schnell, your Honor, for

21    plaintiff, Charlotte Bennett, as well as Kayla Morin, of the

22    Katz Firm also.

23             THE COURT:  Okay.  Good afternoon.

24             Anyone else?

25             MR. SCHWAB:  Good afternoon, your Honor.
```

O58UBENC

1          Sorin Schwab on behalf of Jill DesRosiers.

2          THE COURT:  Anyone else?

3          All right.  Very good.

4          So we're here to this afternoon, as everyone knows, on

5    the motions to compel and corresponding motions to quash with

6    respect to the subpoenas to both the Attorney General as well

7    as the two law firms, ECF Nos. 199, 222, 207, and 227.

8          The way I'd like to proceed is to hear from

9    Mr. Cuomo's counsel first and then from the Attorney General

10   and then from the law firms and then to give Mr. Cuomo's

11   counsel to chance to respond and then anyone else who wishes to

12   be heard, to speak.

13         So, Ms. Trzaskoma, if you prefer to sit or stand

14   wherever you're more comfortable.

15         MS. TRZAKOMA:  I will stand, your Honor.

16         THE COURT:  Okay.

17         MS. TRZAKOMA:  Thank you.

18         So I was rereading the briefing, quite voluminous

19   briefing, in this matter, and I just want to state at the

20   outset this that is not a grudge match.  Yes.  We and our

21   client believe that the Attorney General's report was deeply

22   flawed.  In fact, we know it was, it is, because the Attorney

23   General investigators never obtained or reviewed or considered

24   hundreds or potentially thousands of highly relevant documents

25   that directly undercut Ms. Bennett's claims, but proving that

O58UBENC

1    the Attorney General conducted a biased and incomplete and

2    flawed investigation is not what's currently at issue in the

3    motions before your Honor.  What is currently on the table is

4    Governor Cuomo's ability to obtain evidence to prove that

5    Ms. Bennett's allegations are false and that the legal claims

6    that she has brought against Governor Cuomo have no merit, that

7    Ms. Bennett's lawsuit overlaps with the Attorney General's

8    investigation does not in any way make the subpoenas improper.

9    We are entitled to discovery of relevant documents that are

10   proportional to the needs of the case, and in this case,

11   Ms. Bennett's allegations are broad.  She doesn't allege a

12   single incident or two.  She alleges that her entire work

13   environment was inflicted -- infected with bias.  And the

14   documents that we seek here are a few dozen -- statements of a

15   few dozen witnesses who worked in the executive chamber.  Those

16   witnesses who were interviewed in the context of an

17   investigation into potential sexual harassment at the executive

18   chamber could not be more relevant, nor do we believe if there

19   is any significant burden on the Attorney General's Office to

20   produce those materials particularly because they have already

21   been redacted for any conceivable work product or other

22   privilege.

23            THE COURT:  If I could just interrupt one moment,

24   Ms. Trzaskoma.  I noticed that in the Eastern District case,

25   the Cuomo versus Attorney General case, the subpoena there has

O58UBENC

1    been -- the original subpoena was withdrawn and has since been

2    narrowed.  I didn't look to see the specifics of what was

3    narrowed but can that be done here?  Is there any narrowing of

4    the subpoena to the OAG that can be done here?

5        MS. TRZAKOMA:  Your Honor, we don't know who was

6    interviewed, so I'm not sure if there's a possibility of

7    narrowing, but I do think that each of the witnesses who were

8    executive chamber employees or who mentioned Ms. Bennett or

9    Ms. Boylan, would be relevant, and, again, we're talking about

10   witness statements.  We've provided your Honor with an example

11   of one that are fairly straightforward, not voluminous.  So I

12   think, you know, in terms of proportionality, they can be

13   turned over with a push of a button.

14       THE COURT:  And how did you get the one from

15   Ms. Brady?  I'm assuming that you're referring to what was

16   attached to your reply declaration.  How did you come to have

17   that one?

18       MS. TRZAKOMA:  So, as you may have read in the

19   Attorney General's papers, they did provide certain district

20   attorney's offices with copies of certain investigative

21   materials including interview memos and in a now-dismissed

22   criminal case that was brought against our client, the district

23   attorney in that proceeding provided them to Governor Cuomo's

24   counsel as part of criminal discovery.

25       THE COURT:  Okay.  And is that the only memo that you

O58UBENC

1   have?

2           MS. TRZAKOMA:  No, your Honor.  We have 31 of them.

3   So to the extent -- so our reading of the Attorney General's

4   Office papers is that our request would encompass approximately

5   85.  So we already have just 31 of those.  So I think it's, you

6   know, it's -- it's several dozen but it's not more than, I

7   don't think, 50.

8           THE COURT:  Okay.  So you have 31 of the 85 that you

9   are seeking in the subpoena?

10           MS. TRZAKOMA:  Correct.

11           THE COURT:  Okay.  And the 31 that you have, are those

12   are the ones that you're saying that the Attorney General's

13   Office has voluntarily provided to you, or through some other

14   means?

15           MS. TRZAKOMA:  Those were provided by the AG's Office

16   to the district attorney, and the district attorney -- the

17   Albany District Attorney turned them over.

18           THE COURT:  Okay.  So, in that one criminal case,

19   you're saying there were 31 memos that the Attorney General

20   provided to the district attorney, the district attorney then

21   provided them to you as part of discovery, but that's the only

22   channel through which you've received -- Mr. Cuomo has received

23   those?

24           MS. TRZAKOMA:  Correct.  And at this point, the

25   requests in this case are -- we did narrow in trooper 1 but

O58UBENC

1    those were narrowed to interview memos involving New York State

2    Police employees, and as you may know, in that case, the

3    complaint, it's a rehash of the entire AG report so it -- we

4    also -- our request includes other claimants.

5            THE COURT:  Okay.

6            MS. TRZAKOMA:  Thank you.

7            THE COURT:  Sorry.

8            MS. TRZAKOMA:  No.  I appreciate that.

9            So we're not seeking to boil the ocean.

10           We also have requested unredacted -- unredacted

11   transcripts when the Attorney General put the certain witnesses

12   on the record, they then -- they then made public the

13   transcripts of those interviews, some of them have been

14   redacted.  And we know that some of the redacted information

15   through our -- through discovery in trooper 1 includes

16   information that's highly relevant to the -- highly relevant

17   context to those transcripts and I don't know -- I would have

18   to look and see exactly how many transcripts there are, but,

19   again, that is not terribly voluminous.

20           THE COURT:  So does Mr. Cuomo have any unredacted

21   transcripts?

22           MS. TRZAKOMA:  We do not.

23           So, you know, it's a fairly limited universe of

24   information, and, yet the Attorney General's Office has thrown

25   up every conceivable road block to prevent us from obtaining

O58UBENC

1    that information including making a sovereign immunity argument

2    that, so far as we are aware, prior to the Attorney General's

3    Office making that argument in trooper 1, it never made that

4    argument to block a federal district court subpoena.

5           And, you know, that -- the fact that the Attorney

6    General herself said that she would make all of this

7    information public and she didn't, we think that's appalling.

8    But even more appalling is that the AG is hanging her hat on a

9    state's rights argument, sovereign immunity from federal

10   discovery subpoenas, an argument that is currently being used

11   to block civil rights -- discovery in civil rights cases.  The

12   fact that the Attorney General would prefer to completely upend

13   discovery in all manner of federal lawsuits by finding that

14   states and state agencies are completely immune from federal

15   subpoenas really says a lot about the lengths to which the

16   Attorney General's Office will go to avoid disclosing those

17   documents to us.

18          THE COURT:  To just get away from the hyperbole a

19   little bit, if you could just focus here.  Obviously, the case

20   that's closest to this one is *Felix* decided by Judge Locke, my

21   colleague across the river.  Why does that not apply here?

22          MS. TRZAKOMA:  *So we think Felix* was wrongly decided.

23   As explained in our briefing, we think there is no basis for

24   concluding that a subpoena issued pursuant to Rule 45 is a suit

25   for purposes of -- for purposes of the state sovereign

O58UBENC

```
 1    immunity, and that has support in many -- in many cases across
 2    the country.  There is -- there is *Felix* and there is *Russell*
 3    out of the Fifth Circuit.  So *Felix* -- *Russell* came first, and
 4    then the Attorney General's Office pushed that argument in the
 5    *Felix* case.
 6              THE COURT:  So subpoenas --
 7              MS. TRZAKOMA:  So I think it was wrongly decided.
 8              THE COURT:  Understood.  So a subpoena is issued and a
 9    party is expected to respond.  What happens next if the party
10    does not respond?
11              MS. TRZAKOMA:  What happens next is -- so it's a
12    little -- and I will say, I've been rereading the Attorney
13    General's briefs, and it's unclear to me what their theory of
14    sovereign immunity is here.
15              THE COURT:  I'm trying to focus you on just what
16    happens in the ordinary course if you serve a subpoena on
17    somebody and they don't comply.  What does the party that's
18    serving the subpoena, what do they do next?
19              MS. TRZAKOMA:  The party serving the subpoena pursuant
20    to Rule 45 has the right so the subpoena is, by federal law, a
21    demand for documents.  If the federal law is not complied with,
22    then there is a -- a right to enforce --
23              THE COURT:  Right.
24              MS. TRZAKOMA:  -- that law.
25              THE COURT:  Through a motion.
```

O58UBENC

1          MS. TRZAKOMA:  Through a motion.

2          THE COURT:  Right.

3          MS. TRZAKOMA:  Through a -- through an enforcement --

4     a motion to compel.

5          THE COURT:  And the motion results in a court order.

6          MS. TRZAKOMA:  An order.

7          THE COURT:  Correct.

8          MS. TRZAKOMA:  Direct --

9          THE COURT:  If somebody doesn't comply with a court

10    order, what remedies do you have?

11         MS. TRZAKOMA:  Well, it's what remedies which your

12    Honor has, which is contempt.

13         THE COURT:  But you would need to file a motion

14    seeking to hold the person in contempt.

15         MS. TRZAKOMA:  Yes.  That's right.

16         THE COURT:  And then the result of that is sanctions,

17    monetary or nonmonetary, correct?

18         MS. TRZAKOMA:  That is what the rules provide for,

19    yes, your Honor.

20         THE COURT:  So how is that not like a suit that would

21    both require the Attorney General, a state agency, to appear

22    and defend and also potentially require payments from the New

23    York State Treasury?

24         MS. TRZAKOMA:  So there are -- it is not suit in the

25    sense that sovereign immunity has focused on whether there's --

O58UBENC

1    it's seeking economic relief and a suit -- so under *Ex parte*

2    *Young*, for example, federal courts can compel compliance with

3    federal law.  That is -- that is a century plus of law.

4                THE COURT:  Yes.

5                MS. TRZAKOMA:  So federal courts have the authority to

6    compel compliance with the law, and that includes the authority

7    to impose -- to hold parties in contempt and impose sanctions,

8    and that isn't -- that is -- that is clear law.  This Court

9    could do it.  And if -- if there's a violation of this Court's

10   order, a violation of a federal court law, this Court has the

11   authority to hold the state in compliance.

12               THE COURT:  We're skipping over *Ex parte Young*, we'll

13   get to it, but you cite, Mr. Cuomo cites, I think it's the

14   Rules Enabling Act as the federal law that the Attorney General

15   is not in compliance with.  Is there any Second Circuit,

16   preferably but even any court that's recognized the Rules

17   Enabling Act as a predicate federal law violation on which an

18   *Ex parte Young* argument could be made?

19               MS. TRZAKOMA:  Well, I think there are -- I mean,

20   there are a lot of -- there are -- it is inherent in the

21   structure of our federalist system that this Court, the federal

22   court, has the obligation and the authority to administrator

23   justice in particular cases, and the way that it administers

24   justice is through the federal Rules of Civil Procedure, which

25   have the force of law.  They have the force of federal law.

O58UBENC

```
1        THE COURT:  I tell that to people regularly and they

2   ignore me, but I'm glad you're willing to say it on the record.

3        MS. TRZAKOMA:  They do have -- they are -- it is the

4   only way that this Court can actually do justice, is by

5   enforcing the federal laws.

6        And so I think -- in the Michigan Corrections

7   Organization v. -- which is a Sixth Circuit case, parties can

8   use Ex parte Young to seek orders enforcing procedural rules

9   flow from the Rules Enabling Act.  So that is one case.

10        But I don't think there's any reason to distinguish

11   the Federal Rules of Civil Procedure from other federal laws

12   that states, along with other parties, are obligated to comply

13   with.

14        THE COURT:  I'm not suggesting that there should be a

15   distinction made.  I'm just curious whether any Court has

16   recognized in the context of a violation -- noncompliance with

17   the Federal Rules of Civil Procedure and/or the Rules Enabling

18   Act would recognize that as a predicate for then going to the

19   down the Ex parte Young road.

20        MS. TRZAKOMA:  So I think that's cited in our -- in

21   our briefs.  It's 744F.3d 895.

22        THE COURT:  That's the Michigan case?

23        MS. TRZAKOMA:  That is the Sixth Circuit case.

24        THE COURT:  744F.3d?

25        MS. TRZAKOMA:  89 2014.
```

O58UBENC

1          THE COURT:  Thank you.

2          MS. TRZAKOMA:  Thank you.

3          THE COURT:  What about any Second Circuit authority

4    applying *Ex parte Young* in the context of a subpoena at all?

5          MS. TRZAKOMA:  Sorry.  As we're aware, there is none,

6    and it may because states routinely comply with federal

7    district court subpoenas.  So as far as I know, there is none.

8          The Attorney General's Office has relied heavily, as

9    you may be aware, on the *EPA* case.  That case is

10   distinguishable in two respects.  And I think it's when I was

11   getting to that I'm a little confused about what the Attorney

12   General's argument is.  This is why.  The *EPA* case involved

13   a -- a federal district court subpoena to a federal agency.

14   And the question -- and the subpoena itself -- so in *Russell*

15   and in *Felix*, the theory is that the subpoena, not the

16   enforcement proceeding, but the subpoena itself is -- infringes

17   on state sovereign immunity.  And in *EPA*, the subpoena itself

18   was not the infringing thing because it was federal -- federal

19   district court to federal agency, but instead it was the

20   enforcement, the Court held that the enforcement proceeding was

21   a judicial proceeding for purposes of sovereign immunity.

22         THE COURT:  Okay.  But are we here?  Are we already

23   there?

24         MS. TRZAKOMA:  No.  But here's the problem:  In *EPA*

25   there's -- under -- if there's a federal subpoena to a federal

O58UBENC

1   agency, there is a process under the *EPA* to enforce that

2   subpoena.  So it doesn't leave the federal district court

3   without a remedy or an ability to enforce the subpoena.  There

4   is a remedy.  And there is also a remedy when the subpoena is

5   to a state.  And that remedy is through *Ex parte Young*.

6           THE COURT:  Well, why isn't the remedy FOIL?

7           MS. TRZAKOMA:  FOIL is not a substitute -- so, first

8   of all, this Court does not control the FOIL process --

9           THE COURT:  I totally understand, but I'm just saying,

10  Mr. Cuomo, in terms of his remedies, and he's, as I understand,

11  is pursuing them, I'll ask you more about that in a minute, but

12  FOIL does exist, and that is way for getting discovery, getting

13  documents from a state or a state agency.

14          MS. TRZAKOMA:  So there are a lot of exceptions to

15  FOIL that wouldn't apply in the context of a federal litigation

16  where there's a protective order.  So it is not remotely a

17  complete remedy.  But, in addition, in terms of this Court

18  being able to administer justice pursuant to the federal rules

19  which require speedy, time -- you know, time efficient and cost

20  efficient, having parties have to go through the FOIL process

21  is -- so it's going to result in woefully incomplete

22  productions, a process that is -- takes forever.  We served our

23  FOIL requests for -- on the Attorney General many, many months

24  ago.  We have barely gotten any responses.  And we did file an

25  Article 78 proceeding that the AG's office now says is

O58UBENC

1    potentially moot because they did produce some documents.  So

2    it's just -- it is not even close to a substitute for obtaining

3    discovery in a federal lawsuit.

4             THE COURT:  Okay.  So where are we -- the big issue

5    that I have to decide is whether this subpoena and/or the

6    motions that we're in right now is a suit as the founders

7    contemplated it at the time the 11th Amendment was adopted.

8    And it does say suit and equities.  So it's not just a suit for

9    damages.  It can be one seeking equitable remedies.

10            So where I have to get back to is in the minds of the

11   founders in the late 1700s, and they were -- the concept that

12   they had was that the crown could not be sued, the crown could

13   not be hailed into court.

14            So you cite in your papers some cases that involve

15   subpoenas around that time.  As best as I can tell, they're

16   written in sort of that old English that we all struggled with

17   in law school, or at least I did, they don't appear to be

18   states themselves.  One looks like it was to a county clerk.

19   One looks like it was to some kind of a secretary.  I can't

20   tell who that person was affiliated with.

21            So my question is:  Are there cases from the founding

22   that recognize subpoenas either subpoenas to the crown that the

23   king, King George, could have received a subpoena and been

24   required to comply with it, or to any kind of a state entity

25   around the time of the founding?

O58UBENC

```
 1              MS. TRZAKOMA:  There are, your Honor.  And I would --
 2     I would -- we can do supplemental briefing on this issue.  We
 3     tried not to get -- we had 25 pages, as you know.  I apologize
 4     for all the footnotes.  We were trying to cram it all in.  We
 5     did not do the, "here is what was in the founders' heads."  But
 6     I will say that subpoenas were not -- you know, that there --
 7     that there have been processes to obtain evidence going back to
 8     the founding of this country, and the founder -- the most
 9     important principle that our country was founded on is
10     federalism and supremacy.  And the idea that this -- that if --
11     if an Article 3 Court, which is the federal district court
12     through it -- by which these subpoenas were issued does not
13     have the authority over state to compel documents that are --
14     that is a very slight infringement on the Attorney General's
15     sovereignty.  This is not situation where we are even -- we're
16     not even seeking documents that go to the business of the
17     Attorney General.  These are documents that go to the business,
18     three, four, five years ago of the executive chamber.  So it's
19     not -- the infringement is slight, and I do think that the case
20     law is -- what you see in the case law is Courts are trying to
21     balance state sovereign immunity butt up against federalism
22     principles.  And what I think we have from the Attorney
23     General's briefs.  And maybe even *Russell* is an effort to just
24     put on blinkers and ignore the federalism principles that led
25     the Supreme Court to say an *Ex parte Young*, yeah, yeah, state
```

O58UBENC

1    sovereign immunity, but prospective relief is fine.  And in

2    that regard I do not understand the Attorney General's argument

3    that what we are seeking is retrospective relief.  We're not

4    seeking for this Court to, you know, to hold a past violation.

5    We are asking for this Court to direct compliance with a

6    federal subpoena which flows from federal law.  That's classic

7    prospective relief.

8         And so, if it's not -- if the Court were to find it's

9    a suit, which I don't think it is a suit, it is -- we are not

10   suing the Attorney General.  We are not trying to bring a claim

11   against the Attorney General.  We are not trying to get money

12   from the Attorney General.  All we're trying to do is get

13   documents.

14        And it really is the case that if the Attorney

15   General's position prevails, all sorts of litigants in this

16   courthouse are going to have a very difficult time obtaining

17   documents to be able to prove their claims.  And let me give

18   you an example.  Let's say that instead of Governor Cuomo

19   trying to get documents from the executive chamber or from the

20   Attorney General, it was Ms. Bennett trying to get documents

21   from her former employer to prove her claims of sexual

22   harassment.  Under the Attorney General's theory, Ms. Bennett

23   would be shut out.  The executive chamber could say, sorry,

24   we're not turning those over.  That's what's at stake here.

25   And it is -- I think it is -- it is novel, it is -- there is no

O58UBENC

1    Second Circuit -- I mean, to your Honor's point, there is no

2    Second Circuit case that says they can do this.  And there's

3    not even a District Court case in this district that says they

4    can do it.

5          And I -- to line yourself up with the Fifth Circuit

6    which is so out of step with our circuit, I just -- I find that

7    really, quite shocking, actually.

8          THE COURT:  I'd like to pivot to talk about waiver for

9    a bit.  So even assuming that sovereign immunity applies, you

10   cite in the section of the briefs the opening brief on waiver,

11   there is a citation to several cases that involve, I think,

12   tribal immunity, but I'm more interested in cases that talk

13   about what constitute waiver and state sovereign immunity

14   context.  Are there any that you can specifically point me to

15   in the context of litigation conduct as a waiver.

16         MS. TRZAKOMA:  Yes.  So we do cite to the recent Court

17   of Appeals decision in *Henry*.

18         THE COURT:  Right.

19         MS. TRZAKOMA:  So waiver is a creature of state law.

20   So we look to New York law.  And I think the *Henry* decision

21   makes clear that state -- a state with waive its immunity for

22   its litigation conduct, and I think that has happened here.

23   And let me just tell you why:  It -- it has to do with the

24   Attorney General's decision-making.  So there are two potential

25   sources of waiver.  The first one is that the Attorney General

O58UBENC

1    may have disclosed certain investigative materials to the

2    Department of Justice and to the Eastern District of New York.

3    As your Honor may have read, the Attorney General's Office has

4    declined to state whether it did or it didn't turn anything

5    over.

6          So it has not remotely met its burden that it kept

7    anything confidential, and the burden is on the Attorney

8    General's Office to say that they did.  Instead, they have --

9    they acknowledge that they have turned things to five district

10   attorney's offices without telling us or the Court what those

11   materials are.  So we have materials from one district

12   attorney.  I don't know what was turned over to others.  And

13   that's a waiver that goes not only to sovereign immunity but to

14   the arguments about privilege.  But, in addition, they

15   acknowledge that there were requests from the Department of

16   Justice and from the Eastern District of New York for

17   investigative materials.  And in Ms. Longley's declaration --

18         THE COURT:  When you say Eastern District of New York,

19   you're talking about --

20         MS. TRZAKOMA:  U.S. Attorney's Office.

21         THE COURT:  -- the U.S. Attorney's Office?

22         MS. TRZAKOMA:  U.S. Attorney's Office.

23         THE COURT:  Not Judge Merkl?

24         MS. TRZAKOMA:  Not Judge Merkl.  The U.S. Attorney's

25   Office.

O58UBENC

```
1          So that is -- that statement about -- is in
2   paragraph 27 of Ms. Longley's declaration, ECF 225, in which
3   she acknowledges that on or about August 13, 2021, the U.S.
4   Department of Justice and the U.S. Attorney's Office for the
5   Eastern District of New York jointly requested certain OAG
6   materials in connection with their own investigation into
7   whether the executive chamber led by former Governor Andrew
8   Cuomo engaged in a pattern or practice of sexual harassment and
9   a pattern or practice of retaliation in violation of federal
10  law.  And here's the key, to the extent the OAG provided
11  materials in response, if any, those materials were subject to
12  the same terms of a confidentiality agreement that did not
13  protect against any waiver and certainly not against any waiver
14  of sovereign immunity.
15          THE COURT:  Page 4.
16          MS. TRZAKOMA:  To say the least.  And I do hope the
17  Court will inquire because, if not a total waiver, then at
18  least it's a waiver as to anything that was turned over.
19          But the other -- but the litigation conduct is also
20  troubling, and here's -- as your Honor knows, I guess, I just
21  want to go back in time.  This lawsuit followed the trooper 1
22  lawsuit.
23          THE COURT:  Yes.
24          MS. TRZAKOMA:  And let me just find my notes on this.
25          And I -- when we're talking about litigation conduct
```

O58UBENC

1    waiver, I am talking about a strategic decision by the Attorney

2    General's Office to waive its sovereign immunity for

3    affirmative and offensive purposes.  So the trooper 1 complaint

4    came first, about a year ago, I guess last July, trooper 1

5    Court -- and there were, as your Honor knows, there was motion

6    practice.

7            THE COURT:  Right.

8            MS. TRZAKOMA:  Both a motion to compel, cross-motion

9    for quash.  In July of last year, the trooper 1 Court denied

10   our motion for compel, our original subpoena was very broad

11   because the trooper -- the trooper's complaint was very broad.

12   So the Court denied our motion to compel, but did not rule on

13   the motion to quash.  And that's important because at that

14   moment, there's no motion -- the motion to compel was denied,

15   there's no order compelling compliance, the AG could have

16   withdrawn its motion to quash, but it did not.  Instead, the

17   Attorney General pushed on with its motion to quash, which the

18   trooper 1 Court determined it could not resolve without

19   reviewing the underlying documents.  So the trooper 1 Court, a

20   federal court that the Attorney General says has no authority

21   to compel the AG to produce anything, ordered the Attorney

22   General to produce documents, the very documents that we are --

23   that we are seeking the Court to compel.

24            By the time the trooper 1 Court issued that order to

25   compel or issued that order to produce documents, we had

O58UBENC

1    already served the Attorney General with the subpoena in this

2    case.  And we had made a request for materials under FOIL.  At

3    that moment, when it was ordered, when the AG was ordered to

4    turn over documents in trooper 1, the AG had options.  The

5    Attorney General could have sought a stay of trooper 1 -- of

6    trooper 1's Court order.  The Attorney General could have

7    appealed that order but mostly, or also, the Attorney General

8    could have withdrawn its motion to quash and avoided having to

9    turn over those documents to the federal court.

10         But the AG did none of those things.  Instead, the AG

11    decided to comply with the Court's order.  And I believe that

12    the Attorney General wanted the trooper 1 Court, not this

13    Court, not the state court in the Article 78 proceeding, wanted

14    the trooper 1 Court to decide its privilege claims.  In fact,

15    you'll recall, earlier this year, at the end of last year and

16    earlier this year, the Attorney General's Office practically

17    begged your Honor to stay this proceeding, to defer to

18    Judge Merkl.  Why did the Attorney General's Office comply with

19    an order that it says -- that it -- that infringes on its

20    claimed sovereignty to the same extent as the subpoena?  I

21    believe it's because the Attorney General thought it has -- it

22    believes it has a friendly forum over there, or perhaps the

23    Attorney General's Office preferred the procedural posture in

24    the trooper 1 case on the sovereign immunity issues.

25    Regardless, the Attorney General's Office made a deliberate

O58UBENC

1   decision to disclose documents to a federal court that it could

2   have avoided.  Yes.  There was an order, but the Attorney

3   General's Office did nothing to protect its rights, its claimed

4   rights.

5           And what's even wilder to me is that the Attorney

6   General's Office recently agreed in trooper 1 to provide the

7   trooper 1 Court with even more briefing and more information

8   about its privilege assertions.  The Court asked, and the

9   Attorney General's Office agreed to provide, color-coded

10  versions of the interview memos to identify exactly what

11  privileges were being asserted with respect to what material,

12  that the Attorney General's Office agreed to undergo --

13  undertake this painstaking exercise boggles my mind, especially

14  considering their arguments of burden, the burden of having to

15  redact.  They're going to color-code those documents.  Why not

16  refuse the Court's directions if the attorney's office has

17  sovereign immunity?  I do believe they've waived through their

18  conduct.

19          THE COURT:  The couple of waiver cases that you cite

20  in your brief that involve production of documents, where a

21  Court has recognized the production of documents to be a waiver

22  of both of those I think are outside this circuit.  Are there

23  any cases from within the Second Circuit where a Court has

24  deemed production of documents to whomever, to the third party

25  or another outside of the party who is requesting them to be,

O58UBENC

```
1   to constitute waiver?

2           MS. TRZAKOMA:  We have not but to the extent the

3   sovereign immunity that is being claimed is object all fours

4   with the disclosures, which it is, I don't see how that is not

5   a waiver.

6           THE COURT:  Thank you.

7           MS. TRZAKOMA:  I'm happy to proceed with the other

8   privileges that we -- the other waiver.

9           THE COURT:  Yes, to the extent you can.

10          I am mindful of the time, so maybe if you could wrap

11  up in the next five minutes or so.

12          MS. TRZAKOMA:  Okay.  I'll just touch briefly --

13          THE COURT:  Frankly, I don't know that we need to

14  spend a lot of time on privilege because I think, obviously,

15  sovereign immunity is such a threshold issue, and if then I'm

16  going to get to privilege, I think I need privilege logs.  So

17  I'm not sure we need to spend a lot of time on that today.

18          MS. TRZAKOMA:  That is fine, your Honor, because the

19  privilege -- I was just going to say the Attorney General bears

20  the burden to show that privilege attaches to documents, and it

21  has not shown -- it has not met that burden with respect to

22  any, much less all, of the documents.

23          THE COURT:  I don't think I've ever upheld an

24  assertion to privilege without, at a minimum, looking at a

25  privilege log, let alone doing an in-camera review as well.
```

O58UBENC

1    There are other Courts who may have, but at least my precedent

2    in this courtroom is that I need to do that review.  So, that's

3    why I'm just saying I don't know that you need to spend a lot

4    of time on those points.

5             MS. TRZAKOMA:  That's fine, your Honor.

6             I'll just -- I'll just -- I do want to say that there

7    have been assertions of attorney-client and work-product

8    protection over these interview memos.  They are not

9    communications between an attorney and a client.  There are

10   communications between the Attorney General's Office,

11   investigators, and employees or former employees of the

12   executive chamber.  There is no attorney-client relationship.

13   These are not work product documents.  They were not prepared

14   in anticipation of any litigation.  They were prepared for the

15   purpose of conducting an investigation and issuing a public

16   report.  And to the extent there were -- that the declarations

17   that have been submitted reference vague suggestions of

18   potential disputes that could arise, your Honor's decision in

19   Brook is exactly on point, documents that would have been

20   created, whether or not litigation was anticipated, are not

21   protected by work product immunity.  That is plainly the case

22   for the interview memos, which would have been -- I mean, the

23   potential disputes that were arising were arriving as a result,

24   arguably, the interview memos.  There's no nexus between the

25   interview memos being prepared and those potential disputes.

O58UBENC

1          And I'm -- you know, I also will conclude by saying,

2    you know, the other privileges, like law enforcement,

3    deliberative process are just inapplicable here, and the

4    Attorney General office also goes to great lengths to suggest

5    that information should be protected out of confidentiality

6    concerns.  They're vague, generalized concerns, apparently,

7    applying to everyone, even those who, you know, probably had

8    nice things to say about my client, and those arguments really

9    have no place here where there's a protective order where the

10   events are years ago and where my client hasn't been in office

11   for a long time, but at the end -- and there really is no basis

12   for the Attorney General's Office to claim a concern about

13   retaliation.  Governor Cuomo is entitled to defend himself.

14   He's entitled to challenge the allegations against him.  He's

15   entitled to obtain evidence to disprove Ms. Bennett's claims,

16   and most importantly, Governor Cuomo and the public are

17   entitled to the truth.

18          THE COURT:  Thank you.

19          Mr. Amer?  Ms. Longley?

20          MR. AMER:  Thank you, your Honor.

21          Let me just say at the outset we had, with the Court's

22   permission, would want to split the argument between sovereign

23   immunity, and Ms. Longley taking privilege issues.

24          THE COURT:  That's fine.

25          MR. AMER:  So, on sovereign immunity, the subpoena in

O58UBENC

1    this case should be quashed for two reasons:  One, under Second

2    Circuit precedent, the subpoena or the enforcement of the

3    subpoena, I don't think it matters which one you look at, is a

4    suit that triggers sovereign immunity; and, second, New York

5    sovereign immunity has not been waived.

6            We think the Second Circuit's decision in *EPA v.*

7    *General Electric* is controlling on this issue, qualify and

8    compels the Court to find that the subpoena here is a suit that

9    triggers sovereign immunity?  In the *EPA* case, the Second

10   Circuit spelled that a subpoena served on the *EPA*, which was

11   not a party to the case, was a suit for purposes of triggering

12   sovereign immunity.  And I'm just going to read to you the -- I

13   think the pivotal section of the --

14           THE COURT:  I've read it.  You don't need to reread it

15   to me.

16           MR. AMER:  The point of that provision which cites to

17   the *Dugan* case is to find that because enforcement subpoena

18   could compel the government to act, it triggers sovereign

19   immunity, and whether that government entity is a state agency

20   or a federal agency is completely irrelevant to the *Dugan* test.

21   It simply doesn't matter for purposes of applying the *Dugan*

22   language that the Second Circuit relied on, whether the

23   government is a state agency or a federal agency.

24           THE COURT:  Right.  But if we're compelling the

25   government to act, don't we land in *Ex parte Young* territory

O58UBENC

1    where the Supreme Court has said that it is permissible?

2    MR. AMER:  We don't think *Ex parte Young* possibly

3    applies in any way, shape, or form to the facts of this case.

4    I can -- let me get right to *Ex parte Young*, but I did want to

5    circle back and just review for you the cases that we think

6    support our position about *EPA* and *Dugan*.  But on *Ex parte*

7    *Young*, it's well accepted that for the *Ex parte Young* exception

8    to sovereign immunity to apply, you need to have an ongoing

9    violation of federal law, and we just don't have that here --

10    THE COURT:  Well, what Ms. Trzaskoma says that you're

11    not complying with the subpoena, which is a valid federal court

12    order in effect, and, you know, we're heading down the road of

13    noncompliance, if I order you to compel and you're not and --

14    and you don't comply, or if I order you to produce and you then

15    don't apply -- don't comply, then you're in violation of a

16    Court order, which is a violation of federal law.

17    MR. AMER:  So, with all due respect, that logic is

18    deeply flawed for a couple of reasons.  First of all, I think

19    the argument is not that we're not complying with the subpoena,

20    but we're not complying with the federal rules.  And the answer

21    to that is that we are complying with the federal rules.  The

22    federal rules set out the procedure for opposing a subpoena.

23    It's not self-executing.  You have the right, as the recipient

24    of a federal subpoena, to interpose objections, which we did.

25    They may have -- they might have had an argument had we just

O58UBENC

1    thrown the subpoena in the garbage and not responded to it at

2    all, but we didn't do that.

3              THE COURT:  I think they treated what you're doing as

4    the equivalent.

5              MR. AMER:  Well, it's not.  We have certain right

6    under the federal rules to oppose --

7              THE COURT:  Of course.

8              MR. AMER:  -- that's what we've done. so we are, in

9    fact, complying with the federal rules.

10             THE COURT:  What if I grant the motion to compel and

11   the Attorney General then ignores it, aren't we back in the

12   same place?

13             MR. AMER:  No.  Because this Court has no authority to

14   grant the motion to compel because we are immune from this

15   Court's exercise of jurisdiction over the subpoena.  That's

16   what it means to be immune from suit.  For this Court to issue

17   an order compelling us to comply with the subpoena would

18   violate our sovereign immunity.

19             So, that sort of gets to the other problem with their

20   *Ex parte Young* argument, which is, it's circular.  In every

21   instance where the Court applies *Ex parte Young*, there is a

22   preexisting, ongoing violation of federal law that the *Ex parte*

23   *Young* lawsuit is then brought to remedy.

24             THE COURT:  Okay.

25             MR. AMER:  We don't have that preexisting violation of

O58UBENC

1    federal law.  We just have a subpoena that they, in a circular

2    way, argue serves as both the means to bring us into court and

3    the source of the ongoing violation of federal law.

4         I would, although it's not in the Second Circuit, I

5    would refer the Court to a decision that does discuss, at least

6    in the one we were able to find, that does discuss why *Ex parte*

7    *Young* is not applicable to a subpoena enforcement action.  It's

8    *Estate v.* -- it's *Estate of Gonzalez v. Hickman* out of --

9         THE COURT:  Yes, which a subsequent case *Allen*

10   disagreed with.  So I'm not sure -- there's another case from

11   that same district later that says that cast doubt on *estate of*

12   *Gonzalez.*

13        MR. AMER:  Although I think the why the reason the

14   cast doubt on *Gonzalez* is because, in the Ninth Circuit, a

15   subpoena is not deemed to be a suit for purposes of triggering

16   sovereign immunity, and so to that, extent it conflicts with

17   Second Circuit case law.

18        THE COURT:  Okay.  So Footnote 13 of Mr. Cuomo's

19   opening brief has a dozen cases, at least, I think, where

20   federal courts enforced subpoenas against state agencies and

21   officials.  So how do you -- what was going on there?  Did the

22   Courts in those cases not have -- you're saying that they were

23   violating sovereign immunity by requiring those state agencies

24   and officials to comply with those subpoenas?

25        MR. AMER:  No.  Let me go through some of those cases

O58UBENC

1    and explain why they're distinguishable.  There's maybe one

2    case that I can't distinguish, and I would just chalk it up to

3    a circumstance where the issue was never raised.

4            But the *Freeman v. Rochester Psychiatric Center* Case,

5    the plaintiff served a subpoena on the New York State

6    Department of Labor to obtain a copy of his own unemployment

7    records.  The Department of Labor received from the plaintiff a

8    signed authorization for those records, and the Department of

9    Labor determined that it was required under state law to

10   provide those records deeming that state law to have waived

11   sovereign immunity.  I would also point out, and this sort of

12   goes to Ms. Trzaskoma's example of Ms. Bennett seeking to get

13   from the executive chamber her employment records.  The state

14   routinely provides employees of state agencies with their

15   employment records through FOIL, if they are provided with a

16   duly executed authorization.

17           THE COURT:  So you're saying the interview memos are

18   Ms. Bennett's employment records?

19           MR. AMER:  No.  They're not.  I think Ms. Trzaskoma

20   gave us an example of why it's problematic to adopt our

21   position, the example of Ms. Bennett seeking her own employment

22   records in this case, and my answer is that that's the type of

23   record that would routinely be provided under FOIL.

24           THE COURT:  But she couldn't get emails, her emails,

25   for example you're saying?

O58UBENC

1          MR. AMER:  No.  I'm saying she would have to go

2     through FOIL, which is the statutory waiver of sovereign

3     immunity that New York has agreed to.

4          *Screen v. Quality Protection Services* case, that's

5     another example of a case where there was an authorization to

6     obtain personnel records from the New York State Department of

7     Labor.  So I think that's the same as the *Freeman* case.  The

8     *Pierce v. Devon* case, that case involved a defendant

9     correctional officer who was a party to the case, and it's

10    entirely unclear from the decision whether or not the documents

11    were within that defendant's custody, possession, or control.

12    So, in other words, that's a situation, which I think is

13    common, your Honor, in 1983 cases where the plaintiff names as

14    a defendant a state official, either through *Ex parte Young* or

15    in an individual capacity basis and the document production

16    goes forward because the state official who has custody,

17    possession, or control of records is a named party and you can

18    get them through party discovery, which is --

19         THE COURT:  I thought almost all of -- I thought I

20    read them all as involving subpoenas, not party requests.

21         MR. AMER:  I think if you read the decision in *Pierce

22    v. Devon* it's clear that there were correctional officers who

23    were defendants, and it's unclear whether the Court is saying

24    you need to provide the documents because you're a party to

25    this case versus I'm going to order them to be provided through

O58UBENC

1    the subpoena.

2            THE COURT:  If you're party, you don't need Rule 45.

3            MR. AMER:  I understand that.  I think there was a

4    subpoena issued to DOCCS, but there was also a defendant in the

5    case who was a correctional officer, and what I'm saying is

6    it's unclear from the decision which is the avenue through

7    which the Court determined that the documents should be

8    provided.

9            *Lynch v. the City of New York*, which is in that same

10   footnote, I read that to be nothing more than a requirement

11   that the parties meet and confer.  It says nothing more than

12   that.

13           THE COURT:  Well, but, under your theory of

14   federalism, I could not even order you to meet and confer with

15   Ms. Trzaskoma about the subpoena.  You're saying the subpoena

16   stops at the door.  She can't even come in the federal

17   courthouse with that subpoena and I can't -- I can do nothing

18   about it.  So how did that Court have authority to direct the

19   state agency to meet and confer under your theory?

20           MR. AMER:  Your Honor, I don't think complying with

21   the rules to get us to a motion to quash would be sufficient to

22   cross over this line.  I think it's when the Court acts on the

23   subpoena to compel the production of document that we have a

24   problem with sovereign immunity.

25           And I also think in the *Montesa v. Schwartz* case, that

O58UBENC

1    involved a subpoena served on New York State Education

2    Department, and it involved the Family Education Rights Privacy

3    Act or FERPA and whether or not the documents being sought from

4    the Education Department under FERPA was an abrogation of state

5    sovereign immunity.

6         All of this is to say, by the way, your Honor, that I

7    don't think that what happened in prior cases where this

8    sovereign immunity defense may not have been issued -- may not

9    have been raised and was not an issue, in any way precludes us

10   from raising the sovereign immunity issue in this case.

11        THE COURT:  Right?  But you also tell me that it's not

12   waivable.

13        MR. AMER:  That's true.  It is not waivable.

14        THE COURT:  So how do you speak to those cases where

15   obviously the state official waived it?

16        MR. AMER:  It's not waivable by litigation conduct.

17   It is of course waivable by legislation, and the New York --

18   and New York has waived it by legislation.  New York enacted

19   the Court of Claims Act.  New York has enacted FOIL.  So the

20   point of the argument --

21        THE COURT:  I thought *Henry* said that it could be

22   waived by litigation conduct.

23        MR. AMER:  So we think the other side seriously

24   misreads *Henry*.

25        THE COURT:  You're being nice and pointing out Ms.

O58UBENC

1    Trzaskoma.  I read it the same way she does.

2              MR. AMER:  Let me tell you why *Henry* --

3              THE COURT:  Tell me why I'm wrong, Mr. Amer.  I'd love

4    to hear that.

5              MR. AMER:  The reason why *Henry* does not abrogate New

6    York's rule that you can't waive sovereign immunity by

7    litigation conduct is because the Court in *Henry* recognized

8    three different types of sovereign immunity.  It recognized a

9    state sovereign immunity from suit in federal court; it

10   recognized a state's sovereign immunity from litigation in

11   other state's courts, which it called interstate sovereign

12   immunity; and it recognized state sovereignty of a state in its

13   own courts, which would be the sovereign immunity here, which

14   is New York's immunity from suit in New York's own courts.  The

15   *Henry* case dealt solely with interstate sovereign immunity.

16   That case was about whether New Jersey Transit Authority could

17   be subject to suit in the courts of New York.  And the Court

18   held that interstate sovereign immunity is akin to personal

19   jurisdiction, and so it can, in fact, be waived, but the Court

20   distinguished the case before it from a circumstance involving

21   sovereign immunity of a state in its own courts, and the Court

22   went on to note that the result in that type of case is

23   distinguishable from the case that was before it because New

24   York's immunity from suit in New York courts is a function of

25   legislation, the New York Court of Claims Act, and it involves

O58UBENC

1    the scope of the Court of Claims' jurisdiction.  So I would

2    submit that based on the Court's distinguishing these different

3    types of sovereign immunity, it was saying that New York's

4    immunity to suit in New York is still a function of subject

5    matter jurisdiction which is not waivable --

6          THE COURT:  Okay.  But you're familiar with the

7    Foreign Sovereign Immunity's Act, I presume.  It doesn't

8    probably come up for you often, but the Second Circuit has

9    clearly held that foreign sovereign immunity is waivable by

10   litigation conduct.  The Court is also -- Courts have also held

11   that tribal sovereign immunity is also waivable by litigation

12   conduct.

13         Why isn't the same rule, why are states different,

14   that litigation conduct cannot waive sovereign immunity?

15         MR. AMER:  Because, as the Second Circuit has

16   recognized, the question of whether sovereign immunity is

17   waivable, state -- broad state sovereign immunity is waivable

18   is a function of state law, not federal law.  So this Court

19   needs to look to the law of New York to determine whether New

20   York sovereign immunity is waivable by litigation conduct.

21         And I would ask the Court to look again at pages 372

22   to 373 of the *Henry* decision.  It's the portion of the decision

23   that distinguishes the two different types of sovereign

24   immunity that I've been talking about, and I think it's clear

25   from reading that portion of the decision that while the Court

O58UBENC

1    is saying interstate sovereign immunity can be waived by

2    litigation conduct, that is not the case with respect to New

3    York's own immunity within the courts of New York.

4           THE COURT:  But why weren't we -- why isn't this more

5    like interstate immunity because you're in effectively the

6    court of a different sovereign?  New York versus New Jersey is

7    somewhat -- is not perfectly analogous but it's more like

8    New York versus federal court because you're in the court of a

9    different sovereign.  So why are you saying that -- I'm still

10   not following why you think it's special.

11          MR. AMER:  So this raises a very important point, your

12   Honor, and it's something that you need to be cognizant of when

13   you're looking at a lot of these cases, which is many of these

14   cases turn solely on 11th Amendment immunity.  We are not

15   relying solely on 11th Amendment immunity.

16          THE COURT:  I know.

17          MR. AMER:  And it's the broader state sovereign

18   immunity which is the immunity that New York would have even if

19   a New York court, state court, that is the basis for our

20   sovereign immunity argument, and we think it's clear, based on

21   *Henry* that the only -- that it's only abrogating the New York

22   rule about the non-waivability of sovereign immunity through

23   litigation conduct with respect to interstate sovereign

24   immunity and it -- and it is drawing an analogy to personal

25   jurisdiction, and it's making a distinction, a distinction that

O58UBENC

1   this Court should recognize between interstate sovereign

2   immunity, which is not what we're talking about here, and New

3   York's broader sovereign immunity in the courts within the

4   state of New York, federal, or state.  And the section that I

5   just referred you to, 372 to 373, speaks to this very issue and

6   makes clear that the Court is not suggesting that New York's

7   own sovereign immunity within the courts of New York is

8   anything other than what the rules currently provide, which is

9   that it's subject matter jurisdiction that is not waivable by

10  litigation conduct.

11          I do want to just mention --

12          THE COURT:  Let me just get to the heart of this.

13          MR. AMER:  Yes.

14          THE COURT:  Would you -- did the Attorney General

15  produce to the Department of Justice in Washington or to or the

16  U.S. Attorney's Office in the Eastern District of Brooklyn --

17  in the Eastern District of New York any of the materials that

18  Mr. Cuomo is requesting here?

19          MR. AMER:  I'm going to have to defer to Ms. Longley

20  because I don't know the answer.

21          THE COURT:  Okay.

22          MR. AMER:  All I can say thought is that whatever we

23  did produce, to the extent there was material that was

24  produced, it was produced subject to an agreement, cooperation

25  agreement between law enforcement entities that we believed

O58UBENC

1    preserved all of our concerns about confidentiality and

2    privilege, and we don't see how that conduct, in any instance,

3    even -- so let me -- let me back up and say, even assuming that

4    the New York rule was you could waive sovereign immunity

5    through litigation conduct, it's clear that nothing that

6    happened here rises to that level.  And I would point you to

7    the *Ghawanmeh v. Vermont* case, I think that -- you had asked

8    for a case within the Second Circuit that discusses the

9    standard for waiver by litigation conduct.  That case involved

10   a suit brought against the State of Vermont, and in that case,

11   Vermont renounced in the early phases of the litigation any

12   intention to invoke the defense of sovereign immunity and it

13   proceeded to litigate the case, and then Vermont changed its

14   mind and it raised the sovereign immunity defense.  And I'm

15   just going to read from the Court's decision, this is *Beaulieu*

16   *v. Vermont*, 807 F.3d 478.  It's a 2015 Second Circuit decision.

17   This is at page 491:  Even assuming that prejudicial product by

18   a state defendant can override state law limiting the manner in

19   which the state's general sovereign immunity may be waived or

20   abrogated, we find no such prejudicial conduct here.  It is

21   true that defendants changed their strategy, and that earlier

22   invocation of Vermont's immunity might have resulted in earlier

23   dismissal sparing plaintiff some burden and expense, but there

24   is no record of duplicitous conduct by defendants or of serious

25   unfairness to plaintiffs resulting from the tardy invocation of

O58UBENC

1    immunity.  The Court below ordered further discovery on the

2    sovereign immunity question and the parties had months to brief

3    it.  Accordingly, we reject plaintiff's final argument that

4    defendants waived Vermont's general sovereign immunity by their

5    litigation conduct.

6         Your Honor, if Vermont, in that case, did not waive

7    its litigation conduct by renouncing the defense proceeding

8    with the litigation and then changing its mind; a fortiori,

9    there is no way that this record would support a finding of

10   waiver of sovereign immunity on litigation conduct, and there's

11   certainly no prejudice that arises from our office providing to

12   the DOJ any material from the investigation because it's not as

13   though the plaintiff here, Bennett, has anything that they

14   don't have.  It's not as though it's like one of these cases

15   where a party gives material to one side of the V. and not the

16   other side of the V.  So just looking at the *Beaulieu* case

17   there's just no way that anything that happened here could

18   possibly be construed as waiver by litigation conduct.

19        I'll also mention that, you know, the Second Circuit

20   recognizes, in the passage that I just read, that the whole

21   question of whether Vermont can even waive its sovereign

22   immunity by litigation conduct is one that it's not passing on

23   because it says even if you could waive by litigation conduct,

24   you haven't met the standard here, but it does recognize that

25   the question is controlled by Vermont law, not by federal

O58UBENC

1    Second Circuit precedent.

2            I also want to mention that I -- well, I did want to

3    just quickly talk about a handful of the cases that we think

4    are very pertinent here.  Obviously, you mentioned the *Felix*

5    case.  We think Judge Locke got it right.  There's no flaw in

6    his rationale.  He was compelled the same way we think this is

7    this Court a compelled under the *EPA* case to conclude that a

8    subpoena is a suit for purposes of triggering sovereign

9    immunity.

10           Judge McMahon in the *Catskill Development* case reached

11   the same conclusion with respect to a subpoena served on tribal

12   officials.  We don't think there's any daylight between that

13   case and this case, that it's the same situation.  It's a

14   subpoena served on an official of an entity that enjoys

15   sovereign immunity.  And Judge McMahon relied on the *EPA*

16   holding based on the *Dugan* case.  There are three circuit cases

17   outside the Second Circuit that all compel the result we're

18   asking for.  Obviously, the *Russell* case in the Fifth Circuit,

19   tell that case involved state officials.  So it's directly on

20   point.  The Eighth Circuit and Tenth Circuit have both held

21   that, just like Judge McMahon held in the *Catskill Development*

22   case that subpoenas served on tribal officials triggers

23   sovereign immunity, the tribal sovereign immunity.

24           All of the cases that the other side cites that come

25   out the other way do so because either they're only dealing

O58UBENC

1    with 11th Amendment immunity and not the broader state

2    immunity, or they fundamentally disagree with the Second

3    Circuit that a subpoena is a suit for purposes of triggering

4    sovereign immunity, and the reason why they disagree is because

5    I don't think they're faithful to the language of *Dugan*.   I

6    think they -- I think they -- so *Dugan* says the general rule is

7    that a suit is against the sovereign if the judgment sought

8    would expand itself on public treasury or domain, according to

9    the theory with the public administration, or 1 effect of the

10    judgment would be to restrain the government from acting or

11    compel it to act.

12           And I think a number of courts stop at the first half

13    of that sentence and look only at the effect on the state

14    treasury, and I think that's erroneous.  That may be, you know,

15    some Courts view that as where you stop the analysis when

16    you're talking about 11th Amendment immunity, but clearly

17    when you're talking about state's broader sovereign immunity,

18    you have to include the second half of the *Dugan* standard, and

19    you have to look at whether or not you're going to be

20    compelling the government to either refrain from acting or --

21    from taking an affirmative act.

22           So I do think that the other cases that they cite to

23    outside the Second Circuit can't be followed because they

24    conflict with the *EPA* holding of the Second Circuit, and,

25    honestly, I think that the Second Circuit's decision in *EPA*

O58UBENC

1    compels the Court to find that we do have sovereign immunity

2    here as to this subpoena, and I don't think there's any basis

3    to hold waiver.

4           I will just quickly mention that I think the argument

5    about our position leading to some parade of horribles where

6    nobody can ever get any documents from state agencies is

7    completely overblown, your Honor.  And it's overblown for four

8    reasons, I think:

9           The first reason, which I believe I mentioned, is that

10   in most Civil Rights 1983 cases, the plaintiff names as a party

11   defendant a state official either because, through *Ex parte*

12   *Young*, they're seeking some prospective injunctive relief or

13   because they named the state official in his or her his or her

14   individual capacity, which they're allowed to do, that doesn't

15   trigger sovereign immunity.  And it's often the case that those

16   individuals who are named defendants are in custody,

17   possession, or control of the documents that are being sought.

18   So they are just obtainable through ordinary party discovery.

19          Second, it's often the case that state agency

20   documents are FOILable.  They're not subject to any exceptions

21   to FOIL, and that's the legislative waiver that New York has

22   entered into of its sovereign immunity with respect to how

23   documents can be obtained from state agencies.

24          Third, it may be the case that there is parallel or

25   related litigation to a civil rights action in the New York

O58UBENC

Court of Claims.  That is permitted because New York has,

through the Court of Claims Act, waived its sovereign immunity?

And so that's a circumstance where whatever documents the

plaintiff who has perhaps two different lawsuits, one in the

Court of Claims against New York State and one maybe in federal

court under 1983, can get whatever documents it needs through

the Court of Claims action that is also pending.

         Fourth, Congress has the ability to abrogate state

sovereign immunity exercising proper powers, and it has done

so.  So, for example, Title II of the ADA, Courts have read

that statute to waive state sovereign immunity.  And in any

particular action or federal statute, you would need to look at

whether or not Courts have held that Congress has abrogated

state sovereign immunity.  I believe Courts have held, for

example, that in addition to Title II of the ADA, the Voting

Rights Act is another example of Congressional litigation that

abrogates sovereign immunity.

         So the fact is that it will be the rare case where the

state sovereign immunity precludes a litigant from obtaining

documents from the state for use in a pending litigation.  It

would be -- it would need to be a unique case like this one,

where there is no state official named as a defendant who would

have custody, control, or possession over the documents, where

the documents are subject to FOIL exceptions, like privileges

that attach to these documents.  There is no related litigation

O58UBENC

1    in the New York Court of Claims that would give the movant here

2    access to the documents, and there's no abrogation of sovereign

3    immunity by Congress.

4              THE COURT:  I would like to hear from Ms. Longley.

5    I'm just mindful of the time.

6              MR. AMER:  So for all those reasons, your Honor, we

7    think the Second Circuit has spoken on this issue and that your

8    Honor should follow Judge Locke's decision in the *Felix* case

9    and hold that a sovereign immunity applies and it has not been

10   waived.

11             Thank you, your Honor.

12             THE COURT:  Okay.  Thank you.

13             So, Ms. Longley, let's start with the question that

14   Mr. Amer left hanging which is whether the materials that the

15   Attorney General provided to the Department of Justice, any of

16   its branches, included any of the materials that Mr. Cuomo is

17   requesting here.

18             MS. LONGLEY:  Your Honor, I really don't want to not

19   answer your question, but I am a little uncomfortable getting

20   into the specifics about what information may have been shared

21   with fellow law enforcement that's not already publicly

22   available, but what I can say is to echo what my colleague

23   said, if documents were shared, they were done pursuant to

24   confidentiality agreements in the context of law enforcement

25   entities working together and they were certainly not shared

O58UBENC

1  with plaintiff.  They have not ever been shared with parties to

2  this litigation other than Defendant Cuomo who has gotten some

3  materials through criminal discovery.

4          THE COURT:  Is there an index of what was provided to

5  the Department of Justice or a list?

6          MS. LONGLEY:  I'm not aware of one.

7          THE COURT:  Okay.

8          MS. LONGLEY:  But, you know, I think, you know --

9          THE COURT:  How would we find out what was provided in

10  way that you could -- I'm not asking for substantive answer, if

11  you're -- I wish I was getting an answer to my question, but

12  I'm just, procedurally, if I wanted to know, if this Court

13  wanted to know what was in the AG's production to the

14  Department of Justice, is there a way for that information to

15  be provided to the Court?

16          MS. LONGLEY:  Perhaps, at the risk of opening

17  ourselves up to another waiver argument, I would say perhaps

18  in-camera our office could share that information voluntarily

19  perhaps, so as -- although we disagree that responding to a

20  Court order asking for an in-camera review so it can rule on a

21  motion to quash, we don't think that's waiver.  Perhaps that

22  would be a way to respond.  But I'm uncomfortable right now in

23  open court when it's not something that our office has publicly

24  shared and it's not something that the Department of Justice

25  has publicly shared.  There are a lot of people on the phone.

O58UBENC

1          THE COURT:  All right.  So setting that aside, is

2     there a privilege log with respect to the materials that

3     Mr. Cuomo is seeking?

4          MS. LONGLEY:  Yes, your Honor.  We did provide

5     Mr. Cuomo with a privilege log.  It was attached to our

6     responses and objections.  And I believe it was submitted as an

7     exhibit to the Longley declaration.

8          THE COURT:  Right.  I think it's just categorial.

9          MS. LONGLEY:  Okay.

10          THE COURT:  There's not a document-by-document --

11          MS. LONGLEY:  That has not been completed.  No.  That

12     hasn't been done.

13          THE COURT:  Okay.  All right.  And then are you able

14     to speak to the status of the production in response to

15     Mr. Cuomo's FOIL requests?

16          MS. LONGLEY:  I can briefly.  I can say that

17     Mr. Cuomo -- I don't know when this case was started, but I can

18     say I think it was a while after this case was started he

19     submitted his first FOIL request to our office.  And that --

20          Yes.  Let me just say our report -- the Attorney

21     General's Office's Report on the allegations of sexual

22     harassment against the governor was released in August of 2021.

23     The trooper 1 lawsuit started in February of 2022.  We were

24     first subpoenaed in July of 2022, and we first received a FOIL

25     request from former Governor Cuomo in July of 2023.

O58UBENC

1           It is being processed in the normal course.  There is

2    a rolling production of the documents that are being produced

3    consistent with the FOIL timelines and standards.  I can say

4    that thousands of pages have already been produced.  They're

5    going to continue to be produced until a final determination is

6    made by the FOIL officers, at which point, if Mr. Cuomo

7    disagrees with the final, you know, resolution of that, he has

8    a right to administratively appeal that to the Attorney

9    General's Office.  If he disagrees with that determination, he

10   can appeal that in the state court under Article 78.

11           THE COURT:  Okay.  Are there circumstances under which

12   the Attorney General could disclose the names of the witnesses

13   who were interviewed as part of the investigation?

14           MS. LONGLEY:  Your Honor, that goes to the core of

15   what the Attorney General's Office is interested in protecting

16   against disclosure go to, and so the office has, so far, been

17   unwilling to provide a list, and that is because, as set forth

18   in the Trzaskoma declaration, there are over 100 witnesses to

19   the investigation whose identities are not publicly known.  The

20   witnesses who are publicly known have experienced harassment

21   and retaliation by many of the defendants in this case because

22   they cooperated with the investigation.  The investigators

23   determined at the time -- while the investigation was underway

24   that witnesses had credible fears of retaliation.

25   Unfortunately, many of those fears have borne out in a very

O58UBENC

1    public setting.

2         And so, you know, what I -- if I could maybe just take

3    a step back and talk about the investigation and Executive Law

4    63(8), I'd like to do that.  I think that will address some of

5    your questions here.

6         The Attorney General's Office was authorized to

7    investigate under New York State Law Executive Law 63(8)

8    because they got a referral.  Our office got a referral from

9    the former governor that gave us jurisdiction to conduct the

10   investigation.  Confidentiality, including the confidentiality

11   of a witness' identities is baked into 63(8) and it provides

12   that anyone who shares information from the investigation,

13   including the identities of witnesses, can be subject to

14   misdemeanor liability.  63(8) also allows the Attorney General

15   to appoint officers to assist with an investigation.  Those

16   officers do not have to be attorneys.  They can be.  But the

17   referral letter from the governor's office, which is Exhibit 1

18   to the Longley declaration does two things that are relevant

19   here:  It requests that the people who conduct the

20   investigation be attorneys, evincing the understanding it would

21   be a privileged investigation.  It sets up the investigation

22   under 63(8), which has confidentiality baked in, and it also

23   says, and this will be relevant later, that the findings will

24   be disclosed in a public report after the review.  It doesn't

25   say anything about the full investigative file being disclosed.

O58UBENC

1    It's specific to the findings.

2              THE COURT:  Right.  But the Attorney General in this

3    case went beyond what 63(8) says and said, I will make the

4    investigation materials public.  So didn't her statements

5    override even what the statute provides?

6              MS. LONGLEY:  The Attorney Generally -- the statute

7    allows the Attorney General and in theory that the governor's

8    office have discretion about what can be disclosed.  So the

9    Attorney General did have that discretion.  What I will say

10   about the materials that were made public, those were done --

11   this was -- there was a lot of public interest in the

12   investigation.  This was a high-stakes investigation.  It led

13   to the governor deciding to resign.  It lead to a fallout for

14   many other people.  And the office determined it was important

15   to give the public as much information as it could to

16   understand the report without breaching in any way

17   confidentiality or identities of individuals who had fears of

18   retaliation.

19             And so what it did, it took a long time, and this will

20   go to the burden, it expended a lot of resources to very

21   carefully review and redact materials and make sure what was

22   released was narrowly material tailored to be actually

23   materials that the Attorney General's findings and conclusions,

24   and that it wasn't going to expose private, confidential

25   information about people who cooperated or their family members

Case 1:22-cv-07846-VSB-SLC    Document 265    Filed 05/17/24    Page 53 of 77    53

O58UBENC

1    or friends.

2         THE COURT:  Right.  But I think what Ms. Trzaskoma is

3    saying on behalf of Mr. Cuomo is that was selective and that

4    there are statements, or there could be statements in what --

5    in the investigation materials that are helpful to Mr. Cuomo or

6    undercut Ms. Bennett's allegations, and simply the Attorney

7    General has just decided not to disclose those.

8         MS. LONGLEY:  Your Honor, this -- I mean, that's in

9    the larger public relations, you know, world that we exist in,

10   and there are feelings about the report, but the Attorney

11   General hasn't put anything out there in terms of this

12   litigation, and there's -- they are speculating that maybe it

13   would be helpful to have some of the materials that they don't

14   have for the report.  But civil discovery doesn't entitle them

15   to go into the internal investigative files of the law

16   enforcement agency just because it might be helpful to them.

17   And one of the things that they've said that they -- you know,

18   they were forcing them to do discovery the hard way, quote, the

19   hard way, and it's -- you know, we're just asking that they use

20   the information they have.  Like, they know everyone who worked

21   in the executive chamber because their client was the boss.

22   They know who is in the plaintiff's initial disclosures and

23   people she intends to rely on.  They have plenty of information

24   of what's publicly available to use that to conduct discovery

25   themselves.  To say that, oh, it would be really convenient to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O58UBENC

1    have the top law enforcement agency's internal files that --

2    you know, the investigative teams' communications with each

3    other, that would be helpful.  That's just not enough to get it

4    in this particular --

5            THE COURT:  I don't think they're asking for the

6    team's communications, other than the memos.  We're just

7    talking about if there's somebody who worked in the executive

8    chamber who said, Ms. Bennett made it all up, or, that's

9    totally wrong, I was there, and it was 180 degrees from the way

10    she described it, I'm not saying that there is a witness who

11    says that, but if there is a witness statement in the

12    investigative materials that undercuts her claims, that's

13    indisputably relevant here.  And it sounds, based on what

14    you've said, that's not a statement that would support the

15    Attorney General's findings in the report.  So that's something

16    that she has decided not to disclose, but it -- Mr. Cuomo has

17    an entitlement to it.

18            MS. LONGLEY:  Your Honor, Mr. Cuomo has every ability

19    to go and depose former executive chamber employees that he

20    can -- that he wants to.  He can depose the plaintiff and ask

21    her who knows what, and then depose those people.  There's

22    nothing stopping him from doing that.  And it's not relevant

23    what those witnesses -- you know, what OAG's deputized attorney

24    investigators wrote down in a memo about their conversations

25    with those witnesses.  That's what's not relevant to this case.

O58UBENC

```
1   And he does not have, and we can get to this later on

2   privileges, in order to pierce even some of the ones that are

3   called, I would need a compelling need for the material, which

4   means he can't get it somewhere else.  He hasn't tried to get

5   it somewhere else.  He can't show that.

6         THE COURT:  Have you seen how many subpoenas he wants

7   to issue in this case?  We may be getting there.

8         MS. LONGLEY:  Yes.  But that goes to the heart of it.

9   And so, not to, you know, I'm certainly understanding that

10  people don't want to do -- want to be efficient in the world,

11  but for our office, the ability to protect the integrity of our

12  investigations and our investigative files, even when an

13  investigation is closed is really, really important.  So it is

14  a huge burden and huge threat to our office's core functioning

15  to be able to fulfill its statutory and Constitutional

16  obligations.  If every time we do an investigation the subject

17  of that investigation who has a documented history of

18  retaliating against people who cooperate in an investigation in

19  a case like this where there is just really not any relevance

20  or very marginal relevance and he could get it other ways, if

21  he's able to just peak behind the curtain and get into our

22  internal and confidential files, I think that really will be a

23  huge threat to the public's trust in our ability be to run

24  investigations and get cooperation from witnesses who put a lot

25  on the line to cooperate with our investigations, and it can
```

O58UBENC

```
 1    play out in a lot of other areas, not just if we're

 2    investigating a sitting governor.

 3         THE COURT:  Is deliberative process privilege off the

 4    table.  You're not asserting that anymore?

 5         MS. LONGLEY:  It's on the table, your Honor.  We've

 6    raised it on page 5 of our motion to -- our brief in support of

 7    our motion to quash.  We reference it and we attach our

 8    responses -- we attach our responses and objections to the

 9    subpoena where we raise it there.  We didn't analyze it in

10    detail in the brief, but I'd be happy to explain our argument

11    for it now, but we are not -- it is not off the table.

12         THE COURT:  All right.  I don't need you to explain

13    it.

14         MS. LONGLEY:  Okay.  Thank you.

15         If I could say one more thing about the 63(8)

16    structure of the investigation, it's that, you know, when these

17    allegations were raised against the former governor, nothing

18    required him to use the vehicle of 63(8) to have this

19    investigation done.  He could have had someone in his office

20    look into the allegations.  He could have referred the

21    allegations to the Governor's Office of Employee Relations like

22    their policy required.  He could have hired an outside counsel

23    to do it and said I'm going to have an open book investigation.

24    That's not what he did.  He used 63(8), which has all there's

25    confidentiality provisions in and, you know, I think that the
```

O58UBENC

1      expectation of the state in how this investigation was set up

2      was one to protect confidentiality and privilege, and that

3      includes confidentiality of sources.

4              I also want to talk about just the litigation risks

5      that the office was aware of from the beginning.  The office

6      anticipated, however the outcome of the investigation went,

7      that there was likely to be litigation coming from multiple

8      sides.  If complainants -- if there was no finding,

9      complainants would not have been satisfied with the report and

10     the investigation.  The findings went against the governor, as

11     they did, he would have -- we expected he would challenge it.

12     His attorneys had said so during the investigation.  And that

13     also in March of 2021, which is the same month that our

14     investigation started, the Assembly Judiciary Committee opened

15     an impeachment investigation which obviously could lead to a

16     judicial proceeding of an impeachment proceeding.  So those

17     were all built into how the investigation was structured.

18             And if I can talk a little bit about the interview

19     memos because it was something that your Honor said related to

20     communications.  And so I want to just explain that.  These

21     were -- so there were almost 200 witnesses that were

22     interviewed in the investigation.  There were 79,000 documents

23     received.  There was a great investigative team, but not every

24     single member of the investigative team could be at every

25     single interview or review every single document.  And so what

O58UBENC

1  these memos were used to do was to have the one or two lawyers

2  who did do the interview memorialize what they thought was

3  important from the interview and use that to communicate with

4  the rest of the team about their mental impressions of it, the

5  information they gathered, and what they -- what was worth

6  writing down, what wasn't worth writing down, and what they

7  thought the next step should be.  These memos were then shared

8  with the entire investigative team and they were used to

9  develop the investigative strategy throughout, and ultimately

10  considered by the lead investigators in how they came to their

11  conclusions and findings for the -- on the ultimate issue that

12  was asked by the client, which is OAG, which is whether the

13  governor engaged in sexual harassment or retaliation.

14           THE COURT:  I know that I have your declaration, but

15  you were not a member of the investigation team?

16           MS. LONGLEY:  I was not a member of the investigative

17  team.  I was involved in the hiring.  I don't want to become a

18  witness here.  But I will say I was involved in the structuring

19  of the investigation and the investigator did report to me on

20  weekly basis.

21           THE COURT:  Okay.  Thank you.

22           MS. LONGLEY:  I also want to say that these memos are

23  documents that have a lot of information including privileged

24  information.  They also have sensitive information that's set

25  forth in the Trzaskoma declaration in paragraph 10.  And this

O58UBENC

```
 1    is -- I'll get to this later with the law enforcement

 2    privilege, but I just want to paint a picture for the Court

 3    that they have identities of witnesses who fear of retaliation,

 4    they have PIIs.  They have health information about witnesses

 5    and others, including minor children.  They have confidential

 6    employment, personnel information.  They have information about

 7    law enforcement techniques and security plans, and they have

 8    various other types of personal information about people's

 9    romantic and sexual lives.

10          Witnesses were told that the investigation was being

11    conducted under 63(8).  I believe they were given copies of the

12    law and which -- and so they were -- it was communicated to

13    them that there were these confidentiality provisions built in.

14    It was also assured to them by the investigators that OAG

15    viewed the information as confidential and would not be

16    disclosing except as necessary to fulfill the mandate to

17    conduct the investigation and publicly release the findings.

18          Quickly, and I actually just to get something

19    Ms. Trzaskoma said about redaction, I feel like a broken record

20    here, but because Mr. Cuomo's counsel keeps saying that the

21    memos have been redacted for all applicable privileges, and I

22    just want to dispel the Court of that idea.  That's just not

23    true.  The office is claiming privilege on the entirety of the

24    memos, but it's also, you know -- and if -- we hope we don't

25    get to this point, but if there a need to try to review to
```

O58UBENC

1    redact these memos, they are so replete with sensitive

2    information, privileged information, that that has not been

3    done and it would require a lot of resources to do.

4            And I want to just describe the transcripts briefly.

5    There are 41 transcripts on our website in redacted form.  They

6    are very lightly redacted.  And the redactions there are to

7    protect information covered by the law enforcement privilege.

8    As I said before, I think they were redacted in a way that we

9    wanted the public to be able to understand the report but we

10   didn't want to unnecessarily expose people's personal, private,

11   or embarrassing information, if it wasn't material to the

12   findings of the report, and we think that doing that in this

13   case, or any case, would discourage future cooperation from

14   witnesses if they think that, you know, any time -- oops, I

15   forgot, I mentioned this thing about, you know, a personal

16   thing and --

17           THE COURT:  Right.

18           MS. LONGLEY:  And it's now going to be disclosed even

19   though it's not material to anything.

20           Finally, before getting the merit's arguments, but I

21   am sensitive to the time but I do just want to talk a little

22   bit about the historical context in which we received the

23   subpoena in the Bennett case.  In the Longley declaration,

24   paragraphs 41 to 45, it sets forth how investigators determined

25   there were credible fears of retaliation by witnesses, but

O58UBENC

```
 1   also, in particular, starting on paragraph 44 of the Longley
 2   declaration, it outlines very recent harassment of witnesses to
 3   OAG's investigation.  That includes the activities of Madeline
 4   Cuomo acting at the direction of her brother and directing an
 5   online group to publicize bimbo photos of the complainants.
 6           THE COURT:  I've had a lot of litigation about this.
 7           MS. LONGLEY:  Okay.  You're familiar with it?
 8           I'll just say, I don't know if you're familiar with
 9   the Anna Liss-Jackson saga --
10           THE COURT:  I understand what the Attorney General's
11   assertions are about retaliation and we don't need to go into
12   them.
13           MS. LONGLEY:  Okay.  I'll refer to my declarations
14   then.
15           What would be helpful to the Court in terms of going
16   through, you know, I would say that we have two types of
17   objections to the subpoena beyond sovereign immunity.
18           The first is that there's no relevance to these
19   materials, or even if there's marginal relevance, the burden on
20   our office of reviewing and producing that is undue and not
21   proportional --
22           THE COURT:  You don't have to go into that either.
23           MS. LONGLEY:  Okay.  And what about privileges?  So
24   that we three buckets of privileges.
25           THE COURT:  I don't see how I can reach a decision on
```

O58UBENC

1    privilege issues without a log and without an in-camera review.

2    So I don't think we need to get into the merits of those points

3    today.  But if you want to briefly make a record on anything,

4    you're welcome to.

5              MS. LONGLEY:  I think we can --

6              Can I have one moment, your Honor --

7              THE COURT:  Of course.

8              MS. LONGLEY:  -- just to review my notes?  Thank you.

9              Your Honor, I think what I will do is quickly just

10    state the privileges for the record, and then make one comment,

11    and then see if the Court has any questions.

12              THE COURT:  Sure.

13              MS. LONGLEY:  So the privileges that we're asserting

14    on the interview memos are attorney-client privilege, attorney

15    work product, deliberative process, and public interest

16    privileges, and law enforcement privilege.  And then with

17    respect to the unredacted transcripts, the only privilege we

18    are asserting there is law enforcement privilege.

19              THE COURT:  Okay.

20              MS. LONGLEY:  And I would just make one closing remark

21    about law enforcement privilege in response to something that

22    counsel said, which is this idea that it would only be a slight

23    infringement somehow on the executive chamber, or to get

24    information from our investigative files to release these memos

25    would be some kind of slight infringement.  And I just really

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O58UBENC

1    could not disagree with that statement more and just say that

2    our office is very, very strongly opposed to becoming a tool

3    for Defendant Cuomo here to use our investigative materials to

4    try to further retaliate and harass people who were very brave

5    to cooperate with our investigation, and that, as our duties to

6    the state, are to also enforce the laws of the state including

7    the anti-harassment and discrimination of retaliation laws.

8    And we think there's a high risk that the materials would be

9    used to counter those purposes.  And we think that it would

10   also create a really dangerous public perception that our

11   office can't protect witnesses and their sensitive information

12   from the targets of investigation in this case in this very

13   public way.  This particular defendant and the other defendants

14   here are able to access these materials given the lack of need

15   for it in the Bennett case.

16          So for all of those witnesses, as well as state

17   sovereign immunity, we believe the subpoena should be quashed.

18          THE COURT:  Thank you.

19          MS. LONGLEY:  Thank you.

20          THE COURT:  Mr. Weaver?  Or Mr. Grant?

21          Let's take a five-minute break.

22          (Recess)

23          THE COURT:  Mr. Weaver.

24          MR. WEAVER:  Thank you, your Honor.

25          Andrew Weaver, Cleary Gottlieb Steen & Hamilton.  I am

O58UBENC

1    here with my colleague from the Vladeck firm, Mr. Grant.

2              THE COURT:  Yes.

3              MR. WEAVER:  I'm mindful of the time, your Honor, and

4    plan to be extremely brief.

5              I'm, of course, here to any answer any questions you

6    might have but hoping to just wanting to clarify a discussion

7    of a case that was discussed earlier and, two, to make two

8    brief points on the question, if sovereign immunity applies,

9    whether that sovereign immunity would also support the firm's

10   quashing the subpoenas at issue here.

11             First, your Honor, you had asked the question earlier

12   whether there was any case applying *Ex parte Young* that had

13   invoked the Rules of the Enabling Act and you were pointed to

14   the Sixth Circuit case, the *Michigan Corrections* case.  I just

15   wanted to clarify what was relevant about the Rules Enabling

16   Act in that holding, what Judge Sutton is doing that in opinion

17   was discussing the Supreme Court's decision and noting that

18   there was a question of whether there was an underlying cause

19   of action, and Judge Sutton speculated was that because the

20   relief sought in that case was procedural that arguably that

21   would not be needed because of the Rules Enabling Act.  It was

22   certainly not the issue before the judge.  It was not any part

23   of the decision for the reasons that were already argued, not

24   relevant, I think, to the facts here.

25             THE COURT:  Thank you.

O58UBENC

1          MR. WEAVER:  Your Honor, we, as was pointed out in our

2     papers, and won't repeat all of them here, there are unique

3     facts to this case as to why, if, assuming sovereign immunity

4     applies to the Attorney General, it would also extend to the

5     firms' motions to quash the subpoena.

6          The first point is a direct sovereign immunity

7     application, as you are well aware, and as already outlined,

8     this investigation, everything that was created as relevant

9     here arises out of Executive Law 63(8), and through that, the

10    Attorney General is authorized to deputize lawyers,

11    individuals, here they happen to be lawyers, to conduct the

12    investigation.  So that's what the Attorney General did.  And

13    the individuals who were deputized both as special deputies and

14    as special assistants were acting on behalf of the Attorney

15    General, conducting the Attorney General's investigation.  The

16    Attorney General is authorized under the statute to conduct the

17    investigation and to deputize others today to do the Attorney

18    General's work here.  So these individuals, the attorneys, are

19    clearly officers, and as such, if they were direct employees of

20    the Attorney General, I don't think there would be a question.

21    The only question is because they are technically nonemployees,

22    would the sovereign immunity apply.  And I don't think there's

23    any question that it would to those special deputies and to the

24    special assistants, who were state actors.

25          Now, Defendant Cuomo has attempted to get around that

O58UBENC

1    point by serving the subpoenas on the firms themselves and not

2    on the special deputies and not on the special assistants

3    because I don't think there would be a question of sovereign

4    immunity would extend.  But idea that the firms, where these

5    special deputies and special assistants are partners and

6    lawyers are somehow separate and distinct really doesn't

7    acknowledge the reality of what a lawyer in a law firm really

8    is.

9              And, in fact, putting aside the idea that the Attorney

10    General retained the law firm, which I'll address in my second

11    point, the fact that the documents exist at the firms exist

12    because these state actors, these agents who are members of the

13    firms or employees of the firms, created these documents.  And

14    that's why they're there.

15             So the idea that the defendant could come and ask the

16    Attorney General to produce a set of documents and for your

17    Honor to rule that you cannot compel that because of sovereign

18    immunity and then go to those lawyers who created those

19    documents on behalf of the Attorney General, the very same

20    documents using the exact same process that the Attorney

21    General would use, if so compelled, does not apply, would

22    completely undermine that sovereign immunity exists and is

23    afforded, assuming your Honor rules such for the Attorney

24    General.

25             Now, separately though, the Court doesn't need to get

O58UBENC

1    to that point because, in addition to the special deputies and

2    the special assistants who were appointed pursuant to the

3    Executive Law 63(8), the Attorney General did retain the two

4    firms to provide legal and investigatory services in support of

5    the investigation.  And Second Circuit case law was very clear

6    that where a client is privileged from producing information,

7    that client's information is also privileged if sought from the

8    lawyers, the law firm that holds that information.

9            Now, Defendant Cuomo argues that sovereign immunity is

10   not such a privilege, that it's captured by Second Circuit law.

11   But in our papers we cite to numerous cases from the Supreme

12   Court, Second Circuit, Southern District, that make clear

13   sovereign immunity is privilege.  It is a privilege from not

14   being sued, from not being compelled.  So if the Attorney

15   General is entitled to sovereign immunity and cannot be

16   compelled to produce those documents, then the lawyers, the law

17   firms that they have retained cannot be compelled to produce

18   those very same documents.

19           And I would just point to the Court -- the Supreme

20   Court's decision in *Fisher*, I think, clarifies this point.  In

21   that case, it was an issue with a taxpayer and Fifth Amendment

22   privilege, and what the Court looked at in that case was and it

23   acknowledged if -- the client could not be compelled due to the

24   Fifth Amendment to produce its accounting records which were

25   given to the law firm for legal advice, then the law firm

O58UBENC

1    itself could not be compelled.  The question before the Supreme

2    Court ended up being, did the underlying documents held by the

3    client, would compel the client to produce, violate the Fifth

4    Amendment.  That was the question the Supreme Court decided.

5            But, here you may just assume the fact that the

6    underlying client information from the Attorney General is

7    protected by sovereign immunity and cannot be compelled.  So

8    applying *Fisher* to the facts with that assumption, then it's

9    clear that if they are immune from being produced, the lawyers

10   who have that information, here the facts are even more special

11   because it's not like the Attorney General had the documents

12   and transferred them over, the documents were created within

13   the firm by the special deputies, by the special assistants,

14   within the work they did on behalf of the Attorney General as

15   state actors.

16           Accordingly, to the extent your Honor does find

17   sovereign immunity protects and is a basis for the Attorney

18   General to quash the subpoena, it's also a basis for the firms

19   to quash the subpoena.

20           I'm happy to answer any questions you have, your

21   Honor.

22           THE COURT:  Okay.  Thank you.  I think I'm all set,

23   Mr. Weaver.

24           MR. WEAVER:  Thank you.

25           THE COURT:  Mr. Grant, do you want to add anything?

O58UBENC

1          MR. GRANT:  No.  I don't want to muck anything up.

2          THE COURT:  Okay.  You wouldn't be.

3          Then, Ms. Bennett's counsel, Ms. Schnell, did you want

4     to be heard today?

5          MS. SCHNELL:  No.  We don't have anything, your Honor.

6     Thank you.

7          THE COURT:  Okay.  Any of the other defendants'

8     counsel wish to be heard?

9          So, Ms. Trzaskoma, I'll give you 27 minutes.

10         MS. TRZAKOMA:  Thank you, your Honor.

11         So a couple of corrections or amendments.

12         And just so the record is clear, in the FOIL

13    proceeding, I -- as Ms. Longley noted that FOIL request, which

14    we -- which we filed or, you know, the FOIL request, we made it

15    because the Attorney General's Office and the trooper 1 case

16    told us to make it and we filed it after our motion to compel

17    the subpoena in that case was denied.  We certainly hoped that

18    we would be able to obtain the materials through subpoena.  It

19    has taken nearly a year and we have received, although

20    Ms. Longley referred to thousands of pages, what she's

21    referring to is a production of a handful of transcripts that

22    had already been publicly released redacted form and those

23    transcripts were again redacted by the FOIL officer, I guess,

24    with different redactions.

25         So to be clear, our FOIL request requested unredacted

O58UBENC

1    transcripts and what we've gotten is a very small handful of

2    transcripts that have completely different redactions. it's

3    not -- it's just not a process by which we can obtain documents

4    for use here.  And I am somewhat surprised, although not

5    really, that the Attorney General's Office cannot even tell you

6    or won't even tell you if the materials that were turned over

7    to the federal government voluntarily encompassed the materials

8    that are at issue here.  Just that -- they don't have to give

9    names --

10           THE COURT:  I know.

11           MS. TRZAKOMA:  They don't have to say anything, except

12   did they already turn those documents over to the U.S.

13   Government?  And if so, there can be no claim of sovereign

14   immunity not to produce those documents to another -- to a

15   federal court.

16           Going back to the question of whether *Henry* abrogates

17   *Morrison*, Mr. Amer focused on the fact that it was an

18   interstate -- that it was an interstate sovereign immunity

19   issue.  If you -- if the Court looks back at the two cases that

20   the Attorney General's Office has relied on, *Milord*, which is a

21   Southern District case which in turn relies on *Morrison*,

22   *Morrison*, that principal case from New York State Court from

23   the Second Department -- or the First Department, I think.

24           THE COURT:  Second.

25           MS. TRZAKOMA:  Second Department, is an interstate

O58UBENC

1    case.  It's exactly the same.  And it -- the argument about

2    sovereign immunity that the Attorney General's Office is making

3    is that sovereign immunity is sovereign immunity is sovereign

4    immunity is sovereign immunity, whether it's tribal, it's

5    state, it's federal, there is -- there is -- the argument about

6    *Henry* makes no sense considering their other positions.

7         I also -- I do want to address, because I hadn't had

8    an opportunity to address the question about whether the Cleary

9    and Vladeck firms are cloaked in sovereign immunity.  They are

10   not.  Courts have been very clear that a contractual

11   relationship like between the Attorney General's Office and the

12   Cleary and Vladeck firms is not enough to extend the

13   fundamental and carefully-limited immunity that states enjoy

14   where the only connection to the sovereign is by contract.  In

15   fact, nearly every circuit court to have considered the issue

16   categorically denies extending state sovereign immunity to

17   private parties, and it doesn't matter whether the fact that

18   Cleary and Vladeck had the documents because their employees

19   were deputized at the one point, no longer are, or that it

20   arose out of an investigation.  The fact -- the sovereign

21   immunity argument is that -- is the compulsion of the state to

22   act.  That is what they're complaining about the Attorney

23   General's office.  When -- if Cleary and Vladeck are directed

24   to turn over these materials, there is nothing compelling the

25   Attorney General's Office.  It is an order compelling two

O58UBENC

1    private law firms and this is not a situation like in the

2    *Ghawanmeh* case that is cited in the firm's brief where an

3    employee -- you know, employees were subpoenaed and to obtain

4    the documents and produce them, they would have had to go in

5    and break into their employer's office and steal the documents.

6    Cleary and Vladeck had possession, custody, and control of

7    these documents, and it is not correct, as the Attorney

8    General's Office argues, and the firms argue, that they were --

9    that the Attorney General had exclusive control over these

10   documents.

11          The agreements between the Cleary and Vladeck firms

12   and the Attorney General's Office, in fact, contemplate that

13   there might be a subpoena to the firms for these documents and

14   the two firms retained the right to retain documents to the

15   extent they needed to for purposes of complying with their

16   ethical obligations.

17          And I -- and critically, the documents themselves are

18   not protected.  They may be protected by a privilege but

19   immunity and state sovereign immunity is not the kind of

20   privilege that would protect a document.  State sovereign

21   immunity protects the institution, not the documents.

22          I also do want to note that we have -- I think I said

23   that in connection with the Albany District Attorney's Office

24   discovery we received interview memos.  We did also receive a

25   handful of unredacted transcripts.  So we have a couple of

O58UBENC

1    those.

2            And then finally, I know your Honor doesn't want to

3    hear about the retaliation -- the alleged retaliation, but I

4    cannot let it go uncorrected.  The so-called retaliation that

5    the Attorney General's Office is referring to is defense, is

6    Governor Cuomo's efforts to defend himself.  If you look -- at

7    the Court looks at Ms. Longley's declaration, the instances of

8    harassing conduct are instances where the governor or his

9    counsel are criticizing the Attorney General's report, calling

10   it shoddy, biased, calling out that the Attorney General hasn't

11   shared all her evidence, that the investigators hadn't provided

12   Governor Cuomo with the information underlying the report, that

13   that they hadn't responded to written requests, that -- that

14   they disagreed with the information, that they thought that the

15   investigators were biased, and that the Attorney General was

16   politically motivated.  That's not harassment.  That's not

17   retaliation.  That's just a defense.

18           And then if your Honor looks at what -- and I do

19   need -- I do need to correct the record on the deposition

20   transcript of Ms. Ana Liss-Jackson, which the Attorney General

21   does not -- it's inaccurate.  That transcript was -- parts of

22   it were disclosed but the parties of that were disclosed

23   publicly, the attorney for Ms. Liss-Jackson had informed us

24   specifically that the -- that there were portions of the

25   transcript that were not subject to the protective order.  He

O58UBENC

1   later changed his mind.  Ms. Liss-Jackson apparently later

2   changed her mind but that whole transcript was not released.

3   The only portions that were ever released were portions that a

4   Ms. Liss-Jackson's told us could be released.

5          And, finally, the so-called harassing and retaliatory

6   discovery that is on page 18 of Ms. Longley's declaration,

7   those -- all of those relate to letters that nonparties

8   submitted to the trooper 1 Court complaining about the fact

9   that Governor Cuomo had subpoenaed them.  And, again, the

10  trooper 1 complaint, very broad, includes all the allegations

11  relating to anything having -- any claimant in the Attorney

12  General's report.  Of course, we had to subpoena them and their

13  key witnesses.

14         And we -- and what is more -- what is missing from

15  Ms. Longley's allegation that these were retaliatory acts is

16  that the Court has ordered those witnesses to comply with those

17  subpoenas.  This isn't retaliatory.  It's not harassing.  This

18  is discovery.  This is the way it works.  And it is -- it is

19  outrageous that Governor Cuomo's effort to defend himself are

20  characterized like that and that his lawyers' efforts to do

21  their jobs are characterized like that.

22         And as for the contention by the Attorney General that

23  witnesses were promised confidentiality, I do not believe that

24  the Attorney General's Office could ever -- there was supposed

25  to be a written report -- every -- that was going to be

O58UBENC

1    released to the public -- every -- that was -- that was the

2    mandate, that was the referral letter, that was in the

3    engagement agreement, that was in -- that was -- that was the

4    purpose of this investigation, to issue a public report.  How

5    on earth could the Attorney General's Office promise witnesses

6    that they would not release their information?

7            And the Attorney General's Office, for -- for the

8    Attorney General's Office to state on the record that they made

9    efforts to protect witnesses, that is just false because they

10   released, without any notice to those witnesses, including the

11   claimants, they released the report without notice to them and

12   they released their transcripts, and in certain instances,

13   their videotaped testimony without any notice to those

14   witnesses and included -- I have -- I just have to say this,

15   for example, Ms. DeRosa, who was a witness, her personal

16   information was disclosed by the Attorney General's Office.  It

17   was splashed across -- across papers, personal information

18   about allegations that turned out not to be true.

19           So we have a protective order in this case.  We will

20   abide by the protective order.  There is no reason for us not

21   to know the names of people, of witnesses who were interviewed

22   by the Attorney General's Office.  There is no reason for us

23   not to see the information including because to the extent

24   people were -- witnesses were talking about their personal

25   sexual experiences, some of those are directly relevant to this

O58UBENC

1    case.

2              THE COURT:  Thank you.

3              MS. TRZAKOMA:  Thank you.

4              THE COURT:  Okay.

5         MR. AMER:  I just had one point of clarification for

6    your Honor you had raised at the beginning of the argument, the

7    question about the narrower subpoena that was just served

8    recently in the Eastern District case.

9              THE COURT:  Right.

10        MR. AMER:  I didn't want the Court to be under any

11   misimpression that that was somehow narrower than the scope of

12   the subpoena here that we're litigating over.  The two

13   subpoenas now are actually more coequal.  They both seek the

14   two buckets of material, the unredacted transcripts and the

15   interview memos.  I think there may be a handful fewer

16   interview memos being sought in the Eastern District just

17   because it's a different action, but, you know, I think that

18   the narrower subpoena is not narrower in any material respect

19   from the subpoena here.

20             THE COURT:  Okay.  Thank you for that clarification.

21             Anyone else?  Any final points?

22             Okay.  We will ask the parties to order a transcript

23   of this oral argument on a quick turnaround, if you would, so

24   that we can get a decision out to you as soon as possible.

25             I don't, at the moment, think there's any supplemental

O58UBENC

1    briefing that I need.  If that changes, I will let you know as

2    soon as possible.

3              Thank you very much everyone.

4              Have a good afternoon.

5              We're adjourned.

6                                    o0o

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25