UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHARLOTTE BENNETT,

               Plaintiff,

      -v-

ANDREW M. CUOMO, MELISSA DEROSA, JILL
DESROSIERS, and JUDITH MOGUL,

               Defendants.

CIVIL ACTION NO.: 22 Civ. 7846 (VSB) (SLC)

**OPINION & ORDER**

**SARAH L. CAVE,** United States Magistrate Judge.

## I. INTRODUCTION

Before the Court are: (i) the motion of Defendant Andrew M. Cuomo ("Mr. Cuomo")
to compel non-party the Office of the Attorney General of the State of New York (the "OAG")[1] to
comply with a subpoena dated August 21, 2023 (the "OAG Subpoena") seeking materials
concerning the claims that Plaintiff Charlotte Bennett ("Ms. Bennett") has asserted against
Mr. Cuomo in this action (ECF No. 199 (the "OAG MTC")); (ii) the OAG's cross-motion to quash
the OAG Subpoena (ECF No. 222 (the "OAG MTQ")); (iii) Mr. Cuomo's motion to compel non-
parties Cleary Gottlieb Steen & Hamilton LLP ("Cleary") and Vladeck, Raskin & Clark, PC
("Vladeck," with Cleary, the "Law Firms")) to comply with subpoenas dated November 9, 2023
(the "Law Firm Subpoenas," with the OAG Subpoena, the "Subpoenas") seeking materials
identical to those sought through the OAG Subpoena (ECF No. 207 (the "Law Firm MTC")); and
(iv) the Law Firms' cross-motion to quash the Law Firm Subpoenas (ECF No. 227 (the "Law Firm
MTQ," with the OAG MTC, OAG MTQ, and the Law Firm MTC, the "Motions")).  On May 8, 2024,

---

[1] Letitia James is the Attorney General of the State of New York ("Ms. James").  (ECF No. 223 at 1).

the Court heard oral argument on the Motions.  (ECF Nos. 202 ¶ 2; 265).  For the reasons set

forth below, (i) the OAG MTC is DENIED; (ii) the OAG MTQ is GRANTED; (iii) the Law Firm MTC is

DENIED; and (iv) the Law Firm MTQ is GRANTED.

## II.BACKGROUND

### A.  Factual Background

#### 1.  Ms. Bennett's Tenure in the Executive Chamber

Ms. Bennett, previously an aide to Mr. Cuomo during his tenure as Governor of the State

of New York, alleges that throughout her employment from May 2019 until June 2020,

Mr. Cuomo "subjected her to sexualized comments about her appearance, assigned her

humiliating and demeaning tasks, and beginning in early June 2020, subjected her to invasive and

unwanted questions about her personal life, romantic and sexual relationships, and history as a

survivor of sexual assault."  (ECF No. 1 ¶ 2 (the "Complaint")).  Ms. Bennett alleges that she

informed Defendants Jill DesRosiers ("Ms. DesRosiers"), Judith Mogul ("Ms. Mogul"), and Melissa

DeRosa ("Ms. DeRosa"), who were Mr. Cuomo's Chief of Staff, Special Counsel, and Secretary,

respectively, about Mr. Cuomo's conduct, but they failed to act, and further discriminated and

retaliated against her.  (Id. ¶¶ 12–14, 81–85, 91–106, 164–72, 183–200, 218–35).  On October 23,

2020, Ms. Bennett resigned.  (Id. ¶ 122).

#### 2.  The OAG Investigation[2]

In December 2020, Executive Chamber staff member Lindsey Boylan ("Ms. Boylan")

published her account of sexual harassment by Mr. Cuomo.  (ECF No. 1 ¶ 5).  See Cuomo I, 683

---

[2] A detailed description of the OAG Investigation and a parallel investigation by the New York State
Assembly Judiciary Committee (the "AJC") appears in the July 21, 2023 memorandum and order issued by
the Honorable Taryn A. Merkl.  See Cuomo v. N.Y. State Assembly Judiciary Comm., 683 F. Supp. 3d 258,

F. Supp. 3d at 262–64.  In February 2021, Ms. Bennett "decided to make public her [] experience of sexual harassment by" Mr. Cuomo.  (ECF No. 1 ¶ 125).  On February 27, 2021, The New York Times published an article describing instances of Mr. Cuomo's alleged sexual harassment of Ms. Bennett during her employment.  (Id. ¶ 126).  On March 1, 2021, Mr. Cuomo, then Governor, referred Ms. Bennett's allegations to the OAG for an investigation (the "OAG Investigation") pursuant to New York Executive Law § 63(8).  (Id. ¶ 129).

On March 8, 2021, the OAG issued a press release announcing the appointment pursuant to § 63(8) of Joon H. Kim ("Mr. Kim"), a Cleary partner, and Anne L. Clark ("Ms. Clark"), a Vladeck partner, and their respective Law Firms to lead the OAG Investigation and issue a public report. (ECF No. 201 ¶ 4 (citing Press Release, Office of the New York State Attorney General, Attorney General James Makes Appointments to Lead Investigation Into Sexual Harassment Allegations Against Governor Cuomo (Mar. 8, 2021), https://ag.ny.gov/press-release/2021/attorney-general-james-makes-appointments-lead-investigation-sexual-harassment)); see ECF No. 225-4 at 2–3).  The letters appointing Mr. Kim and Ms. Clark provided:

> As a Special Deputy Attorney General appointed under Executive Law § 63(8), you have the authority to investigate and report on allegations of, and circumstances surrounding, sexual harassment by Governor Andrew Cuomo.  This authority includes the power to subpoena witnesses, compel their attendance, examine them under oath and require that any books, records, documents or papers relevant or material to the inquiry be turned over to you for inspection, examination or audit.

> The powers conferred under this appointment shall be used exclusively for the benefit of the OAG and the People of the State of New York. . . .

> During [the] appointment period, you will report to Jennifer Levy, First Deputy Attorney General or her designee(s), on behalf of the Attorney General.

---

262–63 (E.D.N.Y. 2023) ("Cuomo I"), recons. denied sub nom. Cuomo v. Off. of the N.Y. State Att'y Gen., No. 22 Misc. 3044 (LDH) (TAM), 2024 WL 1345529 (E.D.N.Y. Mar. 29, 2024) ("Cuomo II").

(ECF No. 225-4 at 2–3 (the "Appointment Letters")).

The OAG engaged the Law Firms "to provide investigation and legal services by assisting the [OAG] in its review of allegations of, and circumstances surrounding, sexual harassment" by Mr. Cuomo.  (ECF No. 225-5 at 2, 5 (the "Engagement Letters")).   The Engagement Letters provided:

> Pursuant to the [OAG's] March 8, 2021 appointment of members of the FIRM under Executive Law Section 63(8), and consistent with the Agreement, FIRM is authorized to utilize any of its resources as it deems appropriate to carry out the [OAG Investigation] consistent with the Section 63(8) appointment letters and the scope of services as set forth below.

(Id.)  Mr. Kim and Ms. Clark assembled a team of six Special Deputies and ten Special Assistants from the Law Firms (together, the "Investigation Team").  (ECF No. 225 ¶ 12).  The OAG contends that an attorney-client relationship existed "between the Investigat[ion] Team, the [L]aw [F]irms, and internal OAG attorneys working on the Investigation, all acting as attorneys to [the] OAG, the client."  (Id. ¶ 15).

On March 8, 2021, the Investigation Team commenced the OAG Investigation. (ECF No. 225 ¶¶ 12, 17).   The Investigation Team members "used OAG email accounts for purposes of carrying out their OAG-related duties."  (ECF No. 238 at 6 n.3).  The Investigation Team "periodically reported to [the] OAG, consulting with attorneys in [the] OAG's Office of General Counsel on issues relating to powers, practices, and procedures[.]"  (ECF No. 224 ¶ 5; see ECF Nos.  225 ¶¶ 8, 19; 225-4 at 2–3; 225-5 at 2, 5;).   During the OAG Investigation, Mr. Cuomo and others "indicated that they might assert legal challenges to aspects of the [OAG] Investigation, including the selection and appointment of [Mr. Kim and Ms. Clark], the scope of issued subpoenas, privileges, and access to investigative materials produced by other witnesses."

(ECF No. 224 ¶ 6; see ECF No. 225 ¶ 20).  As a result, the "OAG anticipated that litigation or other judicial proceedings initiated by [Mr.] Cuomo or others aligned with him were likely to result if the [OAG] Investigation yielded any negative results for [Mr.] Cuomo or the Executive Chamber." (ECF No. 225 ¶ 20).

On August 3, 2021, the OAG and the Law Firms issued a report concluding that Mr. Cuomo sexually harassed multiple women in the Executive Chamber in violation of federal and state law and the Executive Chamber's policies.  (ECF No. 201 ¶ 5 (citing Report of Investigation into Allegations of Sexual Harassment by Governor Andrew M. Cuomo, State of New York Office of the Attorney General (Aug. 3, 2021), https://ag.ny.gov/sites/default/files/2021.08.03_nyag_-_investigative_report.pdf) (the "OAG Report"); see ECF Nos. 1 ¶ 135; 224 ¶ 7; 225 ¶ 18).  The OAG Report attached 111 exhibits, including 400 pages of evidence.  See Cuomo I, 683 F. Supp. 3d at 263.  A press release the same day noted that Mr. Kim and Ms. Clark, as well as other attorneys from the Law Firms, had been designated as "Special Deputies to the First Deputy Attorney General" to conduct the OAG Investigation and issue the OAG Report.  (ECF No. 201 ¶ 7 (citing Press Release, Office of the New York State Attorney General, Independent Investigators Find Governor Cuomo Sexually Harassed Multiple Women, Violated State and Federal Laws (Aug. 3, 2021), https://ag.ny.gov/press-release/2021/independent-investigators-find-governor-cuomo-sexually-harassed-multiple-women)).  During a press conference, Ms. James, Mr. Kim, and Ms. Clark described some of the evidence uncovered during the OAG Investigation and summarized the findings in the OAG Report.  (ECF No. 201 ¶ 6 (citing Rᴇᴠ, NY Gov. Andrew Cuomo Sexually Harassed Multiple Women, Report Finds: Letitia James Press Conference Transcript (Aug. 3, 2021), https://www.rev.com/blog/transcripts/ny-gov-andrew-cuomo-sexually-

harassed-multiple-women-report-finds-letitia-james-press-conference-transcript)).   The OAG

Investigation included interviews of 179 individuals, 41 of whom provided testimony under oath.

(See OAG Report at 15).   The identities of at least 100 of the witnesses have not been publicly

disclosed.   (ECF Nos. 224 ¶ 11; 225 ¶ 38).   The OAG Investigation also involved the issuance of

over 70 document subpoenas and collection of over 74,000 documents.   (ECF Nos. 224 ¶ 5;

225 ¶ 18).

On August 6, 2021, in response to a request from the AJC, which was conducting an

impeachment investigation of Mr. Cuomo, the OAG produced materials from the OAG

Investigation.   (ECF No. 225 ¶ 22 (the "AJC Production")).   The OAG conditioned the AJC

Production on the AJC's agreement:

> that in maintaining or disclosing any of the provided materials, it will endeavor to
> do so in a manner that protects any privileges attaching to such materials, and
> which is in furtherance of our shared duty to protect the public interest.  Finally,
> [the] OAG and [the AJC] confirm their understanding that by providing these
> materials or other information, [the] OAG is not waiving confidentiality or privilege
> with respect to any other materials or information or aspects of OAG
> investigations.

(Id. (the "Conditions")).

On August 10, 2021, Mr. Cuomo announced his resignation as Governor.

(ECF No. 1 ¶ 140).   After Mr. Cuomo's counsel made comments criticizing the OAG Report

(see ECF No. 225 ¶¶ 43–44), the OAG issued a press release responding that the OAG Report and

exhibits "clearly corroborate the experiences of the complainants, yet the governor and his aides

continue to undermine those who seek to expose this dangerous conduct."  (ECF No. 201 ¶ 14

(citing Press Release, Office of the New York State Attorney General, Statement from Attorney

General's Office in Response to Rita Glavin's Comments (Aug. 10, 2021), https://ag.ny.gov/press-release/2021/statement-attorney-generals-office-response-rita-glavins-comments)).

In mid-August 2021, in response to requests from five District Attorneys (the "DAs"), the OAG provided materials from the OAG Investigation to the DAs under the same Conditions as the AJC Production. (ECF No. 225 ¶¶ 25–26). According to a September 1, 2021 news article, the OAG also complied with a request from the DAs to delay the release of transcripts from witness interviews in the OAG Investigation, citing the DAs' ongoing review of the allegations against Mr. Cuomo. (ECF No. 201 ¶ 8 (citing Nick Reisman, New York Attorney General Says Transcripts in Cuomo Probe Won't Be Released at this Time, SPECTRUM NEWS 1 (Sept. 1, 2021, 3:41 PM), https://spectrumlocalnews.com/nys/central-ny/ny-state-of-politics/2021/09/01/ag-james-says-transcripts-in-cuomo-probe-won-t-be-released); see ECF No. 225 ¶¶ 29–30).[3] Also in mid-August, in response to a request from the United States Department of Justice and the United States Attorney's Office for the Eastern District of New York (together, "DOJ"), the OAG provided materials from the OAG Investigation, again subject to the Conditions. (ECF No. 225 ¶ 27 (the "DOJ Production")).[4]

On November 10, 2021, the OAG announced the beginning of "the rolling release" of "all transcripts and corresponding exhibits" from the OAG Investigation. (ECF No. 201 ¶ 9 (citing

---

[3] On October 28, 2021, the Albany County District Attorney's Office filed a criminal complaint against Mr. Cuomo. (See Press Release, Office of the New York State Attorney General, Transcripts and Exhibits From Independent Investigation Into Sexual Harassment Allegations Against Former Governor Cuomo Begin to Be Released (Nov. 10, 2021), https://ag.ny.gov/press-release/2021/transcripts-and-exhibits-independent-investigation-sexual-harassment-allegations)). The complaint was later dismissed. (ECF No. 201 ¶ 18 (citing Dan Mangan, Criminal Groping Case Against Ex-New York Gov. Andrew Cuomo Formally Dismissed, CNBC (Jan. 7, 2022, 2:11 PM), https://www.cnbc.com/2022/01/07/andrew-cuomo-criminal-case-against-ex-new-york-governor-dismissed.html)).

[4] At oral argument, the OAG declined the Court's request to list the contents of the DOJ Production. (ECF No. 265 at 47–48).

Press Release, Office of the New York State Attorney General, Transcripts and Exhibits From Independent Investigation Into Sexual Harassment Allegations Against Former Governor Cuomo Begin to Be Released (Nov. 10, 2021), https://ag.ny.gov/press-release/2021/transcripts-and-exhibits-independent-investigation-sexual-harassment-allegations)).   On January 20, 2022, the OAG announced the release of "the final set of videos, transcripts, and corresponding exhibits from" the OAG Investigation.  (ECF No. 201 ¶ 10 (citing Press Release, Office of the New York State Attorney General, Transcripts, Exhibits, and Videos From Independent Investigation Into Sexual Harassment Allegations Against Former Governor Cuomo Released (Jan. 20, 2022), https://ag.ny.gov/press-release/2022/transcripts-exhibits-and-videos-independent-investigation-sexual-harassment) (the "Jan. 2022 Press Release")).   In total, transcripts and exhibits from 28 witnesses were released, i.e., the transcripts and exhibits for 151 witnesses have not been released.  (See Jan. 2022 Press Release).   The process to review and redact the transcripts, exhibits, and video footage took approximately five months, comprising 3,600 attorney and paralegal hours.  (ECF Nos. 224 ¶¶ 9–12; 225 ¶ 33).

### 3.  Subsequent Events

On October 29, 2021, Ms. James declared her candidacy for governor of the State of New York.  (ECF No. 201 ¶ 12 (citing Katie Glueck, Letitia James Declares Her Candidacy for N.Y. Governor, THE NEW YORK TIMES (Oct. 29, 2021), https://www.nytimes.com/2021/10/29/nyregion/letitia-james-governor.html)).                 On December 9, 2021, Ms. James withdrew from the gubernatorial race.  (See Katie Glueck & Nicholas Fandos, Letitia James Drops Out of N.Y. Governor's Race, THE NEW YORK TIMES (Dec. 9,

2021),                          https://www.nytimes.com/2021/12/09/nyregion/letitia-james-drops-out-governor.html)).

On September 13, 2022, Mr. Cuomo filed a complaint against Ms. James, Mr. Kim, and Ms. Clark with the Attorney Grievance Committee of the New York State Supreme Court, Appellate Division, First Department.  (ECF No. 201 ¶ 11 (citing Complaint by Former Governor Andrew M. Cuomo Against Attorney General Letitia Ann James, Joon Kim, Esq., and Anne Clark, Esq.   (Sept. 13,   2022),   https://int.nyt.com/data/documenttools/cuomo-james-ethics-complaint/495279a9c683329e/full.pdf)).

In July 2023, Mr. Cuomo submitted to the OAG a request under the New York Freedom of Information Law, N.Y. Pub. Officers L. §§ 84 et seq. ("FOIL"), for materials from the OAG Investigation, which the OAG denied.  (ECF Nos. 225 ¶ 61; 265 at 49).   On January 18, 2024, Mr. Cuomo filed in New York State Supreme Court a petition against the OAG under Article 78 of the New York Civil Practice Law and Rules to challenge the denial of his FOIL request. (ECF No. 201 ¶ 13 (citing Cuomo v. Off. of the N.Y. Att'y Gen'l, No. 150515/2024 (Sup. Ct., N.Y. Cnty.), ECF No. 1) (the "Art. 78 Proceeding")).   The materials Mr. Cuomo sought in his FOIL request are the same as those he seeks in the Subpoenas.  (ECF No. 225 ¶ 62).  The OAG has been reviewing and producing materials in response to the FOIL request "on a rolling basis based on applicable FOIL standards and exemptions, including any applicable privileges."  (ECF Nos. 225 ¶¶ 62, 64; 265 at 50).  To date, in response to his FOIL request Mr. Cuomo has received "a very small handful of transcripts that have completely different redactions" from other copies of the same transcripts that Mr. Cuomo obtained.  (ECF No. 265 at 69–70).  On June 10, 2024, the state court issued a non-final "Interim Decision [&] Order" that, inter alia, granted in part and denied

in part the OAG's motion to dismiss the Art. 78 Proceeding and set deadlines for further proceedings. See Cuomo v. Off. of the N.Y. Att'y Gen'l, No. 150515/2024 (Sup. Ct., N.Y. Cnty.), ECF No. 58). In addition, Mr. Cuomo received from the Albany DA, through criminal pretrial discovery, 31 interview memos that the Law Firms had prepared and the OAG had provided to the Albany DA. (ECF Nos. 240-1; 265 at 7–8).

On January 26, 2024, the DOJ announced that it had "found that former Governor Cuomo subjected at least thirteen female employees of New York State, including Executive Chamber employees, to a sexually hostile work environment[,]" and that Mr. Cuomo's "senior staff were aware of his conduct and retaliated against four of the women he harassed." (Agreement Between the United States and the State of New York Executive Chamber Regarding Workplace Reform, Dep't of Just. (Jan. 26, 2024), https://www.justice.gov/crt/media/1335301/dl?inline (the "DOJ Settlement"); see Press Release, U.S. Dep't of Just., Off. of Pub. Affs., Justice Department Secures Settlement Agreement with State of New York Executive Chamber to Resolve Sexual Harassment and Retaliation Claims Under Title VII (Jan. 26, 2024), https://www.justice.gov/opa/pr/justice-department-secures-settlement-agreement-state-new-york-executive-chamber-resolve).

## B. **Procedural Background**

### 1. **Ms. Bennett's Claims**

On September 14, 2022, Ms. Bennett filed the Complaint, which asserts eleven claims. (ECF No. 1 ¶¶ 146–244). Against Mr. Cuomo, Ms. Bennett asserts claims for sex discrimination and retaliation in violation of the Equal Protection Clause of the Fourteenth Amendment; sexual harassment and retaliation under the New York State Human Rights Law, N.Y. Exec. L. §§ 290,

296(7) ("NYSHRL"); and sex discrimination and retaliation under the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, et seq. ("NYCHRL").  (ECF No. 1 ¶¶ 146–63, 173–82, 201–17, 236–44).  Against Ms. DesRosiers, Ms. Bennett asserts claims for retaliation under the Equal Protection Clause, NYSHRL, and NYCHRL; aiding and abetting sexual harassment under the NYSHRL; and sex discrimination under the NYCHRL.  (Id. ¶¶ 164–72, 183–200, 218–35).  Against Ms. Mogul and Ms. DeRosa, Ms. Bennett asserts claims for aiding and abetting sexual harassment under the NYSHRL and sex discrimination under the NYCHRL.  (Id. ¶¶ 183–92, 218–27).

### 2.  The MTDs and Pretrial Discovery

On November 18, 2022, Defendants[5] filed motions to dismiss the Complaint, which are pending before the Honorable Vernon S. Broderick.  (ECF Nos. 27; 31; 32; 37 (the "MTDs")).  Judge Broderick denied Defendants' request to stay discovery pending a decision on the MTDs, finding that they had "not made a strong showing that [Ms.] Bennett's claims are unmeritorious or that responding to discovery will be particularly burdensome."  (ECF No. 69 at 10).

On June 28, 2023, Judge Broderick entered a case management plan and scheduling order setting, inter alia, a fact discovery deadline of February 27, 2024.  (ECF No. 76 ¶ 7).  Since Judge Broderick referred the matter on August 18, 2023 for general pretrial supervision (ECF No. 82; ECF min. entry Aug. 18, 2023), the Court has held multiple conferences to address disputes concerning party and non-party discovery.  (See, e.g., ECF Nos. 83; 85; 87; 88; 95; 105; 114; 127; 135; 144; 150; 162; 164; 166; 182; 185; 189; 202; 204; 221; 230; 234; ECF min. entry Aug. 22, 2023; ECF min. entry Oct. 20, 2023; ECF min. entry Jan. 4, 2024; ECF min. entry Feb. 1, 2024;

---

[5] "Defendants" refers to Mr. Cuomo, Ms. DeRosa, Ms. DesRosiers, and Ms. Mogul.

ECF min. entry Feb. 26, 2024; ECF min. entry Mar. 22, 2024).  The fact discovery deadline is currently January 31, 2025.  (ECF No. 233 ¶ 1.a).

### 3.  The Subpoenas and the Motions

The Subpoenas each seek documents, videos, and unredacted transcripts for Ms. Bennett, Trooper 1,[6] Ms. Boylan, current and former Executive Chamber employees under Mr. Cuomo, and any witness in the OAG Investigation who referenced Ms. Bennett, Trooper 1, or Ms. Boylan during their interview or testimony with the OAG (collectively, the "Requested Materials")). (ECF Nos. 192-1 at 9; 192-2 at 9; 201-1 at 9).  The OAG responded and objected to the OAG Subpoena on the following grounds (as relevant to the OAG MTQ): (i) the "OAG's broad sovereign immunity and the Eleventh Amendment to the United States Constitution"; (ii) vagueness, overbreadth, undue burden, disproportionality, and relevance; (iii) attorney-client privilege ("ACP"); (iv) work product protection ("WPP"); (v) law enforcement privilege ("LEP"); (vi) deliberative process privilege ("DPP"); and (vii) public interest privilege ("PIP," with ACP, WPP, LEP, and DPP, the "Privileges").  (ECF Nos. 201-2; 201-3 (the "OAG Responses")).[7]  The OAG Responses also attached a one-page categorical, i.e., not document-by-document, privilege log. (ECF No. 201-2 at 8; 201-3 at 8).  The OAG and the Law Firms adopted and asserted the OAG Responses as to the Law Firm Subpoenas.  (ECF No. 195-3).

The OAG estimates that the Requested Materials would include 85 interview memos, 35 transcripts, and 35 video testimonies.  (ECF No. 224 ¶ 16).  The OAG also represents that the

---

[6] The plaintiff in the civil action captioned Trooper 1 v. N.Y. State Police, No. 22 Civ. 893 (LDH) (TAM) (E.D.N.Y.) (the "Trooper 1 Action")).

[7] As to the videos and unredacted transcripts, the OAG only asserted LEP and PIP.  (ECF Nos. 201-2 at 8; 201-3 at 8).

Requested Materials include "highly sensitive and confidential information pertaining to witnesses as well as their family members and other individuals." (ECF No. 225 ¶ 36; see ECF No. 224 ¶¶ 10–11). The OAG maintains that Under New York Civil Rights Law § 73[8] and OAG policy witnesses "are not entitled to copies of their testimony transcripts" and "may obtain copies of their testimony transcripts in redacted form on [the] OAG's website just like any other member of the public." (ECF No. 225 ¶ 40).

### 4. Discovery In the Trooper 1 Action

Trooper 1, a member of Mr. Cuomo's Protective Service Unit, alleges in the Trooper 1 Action that Mr. Cuomo sexually harassed her while he was in office and cites allegations that stem from the OAG Investigation. See Cuomo I, 683 F. Supp. 3d at 263–64. Mr. Cuomo served on the OAG a subpoena seeking a broader scope of documents related to the OAG Investigation and OAG Report. Id. at 265–66. (See ECF No. 225-7 (the "Trooper 1 Subpoena")). As here, the OAG objected to the Trooper 1 Subpoena on grounds of "broad state sovereign immunity," relevance, proportionality, burden, ACP, WPP, DPP, and LEP. Cuomo I, 683 F. Supp. 3d at 276. In response to the Trooper 1 Subpoena, the OAG voluntarily agreed to provide documents that the Investigation Team "collected from outside sources that reference[d] Trooper 1 by name," but not interview memoranda or unredacted transcripts for Trooper 1 or any other witness. (ECF No. 225 ¶ 48; see ECF No. 265 at 24–25). As here, Mr. Cuomo moved to compel production

---

[8] This statute provides in relevant part that "a witness shall be entitled to receive a copy of his testimony at [a public hearing] at his own expense" and that, "[w]here testimony which a witness has given at a private hearing becomes relevant in a criminal proceeding in which the witness is a defendant, or in any subsequent hearing in which the witness is summoned to testify, the witness shall be entitled to a copy of such testimony, . . . provided [] that the furnishing of such copy will not prejudice the public safety or security."  N.Y. Civ. Rts. L. § 73(4).

by the OAG, and the OAG cross-moved to quash.  See Cuomo I, 683 F. Supp. 3d at 264–66.

(See ECF Nos. 201 ¶ 23; 201-8 at 5).[9]  While those motions were pending, and notwithstanding

its assertion of state sovereign immunity, "the OAG agreed to and did produce to Governor

Cuomo certain documents concerning Trooper 1."   (ECF No. 201 ¶ 23 (the "Trooper 1

Production")).

Following oral argument, the Honorable Taryn A. Merkl, United States Magistrate Judge

for the Eastern District of New York, denied Mr. Cuomo's motion to compel because he had failed

to "establish relevance for the broad swath of documents" he sought, which were "too broad,

and disproportionate to the needs of the [] case[,]" and would have "impose[d] a substantial

undue burden and significant expense" on the OAG, a non-party.  Cuomo I, 683 F. Supp. 3d at

278–80.  Judge Merkl did not reach the OAG's alternative argument, sovereign immunity.  Id. at

280–82.   Although Mr. Cuomo subsequently narrowed his demands under the Trooper 1

Subpoena, the OAG continued to maintain that the materials he requested were privileged.

(ECF Nos. 201 ¶¶ 23, 28; 225 ¶ 55).  At Judge Merkl's direction, the OAG submitted a document-

by-document privilege log, and subsequently, for in camera review: "(1) the Trooper 1 interview

memo; (2) the Trooper 1 testimony transcript; and (3) all other interview memos and interview

summaries identified in the privilege log."  (ECF No. 201-8 at 10 (the "In Camera Materials");

see ECF No. 201 ¶ 28).  The OAG contends that the In Camera Materials consisted of "the partially

redacted versions of the interview memoranda that were shared with fellow government

investigators and that had previously been redacted only for that limited purpose."  (ECF No. 225

---

[9] The motions regarding the Trooper 1 Subpoena received separate docket numbers.  See Cuomo I, 683 F.
Supp. 3d 258.  (See Cuomo v. N.Y. State Assembly Judiciary Comm., No. 22 Misc. 3027 (LDH) (TAM)
(E.D.N.Y.) and Cuomo v. Off. of N.Y. State Att'y Gen'l, No. 22 Misc. 3044 (LDH) (TAM) (E.D.N.Y.)).

¶ 56).  Judge Merkl subsequently denied Mr. Cuomo's motion for reconsideration of the denial

of his motion to compel.  See Cuomo II, 2024 WL 1345529, at *3–5.

### III. DISCUSSION

**A.  Legal Standard**

Federal Rule of Civil Procedure 45 permits a party to serve a subpoena on a non-party

to produce documents.  See Fed. R. Civ. P. 45(a)(1)(D).  "The party issuing the subpoena must

demonstrate that the information sought is relevant and material to the allegations and claims

at issue in the proceedings."  Night Hawk Ltd. v. Briarpatch Ltd., L.P., No. 03 Civ. 1382 (RWS),

2003 WL 23018833, at *8 (S.D.N.Y. Dec. 23, 2003).[10]  A party whose personal rights are implicated

by a subpoena may move to quash or modify the subpoena if it, inter alia, "requires disclosure of

privileged or other protected matter, if no exception or waiver applies[,]" or imposes an "undue

burden" to comply.  Fed. R. Civ. P. 45(d)(3)(A)(iii)–(iv).  In addition, the Court may consider the

expense and inconvenience imposed on the non-party to whom the subpoena is directed.

Night Hawk, 2003 WL 23018833, at *8; see Fed. R. Civ. P. 45(d)(1).

On a motion to quash asserting that privilege prevents disclosure, "[t]he party invoking a

privilege bears the burden of establishing its applicability to the case at hand."  Atwell v. City of

New York, No. 07 Civ. 2365 (WHP), 2008 WL 5336690, at *1 (S.D.N.Y. Dec. 15, 2008); see United

States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO, 119 F.3d

210, 214 (2d Cir. 1997) (explaining that the burden to establish privilege rests with the party

asserting it); ResQNet.com, Inc. v. Lansa, Inc., No. 01 Civ. 3578 (RWS), 2004 WL 1627170, at *2

---

[10] Unless otherwise indicated, internal citations and quotation marks are omitted from case citations.

(S.D.N.Y. July 21, 2004) ("The burden of persuasion in a motion to quash a subpoena and for a protective order is borne by the movant.").

Motions "to quash a subpoena are . . . entrusted to the sound discretion of the district court."  In re Fitch Inc., 330 F.3d 104, 108 (2d Cir. 2003) (per curiam).  Further, the district court "has broad latitude to determine the scope of discovery and to manage the discovery process."  Hutchins v. Palmer, No. 12 Civ. 5927 (JFB) (AKT), 2015 WL 13713335, at *13 (E.D.N.Y. Mar. 31, 2015); see, e.g., EM Ltd. v. Rep. of Argentina, 695 F.3d 201, 207 (2d Cir. 2012).

### B.  Analysis of the OAG Subpoena

The OAG MTQ seeks to quash the OAG Subpoena on three grounds:  sovereign immunity, relevance and proportionality, and the Privileges.  (See ECF No. 223 at 12–31; 243 at 5–14).  In the OAG MTC, Mr. Cuomo disputes each ground.  (See ECF Nos. 200 at 15–30; 239 at 10–31).  Because, as explained below, the OAG's assertion of sovereign immunity implicates the Court's authority to hear this dispute, see Alden v. Maine, 527 U.S. 706, 730 (1999), the Court addresses it first before turning to the other grounds.

#### 1.  Sovereign Immunity

##### a.  Legal Standard

As the Second Circuit has explained, "[t]he concept of state sovereign immunity encompasses different species of immunity."  Beaulieu v. Vermont, 807 F.3d 478, 483 (2d Cir. 2015).  First, the Eleventh Amendment to the United States Constitution prohibits the "Judicial power of the United States" from extending to "any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. Amend. XI.  "Adoption of the Amendment responded

most immediately to the States' fears that 'federal courts would force them to pay their Revolutionary War debts, leading to their financial ruin.'" Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 39 (1994) (quoting Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 151 (1984) (Stevens, J., dissenting)).  The Second Circuit has recognized "the twin reasons for the Eleventh Amendment: (1) protecting the dignity of the state, and (2) preserving the state treasury." Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ., 466 F.3d 232, 241 (2d Cir. 2006). Of these two reasons, the Second Circuit has "observe[d] that the Supreme Court has long identified the states' sovereign dignity as the primary concern of the Eleventh Amendment." Id. (citing In re Ayers, 123 U.S. 443, 505 (1887) ("The very object and purpose of the [E]leventh [A]mendment were to prevent the indignity of subjecting a state to the coercive process of judicial tribunals at the instance of private parties.")); see Fed. Mar. Comm'n v. S.C. State Ports Auth., 535 U.S. 743, 765 (2002) ("FMC") (noting that a "central purpose" of state sovereign immunity is to "accord the States the respect owed them as joint sovereigns"); but see Hess, 513 U.S. at 48 (endorsing cases recognizing "the vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations"); Clissuras v. City Univ. of N.Y., 359 F.3d 79, 82 (2d Cir. 2004) (per curiam) (explaining that "the extent to which the state would be responsible for satisfying any judgment" is the "most salient factor in Eleventh Amendment determinations"). This Eleventh Amendment immunity "acts as a limitation on the federal judiciary's Article III powers." Beaulieu, 807 F.3d at 483 (citing Alden, 527 U.S. at 716–21).  The Eleventh Amendment accordingly renders a state's treasury immune "from claims for damages brought by private entities in federal courts." Beaulieu, 807 F.3d at 483 (citing Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996)); see Edelman v. Jordan, 415 U.S. 651, 663 (1974) (collecting cases holding that

"an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State"); Hans v. Louisiana, 134 U.S. 1, 15 (1890) (explaining that, absent waiver, Eleventh Amendment precludes suit in federal court by citizens against a state).

Second, "[s]tates also enjoy a broader sovereign immunity, which applies against all private suits, whether in state or federal court." Beaulieu, 807 F.3d at 483; see Alden, 527 U.S. at 724 (holding that "the Constitution was understood, in light of its history and structure, to preserve the States' traditional immunity from private suits"). This second type of state sovereign immunity derives from the recognition "that the states 'entered the Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant.'" Silva v. Farrish, 47 F.4th 78, 84 (2d Cir. 2022) (quoting Va. Off. for Prot. & Advoc. v. Stewart, 563 U.S. 247, 253 (2011)). Where sovereign immunity applies, a district court "lack[s] subject matter jurisdiction" to consider a claim against a state, absent waiver or abrogation by Congress. Close v. State of New York, 125 F.3d 31, 38–39 (2d Cir. 1997).

A state may assert sovereign immunity at any stage of a proceeding. See Calderon v. Ashmus, 523 U.S. 740, 745 n.2 (1998). Both types of sovereign immunity apply to a state as well as state agencies and officials acting in their official capacities. See Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429 (1997); In re Deposit Ins. Agency, 482 F.3d 612, 617 (2d Cir. 2007) (explaining that the Eleventh Amendment's "jurisdictional bar also immunizes a state entity that is an 'arm of the [s]tate,'" as well as "a state official acting in his or her official capacity") (quoting Northern Ins. Co. of N.Y. v. Chatham Cnty., Ga., 547 U.S. 189, 194 (2006)). The state agency or official asserting sovereign immunity bears the burden of establishing the entitlement to immunity. See Woods, 466 F.3d at 237–39.

"The Eleventh Amendment does not bar all claims against officers of the State, even when directed to actions taken in their official capacity and defended by the most senior legal officers in the executive branch of the state government." Fla. Dep't of State v. Treasure Salvors, Inc., 458 U.S. 670, 684 (1982). A suit seeking only prospective injunctive relief against a state official— as opposed to retrospective monetary damages—is thus permissible notwithstanding the Eleventh Amendment. See Ex parte Young, 209 U.S. 123, 155–56 (1908) (collecting authorities supporting principle that a federal court has equitable jurisdiction to enjoin state officers from engaging in an act that violates the United States Constitution); see also P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993) (explaining that "Young and its progeny render the [Eleventh] Amendment wholly inapplicable to a certain class of suits"); Henrietta D. v. Bloomberg, 331 F.3d 261, 287 (2d Cir. 2003) (noting that the "Eleventh Amendment . . . does not preclude suits against state officers in their official capacity for prospective injunctive relief to prevent a continuing violation of federal law"). The Supreme Court subsequently explained that "Young applies only where the underlying authorization upon which the named official acts is asserted to be illegal." Papasan v. Allain, 478 U.S. 265, 277 (1986). Under Ex parte Young, the Eleventh Amendment does not bar a suit against state officers, acting in their official capacities, provided that the complaint "(a) 'alleges an ongoing violation of federal law' and (b) 'seeks relief properly characterized as prospective.'" Deposit Ins. Agency, 482 F.3d at 618 (quoting Verizon Md. Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (2002)). Where the state official's action is only alleged to be illegal as a matter of state law, the Eleventh Amendment is not a bar. See Papasan, 478 U.S. at 277 (citing Pennhurst, 465 U.S. at 104–06). Some courts outside the Second Circuit have deemed discovery requests to non-party state officials "seeking only

prospective injunctive relief" <u>not</u> to be "an action against the state and, as a result, [] not subject to the doctrine of sovereign immunity." <u>Bonnet v. Harvest (U.S.) Holdings, Inc.</u>, 741 F.3d 1155, 1162 n.1 (10th Cir. 2014) (quoting <u>Crowe & Dunlevy, P.C. v. Stidham</u>, 640 F.3d 1140, 1154 (10th Cir. 2011)).

In addition, neither type of sovereign immunity precludes a suit for monetary damages against state officials in their individual capacities.  <u>See</u> <u>Alden</u>, 527 U.S. at 757 (explaining that "a suit for money damages may be prosecuted against a state officer in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself, so long as the relief is sought not from the state treasury but from the officer personally"); <u>Hafer v. Melo</u>, 502 U.S. 21, 25–31 (1991) (holding that state officers may be held personally liable for damages for actions in their official capacities).

### b.  <u>Application</u>

#### i.  <u>Sovereign Immunity Applies.</u>

##### a)  <u>Text and History</u>

The Court begins with the text of the Eleventh Amendment, which, as discussed above, precludes "the Judicial power of the United States" from "extend[ing] to any suit in law or equity, commenced or prosecuted against" a State.  U.S. Const. Amend. XI.  In 1795, when the Eleventh Amendment was adopted, a "suit" meant "[a] petition[,]" "an address of entreaty[,]" or "a process at law."  2 J. Ash, The New and Complete Dictionary of the English Language (1795); 1 S. Johnson, A History of the English Language, at 5 (6th ed. 1785); <u>see also</u> 2 N. Webster, An American Dictionary of the English Language (1828) (defining suit, <u>inter alia</u>, as "[a] petition; a seeking for something by petition or application"; "an action or process for the recovery of a

right or claim; legal application to a court for justice; prosecution of right before any tribunal")).[11]

In an early case examining the Eleventh Amendment, Chief Justice John Marshall viewed a "suit" to encompass "the prosecution, or pursuit, of some claim, demand, or request."  Cohens v. Virginia, 19 U.S. 264, 407 (1821); see also The Siren, 74 U.S. 152, 154 (1868) (explaining that a sovereign "cannot be subjected to legal proceedings at law or in equity without [its] consent"). These sources combine to suggest that the Founders understood a "suit" against a State to have a broad meaning that encompassed any application, petition, process, or proceeding, in a tribunal of law or equity, claiming, demanding, or requesting something from that State.

With this original understanding of the term "suit" in mind, the Supreme Court has recognized that "[t]he generation that designed and adopted our federal system considered immunity from private suits central to sovereign dignity[,]" and was aware when the Eleventh Amendment was adopted that "it was well established in English law that the Crown could not be sued without consent in its own courts."  Alden, 527 U.S. at 715; see FMC, 535 U.S. at 760 (recognizing that "the Framers thought it an impermissible affront to a State's dignity to be required to answer the complaints of private parties in federal court").  As "Blackstone—whose works constituted the preeminent authority on English law for the founding generation— " emphasized, "'no suit or action can be brought against the king, even in civil matters, because no court can have jurisdiction over him.'"  Alden, 527 U.S. at 715 (quoting 1 W. Blackstone, Commentaries on the Laws of England 234–35 (1765)).  The Supreme Court later explained "[t]he general rule [] that a suit is against the sovereign if the judgment sought would expend itself on

---

[11] The Supreme Court has recently utilized these dictionaries as sources for the meaning of words when the Constitution was adopted.  See Consumer Fin. Prot. Bureau v. Comty. Fin. Servs. Ass'n of Am., 601 U.S. 416, 427 (2024).

the public treasury or domain, or interfere with the public administration, . . . or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." Dugan v. Rank, 372 U.S. 609, 620 (1963) (emphasis added) (finding that action against federal officials that "would not only interfere with the public administration but also expend itself on the public treasury" was a "suit" to which sovereign immunity applied); see Lewis v. Clarke, 581 U.S. 155, 167 (2017) (noting that "the concern that originally drove the adoption of the Eleventh Amendment [was] the protection of the States against involuntary liability").

In addition, the Supreme Court "has repeatedly held that the sovereign immunity enjoyed by the States extends beyond the literal text of the Eleventh Amendment" to encompass "adjudicative" or "judicial proceedings" brought by private parties in other tribunals. FMC, 535 U.S. at 754–61; see Alden, 527 U.S. at 727 ("[T]he Court has upheld States' assertions of sovereign immunity in various contexts falling outside the literal text of the Eleventh Amendment."); see id. at 728 (collecting cases that "rejected [] requests to conform the principle of sovereign immunity to the strict language of the Eleventh Amendment"). It has long been established that whether a proceeding "is to be deemed a suit against a state . . . is to be determined not by the mere names of the titular parties but by the essential nature and effect of the proceeding, as it appears from the entire record[.]" In re State of New York, 256 U.S. 490, 500 (1921). This Court also follows the guidance of those decisions recognizing that "the states' sovereign dignity [is] the primary concern of the Eleventh Amendment[.]" Woods, 466 F.3d at 241 (citing Ayers, 123 U.S. at 505); see FMC, 535 U.S. at 765 (explaining that the "central purpose" of state sovereign immunity "is to accord the States the respect owed them as joint sovereigns"); In re Charter Oak Assocs., 361 F.3d 760, 769 (2d Cir. 2004) (noting that "the primary concern of the Eleventh

Amendment" is avoiding "danger that the state will be subjected to the 'indignity' of being haled into court") (quoting FMC, 535 U.S. at 760).

### b)  Relevant Case Law

The threshold question before the Court is whether enforcement of the OAG Subpoena against the OAG, an agency of New York State, is a "suit" against the state that is barred by sovereign immunity.  The Second Circuit has not directly addressed whether a subpoena to a state agency and subsequent efforts to enforce it are "the type of proceeding[] from which the Framers would have thought the States possessed immunity when they agreed to enter the Union."  FMC, 535 U.S. at 756; see Cuomo I, 683 F. Supp. 3d at 281–82; Jackson v. AFSCME Local 196, No. 07 Civ. 471 (JCH) (HBF), 2008 WL 1848900, at *2 (D. Conn. Apr. 25, 2008).  The Second Circuit has held, however, that an action to enforce a subpoena served on a federal agency was a "judicial proceeding" that triggered federal sovereign immunity.  See U.S. Env. Prot. Agency v. Gen'l Elec. Co., 197 F.3d 592, 597–98 (2d Cir. 1999) ("EPA I"), am. on reh'g on other grounds, 212 F.3d 689 (2d Cir. 2000).  In EPA I, the Second Circuit recognized the "long settled law that, as an attribute of sovereign immunity, the United States and its agencies may not be subject to judicial proceedings unless there has been an express waiver of that immunity."  Id. at 597.  The court thus deemed "[a] judicial proceeding [to have been] brought against the sovereign if the result could serve 'to restrain the government from acting, or to compel it to act.'"  Id. (quoting Dugan, 372 U.S. at 620).  The parties dispute whether the Second Circuit's holding in EPA I controls here, where a private party is seeking to compel a state agency's compliance with a federal subpoena. (Compare ECF No. 223 at 13–14 with ECF No. 239 at 11–12; see ECF No. 265 at 15, 29).

Three decisions by district courts within the Second Circuit are also relevant to the question before the Court.  While not expressly applying EPA I, the court in Felix v. County of Nassau held that a non-party subpoena to the OAG was "exactly the type of coercive judicial process" prohibited by sovereign immunity, which "covers more than lawsuits in which the State is named as a defendant."  344. F.R.D. 441, 445 (E.D.N.Y. 2023) (agreeing with Russell v. Jones, 49 F.4th 507 (5th Cir. 2022) that sovereign immunity precluded enforcement of subpoena against state agency).  In contrast to Felix, the district court in Jackson enforced a subpoena against a Connecticut state agency, distinguishing EPA I and explaining that "[b]ecause the Supreme Court has construed the Eleventh Amendment immunity to be liability from suit because of the possibility that a judgment will be paid out of the State's treasury, the Eleventh Amendment [did] not apply to the subpoenas at issue."  Jackson, 2008 WL 1848900, at *3.  Finally, the Honorable Colleen McMahon, former Chief Judge of this District, applied the rule in EPA I to hold that tribal sovereign immunity barred a non-party subpoena to an American Indian tribe and its attorneys while working for the tribe, which "'possess[ed] the common-law immunity from suit traditionally enjoyed by sovereign powers[.]'"  Catskill Dev., L.L.C. v. Park Place Ent. Corp., 206 F.R.D. 78, 87 (S.D.N.Y. 2002) (quoting Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58 (1978)).

Outside the Second Circuit, several courts have concluded that "a discovery request under the Federal Rules of Civil Procedure" to a non-party state agency or official does not "constitute[] 'a suit' or 'suing' the state within the meaning of the Eleventh Amendment."  Allen v. Woodford, 544 F. Supp. 2d 1074, 1078–79 (E.D. Ca. 2008); see Barnes v. Black, 544 F.3d 807, 812 (7th Cir. 2008) (holding that order directing non-party state official to produce documents in discovery "do[es] not violate the Eleventh Amendment"); In re Mo. Dep't of Nat'l Res., 105 F.3d 434, 436

(8th Cir. 1997) ("There is simply no authority for the position that the Eleventh Amendment shields government entities from discovery in federal court."); Charleston Waterkeeper v. Frontier Logistics, L.P., 488 F. Supp. 3d 240, 250–51 (D.S.C. 2020) (holding that state sovereign immunity did not preclude enforcement of subpoena to state agency); Ali v. Carnegie Inst. of Wash., 306 F.R.D. 20, 30 n.8 (D.D.C. 2014) (collecting cases holding that Eleventh Amendment did not shield non-party state entity from responding to discovery requests); Wilson v. Venture Fin. Grp., No. C09-5768 (BHS), 2010 WL 4512803, at *1–2 (W.D. Wash. Nov. 2, 2010) (holding that Eleventh Amendment did not shield state from compliance with non-party subpoena); Laxalt v. McClatchy, 109 F.R.D. 632, 634–35 (D. Nev. 1986) (holding that Eleventh Amendment did not bar subpoena and notice of deposition to non-party state official); see also U.S. Dep't of Just. v. Ricco Jonas, 24 F.4th 718, 727 (1st Cir. 2022) (holding that Eleventh Amendment did not bar proceeding to enforce administrative subpoena against state official, which did "not involve a claim in law or equity against the" state nor result in judgment against state "that could have a conceivable effect on" state treasury).

In addition, numerous courts within the Second Circuit have enforced non-party subpoenas against state agencies and officials.  See Suffolk Cnty. Water Auth. v. Dow Chem. Co., No. 17 Civ. 6980 (NGG) (RLM), et al., 2022 WL 1025932, at *2 (E.D.N.Y. Apr. 6, 2022) (granting motion to compel New York state agency's compliance with non-party subpoena); Screen v. Quality Prot. Serv., Inc., No. 20 Civ. 2506 (LGS), 2020 WL 7246926, at *1 (S.D.N.Y. Dec. 8, 2020) (granting application to serve Rule 45 subpoena on New York state agency); Freeman v. Rochester Psychiatric Ctr., No. 16 Civ. 6668 (MAT) (MWP), 2018 WL 4275984, at *4 (W.D.N.Y. Sept. 7, 2018) (granting motion to compel New York state agency's compliance with non-party

subpoena), adopted by, 2018 WL 4562078 (W.D.N.Y. Sept. 24, 2018), aff'd on other grounds, 818 F. App'x 34 (2d Cir. 2020) (summary order); Pierce v. Demmon, No. 14 Civ. 1028 (GTS) (DEP), et al., 2015 WL 7077227, at *2 (N.D.N.Y. Nov. 12, 2015) (granting motion to compel New York state agency's compliance with subpoena as narrowed); Montesa v. Schwartz, No. 12 Civ. 6057 (CS) (JCM), 2015 WL 13016354, at *2 (S.D.N.Y. Nov. 3, 2015) (enforcing Rule 45 subpoena, which sought "matters that [we]re relevant to [plaintiffs'] claims and defense" and whose "lawfulness" was undisputed, to New York state agency).  In none of these cases, however, did the courts address the issue of state sovereign immunity.

### c)   The OAG Subpoena and the OAG MTC

The OAG Subpoena, which issued pursuant to the Court's authority under Rule 45, is itself "a court order that requires [the OAG] to provide specified information." Martin v. Neil, Nos. 08 Civ. 1311 (NG) (JO), 09 Misc. 194 (NG) (JO), 2009 WL 1161009, at *1 n.1 (E.D.N.Y. Apr. 28, 2009) (noting that "no court order is needed to impose on the subpoena recipient an obligation to produce that information"); see Alston v. W. 88th Garage LLC, No. 11 Civ. 8317 (AJN) (HBP), 2012 WL 6629051, at *1 (S.D.N.Y. Oct. 9, 2012) (noting that Rule 45 subpoena was itself a court order), adopted by, 2012 WL 6629116, at *2 (S.D.N.Y. Dec. 20, 2012).  The OAG MTC, similarly, seeks an order from this Court compelling the OAG to produce the Requested Materials.  (ECF Nos. 199; 200 at 13).  By issuing the OAG Subpoena, and then seeking to enforce it through the OAG MTC, Mr. Cuomo has twice invoked "the Judicial power of the United States," U.S. Const. Amend. XI, to require the OAG to produce the Requested Materials, i.e., to "compel [the OAG] to act[.]" Dugan, 372 U.S. at 620.  Were the Court to order the OAG to comply with the OAG Subpoena and the OAG then failed to abide by that order, the OAG would be in contempt under Rule 45(g) and,

on notice, subject to sanctions for non-compliance.  See, e.g., United Fabrics Int'l, Inc. v. Metro 22, Inc., No. 16 Misc. 253 (JGK), 2016 WL 6310775, at *1–2 (S.D.N.Y. Oct. 27, 2016) (imposing monetary contempt sanctions under Rule 45(g) based on subpoena recipient's non-compliance with subpoena and subsequent court orders); Jalayer v. Stigliano, No. 10 Civ. 2285 (LDH) (AKT), 2016 WL 5477600, at *2–4 (E.D.N.Y. Sept. 29, 2016) (under Rule 45(g), ordering party to show cause why he should not be held in contempt for non-compliance with subpoena); Moritz v. Town of Goshen, No. 15 Civ. 5424 (NSR) (LMS), 2016 WL 11701300, at *3 (S.D.N.Y. July 15, 2016) (ordering subpoena recipient to show cause why she should not be held in contempt under Rule 45(g)).  The OAG Subpoena and corresponding OAG MTC therefore represent judicial proceedings in which a State agency is "subject[ed] [] to the coercive process of judicial tribunals at the instance of private parties," an "indignity" that the Eleventh Amendment exists to prevent. Seminole Tribe of Fla., 517 U.S. at 58.  Accordingly, the Court concludes that the OAG Subpoena and corresponding OAG MTC are each a "suit" or "judicial proceeding" that "is barred by sovereign immunity in the absence of a waiver."  EPA I, at 597.[12]

In reaching this conclusion, the Court has carefully reviewed the decisions, mentioned above, by the other district courts within the Second Circuit to have addressed similar subpoenas, and finds the rationale in Felix, on which the OAG relies (ECF Nos. 223 at 14; 265 at 43), more persuasive than that in Jackson, on which Mr. Cuomo relies (ECF Nos. 200 at 18; 239 at 11–12). In Felix, the court acknowledged—as this Court has (see §§ III.B.1.b.i.a–b, supra)—that the Supreme Court has deemed paramount the Eleventh Amendment's purpose of preventing "'the

---

[12] Cf. Cuomo v. Dreamland Amusements, Inc., Nos. 08 Civ. 7100 (JGK) & 08 Civ. 6321 (JGK), 2008 WL 4369270, at *9–10 (S.D.N.Y. Sept. 22, 2008) (finding that OAG's issuance of and motions to compel compliance with subpoenas were an "ongoing state proceeding" for Younger abstention purposes).

indignity of subjecting a state to the coercive process of judicial tribunals at the insistence of private parties.'"   344 F.R.D. at 445 (quoting <u>Ayers</u>, 123 U.S. at 505).[13]   In allowing the enforcement of the subpoena in <u>Jackson</u>, however, the court placed greater emphasis on the fact that no "judgment will be paid out of the State's treasury[,]" citing Supreme Court authorities that cited "'the vulnerability of the state's purse [as] the most salient factor[.]'"   2008 WL 1848900, at *2–3 (quoting <u>Hess</u>, 513 U.S. at 47).   In doing so, however, the <u>Jackson</u> court did not acknowledge the Second Circuit's recognition that, while the Supreme Court has not "cast[] doubt on" <u>Hess</u>, "the states' sovereign dignity" nevertheless remains "the primary concern of the Eleventh Amendment."   <u>Woods</u>, 466 F.3d at 241–42 (noting that <u>FMC</u> "reiterat[ed] [this] long-established and non-controversial principle"); <u>see</u> <u>Charter Oak</u>, 361 F.3d at 769 (explaining that preventing the "indignity of being haled into court [] is the primary concern of the Eleventh Amendment").   This Court must follow the Second Circuit's guidance in <u>Woods</u> and <u>Charter Oak</u> that preservation of New York's sovereign dignity weighs heavier in the sovereign immunity analysis than the absence of an impact on the State's treasury.   In addition, the Court respectfully disagrees with the <u>Jackson</u> court's conclusion that, because <u>EPA I</u> involved a subpoena to a federal agency, its holding was "not controlling" on the question whether the Eleventh Amendment barred enforcement of a subpoena to a state agency.   2008 WL 1848900, at *2–3. Regardless of whether an agency is state or federal, a Rule 45 subpoena and subsequent motion to enforce it seek to "compel [that agency] to act," <u>Dugan</u>, 372 U.S. at 620, thereby subjecting

---

[13] Mr. Cuomo does not mount much of a counter to <u>Felix</u>, other than to argue that it "was wrongly decided."  (ECF No. 265 at 10–11; <u>see also</u> ECF No. 200 at 18–19).

that agency to the type of "coercive process" that the doctrine of sovereign immunity exists to prevent.  Ayers, 123 U.S. at 505.

In the absence of express Second Circuit authority, the Court notes that this conclusion is consistent with the ruling of another Circuit Court of Appeals that state sovereign immunity precludes a subpoena to a non-party state official.  In Russell v. Jones, the Fifth Circuit held that "the nature of sovereign immunity as interpreted by the Supreme Court and applied by [that] circuit and others in analogous contexts" barred subpoenas to state officials.  49 F.4th 513–19.  The Court's conclusion in this action is also consistent with those decisions holding that the immunity of American Indian tribes, which "have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers[,]" Santa Clara Pueblo, 436 U.S. at 58, similarly precludes enforcement of a subpoena against a tribe.  See Catskill Dev., 206 F.R.D. at 87–88 (following EPA I in holding that enforcement of subpoena against American Indian tribe was barred by tribal sovereign immunity); see also Bonnet, 741 F.3d at 1162 (holding subpoena against American Indian tribe unenforceable due to tribal sovereign immunity); Alltel Commc'ns, LLC v. DeJordy, 675 F.3d 1100, 1104 (8th Cir. 2012) (same).

Accordingly, the Court finds that state sovereign immunity precludes the OAG Subpoena and Mr. Cuomo's efforts to enforce it through the OAG MTC.

### ii.   Ex parte Young Is Inapplicable.

In the alternative, Mr. Cuomo argues that his efforts to enforce the OAG Subpoena fall within the scope of "prospective relief" permitted by the Ex parte Young doctrine.  (ECF Nos. 200 at 16–17; 239 at 12–14; 265 at 16).  The OAG responds that the doctrine is inapplicable because the OAG Subpoena is directed to a state agency, rather than a state official, and because

Mr. Cuomo has not established that the "OAG is engaging in an ongoing violation of federal law[.]" (ECF No. 223 at 16; see ECF No. 265 at 30–32).

Setting aside whether the OAG Subpoena is directed to a state agency rather than an individual acting in an official capacity, Mr. Cuomo's effort to invoke Ex parte Young fails for the principle reason that he has not established that the OAG has "threaten[ed]" or is "about to commence proceedings, either of a civil or criminal nature, to enforce against parties [in a manner that] affected an unconstitutional act, violating the Federal Constitution" or a federal statute. Ex parte Young, 209 U.S. at 156; see Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 277 (1997) (explaining that Ex parte Young doctrine is limited to cases where relief is sought against individual state officers in a federal forum "based on a federal right"). To determine whether Ex parte Young is applicable, the "court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Verizon, 535 U.S. at 645; see, e.g., Va. Off. for Prot. & Advoc., 563 U.S. at 261 (holding that Ex parte Young permitted action against state official alleging non-compliance with federal statute); Silva, 47 F.4th at 84–86 (holding that Ex parte Young permitted suit against state agency seeking declaration that enforcement of New York State fishing regulations violated federal statutes).

To meet this standard, Mr. Cuomo attempts to cast the OAG's refusal to produce the Requested Materials as a violation of the Federal Rules of Civil Procedure and thereby a violation of the Rules Enabling Act, 28 U.S.C. § 2072(a). (ECF Nos. 239 at 12–13; 265 at 14). But, as the Court has found above (see § III.B.1.b.i, supra), the OAG's assertion of sovereign immunity in the OAG Responses as a ground for non-production of the Requested Materials was the proper

mechanism under the Federal Rules of Civil Procedure.  See Fed. R. Civ. P. 45(d)(1), (e)(2).

Mr. Cuomo therefore has not established any violation of any "federal right," Idaho, 521 U.S. at

277, on which to predicate an action for prospective relief under Ex parte Young.  See Green v.

Mansour, 474 U.S. 64, 73 (1985) (holding that Ex parte Young was inapplicable where there was

neither a "claimed continuing violation of federal law, and therefore no occasion to issue an

injunction[,]" nor "any threat of state officials violating" federal law in the future); In re

Metromedia Fiber Network, Inc., 299 B.R. 251, 276 (Bankr. S.D.N.Y. 2003) (holding that Ex parte

Young was inapplicable where no "purported violation of federal law [was] alleged").

Furthermore, Mr. Cuomo provides no persuasive, let alone controlling, authority from the

Second Circuit or any district court within it recognizing that Ex parte Young exempts from state

sovereign immunity a Rule 45 subpoena and subsequent motion to compel.  (ECF No. 265 at 14).

He cites, for example, dicta in a footnote in a Tenth Circuit decision intimating that "neither a

state nor a tribe would appear to be immune from a discovery request served on the appropriate

agency official[.]"  Bonnet, 741 F.3d at 1162 n.1 (cited in ECF No. 200 at 16–17).  But Bonnet held,

consistent with this Court's conclusion above, that the subpoena was a "suit" barred by tribal

sovereign immunity and expressly noted that it was not deciding whether service on a tribal

agency, as opposed to "a tribal official or state agency or official" required a different result.  Id.

Mr. Cuomo's reliance on the Sixth Circuit's decision in Michigan Corrections Organization

v. Michigan Department of Corrections, 774 F.3d 895 (6th Cir. 2014), is no more persuasive.

(ECF Nos. 239 at 12–13; 265 at 13–14).  There too the court found that because "Ex parte Young

provides a path around sovereign immunity if the plaintiff already has a cause of action from

somewhere else[,]" Ex parte Young did not permit an action seeking to require a state agency to

comply with the Federal Labor Standards Act, 29 U.S.C. §§ 201 et seq., which "nowhere creates a private right of action to enjoin wage-and-hour violations[.]"  Id. at 903, 905.  Indeed, the Sixth Circuit acknowledged that the Supreme Court has only "allow[ed] litigants to use Ex parte Young to sue a state official when the statute contains a private cause of action[,]" the only possible exception being Quern v. Jordan, 440 U.S. 332 (1979).  In Quern, the Supreme Court permitted the plaintiffs' claims for prospective injunctive relief under Ex parte Young, id. at 349–49, even though the "allegedly violated statute contain[ed] no such private cause of action[,]" because the plaintiffs otherwise had a cause of action under 42 U.S.C. § 1983.  Michigan, 774 F.3d at 906.[14] Mr. Cuomo invokes the Sixth Circuit's dicta in Michigan that the Quern plaintiffs "might not have needed" their § 1983 cause of action because their request to send a class action notice was "arguably procedural, not remedial, and thus arguably authorized by the Rules Enabling Act."  Id. (emphasis added).  But the Sixth Circuit's speculation about a possible alternative rationale to justify the result in Quern fails to provide definitive authority this Court would need to conclude that the Rules Enabling Act permits an Ex parte Young action to enforce to the OAG Subpoena. This is particularly true given the clear authority in this Circuit that neither the Rules Enabling Act nor the Federal Rules of Civil Procedure create a private cause of action.  See Parisi v. Goldman,

---

[14] Quern was the sequel to Edelman, in which the Supreme Court held that the plaintiffs' § 1983 claim for retroactive welfare benefits was, in fact, barred by the Eleventh Amendment.  See Quern, 440 U.S. at 334–35; Edelman, 415 U.S. at 679.  On remand, the district court ordered the state officials to send a notice to each plaintiff of the amount of benefits he or she had been denied, Jordan v. Trainor, 405 F. Supp. 802, 809 (N.D. Ill. 1975), but the Seventh Circuit reversed, finding that the "proposed form of notice would have been barred by the Eleventh Amendment, since it at least purported to decide that Illinois public funds should be used to satisfy the claims of plaintiff class members without the consent of the State by its appropriate officials."  Quern, 440 U.S. at 335; see Jordan v. Trainor, 563 F.2d 873, 875 (7th Cir. 1977). In Quern, the Supreme Court reversed, holding that the notice was "more properly viewed as ancillary to the prospective relief already ordered by the court" and therefore "[fell] on the Ex parte Young side of the Eleventh Amendment line rather than on the Edelman side."  440 U.S. at 346–47, 349.

Sachs & Co., 710 F.3d 483, 488 (2d Cir. 2013) (explaining that Federal Rules of Civil Procedure do not create private right of action); George & Co. LLC v. Spin Master Corp., Nos. 19 Civ. 4391 (RPK) (SJB), 19 Civ. 4883 (RPK) (SJB), 2020 WL 3865098, at *8 (E.D.N.Y. July 7, 2020) (collecting cases); 28 U.S.C. § 2072(b) ("Such rules shall not abridge, enlarge or modify any substantive right. . . .") (emphasis added).  Finally, even if a violation of the Rules Enabling Act could be a predicate federal law violation for an Ex parte Young action, the manner in which the OAG has responded to the OAG Subpoena—i.e., the OAG Responses and the subsequent OAG MTQ—complies with Rule 45, and therefore, no violation of the Rule Enabling Act exists.  See Fed. R. Civ. P. 45(d)(3), (e)(2).

Accordingly, Ex parte Young does not provide a path for Mr. Cuomo to overcome state sovereign immunity and enforce the OAG Subpoena.

### iii.   The OAG Has Not Waived Sovereign Immunity.

Because sovereign immunity applies, the OAG Subpoena is unenforceable absent a waiver (or congressional abrogation, which does not exist here).  See Close, 125 F.3d at 38–39. Mr. Cuomo contends that the OAG has waived sovereign immunity by: (i) submitting the In Camera Materials to Judge Merkl in the Trooper 1 Action; (ii) making the Trooper 1 Production; and (iii) making the DOJ Production.  (ECF Nos. 200 at 19–21; 239 at 15–19; 265 at 23–25). The OAG contends that broader state sovereign immunity is not waivable, and even if it were, "the facts here cannot possibly support a finding of waiver."  (ECF No. 223 at 18–19; see ECF No. 265 at 29).

### a) **Sovereign immunity is waivable.**

As an initial matter, the Court disagrees with the OAG's assertion that sovereign immunity is not waivable. (ECF Nos. 223 at 18; 265 29, 36). The Founders understood that "[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual <u>without</u> <u>its</u> <u>consent</u>[,]" <u>i.e.</u>, without waiving its sovereign immunity. The Federalist No. 81, at 455 (Alexander Hamilton) (Penguin Books ed., 1987). Accordingly, the Supreme Court has long recognized that "a State's voluntary appearance in federal court [can] amount[] to a waiver of its Eleventh Amendment immunity." <u>Lapides v. Bd. of Regents of Univ. Sys. of Ga.</u>, 535 U.S. 613, 619 (2002) (citing <u>Clark v. Barnard</u>, 108 U.S. 435, 447 (1883)); <u>see</u> <u>Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.</u>, 527 U.S. 666, 675–76 (1999) (explaining that state waives immunity if it "voluntarily invokes" or "makes a clear declaration that it intends to submit itself" to federal court jurisdiction); <u>Gardner v. State of New Jersey</u>, 329 U.S. 565, 574 (1947) (holding that state "waives any immunity . . . respecting the adjudication of" a "claim" it voluntarily filed in federal court); <u>Gunter v. Atl. Coast Line R. Co.</u>, 200 U.S. 273, 284 (1906) (explaining that "where a State voluntarily become[s] a party to a cause, and submits its rights for judicial determination, it will be bound thereby and cannot escape the result of its own voluntary act by invoking the prohibitions of the [Eleventh] Amendment"); <u>Clark</u>, 108 U.S. at 447 (holding that state's voluntary appearance as intervenor waived Eleventh Amendment immunity); <u>see</u> <u>also</u> <u>Beaulieu</u>, 807 F.3d at 483 (collecting cases recognizing that a state "may elect to waive either type of immunity either in federal or state court."); <u>Charter Oak</u>, 361 F.3d at 767 ("The doctrine of waiver by litigation, which derives directly from the Eleventh Amendment, is founded . . . upon 'the judicial need to avoid inconsistency, anomaly, and unfairness.") (quoting <u>Lapides</u>, 535 U.S. at 620); <u>Gulino</u>

v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y., No. 96 Civ. 8414 (KMW), 2016 WL 7320775, at *6 (S.D.N.Y. July 18, 2016), adopted by, 2016 WL 7243544 (S.D.N.Y. Dec. 14, 2016) ("A state may consent to suit by making an explicit, clear declaration that it intends to submit itself to the Court's jurisdiction or by invoking federal jurisdiction through its conduct in litigation."); Mohegan Tribe v. State of Connecticut, 528 F. Supp. 1359, 1367 (D. Conn. 1982) (collecting cases finding states' litigation conduct to have waived sovereign immunity); see also Cuomo I, 683 F. Supp. 3d at 281–82 & n.18 (noting that sovereign immunity is waivable).

For the proposition that sovereign immunity is not waivable, the OAG relies on a decision of the Appellate Division, Second Department, stating that sovereign immunity is a bar "that entails a lack of subject matter jurisdiction," which a court "may not acquire by waiver." Morrison v. Budget Rent A Car Sys., Inc., 230 A.D.2d 253, 260–62 (2d Dep't 1997). (See ECF No. 223 at 18). As Mr. Cuomo correctly points out (ECF No. 239 at 16), however, the New York Court of Appeals recently abrogated that aspect of Morrison when it recognized that state sovereign immunity "is waivable based on litigation conduct." Henry v. N.J. Transit Corp. 39 N.Y.3d 361, 371–72 (2023) (citing Franchise Tax Bd. of Cal. v. Hyatt, 587 U.S. 230, 235 n.1 (2019)). The Court of Appeals' decision in Henry thus substantiated the Second Circuit's "assum[ption] that prejudicial conduct by a state defendant" can waive sovereign immunity. Beaulieu, 807 F.3d at 491; see Cuomo I, 683 F. Supp. 3d at 282 n.18 (recognizing that both types of state sovereign immunity "are waivable" and noting that "the fact that sovereign immunity is waivable suggests it is not a threshold jurisdictional issue"); cf. Kozaczek v. N.Y. Higher Educ. Servs. Corp., 503 F. App'x 60, 62 (2d Cir. 2012) (summary order) (recognizing that state or state agency could waive sovereign

immunity by litigation conduct but finding that filing motion to dismiss did not constitute waiver).[15]

Finally, the recognition that a state's conduct can waive sovereign immunity is consistent with the recognition that other types of sovereign immunity are similarly waivable by litigation conduct.  See, e.g., Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A., 727 F.2d 274, 278 (2d Cir. 1984) (recognizing that "district courts have discretion to determine that the conduct of a party in litigation does [not] constitute a waiver of foreign sovereign immunity in light of the circumstances of a particular case"); Gristede's Foods, Inc. v. Poospatuck (Unkechauge) Nation, No. 06 Civ. 1260 (KAM), 2009 WL 4981905, at *9 (E.D.N.Y. Dec. 10, 2009) (finding that certain litigation conduct constituted limited waiver of tribal sovereign immunity).

The Court thus rejects the OAG's assertion that sovereign immunity is not waivable.

**b) The OAG has not waived sovereign immunity.**

The Court now turns to whether the OAG's litigation conduct, in fact, waived sovereign immunity.  Mr. Cuomo contends that by submitting the In Camera Materials to Judge Merkl and by making the Trooper 1 Production and the DOJ Production, the OAG has waived any sovereign immunity.  (ECF Nos. 200 at 20–21; 239 at 15–19; 265 at 23–25).[16]  The Court finds that none of this conduct waived sovereign immunity.

---

[15] While the OAG is correct (ECF No. 265 at 37–40), that interstate sovereign immunity, as opposed to Eleventh Amendment immunity of a state from suit in federal court, was implicated in Henry, see 39 N.Y.3d at 368, Henry did not disagree with the Supreme Court precedent, discussed above, recognizing that a state's litigation conduct could waive Eleventh Amendment immunity.

[16] Mr. Cuomo does not argue, nor does the Court find, that the OAG MTQ itself waived sovereign immunity.  See Felix, 344 F.R.D. at 446 n.1 ("The act of moving to quash, in and of itself, is insufficient to waive sovereign immunity."); Fed. R. Civ. P. 45(d)(3)(A)(iii) (permitting motion to quash subpoena that

Whether a state has waived sovereign immunity is a question of state law.  See Alden, 527 U.S. at 757–58; accord Milord-Francois v. N.Y. State Off. of Medicaid Inspector Gen'l, 635 F. Supp. 3d 308, 319 (S.D.N.Y. 2022).  As discussed above, the Court finds that, under New York law, a sovereign may waive its immunity through its litigation conduct.  (See § III.B.1.b.iii.a, supra). Federal courts employ a "'stringent' test [] to determine whether waiver has occurred." McGinty v. New York, 251 F.3d 84, 93 (2d Cir. 2001) (citing Coll. Sav. Bank, 527 U.S. at 675–76).  "For a state to be found to have waived its Eleventh Amendment immunity a state must speak in 'the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" McGuire v. Switzer, 734 F. Supp. 99, 106 (S.D.N.Y. 1990) (quoting Edelman, 415 U.S. at 673).  Waiver may also exist where there is a "record of duplicitous conduct by" the state or "serious unfairness" to the other party from the state's "tardy invocation of immunity." Beaulieu, 807 F.3d at 491.  In addition, the state's conduct must evidence an "intention to subject itself to suit in federal court." Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241 (1985).  Federal courts generally will not find waiver of state sovereign immunity unless "the state voluntarily invokes the jurisdiction of the federal courts or . . . makes a 'clear declaration' that it intends to submit itself to federal court jurisdiction." Marisol A. ex rel. Forbes v. Giuliani, 157 F. Supp. 2d 303, 313 (S.D.N.Y. 2001) (quoting Coll. Sav. Bank, 527 U.S. at 675–76).  Mr. Cuomo bears the burden of demonstrating waiver.  See Haber v. United States,

---

"requires disclosure of privileged or other protected matter, if no exception or waiver applies"); see also Call of the Wild Movie, LLC v. Does 1–1,062, 770 F. Supp. 2d 332, 362 (D.D.C. 2011) (holding that non-party's filing of motion to quash did not waive jurisdictional objection); Action Mfg. Co. v. Simon Wrecking Co., 375 F. Supp. 2d 411, 426 (E.D. Pa. 2005) (same); Brunswick Hosp. Ctr. v. Hynes, 52 N.Y.2d 333, 339 (1981) ("A motion to quash or vacate [] is the proper and exclusive vehicle to challenge the validity of a subpoena or the jurisdiction of the issuing authority.").

823 F.3d 746, 751 (2d Cir. 2016).  The import of this authority is that the Court must analyze whether the OAG's "actions affirmatively invoke federal court jurisdiction[,]" so as to waive sovereign immunity, and if so, what is "the scope of the waiver."  Gristede's Foods, 2009 WL 4981905, at *9.

Turning to Mr. Cuomo's arguments, the Court first finds that the OAG's submission of the In Camera Materials to Judge Merkl, pursuant her order in the Trooper 1 Action, did not waive sovereign immunity in this action.  In complying with Judge Merkl's order, the OAG did not voluntarily invoke federal court jurisdiction and did not assert any affirmative claim for relief.  See State of South Carolina v. Wesley, 155 U.S. 542, 545 (1895) (finding no waiver of sovereign immunity where state expressly declined to become party and appeared only to protest federal court jurisdiction over adjudication of its rights to funds at issue); State of Georgia v. Jessup, 106 U.S. 458, 462–63 (1882) (Harlan, J.) (same); cf. Clark, 108 U.S. at 447–48 (holding that, by intervening to assert its own claim to funds in dispute, state waived sovereign immunity); Marisol A., 157 F. Supp. 2d at 313–15 (finding that settlement agreement vesting jurisdiction in federal court to enforce its provisions waived state sovereign immunity).  Rather, the OAG continued to defend against the Trooper 1 Subpoena, asserting that sovereign immunity was a ground for noncompliance, a question Judge Merkl declined to reach.  See Cuomo I, 683 F. Supp. 3d at 280–82.  Mr. Cuomo's contention that the OAG "did nothing to protect its rights" to sovereign immunity in the Trooper 1 Action is simply incorrect.  (ECF No. 265 at 25).  Thus, the Court declines to find that OAG's submission of the In Camera Materials to Judge Merkl in the Trooper 1 Action waived sovereign immunity as to the OAG Subpoena in this action.

Second, the Court reaches a similar conclusion as to the OAG's voluntary decision to provide the Trooper 1 Production to Mr. Cuomo.  As the OAG notes, the Court must look to New York State law to determine whether waiver has occurred.  (ECF No. 223 at 18).  The New York Court of Appeals has held that "[o]nce there has been compliance with [a] subpoena, [] a motion to quash or vacate no longer is available[.]"  Brunswick, 52 N.Y.2d at 339.  In other words, "having complied with the process, the subpoenaed party no longer possesses the option of challenging its validity or the jurisdiction of its issuer."  Id.; see Brown v. Grosso, 285 A.D.2d 642, 644 (2d Dep't 2001) (quashing subpoena "only to the extent that it has not been complied with"); see also Cuomo v. Dreamland Amusements, Inc., 22 Misc. 3d 1107(A), 2009 WL 81139, at *4 (Sup. Ct., N.Y. Cnty. 2009) (holding that parties' partial compliance with subpoena, without first moving to quash, waived subsequent challenge to subpoena); Cherfas v. Wolf, 20 Misc. 3d 1118(A), 2008 WL 2746740, at *2 (Sup. Ct., Kings Cnty. 2008) (noting that "[t]he opportunity to challenge a subpoena by a motion to quash or vacate is no longer available once the party has complied with the subpoena"); People v. Weiss, 176 Misc. 2d 496, 497 (Sup. Ct., N.Y. Cnty. 1998) (denying motion to quash where recipient "ha[d] already complied with the subpoena").  In the Trooper 1 Action, of course, the OAG first moved to quash the Trooper 1 Subpoena and then voluntarily made the Trooper 1 Production.  (ECF Nos. 201 ¶ 23; 201-8 at 5).  Whether this sequence of events waives sovereign immunity in that action is a question left to Judge Merkl.  See Cuomo I, 683 F. Supp. 3d at 282 n.18.  While the Court's research has not revealed precedential Second Circuit authority holding that a voluntary production in one proceeding waives state sovereign immunity in a separate proceeding, the Second Circuit has held that a foreign sovereign's voluntary compliance with discovery requests in one action does not waive the foreign

sovereign's immunity in a separate proceeding.  See Jacubovich v. State of Israel, 816 F. App'x 505, 508–09 (2d Cir. 2020) (summary order) (acknowledging absence of caselaw in which "a foreign sovereign's conduct in one proceeding has been held to impliedly waive sovereign immunity in a different proceeding").  By analogy, the Court concludes that, as with the In Camera Production, even if by making the Trooper 1 Production to Mr. Cuomo the OAG might be deemed to have waived sovereign immunity in the Trooper 1 Action, the Court cannot find that by doing so the OAG has also waived sovereign immunity in this action, where the OAG has moved to quash the OAG Subpoena based on sovereign immunity and has not made any voluntary production to Mr. Cuomo.  This conclusion is consistent with that of courts outside the Second Circuit finding that a state agency's litigation conduct in one action did not waive sovereign immunity in a separate action.  See, e.g., A123 Sys., Inc. v. Hydro-Quebec, 626 F.3d 1213, 1219 (Fed. Cir. 2010) (holding that state agency's voluntary participation in lawsuit was not "a retroactive waiver of its Eleventh Amendment immunity in this separate action"); Biomed. Pat. Mgmt. Corp. v. Cal., Dep't of Health Serv., 505 F.3d 1328, 1339–41 (Fed. Cir. 2007) (same); Verint Ams. Inc. v. Regents of Univ. of Mich., No. 19 Civ. 2892 (JPB), 2020 WL 4747620, at *2–3 (N.D. Ga. Feb. 25, 2020) (same); Nimry v. Iowa Dep't of Nat. Res., No. 08 Civ. 407 (JEG), 2009 WL 10703075, at *2 (S.D. Iowa Jan. 13, 2009) (same).  Therefore, the Court finds that, by making the Trooper 1 Production in the Trooper 1 Action, the OAG did not waive sovereign immunity as to the OAG Subpoena in this action.

The third and final basis on which Mr. Cuomo urges the Court to find waiver is the OAG's voluntary DOJ Production.  (ECF Nos. 200 at 20; 239 at 18–19; 265 at 21–22).  For an act to waive state sovereign immunity, however, it must manifest the state agency's "intention to subject

itself to suit in <u>federal court</u>."   <u>Atascadero</u>, 473 U.S. at 241.   The DOJ Production—while a voluntary disclosure by the OAG to a federal <u>executive</u> agency—was not an act that affirmatively invoked federal <u>court</u> jurisdiction.   The Court therefore concludes that the OAG's decision to make the DOJ Production did not "voluntarily invoke[] the jurisdiction of the federal courts or . . . make[] a 'clear declaration'" of the intent to submit the OAG to "to federal court jurisdiction." <u>Marisol A.</u>, 157 F. Supp. 2d at 313.   Although Mr. Cuomo has cited cases from outside the Second Circuit finding that a production to the federal government waived sovereign immunity (ECF Nos. 200 at 21; 239 at 18), he has not offered persuasive, controlling authority from within the Second Circuit from which this Court may conclude that the DOJ Production waived the OAG's sovereign immunity.[17]

*     *     *

In sum, the Court concludes that the doctrine of state sovereign immunity applies to the OAG Subpoena and the OAG MTC, and that the OAG has not waived that immunity as to the OAG Subpoena in this action.   Nonetheless, Mr. Cuomo is not without mechanisms to seek information from or about other Executive Chamber employees who were interviewed in the OAG

---

[17] One of the cases Mr. Cuomo cites, <u>Jett v. Penner</u>, in which a California district court found that a state agency had waived sovereign immunity by producing documents to another <u>party</u> in the same case, is inapposite.   No. S-02-2036 (GEB) (JFM) (P), 2007 WL 127790, at *2 (E.D. Ca. Jan. 12, 2007) (holding that state agency "cannot provide documents from plaintiff's central file to defendants in this action and then claim sovereign immunity when plaintiff seeks documents in that file").   Similarly, the Idaho district court held in <u>Knox v. U.S. Department of the Interior</u> that the tribe's submission of amicus briefs and declarations in support of a motion to reconsider in <u>that</u> case only opened the door to deposing the declarants about the topics in their declaration and "did not waive the Tribes' sovereign immunity generally[.]"   No. 09 Civ. 162 (BLW), 2012 WL 465585, at *1 (D. Idaho Feb. 13, 2012).   Unlike <u>Jett</u> and <u>Knox</u>, the OAG has not produced the Requested Materials to any party in <u>this</u> case.   Finally, in <u>United States v. James</u>, the tribal agency that had made a voluntary production to the government was <u>not</u> the target of the subpoena, which the court in fact quashed.   980 F.2d 1314, 1320 (9th Cir. 1992).   For these additional reasons, the authorities on which Mr. Cuomo do not compel a finding of waiver here.

Investigation, i.e., information comparable to that contained in the Requested Materials.  First, as noted above, he has submitted the FOIL Request, in response to which he has received transcripts for some witnesses.  (ECF No. 265 at 69).  To the extent that Mr. Cuomo is dissatisfied with the pace or outcome of his FOIL request, the Art. 78 Proceeding remains pending. (ECF Nos. 201 ¶ 13; 265 at 16–17; see § II.A.3, supra).  Second, Mr. Cuomo has voluminous discovery from Ms. Bennett in this action, including her anticipated deposition and her correspondence with other employees in the Executive Chamber, which provides information from which he can assess which individuals to whom he might direct subpoenas.  Indeed, the Court has already permitted Mr. Cuomo and the other Defendants to serve at least 20 additional non-party subpoenas, and more witnesses may become apparent as fact discovery continues. (ECF No. 253).  Third, the other Defendants in this action—Ms. DeRosa, Ms. Mogul, and Ms. Desrosiers—are a likely source of information about which Executive Chamber employees had the most contact with Ms. Bennett and knowledge of her allegations.  Fourth, Mr. Cuomo has not only the OAG's Trooper 1 Production, but all the other party and non-party discovery in the Trooper 1 Action.  Making the discovery produced in the Trooper 1 Action accessible for use in this action would undoubtedly be "an efficient and effective means of avoiding duplicative and costly discovery, as well as avoiding unnecessary delay in the adjudication of cases."  Charter Oak Fire Ins. Co. v. Electrolux Home Prods., Inc., 287 F.R.D. 130, 134 (E.D.N.Y. 2012).  The parties might seek modification of any applicable protective order should that be necessary to facilitate the sharing of the Trooper 1 Discovery.  See, e.g., Royal Park Inv. SA/NV v. Deutsche Bank Nat'l Trust Co., 192 F. Supp. 3d 400, 406–07 (S.D.N.Y. 2016) (modifying protective order to permit sharing of discovery materials between similar litigations); Charter Oak Fire Ins., 287 F.R.D. at 134 (same).

With more than seven months remaining in the fact discovery period (ECF No. 233), there appears to be ample time for Mr. Cuomo to pursue one or more of these alternatives—and perhaps others—to the OAG Subpoena.

### 2.  Relevance and Proportionality

For completeness, the Court also analyzes the OAG's relevance and proportionality objections to the OAG Subpoena.

### a.  Legal Standard

Federal Rule of Civil Procedure 26 permits a party to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  "Although not unlimited, relevance, for purposes of discovery, is an extremely broad concept."  Feltenstein v. City of New Rochelle, No. 14 Civ. 5434 (NSR), 2018 WL 3752874, at *3 (S.D.N.Y. Aug. 8, 2018).  "A party may seek a protective order if the discovery sought would subject the party to annoyance, embarrassment, oppression or undue burden or expense."  Abdelsayed v. N.Y. Univ., No. 17 Civ. 9606 (VSB) (KHP), 2019 WL 2336533, at *2 (S.D.N.Y. June 3, 2019); see Fed. R. Civ. P. 26(c)(1) (providing that court may enter protective order "for good cause").  In addition, the Court "must limit the frequency or extent of discovery otherwise allowed by" the Federal Rules of Civil Procedure "if it determines" that:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

(ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

(iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Fed. R. Civ. P. 26(b)(2)(C); see Amtrust N. Am., Inc. v. Preferred Contractors Ins. Co. Risk Retention Grp., LLC, No. 16 Misc. 340 (CM), 2016 WL 6208288, at *3 (S.D.N.Y. Oct. 18, 2016).

"Rule 45, which governs subpoenas issued to third parties, 'provides additional protection for non-parties subject to a subpoena.'"  CVR Energy, Inc. v. Wachtell, Lipton, Rosen & Katz, No. 14 Civ. 6566 (RJS), 2018 WL 11611854, at *1 (S.D.N.Y. June 25, 2018) (quoting Jones v. Hirschfeld, 219 F.R.D. 71, 74 (S.D.N.Y. 2003)).  "Among other things, Rule 45 requires that a court 'must quash or modify a subpoena that . . . subjects a person to undue burden.'"  Id. (quoting Fed. R. Civ. P. 45(d)(3)(A)(iv)).

### b.  Application

The OAG takes the extreme and unsupportable position that the Requested Materials "have no relevance" to Ms. Bennett's claims and complains that Mr. Cuomo's requests in the OAG Subpoena "are vague and not properly tailored[.]"  (ECF No. 223 at 21–22).  The OAG also contends that the burden of compliance is disproportional to the needs of the case. (Id. at 24–25).  Mr. Cuomo argues that any statements in the Requested Materials concerning Ms. Bennett "or her allegations," or the alleged "hostile work environment" in the Executive Chamber, are relevant to her claims.  (ECF No. 200 at 21–22).  Mr. Cuomo also argues that "statements from or about Ms. Boylan" are relevant "to the extent" that Ms. Bennett invokes those allegations to support her claims or if he decides to "rely on Ms. Boylan as a defense witness."  (ECF No. 200 at 22).

As an initial matter, lack of relevance does not provide a basis to quash the OAG Subpoena under Rule 45(d)(3)(A).  See State Farm Mut. Auto. Ins. Co. v. Khait, No. 21 Civ. 6690 (FB) (VMS), 2023 WL 6541583, at *2–3 (E.D.N.Y. Sept. 26, 2023); Sadis & Goldberg, LLP v. Banerjee, No. 14 Civ. 913 (LTS) (OTW), 2019 WL 13403291, at *2 (S.D.N.Y. Aug. 26, 2019).  In any event, the Court—and Mr. Cuomo—are certainly at a disadvantage, not having seen the Requested Materials. Nonetheless, the Court finds it difficult to conclude that, in an action involving sexual harassment claims of a former aide to Mr. Cuomo, none of the documents from the OAG Investigation into whether he sexually harassed employees in the Executive Chamber—including Ms. Bennett—are relevant to Ms. Bennett's claims or Defendants' defenses.  See Felix, 344 F.R.D. at 443 ("[I]t is hard to imagine that in a litigation concerning an alleged wrongful death that none of the documents concerning the investigation surrounding the death are relevant.")).  (See OAG Report at 44–65).  To the extent that the Requested Materials contain factual information concerning Ms. Bennett's claims or Defendants' defenses thereto—i.e., information responsive to requests 1(a) and (e) and 2(a) and (e) in the OAG Subpoena—that information "is unquestionably relevant since such information evidences a direct nexus to the factual issues striking at the very core of this litigation."  In re Symbol Techs., Inc. Sec. Litig., No. Civ. 53923 (DRH) (AKT), 2017 WL 1233842, at *11 (E.D.N.Y. Mar. 31, 2017) (finding that investigator's interview memoranda that elicited information concerning plaintiffs' allegations of defendant's "wrongdoing" were relevant); see Giles v. Coughlin, No. 94 Civ. 6385 (CSH) (THK), 1998 WL 23223, at *5 (S.D.N.Y. Jan. 13, 1998) (requiring production of "material from completed investigations of the defendants' conduct in the incident in issue[,]" which was "clearly relevant"); Clavir v. United States, 84 F.R.D. 612, 614 (S.D.N.Y. 1979) (finding that DOJ interview memoranda regarding alleged illegal

surveillance activities that were the basis of plaintiffs' claims were "relevant and discoverable unless some recognized privilege applies"); see also Mahulawde v. Fashion Inst. of Tech., 21 Civ. 3878 (PAE), 2022 WL 17363589, at *2 (S.D.N.Y. Dec. 1, 2022) (finding that "witness statements, in the form of memoranda reflecting the factual accounts, by employees, of events relevant to plaintiff['s] [] allegations of discrimination, a hostile work environment, and retaliation" were "probative—potentially, centrally probative—of the allegations at issue").

The Court disagrees with Mr. Cuomo, however, as to the relevance of all "witness statements from or about Ms. Boylan[,]" i.e., requests 1(d) and 2(d).  (ECF No. 200 at 22). The Court has previously been skeptical of the breadth of Mr. Cuomo's requests concerning Ms. Boylan and has substantially narrowed his requests for information from her directly. (See ECF Nos. 164 (narrowing scope of Mr. Cuomo's subpoena to Ms. Boylan); 166 at 13 ("There's not going to be a mini trial in this case about Ms. Boylan."); id. at 35–38 (narrowing Mr. Cuomo's requests to Ms. Boylan)).  Accordingly, consistent with the Court's prior rulings with respect to Ms. Boylan, information in the Requested Materials concerning witness statements from or about Ms. Boylan would be relevant only to the extent that they pertain to either (i) communications with Ms. Bennett for the period from December 2020 through September 14, 2022, or (ii) communications concerning this action or Ms. Bennett's lawsuit against New York State.  (See ECF Nos. 136 at 18–19; 164).

The Court also finds that requests 1(b) and (c) and 2(b) and (c), which seek documents, videos, and transcripts of "any current or former employee of the Executive Chamber under Governor Cuomo" and Trooper 1 (ECF No. 201-1 at 9), seek information that have, at best, "tangential" relevance to this action and would impose an undue burden on the OAG to gather

and produce.  Corbett v. eHome Credit Corp., No. 10 Civ. 26 (JG) (RLM), 2010 WL 3023870, at *3

(E.D.N.Y. Aug. 2, 2010) (granting motion to quash subpoenas that sought "doubtful or tangential

relationship to the allegations" in the action and would therefore be "unduly burdensome").

Accordingly, the Court finds that only requests 1(a), (d), and (e), and 2(a), (d), and (e) of

the OAG Subpoena—as narrowed above—seek information that is relevant and proportional to

this action, and that should be produced unless a privilege applies to shield it from disclosure.

See Fed. R. Civ. P. 26(b)(1).  Narrowing the scope of the OAG Subpoena would reduce any burden

on the OAG, mitigating the concerns the OAG has expressed.  (ECF No. 223 at 24).  In the event,

then, that a reviewing court were to find that sovereign immunity does not apply, the OAG

Subpoena would need to be narrowed consistent with this section.

### 3.  The Privileges

Finally, the OAG argues that one or more of the Privileges protect the Requested

Materials from disclosure.  (ECF Nos. 223 at 25–31; 243 at 12–14).  The OAG has only provided,

however, a one-page, categorical privilege log.  (ECF Nos. 201-2 at 8; 201-3 at 8).  Mr. Cuomo

responds that the OAG has failed to satisfy the burden to show that any of the Privileges apply.

(ECF Nos. 200 at 23–31; 239 at 24–31).  As the Court explained at oral argument (ECF No. 265 at

26–27), it is the usual practice, when presented with the assertion of one or more of the

Privileges, for the Court to receive a document-by-document privilege log and conduct an

in camera review of exemplars of the privileged documents.  See Bennett v. Cuomo, No. 22 Civ.

7846 (VSB) (SLC), 2023 WL 7624669, at *1 (S.D.N.Y. Nov. 14, 2023) (citing Monterey Bay Military

Housing, LLC v. Ambac Assurance Corp., No. 19 Civ. 9193 (PGG) (SLC), 2023 WL 315072, at *1

(S.D.N.Y. Jan. 19, 2023); Bellridge Cap., LP v. EvMo, Inc., No. 21 Civ. 7091 (PGG) (SLC), 2022 WL

17490961, at *2–3 (S.D.N.Y. Dec. 6, 2022); <u>Flynn v. Cable News Network, Inc.</u>, No. 21 Civ. 2587

(GHW) (SLC), 2022 WL 17820854, at *1–2 (S.D.N.Y. Dec. 5, 2022); <u>SGM Holdings LLC v. Andrews</u>,

No. 15 Civ. 8142 (PAC) (SLC), 2022 WL 3447542, at *2 (S.D.N.Y. Aug. 17, 2022); <u>Brook v. Simon &</u>

<u>Ptrs., LLP</u>, No. 17 Civ. 6435 (GBD) (SLC), 2021 WL 5919207, at *1 (S.D.N.Y. Dec. 15, 2021); <u>Coventry</u>

<u>Cap. US LLC v. EEA Life Settlements Inc.</u>, No. 17 Civ. 7417 (VM) (SLC), 2021 WL 4312026, at *1

(S.D.N.Y. Sept. 22, 2021); <u>Ciaramella v. Zucker</u>, No. 18 Civ. 6945 (MKV) (SLC), 2021 WL 4219501,

at *1 (S.D.N.Y. Sept. 16, 2021)).  Given the Court's determination as to state sovereign immunity,

and absent the requisite privilege log and exemplars, the Court makes no assessment whether

and to what extent any of the Privileges apply to the Requested Materials.

### C. <u>Analysis of The Law Firm Subpoenas</u>

The Law Firm Subpoenas seek the same Requested Materials as the OAG Subpoena.

(<u>Compare</u> ECF No. 201-1 at 9 <u>with</u> ECF Nos. 192-1 at 9 <u>and</u> 192-2 at 9).  The Court thus must

determine whether the Law Firms may properly invoke state sovereign immunity against the Law

Firm Subpoenas and Law Firm MTC.[18]  (<u>See</u> ECF No. 204 at 29).

#### 1. <u>Legal Standard</u>

"The immunity recognized by the Eleventh Amendment extends beyond the states

themselves to 'state agents or instrumentalities' that are effectively, arms of a state."  <u>Woods</u>,

466 F.3d at 236 (quoting <u>Regents of the Univ. of Cal.</u>, 519 U.S. at 429); <u>see Lewis</u>, 581 U.S. at 166

("It is well established in our precedent that a suit against an arm or instrumentality of the State

is treated as one against the State itself.").  To determine whether an entity "is, in fact, an arm of

---

[18] To the extent that the Law Firms also invoke the other two grounds raised by the OAG—relevance and
proportionality and the Privileges—as defenses and objections (ECF No. 229 at 5 n.1), the Court's rulings
above apply equally to the Law Firm Subpoenas.  (<u>See</u> §§ III.B.1–3, <u>supra</u>).

the state, courts look to 'the relationship between the State and the entity in question.'" Woods, 466 F.3d at 236 (quoting Regents of the Univ. of Cal., 519 U.S. at 429).   To make this determination, courts have looked to the "essential nature and effect of the proceeding," or to the "nature of the entity created by state law."   Regents of the Univ. of Cal., 519 U.S. at 429. "[T]he governmental entity invoking the Eleventh Amendment bears the burden of demonstrating that it qualifies as an arm of the state entitled to share in its immunity."   Woods, 466 F.3d at 237.

### 2.  Application

The Law Firms argue that the OAG's sovereign immunity extends to the members of the Investigation Team, who were appointed to the pursuant to § 63(8) and thereby "empowered under New York law to step into the shoes of [the] OAG and to exercise [the] OAG's governmental investigative powers[.]"   (ECF No. 229 at 8).   The Law Firms draw a comparison to Catskill, where Judge McMahon quashed not only the subpoena to the tribe but also to its non-member attorneys, who were "acting as a representative of the tribe and within the scope of [their] authority," and therefore "cloaked in the immunity of a tribe just as a tribal official is cloaked in that immunity."   206 F.R.D. at 91 (collecting cases).

Mr. Cuomo responds that the Law Firms cannot invoke sovereign immunity to avoid compliance with the Law Firm Subpoenas for two reasons.   First, Mr. Cuomo argues that the OAG is not the "real party in interest" because the OAG will not be "legally bound by the court's adverse judgment[,]" citing Lewis v. Clarke, 581 U.S. 155, 165 (2017).   (ECF Nos. 208 at 6; 238 at 6).   Second, Mr. Cuomo argues that compelling the Law Firms to produce the Requested Materials "is the sort of prospective relief sanctioned by Ex parte Young."   (ECF Nos. 208 at 7; 238 at 8).

The latter argument is flawed for the same reasons set forth above and need not be discussed further.  (See § III.B.1.b.ii, supra).  The Court therefore focuses on Mr. Cuomo's first argument.

As an initial matter, the Court notes that, while the Law Firm MTQ focuses on the Investigation Team (ECF No. 229 at 8), the Law Firm Subpoenas are directed to the Law Firms, not to Mr. Kim and Ms. Clark or any other member of the Investigation Team.  (ECF Nos. 192-1; 192-2).  Therefore, the threshold question is whether the Law Firms were "more like 'an arm of the state'" with respect to the OAG Investigation.  Mancuso v. N.Y. State Thruway Auth., 86 F.3d 289, 292 (2d Cir. 1996) (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977)).

As private entities, the Law Firms were neither "created by state law[,]" Regents of the Univ. of Cal., 519 U.S. at 429, nor "operated by a state agency."  Mallon v. N.Y. State Off. of Mental Health, No. 10 Civ. 804 (LAK) (MHD), 2011 WL 13521200, at *11 (S.D.N.Y. June 1, 2011) (finding that entity operated by state agency was entitled to Eleventh Amendment immunity).  The Law Firms were, however, "authorized" by the OAG under § 63(8) "to utilize any of [their] resources . . . to carry out" their duties in the OAG Investigation "consistent with" the Appointment Letters, pursuant to which Mr. Kim and Ms. Clark were made Special Deputies, also under § 63(8). (ECF No. 195-2 at 2, 5).  As Mr. Cuomo acknowledges, the OAG Investigation Team members at the Law Firms "used OAG email accounts for purposes of carrying out their OAG-related duties." (ECF No. 238 at 6 n.3).  The members of the Law Firms appointed to the OAG Investigation Team "report[ed] exclusively and in detail to the OAG on a weekly basis" and were tasked with producing the public OAG Report.  (ECF No. 195-2 at 2, 5; see ECF No. 224 ¶ 5).  The Law Firm Subpoenas seek materials that were generated pursuant to the OAG's delegation of authority

during the OAG Investigation.  (ECF Nos. 192-1 at 9; 192-2 at 9).  The Law Firms have possession, custody, and control over the Requested Materials only by virtue of the work that the members of the OAG Investigation Team performed pursuant to the OAG's delegation of its investigative authority under § 63(8), "for the benefit of the OAG and the People of the State of New York." (ECF No. 195-1 at 2–3).  The Law Firms were therefore acting as agents of a state agency—the OAG—and are therefore entitled to the protections of sovereign immunity.  See Mallon, 2011 WL 13521200, at *11 (holding that sovereign immunity protected non-state agency that was "the agent of an agent, an entity that is itself operated by a state agency"); see also Breen v. Mortg. Comm'n of the State of N.Y., 285 N.Y. 425, 430 (1941) (holding that where entity was "an agent of the State" any judgment "obtained against [it] would be against the State"); Adler, Inc. v. Noyes, 285 N.Y. 34, 37 (1941) ("The Commissioner was sued by the title of his office.  The judgment accosts him in his official status.  The State is the real defendant here.").  The Law Firm Subpoenas—and any order granting the Law Firm MTC—would be no different than the OAG Subpoena and any order granting the OAG MTC.  All are legal proceedings seeking "to compel" a state entity, or an agent thereof, "to act," and are therefore "suit[s]" barred by New York's sovereign immunity.[19]  Dugan, 372 U.S. at 620.

---

[19] To the extent that the Law Firm Subpoenas might be construed, in the alternative, as directed to the OAG Investigation Team members at the Law Firms, they too would be deemed "officials at state agencies working on behalf of the state (i.e., in their official capacities)," and thus protected by sovereign immunity. Ideyi v. State Univ. of N.Y. Downstate Med. Ctr., No. 09 Civ. 1490 (ENV) (RML), 2010 WL 3938411, at *3–4 (E.D.N.Y. Sept. 30, 2010) (holding that state instrumentality and its official, to the extent sued in his official capacity, were "entitled to the protection of sovereign immunity"); see Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) (explaining that suits against state officials in their official capacity are "no different from a suit against the State itself" to which sovereign immunity applies).

Mr. Cuomo's reliance on Lewis v. Clarke is misplaced for three reasons.  (ECF No. 238 at 6).  First, in Lewis, the Supreme Court held that, just as a § 1983 civil rights claim against a state official in an individual capacity does not "implicate[] the Eleventh Amendment and a State's sovereign immunity from suit[,]" so too a suit against tribal employees "in their individual capacities" did not implicate tribal sovereign immunity.  581 U.S. at 167–68.  Second, while Mr. Cuomo may be correct that the Law Firm Subpoenas do not "target the state treasury," (ECF No. 238 at 10), the Supreme Court recognized in Lewis—as the Court has discussed above (see §§ III.B.1.a–b, supra)—that the Founders' driving concern in adopting the Eleventh Amendment was "the protection of the States against involuntary liability."  581 U.S. at 167.  The absence of an impact on the state treasury is therefore not dispositive.  Finally, even if state and tribal sovereign immunity are, as Mr. Cuomo asserts "not coextensive," (ECF No. 238 at 7), the Supreme Court reaffirmed that it is appropriate to compare the two types of sovereign immunity—state and tribal—in determining whether the defense of sovereign immunity applies.  Lewis, 581 at 167–68.  For that reason, the OAG correctly invokes Judge McMahon's holding in Catskill that "a tribe's attorney, when acting as a representative of the tribe and within the scope of his authority, is cloaked in the immunity of the tribe just as a tribal official is cloaked in that immunity."  206 F.R.D. at 91 (quashing subpoenas against tribal attorneys on tribal sovereign immunity grounds).  So too here, the Law Firms were agents and representatives of the OAG, acting within the scope of the authority granted by the Engagement Letters pursuant to § 63(8), and were no less immune to subpoenas than the attorneys in Catskill.

Accordingly, the Court finds that state sovereign immunity precludes both the Law Firm Subpoenas and the Law Firm MTC.

## IV.<u>CONCLUSION</u>

For the reasons set forth above, (i) the OAG MTC (ECF No. 199) is DENIED, (ii) the OAG

MTQ (ECF No. 222) is GRANTED, (iii) the Law Firm MTC (ECF No. 207) is DENIED, and (iv) the Law

Firm MTQ (ECF No. 227) is GRANTED.

The Clerk of the Court is respectfully directed to close ECF Nos. 199, 207, 222, and 227.

Dated:     New York, New York
          June 12, 2024

SO ORDERED.

**SARAH L. CAVE**
**United States Magistrate Judge**